UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

THE ADVOCATES FOR HUMAN
RIGHTS, *et al.*

        Plaintiffs,

v.

U.S. DEPARTMENT OF
HOMELAND SECURITY, *et al.*,

        Defendants.

Case No. 0:26-cv-00749 (NEB/DLM)

**MEMORANDUM OF LAW IN
SUPPORT OF PLAINTIFFS'
MOTION FOR A TEMPORARY
RESTRAINING ORDER**

---

# TABLE OF CONTENTS

**INTRODUCTION** ............................................................................... 1

**BACKGROUND** ................................................................................. 2

I.    Operation Metro Surge ............................................................. 2

II.   Defendants Deny Detainees Access to Counsel ....................... 3

III.  Constitutional, Statutory, and Regulatory Rights to Access Counsel ...... 9

**LEGAL STANDARD** ....................................................................... 11

**ARGUMENT** .................................................................................. 12

I.    Plaintiffs Have Standing ......................................................... 12

    A. Plaintiff L.H.M. and the Proposed Class have standing to challenge
       interference with their access to counsel ................................ 12

    B. AHR has standing to bring all claims .................................. 13

        1.   AHR has standing to redress the harms to its rights, resources,
             and mission ................................................................... 13

        2.   AHR has standing to challenge the violation of its volunteer
             attorneys' First Amendment rights .................................. 16

        3.   AHR may assert third-party standing to vindicate the
             constitutional rights of its clients ................................... 18

II.   Plaintiffs are Likely to Prevail on the Merits of Their Claim That
      Defendants' Denial of Access to Counsel Violates Plaintiffs'
      Constitutional and Statutory Rights ....................................... 19

    A. Defendants' actions violate detainees' Fifth Amendment rights. ...... 21

    B. Defendants' actions violate Plaintiffs' First Amendment rights. ....... 24

        1.   Plaintiff L.H.M. and the Proposed Class ......................... 24

        2.   AHR ............................................................................. 26

C. Defendants' actions violate Plaintiff L.H.M.'s and Class Members' rights under the Immigration and Nationality Act .................................... 28

D. Defendants cannot evade their legal responsibilities by calling the Whipple Building a holding facility ............................................ 31

III. Plaintiffs Will Be Irreparably Harmed Absent a Temporary Restraining Order ...................................................................... 32

IV. The Balance of the Equities, and the Public Interest, Favor Plaintiffs .. 35

V. The Relief Plaintiffs Seek is Necessary and Appropriate ........................ 36

**CONCLUSION** .................................................................. **39**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*281 Care Committee v. Arneson*,
  638 F.3d 621 (8th Cir. 2011) .................................................................................... 14

*A.A.R.P. v. Trump*,
  605 U.S. 91 (2025) ...................................................................................................... 34

*A.O. v. Bondi*,
  No. 26-cv-420, 2026 WL 128198 (D. Minn. Jan. 18, 2026) .................................... 30

*Al Khouri v. Ashcroft*,
  362 F.3d 461 (8th Cir. 2004) .............................................................................. 10, 21

*Arkansas ACORN Fair Hous., Inc. v. Greystone Dev., Ltd. Co.*,
  160 F.3d 433 (8th Cir. 1998) .............................................................................. 15, 16

*Arroyo v. U.S. Dep't of Homeland Sec.*,
  No. SACV 19-815, 2019 WL 2912848 (C.D. Cal. June 20, 2019) .......................... 23

*Baltazar-Alcazar v. I.N.S.*,
  386 F.3d 940 (9th Cir. 2004) .................................................................................... 22

*Barrows v. Jackson*,
  346 U.S. 249 (1953) .................................................................................................. 18

*Bolanos v. Arnott*,
  6:25-cv-3380, 2025 WL 3641577 (W.D. Mo. Dec. 16, 2025) .................................. 33

*Bridges v. Wixon*,
  326 U.S. 135 (1945) .................................................................................................. 25

*Caplin & Drysdale, Chartered v. U.S.*,
  491 U.S. 617 (1989) .................................................................................................. 18

*Clarke v. U.S. Dep't of Homeland Sec.*,
  25-cv-6773, 2025 WL 3674471 (E.D.N.Y. Dec. 18, 2025) ...................................... 31

*D.N.N. v. Bacon*,
  1:25-cv-1613, 2025 WL 3525042 (D. Md. Dec. 9, 2025)...................... 20, 23, 29, 32

*Dataphase Sys., Inc. v. C.L. Sys., Inc.*,
  640 F.2d 109 (8th Cir. 1981) ...................................................................... 11, 12, 35

*DeLoach v. Bevers,*
    922 F.2d 618 (10th Cir. 1990) ............................................................................ 24

*Denius v. Dunlap,*
    209 F.3d 944 (7th Cir. 2000) .............................................................................. 24

*Food and Drug Admin. v. All. for Hippocratic Med.,*
    602 U.S. 367 (2024) ............................................................................................ 15

*GLBT Youth in Iowa Schs. Task Force v. Reynolds,*
    114 F.4th 660 (8th Cir. 2024) ............................................................................ 14

*Gonzalez v. Noem,*
    No. 25-C-13323, 2025 WL 3170784 (N.D. Ill. Nov. 5, 2025) .......................... 20, 37

*Goyette v. City of Minneapolis,*
    338 F.R.D. 109 (D. Minn. 2021) ........................................................................ 12

*Granville House, Inc. v. Dep't of Health and Hum. Servs.,*
    715 F.2d 1292 (8th Cir. 1983) ............................................................................ 15

*Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.,*
    182 F.3d 598 (8th Cir. 1999) .............................................................................. 12

*Hunt v. Wash. State Apple Advert. Comm'n,*
    432 U.S. 333 (1977) ............................................................................................ 17

*Iavorski v. U.S. Immigr. & Naturalization Serv.,*
    232 F.3d 124 (2d Cir. 2000) ........................................................................... 9, 22

*Immigrant Defs. Law Ctr. v. Noem,*
    781 F. Supp. 3d 1011 (C.D. Cal. 2025) ..................................................... 27, 29, 36

*Iowa Migrant Movement for Just. v. Bird,*
    157 F.4th 904 (8th Cir. 2025) ..................................................................... 16, 17

*Jet Midwest International. Co. v. Jet Midwest Group., LLC,*
    953 F.3d 1041 (8th Cir. 2020) ............................................................................ 20

*Jiang v. Houseman,*
    904 F. Supp. 971 (D. Minn. 1995) ..................................................................... 22

*Johnson-El v. Schoemehl,*
    878 F.2d 1043 (8th Cir. 1989) ..................................................................... 21, 24

*Juan T.R. v. Noem,*
    No. 26-cv-107, ECF No. 7 (D. Minn. Jan. 26, 2026) .................................... *passim*

*Leslie v. Att'y Gen. of the U.S.*,
   611 F.3d 171 (3d Cir. 2010)....................................................................... 22

*McGowen, Hurst, Clark & Smith, P.C. v. Commerce Bank*,
   11 F.4th 702 (8th Cir. 2021) ............................................................... 13, 14

*Mercado v. Noem*,
   800 F. Supp. 3d 526 (S.D.N.Y. 2025) ..........................................*passim*

*Missouri v. Trump*,
   128 F.4th 979 (8th Cir. 2025).................................................................... 35

*Morehouse Enters., LLC v. Bureau of Alcohol, Tobacco, Firearms and*
   *Explosives*, 78 F.4th 1011 (8th Cir. 2023).............................................. 33

*NAACP v. Button*,
   371 U.S. 415 (1963) ................................................................................... 26

*Nairne v. Landry*,
   151 F.4th 666 (5th Cir. 2025)................................................................... 15

*Nativi-Gomez v. Ashcroft*,
   344 F.3d 805 (8th Cir. 2003) ............................................................... 9, 22

*Orantes-Hernandez v. Thornburgh*,
   919 F.2d 549 (9th Cir. 1990) ...................................................... 29, 35, 38

*Perdomo v. Noem*,
   No. 2:25-cv-05605, 2025 WL 3192939 (C.D. Cal. Nov. 13, 2025)...........*passim*

*Perkins Coie LLP v. U.S. Dep't of Just.*,
   783 F. Supp. 3d 105 (D.D.C. 2025) .................................................. 33, 34

*Powell v. Noble*,
   798 F.3d 690 (8th Cir. 2015) .................................................................... 33

*In re Primus*,
   436 U.S. 412 (1978) ................................................................................... 26

*R.I.L.-R v. Johnson*,
   80 F. Supp. 164 (D.D.C. 2015) ............................................................... 34

*Reno v. Flores*,
   507 U.S. 292 (1993) .............................................................................. 9, 21

*Rodriguez v. Robbins*,
   715 F.3d 1127 (9th Cir. 2013) ................................................................. 34

*Romero v. Bondi,*
    150 F. 4th 332 (4th Cir. 2025) ............................................................. 22

*Schmitt v. Rebertus,*
    148 F.4th 958 (8th Cir. 2025) .............................................................. 36

*Singleton v. Wulff,*
    428 U.S. 106 (1976) ............................................................................. 18

*Southern Poverty Law Center v. U.S. Dep't of Homeland Sec.,*
    18-cv-760, 2020 WL 3265533 (D.D.C. June 17, 2020) ................... 18, 19

*Susman Godfrey LLP v. Exec. Off. of the President,*
    789 F. Supp. 3d 15 (D.D.C. 2025) ....................................................... 34

*Tincher v. Noem,*
    No. 25-cv-4669, 2026 WL 125375 (D. Minn. Jan. 16, 2026) ............. 2, 6

*Tincher v. Noem,*
    No. 26-1105, 2026 WL 160525 (8th Cir. Jan. 21, 2026) ......................... 2

*Torres v. U.S. Dep't of Homeland Sec.,*
    411 F. Supp. 3d 1036 (C.D. Cal. 2019) ..................................... *passim*

*Tot-Choc v. Bondi,*
    No. 26-cv-167, ECF No. 8 (Jan. 16, 2026) .............................................. 8

*U.S. v. Saucedo-Velasquez,*
    842 F.2d 832 (5th Cir. 1988) ............................................................... 22

*U.S. v. Yan Naing,*
    820 F. 3d 1006 (8th Cir. 2016) ............................................................ 28

*United Mine Workers of Am., Dist. 12 v. Ill. State Bar Ass'n,*
    389 U.S. 217 (1967) .......................................................................... 9, 24

*Vasquez Perdomo v. Noem,*
    790 F. Supp. 3d 850 (C.D. Cal. 2025) ................................................. 20

*Whisman Through Whisman v. Rinehart,*
    119 F.3d 1303 (8th Cir. 1997) ......................................................... 24, 26

*Zadvydas v. Davis,*
    533 U.S. 678 (2001) ............................................................................. 21

*Zaid v. Exec. Off. of President,*
    -- F. Supp. 3d --, 2025 WL 3724884 (D.D.C. Dec. 23, 2025) ............... 34

**United States Constitution**

U.S. Const., Amend. I ...................................................................................*passim*

U.S. Const. Amend V ...................................................................................*passim*

U.S. Const. Amend. VI................................................................................ 33, 34

U.S. Const. Amend. XIV ................................................................................ 24

**Statutes & Regulations**

8 U.S.C. § 1229a(b)(4) ........................................................................... 10, 28, 30

8 U.S.C. § 1362.......................................................................................... 10, 22, 28

8 C.F.R. § 235.3(b)(4)(ii)................................................................................. 10

**Other Authorities**

Fed. R. Civ. P. 65(b)(1)(A) .............................................................................. 11

## INTRODUCTION

Over the past year, the Department of Homeland Security has moved from one city to the next, conducting sweeping crackdowns targeting perceived immigrants. During these chaotic operations, federal agents indiscriminately arrest huge numbers of individuals suspected of being non-citizens, many of whom have legal status or clear rights not to be removed or detained. Defendants transport these individuals to overcrowded, under-resourced facilities that Defendants refer to as "holding facilities," where they are either kept in custody for days or processed and then swiftly dragged out of state—in either case, without access to counsel.

As DHS's enforcement operations have moved around the country, they have been followed by unequivocal orders from federal judges in California, New York, Illinois, and Maryland finding that the agency has violated the law by detaining individuals in holding facilities without allowing them access to legal counsel. Defendants are now following the same unlawful playbook in Minnesota, systematically violating the constitutional and statutory rights of detainees by depriving them of access to counsel.

Plaintiffs are (1) the Advocates for Human Rights ("AHR"), a nonprofit legal organization that represents scores of people detained by DHS in Minnesota, and is currently being barred from counseling its clients; and (2) L.H.M., who Defendants detained yesterday at the Whipple Building— Defendants' holding facility in the Twin Cities—and then denied access to her attorney. L.H.M. sues through her next friend C.A. on behalf of a proposed Class of detainees. Because Defendants' practice of denying detainees access to counsel is unconstitutional, and because of the severity of irreparable harm

1

this practice imposes on Plaintiffs, Plaintiffs request that the Court issue a temporary restraining order guaranteeing access to counsel for individuals detained by Defendants.

**BACKGROUND**

## I.    Operation Metro Surge

Beginning in December 2025, Defendants launched what they have described as "the largest DHS operation ever," called "Operation Metro Surge," sending thousands of federal law enforcement agents to Minnesota and specifically to the Twin Cities metro area. Rebecca Santana & Mike Balsamo, *Homeland Security plans 2,000 officers in Minnesota for its 'largest immigration operation ever,'* AP (Jan. 6, 2026), https://perma.cc/KA2E-DW7X.

Defendants claim to have arrested thousands of individuals in a matter of weeks. Sec. Kristy Noem (@Sec_Noem), X (Jan. 19, 2026 at 9:40 AM CT), https://perma.cc/D74M-VJFR. This population includes U.S. citizens arrested for observing Defendants' law enforcement operations, *see*, *e.g.*, Prelim. Inj. Decision, *Tincher v. Noem*, No. 25-cv-4669, 2026 WL 125375, at *2-14 (D. Minn. Jan. 16, 2026), *administratively stayed*, *Tincher v. Noem*, No. 26-1105, 2026 WL 160525, at *1 (8th Cir. Jan. 21, 2026); U.S. citizens of non-European descent arrested for failing to prove to DHS's satisfaction that they are citizens at the time they were arrested, Kim Hyatt & Sofia Barnett, *U.S. citizen swept up in ICE enforcement as Twin Cities operation continues*, Minnesota Star Tribune (Jan. 8, 2026), https://perma.cc/4DWL-C87H; non-citizens who have legal status but are arrested on suspicion of being undocumented, *see, e.g.*, Declaration of J.J.B. ("J.J.B. Decl.") ¶ 17; and immigrants with no criminal record who are lawfully pursuing legal status, like L.H.M. Defendants have

2

even detained individuals as young as two-years old. Sam Levin, *US immigration agents detain two-year-old Minnesota girl: "depravity beyond words,"* The Guardian (Jan. 23, 2026), https://perma.cc/B4LP-JZNK; Nicholas Bogel-Burroughs & Sonia A. Rao, *Detention of 5-Year-Old by Federal Agents Incenses Minneapolis*, New York Times (Jan. 22, 2026), https://perma.cc/DD9Z-2WGZ.

The majority of the individuals arrested and detained in Operation Metro Surge are held initially at the Bishop Henry Whipple Federal Building. Matt Rivers, Janice McDonald, & Armando Garcia, *Lawyers allege Dept. of Homeland Security is denying legal counsel to Minnesota detainees*, ABC News (Jan. 18, 2026), https://perma.cc/EZ53-6MPF. Hundreds of individuals are currently detained at the Whipple Building, for varying lengths of time—some for mere hours and some up to multiple days. J.J.B. Decl. ¶¶ 18, 22; Declaration of J.I.B.C. ("J.I.B.C. Decl.") ¶ 14.

## II.    Defendants Deny Detainees Access to Counsel

Defendants are erecting unlawful barriers to detainees' access to counsel at virtually every stage of their detention. Many detainees are taken to the Whipple Building after their arrest and then immediately whisked off to Texas. *See, e.g.*, J.I.B.C. Decl. ¶ 15; Declaration of Kevin Heinz ("Heinz Decl.") ¶ 5. Although many detainees have Minnesota-based attorneys, Defendants refuse to allow detainees to meet with those attorneys or have a phone call with them, even when their Minnesota-based attorneys are present at the Whipple Building and attempting to speak with them. *See* Declaration of Kimberly Boche ("Boche Decl.") ¶¶ 12,15; Declaration of Danielle Robinson Briand ("Briand Decl.") ¶¶ 8-9 (L.H.M.'s lawyer refused access to L.H.M.); *see also, e.g.*,

Declaration of Hannah Brown ("Brown Decl.") ¶ 29; Declaration of Cedar Weyker ("Weyker Decl.") ¶ 8; Declaration of Kira Kelley ("Kelley Decl.") ¶¶ 12-20. Defendants do not accurately or timely input information about detainees into the U.S. Immigration and Customs Enforcement (ICE) Online Detainee Locator System, thereby preventing their Minnesota-based attorneys from locating them and speaking with them before or after the detainees are transferred. Kelley Decl. ¶¶ 15-19; Heinz Decl. ¶ 6.

All of this "materially impede[s] representation." Boche Decl. ¶ 18. AHR and other Minnesota-based attorneys are often unable to speak with their clients, which impedes their ability to file and litigate habeas petitions that may prevent transfer and further detention. *See* Briand Decl. ¶ 10 (denial of access to L.H.M. impairing L.H.M.'s attorney's ability "to make sure that her medical needs are being accommodated wherever she is being detained, and . . . . assist her habeas counsel in advocating for her release on bond"); Boche Decl. ¶¶ 12-22; *see also, e.g.*, Declaration of Gloria Contreras Edin ("Contreras Edin Decl.") ¶¶ 5, 8; Heinz Decl. ¶ 8; Kelley Decl. ¶ 10. In addition, AHR and other Minnesota-based attorneys "are often entirely unable to meet with [their] clients in person after their transfer and may have considerable difficulty even locating them," and "need to find new cocounsel for any federal or immigration court aspects of [their] client's representation or if documents need to be provided, discussed, or signed in person." Boche Decl. ¶ 18; *see also* Kelley Decl. ¶¶ 11, 19; Weyker Decl. ¶¶ 15-17; Contreras Edin Decl. ¶¶ 12-14.

For those detainees who are not immediately whisked out of Minnesota, Defendants have erected even more barriers to their access to counsel. In some

instances, Defendants have forbidden attorneys from even entering the Whipple Building to try to see their clients or get information about them. Federal agents standing outside the Whipple Building have threatened, intimidated, or otherwise rebuffed multiple attorneys attempting to reach clients detained there. For example, when AHR volunteer attorney Kira Kelley attempted to check on a client who was still being held by ICE three days after a federal judge granted his habeas petition, "two lines of heavily armed DHS personnel" were standing outside the facility and said that Kelley would "be arrested" if she "went any farther." Kelley Decl. ¶¶ 24-25. Another attorney trying to meet with a U.S. citizen client described a "heavily armed ICE agent[]" telling him to "turn [his] car around and get the hell out of here" when he was trying to access a client at Whipple. Declaration of Max Keller ("Keller Decl.") ¶ 10.

Even when attorneys are able to enter the Whipple Building, Defendants refuse to let them see their clients. For years, lawyers have met with their clients at the Whipple Building. *See, e.g.*, Brown Decl. ¶ 15; Briand Decl. ¶ 8; Heinz Decl. ¶ 3. Defendants have now drastically changed their practices, telling attorneys that they do not allow *any* attorney visitation for immigration detainees. Brown Decl. ¶¶ 27, 33; Kelley Decl. ¶ 21. One of AHR's volunteer attorneys was specifically told by Defendants that "if [Defendants] gave one attorney a legal visit [they] would have to give everyone a legal visit," which would be "'chaos.'" Kelley Decl. ¶ 34; *see also* Brown Decl. ¶ 18 ("[An ERO employee] stated that if ERO let me see my clients, they would have to let all

5

the attorneys see their clients, and to 'imagine the chaos' if ERO allowed that to happen.").

As an example of this conduct, attorney Hannah Brown went to Whipple on January 15 to see two clients. Brown Decl. ¶ 4. One was a legally admitted refugee who had already been detained for three days; the other required medication for a seizure disorder, but Defendants had refused to confirm to his family whether he was receiving it. Brown Decl. ¶¶ 9, 11; J.J.B. Decl. ¶¶ 13, 17. Ms. Brown had filed a notice of appearance (known as a form "G-28") for both clients, along with a habeas petition for J.J.B. (her refugee client); her colleague had also filed a habeas petition for K.A.K. (her client requiring medication). Brown Decl. ¶¶ 8-9, 11-12. Multiple agents of Defendants told her that they "don't do attorney visitations" at the Whipple Building. Brown Decl. ¶ 22. This included an attorney with ICE's Office of the Principal Legal Advisor, who said that it was an "across the board" prohibition that he attributed to "an AFOD," presumably Acting Field Office Director David Easterwood of the Saint Paul ICE field office. Brown Decl. ¶ 33. Some of Defendants' agents falsely claimed that Defendants had *never* allowed attorney visits at the Whipple Building, even though Ms. Brown had been countless times over the prior seven years—and even though they were standing in front of a room labeled "ERO Visitation."[1] Brown Decl. ¶¶ 27-28.

---

[1] ERO stands for Enforcement and Removal Operations, a division of ICE that "manages and oversees all aspects of the removal process within ICE" including detention and removal. Decl. of David Easterwood (*Tincher v. Noem*, 25-cv-4669), Dkt. No. 47 at ¶ 3.

Numerous other attorneys and detainees have had similar experiences, and continue to be denied access to attorney-client communications at this very moment. *See, e.g.*, Briand Decl. ¶ 9 (L.H.M.'s lawyer denied access to two clients on January 27); Boche Decl. ¶¶ 14-15; Kelley Decl. ¶¶ 7, 20, 34. For example, L.H.M. was detained around sometime before 1 p.m. on January 27. Briand Decl. ¶ 7. L.H.M.'s immigration attorney went to meet with her around 4 p.m., but Defendants refused to allow her to meet with L.H.M. Briand Decl. ¶ 9. That meeting was particularly critical because L.H.M. recently had cranial surgery and has significant post-surgery restrictions and medical needs; the obstruction of attorney-client communications impaired L.H.M.'s lawyer's ability "to make sure that her medical needs are being accommodated wherever she is being detained, and . . . assist her habeas counsel in advocating for her release on bond." *Id.* ¶ 11.

Defendants do not even allow attorneys to call and speak to their clients; indeed, they rarely if ever answer calls to their phone number or messages sent to the designated email address. Keller Decl. ¶¶ 14-16; Kelley Decl. ¶¶ 12-14; Brown Decl. ¶ 10. In the rare instances where Defendants allow arrestees or detainees to make phone calls, those calls occur in an open hallway where "ICE agents walk around you while you are making calls," J.J.B. Decl. ¶ 16, and can "look[] over [your] shoulder," J.I.B.C. Decl. ¶ 12. As a result, meeting in visitation rooms is the only way for attorneys to communicate with clients detained at the Whipple Building in a way that is "secure, private, or confidential." Brown Decl. ¶ 14, 30.

These barriers have contributed to severe harm to Class members and chaos for Minnesota courts. As Chief Judge Schiltz recently observed, there are "dozens of court orders with which [Defendants] have failed to comply in recent weeks." Order to Show Cause, *Juan T.R. v. Noem*, No. 26-cv-107, ECF No. 7, at *2 (D. Minn. Jan. 26, 2026) ("*Juan T.R.* Order").

> The practical consequence of respondents' failure to comply [with court orders] has almost always been significant hardship to aliens (many of whom have lawfully lived and worked in the United States for years and done absolutely nothing wrong): The detention of an alien is extended, or an alien who should remain in Minnesota is flown to Texas, or an alien who has been flown to Texas is released there and told to figure out a way to get home.

*Id.* For example, AHR's client O. was detained on January 11, 2026. Boche Decl. ¶ 13. AHR informed the St. Paul ERO Office within three hours that O. had a pending asylum case, but received no response. *Id.* One of AHR's volunteer attorneys filed a habeas corpus petition the same day, but Defendants moved him to Texas "so quickly, [AHR] had no ability to meet with him, consult with him, or discuss any aspect of his rights, claims, and the facts relevant to his petition." *Id.* On. January 16, the District Court granted O.'s petition for a writ of habeas corpus and ordered his immediate release in Minnesota. *Id.* at ¶ 14; *see also* Judgment, *Tot-Choc v. Bondi*, No. 26-cv-167, ECF No. 8 (Jan. 16, 2026). Yet 12 days later, he remains in Defendants' custody, apparently in either New Mexico or Texas. Boche Decl. ¶ 14; *see also* Text Order, *Tot-Choc*, ECF No. 27 (Jan. 26, 2026). AHR didn't even learn that he had been moved to New Mexico from Defendants or O. himself; they learned it from one of O.'s teachers, who called detention centers trying to find him. Boche Decl. ¶ 14.

8

And at the same time Defendants are preventing detainees from consulting with their lawyers about their rights, they are pressuring them to sign voluntary departure forms that abandon those rights—what the government has taken to calling "self-deportation." *See, e.g.*, J.I.B.C. Decl. ¶ 23; Boche Decl. ¶ 15; Kelley Decl. ¶ 22. As L.H.M.'s attorney attested, each time one of her clients is transferred to Texas, "it's taken several days before I've been allowed to speak with them. . . . When I finally do talk with them, they've uniformly reported that Defendants' agents questioned them and pressured them to self-deport, and subjected them to inhumane conditions that made them want to give up on their rights just to escape captivity." Briand Decl. ¶ 11.

## III. Constitutional, Statutory, and Regulatory Rights to Access Counsel

The Constitution, Immigration and Nationality Act, DHS regulations, and ICE policies all provide for a right to access counsel.

The Constitution guarantees non-citizens access to legal counsel through the First and Fifth Amendments. The First Amendment guarantees "the right to hire attorneys" as a necessary component of the freedoms of speech, assembly, and petition. *United Mine Workers of Am., Dist. 12 v. Ill. State Bar Ass'n*, 389 U.S. 217, 221-22 (1967). And the Fifth Amendment guarantees due process, including to noncitizens in removal proceedings, *Reno v. Flores*, 507 U.S. 292, 306 (1993); the right to be represented by counsel is "an integral part of the procedural due process to which the alien is entitled." *Iavorski v. U.S. Immigr. & Naturalization Serv.*, 232 F.3d 124, 128 (2d Cir. 2000) (quoted in *Nativi-Gomez v. Ashcroft*, 344 F.3d 805, 807 (8th Cir. 2003)).

Congress has also enacted statutory provisions in the Immigration and Nationality Act guaranteeing access to counsel for detainees in removal proceedings.

The INA provides that a noncitizen in removal proceedings "shall have the privilege of being represented, at no expense to the Government, by counsel of the [noncitizen]'s choosing who is authorized to practice in such proceedings." 8 U.S.C. § 1229a(b)(4)(A); *see also Al Khouri v. Ashcroft*, 362 F.3d 461, 464 (8th Cir. 2004) ("It is well-settled that . . . aliens have a statutory right to counsel at their own expense. . .") (citing 8 U.S.C. § 1229a(b)(4)(A)); 8 U.S.C. § 1362 (requiring the right to counsel from § 1229a(b)(4)(A) in "removal proceedings before an immigration judge and in any appeal proceedings before the Attorney General.").

For individuals detained pending expedited removal proceedings, DHS regulations require "the alien [to] be given time to contact and consult with any person or persons of the alien's choosing," 8 C.F.R. § 235.3(b)(4)(ii). DHS regulations also require that for applicants for asylum, an "alien may consult with a person or person of the alien's choosing" prior to their credible fear interview. *Id.* § 208.30(d)(4).

Finally, ICE's internal policies recognize detainees' right to counsel. ICE's National Detention Standards, which cover detention facilities, state that "[f]acilities shall allow detainees to meet privately with their current or prospective legal representatives and legal assistants." ICE, National Detention Standards 2025 (NDS 2025) at 163, https://perma.cc/4QPT-2VFC. These standards require visits to be permitted "seven days a week, including

holidays" for "a minimum of eight hours per day on regular business days." *Id.* at 166. "Visits between legal service providers (or legal assistants) and an individual detained are confidential and shall not be subject to auditory supervision. Private consultation rooms shall be available for such meetings." *Id.* at 168.

In addition to detention facilities, ICE operates holding facilities for short term holding of detainees, and publishes standards for holding facilities operated by ICE's Office of Enforcement and Removal Operations (ERO). ICE, "Operations of ERO Holding Facilities" (Jan. 31, 2024), https://perma.cc/TC4L-L8AC . Directive 11087.2 does not contain standards for attorney visits to detainees in holding facilities; however, Directive 11087.2 notes that Holding Facilities are facilities "primarily used for [] short-term confinement," which the Directive defines as "a period not to exceed 12 hours, absent exceptional circumstances." *Id.* at 2 & n.3. *See also id.* at 7 ("Absent exceptional circumstances, no detainee should be housed in a holding facility for longer than 12 hours").

## LEGAL STANDARD

Federal Rule of Civil Procedure 65(b) authorizes federal courts to issue temporary restraining orders to prevent "irreparable injury, loss, or damage" that "will result to the movant before the adverse party can be heard in opposition." Fed. R. Civ. P. 65(b)(1)(A).

Courts consider the four *Dataphase* factors when issuing a temporary restraining order: (1) the probability that the movant will succeed on the merits; (2) the threat of irreparable harm to the movant; (3) the balance between this harm and the injury that an injunction would inflect on other

11

parties; and (4) the public interest. *Goyette v. City of Minneapolis*, 338 F.R.D. 109, 115 (D. Minn. 2021) (citing *Dataphase Sys., Inc. v. C.L. Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981)). The moving party bears the burden of establishing these factors. *Id.* (citing *Roudachevski v. All-Am. Care Cnrs., Inc.*, 648 F.3d 701, 705 (8th Cir. 2011)). When applying the *Dataphase* factors, "a court should flexibly weigh the case's particular circumstances to determine whether the balance of equities so favors the movant that justice requires the court to intervene." *Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 601 (8th Cir. 1999) (quoting *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1179 (8th Cir. 1998)).

## ARGUMENT

Plaintiff L.H.M. was initially detained at the Whipple Building and denied access to her attorney. She sues on behalf of a Proposed Class of all persons initially detained by Defendants in Minnesota pursuant to the INA. *See generally* Pls.' Mem. for Provisional Class Cert. Plaintiff AHR has been denied access to their clients. Defendants are violating the constitutional and statutory rights of Plaintiffs on both sides of the Whipple Building's walls, including the First Amendment, Fifth Amendment, and INA. Given the gravity and immediacy of the harms at stake, the Court should issue a temporary restraining order that restores detainees' access to counsel.

## I.    Plaintiffs Have Standing

### A.    Plaintiff L.H.M. and the Proposed Class have standing to challenge interference with their access to counsel

As discussed at length infra Part II, Defendants have deprived Plaintiff L.H.M. and the members of the Proposed Class of their constitutional and

statutory rights. Because those injuries would be redressed by an order facilitating their access to counsel, L.H.M. has standing to pursue her claims under the First and Fifth Amendments and the Immigration and Nationality Act (Counts 1 and 3-8).

**B.    AHR has standing to bring all claims**

AHR is a non-profit organization that provides and facilitates legal services using two complementary approaches. AHR is a legal service provider in its own right, with full time staff who directly represent clients on behalf of AHR. Boche Decl. ¶¶ 2-3, 5, 7, 9-14. Additionally, AHR provides support to a network of volunteer attorneys who work to advance AHR's mission through their own independent representations. *Id.* ¶¶ 3-4, 6, 15.

AHR has standing to challenge Defendants' interference with access to counsel for three independent reasons. First, it has standing to challenge the harms to AHR itself—the burden on the organization's First Amendment rights, and the impacts on its mission and resources. Second, it has representational standing to challenge the violation of its volunteer attorneys' First Amendment rights. Finally, it has third-party standing on behalf of its clients and its volunteers' clients with whom they are unable to speak.

*1.    AHR has standing to redress the harms to its rights, resources, and mission*

For an organization or person to have standing to sue under Article III, they must demonstrate that (1) they "have suffered an injury in fact," (2) that there is a "causal connection between the injury and the conduct complained of," and (3) "the injury will [likely] be redressed by a favorable decision." *McGowen, Hurst, Clark & Smith, P.C. v. Commerce Bank*, 11 F.4th 702, 709

(8th Cir. 2021) (citing *Sanzone v. Mercy Health*, 954 F.3d 1031, 1046 (8th Cir. 2020)). AHR is suffering both constitutional and organizational harms, each of which give it standing to bring this suit.

*Constitutional harms*: For plaintiffs asserting First Amendment injuries, the "standing inquiry is lenient and forgiving." *GLBT Youth in Iowa Schs. Task Force v. Reynolds*, 114 F.4th 660, 667 (8th Cir. 2024) (citation modified). A plaintiff has suffered an injury in fact when they "would like to engage in arguably protected speech" but face an "objectively reasonable" chill to their speech. *281 Care Committee v. Arneson*, 638 F.3d 621, 627 (8th Cir. 2011) (citing *Zanders v. Swanson*, 573 F.3d 591, 594 (8th Cir. 2009)). As described further below, *infra* Part II.B.2, attorneys have a well-established First Amendment right to counsel and associate with their clients, and to petition the government on their behalf.

AHR exercises its First Amendment rights by representing clients detained by Defendants, and has faced more than an "objectively reasonable" chill from engaging in that protected speech; AHR has been explicitly prevented from engaging in that speech by government law enforcement officials who physically control their access to their clients. *See, e.g.,* Boche Decl. ¶¶ 11-12; Weyker Decl. ¶¶ 8, 14. These experiences mirror those of other attorneys seeking access to clients at the Whipple Building. *See* Briand Decl. ¶ 9; Keller Decl. ¶ 19; Brown Decl. ¶¶ 3, 33; Kelley Decl. ¶ 34. By preventing AHR from vindicating its First Amendment rights to counsel its clients, Defendants are the causing AHR's injuries, injuries that would be redressed

by an order by this Court requiring Defendants to provide AHR and its attorneys access to their clients.

*Organizational harms:* An organization has standing to challenge actions that "directly affect[] and interfere[] with [its] core business activities." *Food and Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024) ("AHM"). An organization will have standing where the Defendant's actions have "perceptibly impaired" its "primary mission" rather than merely its "abstract social interests." *Granville House, Inc. v. Dep't of Health and Hum. Servs.*, 715 F.2d 1292, 1297-98 (8th Cir. 1983) (standing for nonprofit addiction service provider to challenge denial of Medicaid funding); *see also*, *e.g.*, *Nairne v. Landry*, 151 F.4th 666, 682 (5th Cir. 2025) (standing for racial justice advocacy organizations to challenge legislative maps that diluted black votes because the laws "interfered directly with [their] core operations—namely, advancing Black political participation"). Such impairment may manifest itself in observable "deflection of an organization's monetary and human resources" in response to the harms caused by defendants. *Arkansas ACORN Fair Hous., Inc. v. Greystone Dev., Ltd. Co.*, 160 F.3d 433, 434 (8th Cir. 1998).

AHR's core mission is to "promote and protect internationally recognized human rights," including by the "provision and facilitation of legal services to migrants to ensure their fair and humane treatment" and the "provi[sion of]] free legal help to people who live or are detained in Minnesota, North Dakota, or South Dakota." Boche Decl. ¶ 2. Defendants have "prohibited [AHR] from visiting or speaking confidentially with" any clients at the Whipple Building since January 11. Boche Decl. ¶ 15. And for clients transferred out of state,

AHR is "often entirely unable to meet with our clients in person after their transfer and may have considerable difficulty even locating them." *Id.* ¶ 18. Defendants' actions impede the ability of AHR attorneys to access the clients they represent, "directly affect[ing] and interfer[ing] with [AHR's] core business activities." *AHM*, 602 U.S. at 395.

Further, because of Defendants' actions, AHR is being forced to "divert significant time and resources from other program work to locate clients, establish basic communication, and pursue emergency filings," which is reducing their "capacity to accept new cases" and "delay[ing] services for existing clients." Boche Decl. ¶ 19; Weyker Decl. ¶¶ 1, 17. AHR has had to reallocate time spent on providing technical assistance to volunteer attorneys in order to spend time "help[ing] them find and access clients," and has made substantial operational changes to account for Defendants' restrictions on attorney access at the Whipple Building. Boche Decl. ¶¶ 19-21. This "deflection of [the] organization's monetary and human resources" is caused by Defendants and suffices to give AHR standing. *Arkansas ACORN*, 160 F.3d at 434.

### 2. *AHR has standing to challenge the violation of its volunteer attorneys' First Amendment rights*

Additionally, AHR has standing to represent its volunteer attorneys. "An organization has representational standing if it can demonstrate that '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires participation of individual members in the lawsuit.'" *Iowa Migrant Movement for Just. v. Bird*,

157 F.4th 904, 916 (8th Cir. 2025) (citing *Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023)). AHA meets all three requirements.

*First*, AHR's volunteer attorneys would have standing to challenge the violation of their First Amendment rights for the reasons already explained. *See supra* Part I.A.1.

*Second*, that interest is plainly germane to AHR's purpose. AHR is an "intentionally volunteer-driven" nonprofit that provides more than 250 volunteer attorneys with "training, technical support, malpractice insurance coverage, and access to interpreters and social services support" to "provide free, high-quality legal representation to low-income immigrants in the Upper Midwest." Boche Decl. ¶¶ 2-3. Enabling volunteer attorneys to represent people in immigration detention is core to AHR's mission. *Id.* ¶¶ 3, 6.

*Third*, this lawsuit does not require participation of the individual volunteer attorneys. Members' participation is required where adjudicating their claims would require "individualized proof" that cannot be "properly resolved in a group context." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 344 (1977). "[A] preliminary injunction . . . does not require individual participation." *Iowa MMJ*, 157 F.4th at 917 (citing *Warth v. Seldin*, 422 U.S. 490 (1975) ("If in a proper case the association seeks a declaration, injunction or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured."). Here, because AHR seeks only prospective relief (rather than, for example, damages which would have to be individualized to each

member) the case does not require the participation of their individual members.

> 3. *AHR may assert third-party standing to vindicate the constitutional rights of its clients*

Finally, because of the barriers Defendants are erecting to AHR's clients' ability to access counsel, AHR may assert standing to vindicate the rights of its clients and its volunteer attorneys' clients.

"Ordinarily, one may not claim standing [] to vindicate the constitutional rights of some third party." *Barrows v. Jackson*, 346 U.S. 249, 255 (1953). But third-party standing may sometimes be appropriate, depending on three factors: "the relationship of the litigant to the person whose rights are being asserted; the ability of the person to advance his own rights; and the impact of the litigation on third party interests." *Caplin & Drysdale, Chartered v. U.S.*, 491 U.S. 617, 623 n.3 (1989).

When considering the first factor, "the attorney-client relationship . . . is one of special consequence" that counsels in favor of third-party standing. *Id.* The second factor will weigh in favor of third-party standing where the third party faces "obstacles" to the assertion of their own rights. *Singleton v. Wulff*, 428 U.S. 106, 117 (1976). And the third factor will weigh in favor of third-party standing where the challenged conduct may "materially impair the ability of third persons in [a third party]'s position to exercise their constitutional rights." *Caplin*, 491 U.S. at 623 n.3 (cleaned up).

At least one other court has recognized third-party standing under similar circumstances, allowing attorneys to vindicate the rights of clients to access counsel in immigration detention. *Southern Poverty Law Center v. U.S.*

*Dep't of Homeland Sec.*, 18-cv-760, 2020 WL 3265533 at * 14 (D.D.C. June 17, 2020) (*SPLC*). That court noted the "clear hindrances to the detained individuals filing their own suits," such as needing to take already-limited time away from advocating their own cases in order to litigate a separate access to counsel claim, the speed at which their removal cases move, potential chilling effects and privacy concerns that detainees may have in litigating their own access to counsel, and often limited English proficiency and knowledge of the U.S. legal system. *Id.*

As in *SPLC*, AHR may properly assert third-party standing to vindicate its clients' constitutional right to counsel. AHR and its volunteer attorneys have attorney-client relationships with individuals detained by Defendants. Boche Decl. ¶ 9; Weyker Decl. ¶¶ 2, 6-7; Kelley Decl. ¶¶ 5, 11. Their clients also face clear hindrances in vindicating their rights that go even beyond those in *SPLC*: on top of the general barriers to filing suit posed by immigration detention, Defendants bar them from speaking with their lawyers. *See also* J.J.B. Decl. ¶¶ 9, 12-13, 17 (describing detention conditions that impede ability to present legal claims); J.I.B.C. Decl. ¶ 13, 14 (same).

## II.    Plaintiffs are Likely to Prevail on the Merits of Their Claim That Defendants' Denial of Access to Counsel Violates Plaintiffs' Constitutional and Statutory Rights.

ICE's violation of detainees' constitutional and statutory rights to access counsel in Minnesota mirrors conduct that has already been enjoined in multiple jurisdictions around the country during the current administration's unprecedented immigration enforcement operations. *Mercado v. Noem*, 800 F. Supp. 3d 526, 578 (S.D.N.Y. 2025) (preliminarily enjoining, *inter alia*,

restrictions on the ability of individuals in holding facilities in New York to access counsel, in violation of the First and Fifth Amendment rights of a class of detainees); *Gonzalez v. Noem*, No. 25-C-13323, 2025 WL 3170784 at *1 (N.D. Ill. Nov. 5, 2025) (issuing a temporary restraining order requiring ICE to, in part, allow for communications between detainees and counsel and ensure they protect confidentiality and attorney client privilege); *Vasquez Perdomo v. Noem*, 790 F. Supp. 3d 850, 896-97 (C.D. Cal. 2025) (issuing a temporary restraining order requiring ICE to provide for legal visitation seven days a week and provide access to confidential phone calls); *Perdomo v. Noem*, No. 2:25-cv-05605, 2025 WL 3192939 at *14 (C.D. Cal. Nov. 13, 2025) (converting TRO into a preliminary injunction after examining an expanded and updated record); *cf. D.N.N. v. Bacon*, 1:25-cv-1613, 2025 WL 3525042 at *13-14 (D. Md. Dec. 9, 2025) (denying a motion to dismiss Plaintiffs' claims that the restrictions on access to counsel at a holding facility in Maryland violate Plaintiffs' constitutional and statutory rights).

Courts considering Defendants' obstruction of the right to counsel have found that they are violating detainees' rights under the Fifth Amendment, the Immigration and Nationality Act, and ICE's own policies, as well as attorneys' and detainees' rights under the First Amendment. Although a "fair chance of prevailing" on any one of these claims would be enough to carry Plaintiffs' burden, *see Jet Midwest International. Co. v. Jet Midwest Group., LLC*, 953 F.3d 1041, 1045 (8th Cir. 2020) (quoting *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008)), Plaintiffs have shown far more than that; each of their claims is likely to succeed.

A.    **Defendants' actions violate detainees' Fifth Amendment rights.**

Defendants are violating detainees' rights to access counsel in two ways: by holding detainees for extended periods of time without the ability to communicate with counsel, and by transferring detainees out of Minnesota even once they are being represented by Minnesota-based counsel. Both of these actions violate detainees' rights to due process under the Fifth Amendment.

The Due Process Clause of the Fifth Amendment guarantees detainees "a right of meaningful access to courts and to judicial process." *Johnson-El v. Schoemehl*, 878 F.2d 1043, 1052 (8th Cir. 1989) (examining the right to counsel for pre-trial detainees). This includes "a reasonable opportunity to seek and receive the assistance of attorneys." *Id.* Their rights can be compromised if the government refuses to let them seek attorney visits, imposes unreasonable restrictions on their access to phone calls with attorneys, or forces a lack of privacy in their consultations with counsel. *Id.*

"[T]he Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001). "It is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings." *Reno*, 507 U.S. at 306. Therefore, "[i]n certain circumstances, depriving an alien of the right to counsel may rise to the level of a due process violation." *Al Khouri*, 362 F.3d at 464.

Several circuits have explicitly held that the "right" of "aliens" to be "represented by counsel at their own expense . . . is 'an integral part of the

procedural due process to which the alien is entitled.'" *Iavorski v. U.S. I.N.S.*, 232 F.3d 124, 128 (2d Cir. 2000) (quoting *Batanic v. INS*, 12 F.3d 662, 667 (7th Cir. 1993)); *see also Nativi-Gomez*, 344 F.3d at 807 (quoting *Iavorski*); *Leslie v. Att'y Gen. of the U.S.*, 611 F.3d 171, 180-81 (3d Cir. 2010) (the "statutory and regulatory right to counsel is [] derivative of the due process right to a fundamentally fair hearing."); *Romero v. Bondi*, 150 F. 4th 332, 340 (4th Cir. 2025) (explaining "noncitizens have a Fifth Amendment right to due process in removal proceedings" and "although noncitizens are not guaranteed an appointed attorney, they do have the right to retain an attorney"); *U.S. v. Saucedo-Velasquez*, 842 F.2d 832, 834 n. 2 (5th Cir. 1988) ("An alien does [] have a right to counsel if the absence of counsel would violate due process under the Fifth Amendment."); *Baltazar-Alcazar v. I.N.S.*, 386 F.3d 940, 944 (9th Cir. 2004) ("The right to counsel in removal proceedings is derived from the Due Process Clause of the Fifth Amendment and a statutory grant under 8 U.S.C. § 1362."). At least one court in this district has similarly noted that courts "have concluded that the Fifth Amendment right to due process is implicated" in "an alien's right to counsel" for immigration proceedings. *Jiang v. Houseman*, 904 F. Supp. 971, 978 (D. Minn. 1995).

Courts have held that government interference with DHS detainees' ability to access counsel violates the Due Process Clause of the Fifth Amendment. *See*, *e.g.*, *Torres v. U.S. Dep't of Homeland Sec.*, 411 F. Supp. 3d 1036, 1063 (C.D. Cal. 2019) ("[T]he Due Process Clause of the Fifth Amendment requires that noncitizens be permitted to retain counsel of their choice at no expense to the government.").

Many recent such cases closely mirror the facts of this case—ICE detaining people in holding facilities during the current administration's enforcement surge and restricting these detainees' ability to access counsel. In *Mercado*, the court found that ICE's failure to "allow for confidential attorney call rooms or in-person visitation" in a holding facility in New York violated Plaintiffs' Fifth Amendment rights. 800 F. Supp. 3d at 577-78. In *Perdomo*, the court found that repeated closures of a California holding facility to attorneys and failures to provide for private attorney client communications had the cumulative effect of "severely imped[ing detainees] from communicating with counsel" in violation of their Fifth Amendment rights. 2025 WL 3192939 at *10-11. And in *D.N.N.*, the court denied the government's motion to dismiss Plaintiffs' Fifth Amendment claims where holding facility detainees in Maryland had argued that "denying them the ability to communicate with their counsel through the mail, unreasonably restricting their ability to meet with attorneys, and [] denying them the ability to make private telephone calls" violated their due process rights." 2025 WL 3525042 at *13-14.

Courts have also found that the government violates the due process rights of detainees represented by counsel when the government transfers those detainees out of state, "effectively destroy[ing] their already-existing counsel relationships." *Arroyo v. U.S. Dep't of Homeland Sec.*, No. SACV 19-815, 2019 WL 2912848 at *17 (C.D. Cal. June 20, 2019).

Defendants' conduct falls squarely within these cases. Defendants are flatly refusing to allow L.H.M. and other Class members to meet with counsel and provide no means to make private attorney-client calls. *See* Briand Decl. ¶

9; *see also, e.g.*, Weyker Decl. ¶ 8; Brown Decl. ¶ 18; J.J.B Decl. ¶ 16; J.I.B.C. Decl. ¶ 12. When an attorney arrives at the Whipple Building to speak with a client for whom they have been hired to advocate—or on whose behalf they have even already filed a habeas petition—Defendants conceal that fact from the client. *See, e.g.*, J.J.B. Decl. ¶ 27. And members of the Detainee Class who already have legal representation in Minnesota have been and are being transferred out of state, impeding their existing legal representation. *See, e.g.*, Boche Decl. ¶ 18; Kelley Decl. ¶¶ 22, 30; Contreras Edin Decl. ¶¶ 8-9, 11, 14; Weyker Decl. ¶ 10; Heinz Decl. ¶¶ 8-10. Defendants are thus denying Detainee Class members "a reasonable opportunity to seek and receive the assistance of attorneys." *Johnson-El*, 878 F.2d at 1052.

**B.    Defendants' actions violate Plaintiffs' First Amendment rights.**

       *1.    Plaintiff L.H.M. and the Proposed Class*

"[T]he freedom of speech, assembly, and petition guaranteed by the First and Fourteenth Amendments give[s] petitioner[s] the right to hire attorneys . . . to assist . . . in the assertion of their legal rights." *United Mine Workers*, 389 U.S. at 221-22. "Government action designed to prevent an individual from utilizing legal remedies may infringe upon the First Amendment right to petition the courts." *Whisman Through Whisman v. Rinehart*, 119 F.3d 1303, 1313 (8th Cir. 1997); *see also Denius v. Dunlap*, 209 F.3d 944, 953 (7th Cir. 2000) ("The right to hire and consult an attorney is protected by the First Amendment's guarantee of freedom of speech, association, and petition"); *DeLoach v. Bevers*, 922 F.2d 618, 620 (10th Cir. 1990) ("The right to retain and

consult with an attorney [] implicates . . . clearly established First Amendment rights of association and free speech.").

"Freedom of speech . . . is accorded aliens residing in this country." *Bridges v. Wixon*, 326 U.S. 135, 148 (1945). As such, courts have concluded that restrictions on the ability of individuals in immigration detention to access counsel violate the First Amendment rights of those detainees. A district court in New York recently found that detainees in an ICE holding facility were entitled under the First Amendment to "consult with and have the advice and assistance of legal counsel," and that ICE's excessive and unjustified restrictions on their access violated their First Amendment rights. *Mercado*, 800 F. Supp. 3d at 565, 578. Similarly, a district court in California explained at the motion to dismiss stage that detainees' "First Amendment right to … hire an attorney and receive sealed mail" may be infringed by "unreasonable restrictions on their right to communicate with the outside world." *Torres v. U.S. Dep't of Homeland Sec.*, 411 F. Supp. 3d 1036, 1067 (C.D. Cal. 2019).

L.H.M. and the other members of the proposed Class has a First Amendment right to access legal counsel that Defendants are systematically infringing. As already explained, Defendants' policies and practices cut off detainees' ability to communicate, consult, and associate with attorneys, and to petition the government through them. *See supra* pp. 3-9; *see, e.g.*, Boche Decl. ¶¶ 11-12; Briand Decl. ¶¶ 9, 11; Weyker Decl. ¶¶ 8, 14; Brown Decl. ¶¶ 10, 18; Kelley Decl. ¶¶ 11, 20, 28, 34; Contreras Edin Decl. ¶¶ 14-15; Heinz Decl. ¶ 10. Class members cannot work with counsel to prove their lawful status and obtain release from detention, maintain jurisdiction in Minnesota,

where they live and work, or receive the assistance of their chosen and established Minnesota-based attorney; they often cannot even obtain release or other rights ordered by this Court. *See, e.g.*, Boche Decl. ¶ 14; Brown Decl. ¶ 7; Kelley Decl. ¶¶ 3-4, 22; *see generally Juan T.R.* Order at 3. For example, L.H.M. recently had cranial surgery and has serious medical needs that may weigh heavily in favor of release on bond or other remedies, but her attorneys' ability to make that case is impaired by their inability to meet with her. Briand Decl. ¶ 10. Defendants' tactics thus "prevent an individual from utilizing legal remedies" and therefore "infringe upon the First Amendment right to petition the courts." *Whisman*, 119 F.3d at 1313. At the precise moment that their First Amendment rights are the most vital, Defendants stand directly athwart them.

### 2. AHR

Defendants' actions also violate the First Amendment rights of AHR and its volunteer attorneys to communicate with and counsel their clients.

The First Amendment protects "lawful means of vindicating legal rights." *See NAACP v. Button*, 371 U.S. 415, 437 (1963). The First Amendment "require[s] a measure of protection for . . . 'advis[ing] another that his legal rights have been infringed and refer[ring] him to a particular attorney or group of attorneys . . . for assistance." *In re Primus*, 436 U.S. 412, 432 (1978) (quoting *Button*, 371 U.S. at 434). Attorneys contacting potential clients "come[] within the generous zone of First Amendment protection reserved for associational freedoms," particularly because "the efficacy of litigation as a means of advancing the cause of civil liberties often depends on the ability to make legal assistance available to suitable litigants." *Id.* at 431.

A court recently granted a preliminary injunction against DHS policies that impaired immigration attorneys' First Amendment rights to "engage in protected speech by advising, assisting, and consulting with asylum-seeking clients." *Immigrant Defs. Law Ctr. v. Noem*, 781 F. Supp. 3d 1011, 1047 (C.D. Cal. 2025) ("*ImmDef*") (cleaned up). These policies included "strict limitations on the time and conditions in which ImmDef could provide legal services to existing clients," "prevent[ing] them from communicating with or advising potential clients," and "forb[idding] them from conducting 'know your rights' presentations for individuals subjected to" DHS's Migrant Protection Protocols. *Id.* Another court refused to dismiss First Amendment claims on behalf of attorneys "claiming a right to associative conduct with their clients and potential clients via telephone and mail, as well as through physical access to private meeting spaces," which were burdened by DHS's "restrictions on visitation, legal mail, [and] attorney calls" for detainees. *Torres*, 411 F. Supp. 3d at 1067.

Since the beginning of Operation Metro Surge, attorneys representing or seeking to represent clients held at the Whipple Building have been regularly denied access to the facility, and in many cases have been unable to communicate with their clients. *See, e.g.*, Boche Decl. ¶¶ 11-12; Weyker Decl. ¶¶ 6-8; Briand Decl. ¶ 9; Brown Decl. ¶ 33; Kelley Decl. ¶ 34. Attorneys cannot counsel their own clients, much less potential clients. *See ImmDef*, 781 F. Supp. 3d at 1047. Attorneys who used to regularly visit existing clients and advise potential clients at the Whipple Building without issue are now prohibited from doing so. *See, e.g.*, Brown Decl. ¶¶ 15, 18; Kelley Decl. ¶¶ 5, 7,

20; Briand Decl. ¶8-9. Their First Amendment rights of speech, association, and petition are severely damaged, obstructing their ability to fulfill their mission as attorneys. *See* Boche Decl. ¶¶ 6, 12 ("Representing people in immigration detention advances AHR's mission by safeguarding due process and human dignity, grounding our advocacy in clients' real-life experiences, and engaging volunteer attorneys in supervised pro bono representation that expands access to justice and strengthens the rule of law."); *see also, e.g.*, Weyker Decl. ¶ 16; Heinz Decl. ¶ 10.

### C.  Defendants' actions violate Plaintiff L.H.M.'s and Class Members' rights under the Immigration and Nationality Act

In addition to their First and Fifth Amendment rights, L.H.M. and the Proposed Class have a right to counsel grounded in the INA, and Defendants' interference with their ability to obtain and consult with counsel violate their statutory rights.

"[A]liens . . . have a statutory right to have counsel represent them at their own expense under 8 U.S.C. §§ 1229a(b)(4)(A) and 1362" in immigration proceedings. *U.S. v. Yan Naing*, 820 F. 3d 1006, 1010 (8th Cir. 2016). These two statutory provisions provide in virtually identical language that aliens in removal proceedings "shall have the privilege of being represented" at no expense to the Government, by counsel "of the alien's choosing who is authorized to practice in such proceedings." 8 U.S.C. §§ 1229a(b)(4)(A).

As one court recently explained, the INA's "right to access counsel begins before any court proceeding, with notices from the agency to the immigrant and with the detention itself." *Torres*, 411 F. Supp. 3d at 1062. And "the

statutory right to counsel" does not "consist[] merely of the right to be advised of the right to counsel and provided a list of pro bono lawyers;" it includes an entitlement to "meaningful access to counsel, including the right to contact counsel at the time, space, and ability to consult with counsel safely and confidentially." *ImmDef*, 781 F. Supp. 3d at 1050.

Courts have found a variety of restrictions to contribute to infringing the INA's right to counsel, such as "lawyers who were forced to meet with their clients in nonconfidential settings," unrepresented citizens being "prohibited from [] approaching legal representatives . . . to discuss possible representation," "limited attorney visitation hours," "failures to notify attorneys of client location transfers," *id.*, "restrictions on telephone access," "difficulty with legal mail," and restrictions on "in-person meetings." *Torres*, 411 F. Supp. 3d at 1060; *see also D.N.N.*, 2025 WL 3525042 at *14 (allowing a claim to proceed given allegations that the government was denying plaintiffs' "ability to communicate with their counsel through the mail," "unreasonably restricting their ability to meet with attorneys," and "denying them the ability to make private telephone calls."). Courts have also found that transferring detainees with attorneys out of state interferes with their rights under the INA. *See, e.g., Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 566 (9th Cir. 1990) (affirming injunction against "transfers" that "interfere with established attorney-client relationships").

This interference with Detainee Class members' statutory right to counsel has a profound effect on their ability to exercise their rights under the INA. Many Detainee Class members are transferred to Texas before ever

having the opportunity to speak with a lawyer, even when a lawyer has already been retained to represent them—and in some cases, even when the lawyer has already successfully obtained a writ of habeas corpus. *See, e.g.*, Kelley Decl. ¶ 22. They then often need to find new representation barred in Texas, because their Minnesota-based lawyers will face obvious logistical barriers seeking to visit clients in detention in Texas, and are typically not licensed to practice in Texas courts (preventing them from, for example, filing habeas corpus petitions on their own). *See, e.g.*, Contreras Edin Decl. ¶ 8; Heinz Decl. ¶ 8. As a result, they can no longer be represented by "counsel of [their] choosing." 8 U.S.C. § 1229a(b)(4). All the while, they may be interrogated and pressured to self-deport, without the advice or advocacy of counsel. *See, e.g.*, J.I.B.C. Decl. ¶ 23; Boche Decl. ¶ 15; Kelley Decl. ¶ 22.

This irreparably harms Detainee Class members above and beyond the violation of their constitutional right. *See, e.g.*, *Mercado*, 800 F. Supp. at 578 ("[T]he conditions and limitations at 26 Fed not only delay critical legal advice to which aliens have a statutory and constitutional rights, they in some instances may completely deprive a detainee of the ability to obtain timely legal advice prior to removal, particularly where the detainee is shipped rapidly from one state to another and ultimately removed swiftly from the United States."); *A.O. v. Bondi*, No. 26-cv-420, 2026 WL 128198, at *1 (D. Minn. Jan. 18, 2026) ("[T]he irreparable harm is clear. If Petitioner is removed from this District, this Court would lose jurisdiction and be unable to adjudicate his habeas petition. And even if a court were able to adjudicate the matter, Petitioner may not be able to participate. As for the request that Petitioner's

counsel be given 72-hours' notice before Petitioner is interviewed, Petitioner's right to counsel may be infringed if his counsel is not present.").

### D. Defendants cannot evade their legal responsibilities by calling the Whipple Building a holding facility

Defendants have asserted to various lawyers seeking access to clients at the Whipple Building that legal visits are not allowed because Whipple is only a temporary detention facility. *See*, *e.g.*, Brown Decl. ¶ 27; Affidavit of Soledad Slowing-Romero, *Hernandez v. Easterwood*, No. 26-cv-162-MJD, ECF No. 7 at ¶ 16 (D. Min. Jan. 12, 2026). But no court has ever found that a detainee's rights turn on ICE's designation of a facility as a holding versus detention facility. Plaintiffs' rights to access counsel flow from the Constitution and the INA, not just Defendants' own policies. These rights do not vary based on whether Defendants label a person as being in "holding" versus "detention," especially when "holding" can last for days.

Courts have recently rejected similar attempts by Defendants to evade constitutional or statutory obligations by simply re-classifying facilities. *See*, *e.g.*, *Pablo Sequen*, 2025 WL 3283283 at *3-4, 29 (preliminarily enjoining unlawful conditions of confinement, particularly with respect to detainees held for more than 12 hours or overnight, notwithstanding the 12 Hour Waiver); *Mercado*, 800 F. Supp. 3d at 574 (noting that the 12 Hour Waiver resulted in a holding facilities "essentially serving as *de facto* detention centers" with the resulting conditions posing an "obvious" "risk of harm."); *Clarke v. U.S. Dep't of Homeland Sec.*, 25-cv-6773, 2025 WL 3674471 at *6 (E.D.N.Y. Dec. 18, 2025) ("the conditions maintained at the Central Islip hold room, given the recklessly expanded use of these facilities by ICE, may well violate constitutional

requisites . . . ICE has created conditions in the Central Islip hold room that violate numerous minimum standards set by ICE to ensure the safe and humane treatment of detainees."); *Neguse*, 2025 WL 3653597 at *29 ("ICE field offices featuring ERO holding facilities appear to be 'used to detain or otherwise house' noncitizens . . . the field office holding facilities have the indicia of detention . . . Defendants' purported exemption of field offices . . . as a categorical matter is therefore contrary to statute."); *D.N.N.*, 2025 WL 3525042 at *12 (allowing an APA claim to proceed against the 12 Hour Waiver on the theory that "as a result of the Waiver, [Plaintiffs] have been subjected to inhumane conditions of confinement.").

Moreover, even if Defendants' attempt to carve "holding" facilities out from the Constitution and the INA were legally cognizable, the facts belie it. Defendants are regularly detaining people at the Whipple Building for far longer than twelve hours. *See, e.g.*, J.J.B. Decl. ¶ 22, 24. Accordingly, any argument by Defendants that they are free to obstruct access to counsel for those detained at the Whipple Building, or any similar federal installation used for the same purpose, must be rejected.

## III.  Plaintiffs Will Be Irreparably Harmed Absent a Temporary Restraining Order

Defendants' restrictions on detainees' ability to access attorneys tramples Plaintiffs' constitutional rights, and the constitutional injuries to Plaintiffs independently constitute irreparable injuries warranting preliminary relief. Further, the burdens placed on detainees' abilities to access counsel will likely lead to further irreparable harms such as prolonged

detention, improper transportation across the country, and potentially wrongful deportation.

"It is well-established that '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Powell v. Noble*, 798 F.3d 690, 702 (8th Cir. 2015) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)). Indeed, "[i]n most instances, constitutional violations constitute irreparable harm." *Morehouse Enters., LLC v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 78 F.4th 1011, 1017 (8th Cir. 2023).

Accordingly, courts evaluating burdens on detainees' access to counsel under the First and/or Fifth Amendments have consistently found the resulting constitutional harms to be irreparable. *Mercado*, 800 F. Supp. 3d at 579 (preliminarily enjoining restrictions on attorney access to "halt ongoing constitutional injuries"); *Bolanos v. Arnott*, 6:25-cv-3380, 2025 WL 3641577 at *1-2 (W.D. Mo. Dec. 16, 2025) (enjoining DHS from repeatedly transferring a detainee to various locations around the country because doing so "violate[d] his due process rights . . . to challenge his removal with the assistance of counsel," and the detainee would be irreparably harmed by "render[ing] [his] right to challenge his removal meaningless.").

Courts have also repeatedly recognized that unlawful government interference with lawyers' ability to represent their clients irreparably harms the clients. *See, e.g.*, *Perkins Coie LLP v. U.S. Dep't of Just.*, 783 F. Supp. 3d 105, 178 (D.D.C. 2025) (finding that government targeting of a law firm for retaliation "violated the Firm's rights under the First, Fifth, and Sixth

33

Amendments, as well as its clients' rights under the Fifth and Sixth Amendments" and that these violations were "sufficient, by themselves, to establish irreparable harm"); *Zaid v. Exec. Off. of President*, -- F. Supp. 3d --, 2025 WL 3724884 at *12 (D.D.C. Dec. 23, 2025) (similar); *Susman Godfrey LLP v. Exec. Off. of the President*, 789 F. Supp. 3d 15, 56 (D.D.C. 2025) (similar).

By depriving Plaintiffs of their rights under the First and Fifth Amendment, as discussed at length above, Defendants' burdens on detainees' access to counsel are irreparably harming Plaintiffs and will continue to do so absent this Court issuing preliminary relief.

Impeding L.H.M.'s and Class members' ability to fully contest their detentions via counsel also subjects them to additional irreparable harms, such as unjustified ongoing deprivations of physical liberty in harmful conditions, *see*, *e.g.*, *R.I.L.-R v. Johnson*, 80 F. Supp. 164, 191 (D.D.C. 2015) (finding detention to be an irreparable harm, particularly given the psychological tolls it takes on detainees); *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013) (needless detention constitutes irreparable harm); *Juan T.R.* Order at 2 (describing extended detention as "significant hardship"); or removal without due process*, see, e.g.*, *A.A.R.P. v. Trump*, 605 U.S. 91, 97-98 (2025) (requiring "constitutionally adequate notice prior to any removal, in order to pursue appropriate relief"); *Mercado*, 800 F. Supp. 3d at 578 ("[I]n some instances [the ICE blockade on counsel access] may completely deprive a detainee of the ability to obtain timely legal advice prior to removal, particularly where the detainee is shipped rapidly from one state to another and ultimately removed swiftly from the United States."; *see also* J.J.B. Decl. ¶ 22 ("It's like they're

trying to drive you crazy. The stress was so much that I felt like I was hallucinating."); J.I.B.C. Decl. ¶ 36 ("Since my release, I have experienced severe stress and trauma. I have not left my house. I am afraid I will be detained again. I have trouble sleeping and feel constant fear."); Boche Decl. ¶ 22 (describing clients' trauma and Defendants' efforts to get clients to abandon their rights). Access to counsel is critical to avoiding these harms; indeed, studies of noncitizens in immigration proceedings show dramatically different outcomes for represented individuals versus those who proceed pro se, with represented individuals far more likely to obtain immigration relief, be granted custody hearings, or secure release. Note, *The Right to Be Heard from Immigration Prisons: A Right of Access to Counsel for Immigration Detainees in the Right of Access to Courts*, 132 Harvard L. Rev. 726, 729 (summarizing empirical evidence). Indeed, Defendants have subjected detainees to pressure to sign voluntary departure forms that abandon their rights, while simultaneously denying access to counsel. *See* Kelley Decl. ¶ 22; J.J.B. Decl. ¶ 23; J.I.B.C. Decl. ¶ 27 (examples of this conduct); *see also Orantes-Hernandez*, 919 F.2d at 565-67 (basing injunction on coercion to sign voluntary departure forms).

## IV. The Balance of the Equities, and the Public Interest, Favor Plaintiffs

The final two *Dataphase* factors also point in favor of granting relief.

When Plaintiffs seek an injunction against the federal government, "[t]he balance of the equities and the public interest … merge." *Missouri v. Trump*, 128 F.4th 979, 996-97 (8th Cir. 2025). And the federal government cannot claim that unlawful conduct is in the public interest. *See id.* at 997

("federal officials' interest in" carrying out unlawful agency action is "minimal given [plaintiffs'] strong likelihood of success in showing it exceeds agency authority"). "[I]t is always in the public interest to protect constitutional rights." *Schmitt v. Rebertus*, 148 F.4th 958, 970 (8th Cir. 2025) (cleaned up), and "the balance of the equities generally favors the constitutionally-protected freedom of expression." *Id.*

Given that the federal government can claim no public interest in violating Plaintiffs' constitutional and statutory rights, given the ongoing constitutional and statutory injuries to Plaintiffs, and given the nature of the harms they are suffering, the balance of the equities "overwhelmingly favors" ensuring their access to counsel. *Perdomo*, 2025 WL 3192939 at *14; *see also Mercado*, 800 F. Supp. 3d at 579-80 ("Because the injunction would halt ongoing constitutional injuries while merely requiring adherence to standards defendants have already adopted … the balance of the equities and the public interest decisively favor plaintiff."); *ImmDef*, 781 F. Supp. 3d at 1054 (given "the urgency of access to counsel, and the maintenance of access to courts . . . the balance of equities and public interest factors tip sharply in ImmDef's favor.").

## V.  The Relief Plaintiffs Seek is Necessary and Appropriate

For the foregoing reasons, immediate relief protecting Plaintiffs' constitutional and statutory rights is needed to avoid irreparable harm while the Court considers the full merits of this case. Accordingly, Plaintiffs primarily ask the Court to do the same thing that multiple courts around the country have done in the face of DHS's reckless disregard of the right to counsel for the people it detains: require DHS to provide reasonable access to counsel.

ICE's own detention standards require that attorney visits be permitted seven days a week, including holidays, for a minimum of eight hours per day on regular business days, and a minimum of four hours per day otherwise, and it requires ICE to ensure these meetings are confidential and provide appropriate facilities for them. NDS 2025 at 166-68. The standards also require ICE facilities to "permit detainees to make direct, free calls to . . . legal service providers," to ensure that the "calls a detainee places to his or her legal representatives" are not subject to any unnecessary limits on duration, and to ensure that such calls are private. *Id.* at 158-161.

The court in *Perdomo* required attorney visitation in line with the NDS, and with access to free and confidential calls with attorneys. Order Granting Plaintiffs' Motion for a Preliminary Injunction, *Perdomo*, 2:25-cv-5606, ECF No 256 at 26 (C.D. Cal. Nov. 13, 2025). Other courts have required Defendants to provide detainees free and confidential access to telephone calls with counsel, contact information for potential pro bono counsel, and a notice of their rights. *Gonzalez*, 2025 WL 3170784, at *1-2; Preliminary Injunction, *Mercado*, 25-cv-6568, ECF No. 97 at 2-3, 5-6 (S.D.N.Y. Sep. 17, 2025). And they have required Defendants to keep counsel apprised of detainees' location through the Online Detainee Locator System. *Gonzalez*, 2025 WL 3170784, at *2; *Mercado*, 25-cv-6568, ECF No. 97 at 4-5.

This Court should follow suit and require that ICE provide detainees in Minnesota the sorts of minimum access to counsel that it already acknowledges it should be providing at detention facilities. And given that the Whipple Building is already equipped with visitation facilities, *see* Brown Decl. ¶ 15, as

are the various Minnesota jails that ICE uses as longer-term detention facilities, this Court should require that that access include the opportunity for in-person visitation, like the court did in *Perdomo*.

Finally, because Defendants are frequently moving detainees out of state while their Minnesota attorneys are trying to speak with them, disrupting the attorneys' ability to represent them, the Court should ensure that Defendants represented by counsel are not swiftly removed from their home state and the jurisdiction of this Court before they have had a reasonable opportunity (72 hours) to seek their release. As Chief Judge Schiltz noted, Defendants' pattern of subjecting people to lengthy detention and unnecessary transfers away from Minnesota has regularly resulted in "significant hardship to aliens (many of whom have lawfully lived and worked in the United States for years and done absolutely nothing wrong)." *Juan T.R.* Order at 2.

Other courts have also taken action to remedy "a pattern of practices which severely impacts" detainees "from communicating with counsel," such as transferring clients with existing representation to "remote detention centers without any notice to counsel" and pressuring them to sign voluntary departure forms while preventing access to counsel. *Orantes-Hernandez*, 919 F.2d at 565-67. This court should similarly act to ensure that represented individuals detained by Defendants' indiscriminate operations have a reasonable opportunity to communicate with counsel and seek their release in Minnesota prior to being placed on Defendants' conveyor belt of detainees around the country.

## CONCLUSION

For the foregoing reasons, the Court should provisionally certify a class and temporarily restrain Defendants from obstructing attorney-client relationships of those detained by Defendants.

Dated: January 28, 2026                      Respectfully submitted,

*s/ Alethea M. Huyser*
Alethea M. Huyser (#0389270)
Rachel L. Dougherty (#0399947)
Devin T. Driscoll (#0399948)
Sarah Theisen (#0402844)
Margaret G. Severson (#0504388)
**FREDRIKSON & BYRON, P.A.**
60 South Sixth Street, Suite 1500
Minneapolis, MN 55402-4400
P: (612) 492-7000
ahuyser@fredlaw.com
rdougherty@fredlaw.com
ddriscoll@fredlaw.com
stheisen@fredlaw.com
mseverson@fredlaw.com

Jeffrey B. Dubner*
Aman T. George*
Mark B. Samburg*
Anashua Dutta*
Elena Goldstein*
**DEMOCRACY FORWARD**
**FOUNDATION**
P.O. Box 34553
Washington, DC 20043
P: (202) 448-9090
jdubner@c.democracyforward.org
ageorge@democracyforward.org
msamburg@democracyforward.org
adutta@democracyforward.org
egoldstein@democracyforward.org

*pro hac vice application filed

*Counsel for Plaintiffs*