UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| The Advocates for Human Rights and L.H.M., through her next friend C.A., <br><br>        Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of Homeland Security; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; TODD LYONS, in his official capacity as Acting Director of Immigration and Customs Enforcement; MARCOS CHARLES, in his official capacity as the Acting Executive Director for Immigration and Customs Enforcement's Enforcement and Removal Operations; DAVID EASTERWOOD, in his official capacity as Acting Field Office Director for Immigration and Customs Enforcement's Enforcement and Removal Operations St. Paul Field Office; U.S. FEDERAL PROTECTIVE SERVICE; and FARON K. PARAMORE, in his official capacity as Director of the Federal Protective Service,<br><br>        Defendants. | Court File No. 0:260-cv-00749 (NEB/DLM)<br><br>**DECLARATION OF KIMBERLY BOCHE** |

## DECLARATION OF KIMBERLY BOCHE

I, Kimberly Boche, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am an attorney licensed to practice in Minnesota (MN Attorney ID No. 0402340). I am a Supervising Attorney at The Advocates for Human Rights ("AHR"), where I have worked since October 2020. I am a member of the American Immigration Lawyers Association ("AILA").

2. AHR is an independent, nonpartisan nonprofit founded in 1983 that works to promote and protect internationally recognized human rights. To advance that mission, one of AHR's core activities is the provision and facilitation of legal services to migrants to ensure their fair and humane treatment in line with internationally-recognized human rights standards and the rule of law. AHR is based in Minneapolis and provides free legal help to people who live or are detained in Minnesota, North Dakota, and South Dakota. Most of our clients are in Minnesota at the time AHR is retained to represent them.

3. AHR is intentionally volunteer-driven: volunteers and interns are integrated into hands-on legal services, research, and advocacy under close supervision. We work with more than 576 volunteer attorneys, the majority of whom live and practice in Minnesota. We provide our volunteer attorneys with training, technical support, malpractice insurance coverage, and access to interpreters and social services support. Many volunteers become members of the organization's Board of Directors, assist AHR with fundraising, and help AHR find additional volunteers to support us in our work.

4. I personally work closely with AHR's volunteer attorneys on habeas and related emergency matters and have worked with them on several of their recent and ongoing representations.

5. Through our Immigration Legal Services ("ILS") program, we provide free, high-quality legal representation to low-income immigrants in the Upper Midwest, including asylum seekers, individuals in detention, unaccompanied children, and trafficking survivors.

6. Representing people in immigration detention advances AHR's mission by safeguarding due process and human dignity, grounding our advocacy in clients' real-life experiences, and engaging volunteer attorneys in supervised pro bono representation that expands access to justice and strengthens the rule of law.

7. AHR's ILS program currently has seven full-time staff attorneys ("FTEs") and two full-time fellows providing direct services. Because of our small staff, most of our work is done in partnership with our volunteer attorneys. While not all AHR volunteer attorneys are engaged with

ILS case work at a given time, at least 576 of our volunteer attorneys have represented clients through the program last year, in close collaboration with our full-time staff.

8.      In my role at AHR, I represent individuals, mostly unaccompanied children, in immigration proceedings, including applications for asylum and Special Immigrant Juvenile Status ("SIJS") before the Immigration Court and United States Citizenship and Immigration Services ("USCIS").

9.      Throughout Operation Metro Surge, AHR staff and volunteers have represented multiple clients detained at the Bishop Henry Whipple Federal Building ("Whipple"). We have represented at least eleven individuals who we know have been detained at Whipple, and the total number is likely higher. This is in addition to three juvenile clients represented by our unaccompanied children's team. All of these clients were sent to Texas before their counsel could meet with them.

10.     I represent two people who have been detained at the Whipple Building since the start of Operation Metro Surge. I have assisted them in pursuing numerous forms of immigration and civil relief, including habeas, in partnership with other attorneys.

11.     Over the past two weeks, since at least January 11, 2026, the Department of Homeland Security ("DHS") and Federal Protective Service ("FPS") have repeatedly obstructed AHR's ability to counsel, speak with, and advocate for its clients. This has played out in my own cases, as well as my colleagues' and our volunteer attorneys' cases.

12.     Despite repeated requests for attorney access and confidential calls, DHS, FPS, and ICE personnel have refused to facilitate in-person legal visits and have failed to provide confidential attorney-client telephone access to our clients before rapidly transferring them out of state. These practices impeded my representation of two clients at Whipple and forced AHR to divert substantial resources away from representation. Instead of applications for relief, I am spending time finding my clients, scheduling meetings that then can't proceed because DHS does not let clients join, spending time updating their families, and in cases where there is additional movement after the first transfer out of Minnesota, finding my clients again.

13.     Client O. is an archetypal example of the obstacles of access to counsel that ICE has created. On January 11, 2026, I learned that ICE had arrested my client, "O.," around 10am while he was at work. Around 1pm I emailed the St. Paul ERO Office to inform them of O.'s pending asylum case. I then called the St. Paul ERO field office. I did not receive any response. One of our volunteer attorneys, Kira A. Kelley, filed a habeas corpus petition for O. in the U.S. District Court for the District of Minnesota the same day he was detained. *See Tot-Choc v. Bondi*, No. 26-cv-167 (D. Minn. Jan. 11, 2026). When I checked his location the next day, he was already in El Paso. Defendants moved him so quickly, I had no ability to meet with him, consult with him, or discuss any aspect of his rights, claims, and the facts relevant to his petition prior to his removal. Before

any attorney-client meeting or confidential call could occur in Minnesota, ICE transferred O. out of state.

14. On January 16, 2026, the District of Minnesota granted O.'s petition for a writ of habeas corpus and expressly ordered his immediate release in Minnesota. Following the Court's order, a deportation officer at the detention center in El Paso stated O.'s case would continue in Texas. We have continued efforts to obtain status updates and secure compliance with the Court's order. I have scheduled attorney meetings via ERO eFile where my client was never made available to me. As of the date of this declaration, O. was moved from Texas to New Mexico; this change in location was relayed to me not by ICE (after my repeated calls and emails) but by O.'s teacher, who personally called the detention center in New Mexico trying to find him. I have made numerous attempts to contact ERO and detention facility officials in Texas to obtain information about O.'s location and to facilitate compliance with the Court's Order. Although I was told by the ICE Attorney on his case that we could expect O. to be home in Minnesota by Tuesday January 20th, on that date we were told he would actually be released on Saturday January 24th. On January 24th, I received an email from O.'s teacher informing me that facility personnel at the Torrance County Detention Center, New Mexico said that O. may be held for up to ten additional days based on alleged COVID exposure. O. called me later that day to tell me he felt fine and was exhibiting no COVID symptoms. To the best of my knowledge, O. has not been released, even though it has been twelve days since the court granted his habeas petition. I have no information about when he will actually be released.

15. Since at least January 11, 2026, I have seen ICE prohibit my colleagues and our volunteer attorneys from visiting or speaking confidentially with a client at Whipple. Our staff, volunteers, and clients have reported having lacking access to confidential calls and pressure on clients to sign voluntary removal forms ("self-deportation") while they were being prevented from speaking to counsel. Clients have described crowded holding cells at Whipple, minimal food, lack of privacy around toilets, and monitored or public phone access with little or no privacy. Defendants do not permit counsel to call the facility and ask to be connected with detained clients. In addition, individuals in ICE custody cannot make confidential phone calls to their attorneys. Clients have mentioned to me that the phones available to them are located in open, non-private areas where conversations can be overheard by ICE personnel or other detainees. Most detained individuals are permitted only a single phone call, which they typically use to contact family. My client who attempted to do both in the limited phone time he got was only left with two minutes to connect with me.

16. Our staff have talked to me about the occasions they attempted to intervene to prevent transfers or to present documentation—including proof of asylee status—at Whipple. In several instances, DHS/ICE personnel stated they would not review documents they "already have" and

proceeded despite clients' lawful status or relief grants, requiring additional advocacy and litigation efforts on AHR's part.

17. For example, on January 9, 2026, two members of AHR's ILS staff went to the ICE–ERO office at the Whipple Building to provide documentation for an individual who had been apprehended earlier that day and who had previously been granted asylum. AHR staff informed the officer at the counter that the individual had been unable to show his asylum approval and related documents during the apprehension. The officer accepted the documents, briefly reviewed them, and made copies at AHR's request. The officer said there was no information in the system yet regarding this individual's arrest and indicated it could take approximately 48 hours for updates to appear in the locator system. AHR staff then explicitly asked whether people were being transferred out of state during that same 48-hour period when arrested individuals' locations are not always updated on the locator systems. The officer responded "it depends on the case."

18. The rapid out-of-state transfers (often to Texas) without notice to counsel and without allowing us to consult with our clients before transfer have materially impeded representation. We are often entirely unable to meet with our clients in person after their transfer and may have considerable difficulty even locating them. Because few of our volunteer attorneys are barred in Texas, we may need to find new co-counsel for any federal or immigration court aspects of our client's representation or if documents need to be provided, discussed, or signed in person. We also must undertake burdensome efforts to re-establish contact with our clients, coordinate with distant facilities, and litigate access-to-counsel issues.

19. These access restrictions and transfers have forced AHR to divert significant time and resources from other program work to locate clients, establish basic communication, and pursue emergency filings. This work is in addition to AHR's long-running, labor-intensive representation of clients pursuing immigration relief over multiple years, which already requires sustained effort to address trauma, safety concerns, and logistical barriers (including clients being kidnapped, going missing, or being re-detained). These added burdens reduce our capacity to accept new cases and delay services for existing clients. Personally, I have been working approximately 60 hours a week during Operation Metro Surge and am spending about half of that time on Whipple-related detentions and their consequences. Organization-wide, these added burdens reduce our capacity to accept new cases and delay services for existing clients.

20. The practices described above also frustrate AHR's mission by diverting resources from other priorities, such as supervising and supporting volunteers. For example, we have had to reduce the amount of technical assistance we can provide to our volunteer attorneys for their substantive legal work because so much of our time needs to be spent trying to help them find and access clients.

21. Because ICE has prevented access to clients at Whipple, AHR has implemented emergency protocols, including rapid-response coordination with pro bono partners, template habeas filings, and after-hours staffing to track transfers and facilitate contact—diverting resources from other priorities and imposing unanticipated costs.

22. Denial of timely access to counsel and confidential communication, combined with transfer-induced disorientation, leaves clients traumatized and vulnerable to coercive tactics. Clients report that DHS personnel tell them that choosing to fight their cases will prolong detention. They also report being pressured to sign removal paperwork. DHS personnel are thus pressuring our clients to abandon their rights during the very time that they are preventing us from speaking with our clients. Without confidential legal advice, many cannot understand or assert their rights. Our inability to explain their rights and the status of their cases leaves our clients unable to evaluate DHS' claims and uncertain about whether to give into the pressure to self-deport and abandon their rights.

23. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: January 28, 2026                Respectfully Submitted,

/s/ *Kimberly Boche*
KIMBERLY BOCHE
MN Attorney ID No.: 0402340
The Advocates for Human Rights
330 Second Ave. S, Suite 800
Minneapolis, MN 55401
612-746-4673
kboche@advrights.org