UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| The Advocates for Human Rights and L.H.M., through her next friend C.A., | Court File No. 0:260-cv-00749 (NEB/DLM) |
| Plaintiffs, | |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of Homeland Security; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; TODD LYONS, in his official capacity as Acting Director of Immigration and Customs Enforcement; MARCOS CHARLES, in his official capacity as the Acting Executive Director for Immigration and Customs Enforcement's Enforcement and Removal Operations; DAVID EASTERWOOD, in his official capacity as Acting Field Office Director for Immigration and Customs Enforcement's Enforcement and Removal Operations St. Paul Field Office; U.S. FEDERAL PROTECTIVE SERVICE; and FARON K. PARAMORE, in his official capacity as Director of the Federal Protective Service, | **DECLARATION OF HANNAH BROWN** |
| Defendants. | |

## DECLARATION OF HANNAH BROWN

I, Hannah Brown, declare the following is true and accurate to the best of my knowledge and recollection.

1. I am an immigration attorney based in the Minneapolis area of Minnesota. I am the owner and sole attorney of HB Law & Advocacy PLLC. I am licensed to practice in Minnesota and California, as well as the U.S. District Courts for the District of Minnesota, Central District of California, Northern District of California, and Eighth and Ninth Circuit Courts of Appeal. I am a member of the American Immigration Lawyers Association ("AILA"), the Minnesota State Bar Association ("MSBA"), and the Hennepin County Bar Association.

2. I have practiced immigration law in Minnesota since 2018. I currently represent individuals who are detained in the custody of the Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE") in their proceedings before the Executive Office for Immigration Review as well as before the federal district courts. I have years of experience representing individuals in ICE custody and litigating petitions for writ of habeas corpus for my clients in the district courts. It is my practice to visit my clients and speak with them in person whenever practical.

3. I represent immigrants because I believe in giving a voice to vulnerable populations, particularly those whose first language is not English. The immigration civil legal system in the United States is convoluted and incredibly difficult to navigate, even for attorneys. It is important to me as a lawyer and as a person to help guide people through this system. Indeed, I find that people who are subjected to detention and prison-like conditions based on civil immigration violations are among the most vulnerable. I often represent my clients pro bono or for significantly reduced rates.

4. On January 15, 2026, I attempted to visit two clients in ICE custody and was denied access to see or speak with either of them.

5. I arrived at around 10:00 a.m. on January 15, 2026 at the Bishop Henry Whipple Federal Building ("Whipple Building") at 1 Federal Drive, Fort Snelling, Minnesota 55111. I went to the ICE ERO office and after about 15 to 20 minutes, I was able to speak with the person at the front desk. ERO is a subcomponent of ICE and stands for "Enforcement and Removal Operations."

6. I explained that I am an attorney and I was there to visit two clients who were currently detained in the Whipple Building in ICE custody. She asked me to write down their A-numbers and first names on a post-it note. This declaration will refer to those clients by their initials, J.J.B. and K.A.K.

7. I represent J.J.B. in a then-pending petition for writ of habeas corpus, which was filed in the District of Minnesota within hours of his arrest by ICE. He is a refugee and ICE had no lawful basis for his arrest or detention, as outlined in the habeas petition.

8. ICE is aware of my representation of J.J.B. because I filed form G-28, Notice of Entry of Appearance as Attorney, electronically via ICE's ERO eFile portal, eroefile.ice.gov/eroefile, on January 14, 2026 at 11:19 p.m. Central Standard Time. A true and correct copy of this Form G-28 is attached hereto as **Exhibit A**, with redactions for J.J.B.'s privacy.

9. I planned to visit J.J.B. at the Whipple Building on the morning of January 15 because I was concerned about his continued detention there, and I wanted to check on him and give him an update on his habeas corpus petition.

10. It is not practical or possible for attorneys or anyone to call the Whipple Building or ERO and ask to speak to someone who is detained there; the phone line for St. Paul ERO rings without someone answering, or there is a busy signal. Additionally, there is no active monitoring of the St. Paul ERO email address. This lack of responsiveness from ERO has gotten increasingly worse over the last year. For example, in the summer and fall of 2025, I might call several times throughout the day and eventually be connected to someone. However in recent months, it is nearly impossible to reach anyone at ERO without going in person. I would not have been able to call ahead to arrange a visit or speak with J.J.B. over the phone, unless he called me. He did not have my phone number with him in detention so he could not have contacted me directly.

11. My representation of K.A.K. is limited to visiting him in detention. One of my co-counsel on J.J.B.'s habeas petition had also filed a habeas petition for K.A.K. She informed me in the early hours of January 15, 2026 that her client K.A.K. was at the Whipple Building, that he has a seizure disorder, and that she was unsure if his family was able to get him his medications through ICE. I let her know that since I was already planning to visit J.J.B., I could also visit K.A.K. and ask him directly if he had received his medications.

12. ICE is aware of my limited representation of K.A.K. because I filed form G-28, Notice of Entry of Appearance as Attorney, electronically via ICE's ERO eFile portal, eroefile.ice.gov/eroefile, on January 15, 2026 at 9:26 a.m. Central Standard Time. A true and correct copy of this Form G-28 is attached hereto as **Exhibit B**, with redactions for J.J.B.'s privacy.

13. A true and correct screenshot of the ICE ERO eFile home page on my account, showing the time of filing each of the above-described G-28s, is attached hereto as **Exhibit C**, with redactions for privacy.

14. On the bottom floor of the Whipple Building, where ERO keeps its detainees, there is a visitation room. The visitation room is locked from the outside but has a placard that says "ERO Visitation". Behind the ERO visitation room door, there is a small waiting area, a desk behind thick glass, and four individual visitation rooms with doors that close. Each visitation room is small and can only comfortably fit one person; there is a thick glass window, and the detainee is brought to the other side of the window for the visitation. There is no way to pass papers back and forth, and you have to speak at an elevated volume to hear each other through the glass. Even if ICE did allow detainees to speak with their attorneys over the phone, the set up at Whipple is not

sufficiently private. The only confidential way to speak with my clients, if ICE had allowed this, would have been through the glass in the ERO visitation room.

15. I am familiar with the ERO visitation setup because I have visited many clients in ERO visitation rooms at the Whipple Building in my legal career. I have been practicing immigration law in Minnesota since 2018, primarily representing immigrants in ICE detention. I could not count the number of clients that I have visited in the visitation rooms. Pre-2020, ICE transported detainees to the Whipple Building to attend their immigration court hearings in person. On a near weekly basis, if not more frequently, I would visit with my clients before and/or after their hearings in Whipple's ERO visitation rooms. More recently, I visited a client in May 2025 who had been ordered released by a judge in the U.S. District Court for the District of Minnesota. He had been transported to the Whipple Building for processing and I visited with him in the ERO visitation room while we waited for ERO to process his release.

16. While waiting to speak with the person at the Whipple Building ERO window, I ran into another attorney I recognized who informed me that she was also there to visit her client.

17. I spoke with a woman behind the ERO window, and informed her that I am an attorney and I was there to visit two of my clients. I also informed her that I had electronically filed my Form G-28 for each client. She asked me to write down their A-numbers and first names on a post-it note. I specifically stated that I was there to visit K.A.K. because I wanted to confirm he had received his medication, and that he has a severe seizure disorder. She recognized his name and knew his family was trying to get his medications to him, apparently because she had also been at the ERO window on January 14 when his family was trying to reach him. This individual took the post-it note into a back room and asked me to wait.

18. After a few minutes, at about 10:40 a.m., she returned and informed me that I would not be allowed to see my clients. She stated that two different people told her that ERO is not allowing any attorney visitations. I asked her who those two people were, and if she could allow me to speak with them, and she refused to share their names or allow me to speak to them. She also stated that if ERO let me see my clients, they would have to let all the attorneys see their clients, and to "imagine the chaos" if ERO allowed that to happen. I explained that there were only two of us who were trying to see our clients at that time—far from chaotic—and that my clients have a right to counsel. She kept repeating that they do not do visits. I let her know that I would wait until someone else could come speak with me and explain why the decision was made to not allow me to see my clients. I also let her know that I have visited countless clients at the Whipple Building and I do know that detainees are allowed to visit their attorneys.

19. At no time did anyone associated with ERO or ICE tell me that my clients were not in the Whipple Building. Repeatedly, I was told that I was not allowed to see them.

20. At around 11:15 a.m., my co-counsel emailed ICE OPLA Chief Counsel Jim Stolley, to inform him that I was being denied access to J.J.B., and asked if he could assist. The

two of them had previously been emailing about J.J.B. and his pending habeas corpus petition. Mr. Stolley responded to my co-counsel at about 11:20 a.m., "I cannot interfere with ERO processing. Ms. Brown will have to wait."

21. Shortly thereafter, another individual working at ERO came into the waiting room, and I approached him and asked if he could help me with visiting my clients. He stated that he is new and doesn't really know much, but that he would look into it. I also gave him my client's A-numbers on a post-it note. The other attorney I knew, then joined by her co-counsel, also provided this ERO employee with their client's A-number. He went to the back room with the post-it.

22. A few minutes later, this individual returned to the waiting room and informed me and the other two attorneys there that none of us would be able to see our clients. He stated that my clients were on an "unassigned docket" and that there was "no case officer to talk to" and that "we don't do visitations at all." I again explained the right to counsel and asked who gave him that information. He would not give me the name of the person who informed him there were no visitations.

23. At around 12:00 p.m., I went down to the ERO visitation room door on the ground floor of the Whipple Building. It was locked, as always, but in the past I have been able to see ERO officers inside who let me bring my clients to the visitation rooms. Directly adjacent to the ERO visitation room is another locked door, which is unlocked by inserting a key card into a reader near the door. I do not know where this door leads, but I saw hundreds of ICE agents coming in and out of that door while I was waiting, the vast majority of whom were armed with at least one gun and one taser. Many of the agents asked me if I could unlock that door for them, and many propped the door open for me, offering me to come back. I informed them all that I was an attorney waiting to visit my detained client, and declined their offer to enter the door. In chatting with these individuals, I learned that almost all of them are new to Minnesota. I asked no less than five individual agents for assistance in finding someone at ERO to let me into the visitation room so I could see my clients. Some said they would ask around, but none came back, and nobody came to the visitation room door.

24. At around 12:15 p.m., K.A.K.'s other attorney emailed Ana Voss, of the Minnesota U.S. Attorney's Office, to inform her that I was being refused access to visit and speak with J.J.B. Ms. Voss is counsel for ICE in the habeas petition for J.J.B. Ms. Voss offered no assistance, instead asking me,

> Can you please be very specific about what you are requesting? A meeting _____(particular parameters)? Observation of your client at booking? Presence for other operations?

I responded that I was trying to speak with my client in a visitation room and that any more information than that would be in violation of attorney-client privilege.

25. The longer I was there, the more worried I grew for my clients. J.J.B. had been detained at the Whipple Building since early on January 13 and had made a phone call his first day to his girlfriend, informing her that he was in chains, he was not given blankets or almost any food, that he was forced to use a toilet in front of the other detainees, and was sleeping on the floor. K.A.K. has a severe seizure disorder and I still had not confirmed he had his medication.

26. I did not move from standing outside the ERO visitation room door. At around 1:00 p.m., after asking many random ERO agents for assistance, I was approached by John Canaday, who identified himself as being with Denver OPLA. He asked if I "actually" represent my clients. He said that they sometimes get an onslaught of attorneys attempting to visit detainees, stating that they represent U.S. citizens, and cannot identify them by name. I informed him that I had filed a G-28 for each client and they had confirmed that at the ERO window earlier that day. I also offered to show him the PACER docket for J.J.B., which reflects that I am his attorney. I was relieved to be speaking to an attorney, because I assumed that once he understood this was a basic access to counsel issue, he would help me see my clients. I informed him (as I did all the other ERO representatives I spoke with) that I just wanted to see and speak with my clients, as is their right. I explained that J.J.B. had been there for days. He said he would see what he could do to help and went into the locked door adjacent to the ERO visitation room.

27. At various points throughout the day, different ERO representatives told me that ERO has never allowed attorney visits, that there is no capacity or space for attorney visits, and that they've never seen an attorney visit. I was told repeatedly that the Whipple Building is no more than a processing center and that I would have to wait to speak with my clients when they arrive at their final destinations. None of my conversations with staff at the Whipple Building indicated that these new restrictions were temporary, or in response to any exigency, and no staff members suggested a different time when attorney visits may be available. Instead, I was simply told repeatedly that due to the nature of the Whipple Building only being for processing, there is no way to allow or accommodate attorney visits.

28. This is obviously contrary to my own personal experience—I have regularly visited clients in ERO custody at the Whipple Building, and before last week, there has never been a question that attorney visits are both possible and permissible. Indeed, I was standing in front of a door with a placard reading, "ERO Visitation." Denial of such visitations is also contrary to the Constitution of the United States.

29. At about 1:05 p.m., John Canaday returned and informed me that he was told there would be no attorney visits and that the Whipple Building was for processing only. He stated the way for detainees to speak with their attorneys would be for the detainees to call out to us. I again told Mr. Canaday that J.J.B. had been there for days and it was imperative that I see him. I also informed him that J.J.B. is a refugee and has a habeas petition currently pending in the District of Minnesota. By this time, K.A.K.'s other attorney informed me she learned K.A.K. had been transported to a detention facility in Texas. I let Mr. Canaday know that there was now only one

detainee that I needed to visit.  He asked me to text him J.J.B.'s name and A-number, which I immediately did, and he returned back into the locked ERO door.

30. As an aside, from my experience visiting clients at Whipple for the last seven years, even if a detainee did know their attorney's name and contact information, there is no way to arrange for a secure, private, or confidential phone call into or out of the Whipple Building detention center. Detainees only get one try to call out to an attorney.  ICE is quickly transferring people out of state, especially to Texas, which makes it even more difficult for attorneys to access their clients. Some clients are randomly released from detention facilities in Texas and left on the street with no information, forced to find their way home.

31. At around 1:30 p.m., Mr. Canaday returned to inform me that he continues to be told no attorney visitations would be allowed.  He was unable to tell me who specifically gave this directive.  He said that he called his boss in Denver, who also said that no attorney visits would be allowed at the Whipple Building. I told him I would not be leaving and he said he would try to speak with Mr. Stolley about it.  I also informed him that time is of the essence for both my clients and myself as I am a nursing mother and would need to pump within the hour.  Mr. Canaday returned back into the locked ERO door.

32. At around this same time, ERO agents had brought protesters into the Whipple Building and pepper spray had been deployed.  I did not see this interaction, but experienced a sore throat, coughing, and burning eyes from the lingering pepper spray, even being on the ground floor of the building.

33. At around 1:45 p.m., Mr. Canaday returned and informed me that "it's not gonna happen" and that he was told "across the board" that I would not be allowed to visit my clients. The final reason given to me was that ICE is not "accommodating attorney-client visits because of the nature of the processing facility." Mr. Canaday would not give me the names of any individuals who made this decision but did say it was "per an AFOD" which I understand to stand for "Acting Field Office Director." Locally, that would be David Easterwood. He did not name Mr. Easterwood and had apparently been given directions by Denver OPLA Chief Counsel so I cannot be sure it was Mr. Easterwood personally who made this call. An agent with "K. Jones" embroidered on his shirt affirmed what Mr. Canaday had told me.  During this conversation, an ERO agent opened the ERO visitation door from the inside to allow in a detainee's family members to drop off property. I asked if I could come in and an ERO agent who had earlier that day told me there were no attorney visits closed the door in my face.  At this point, due to the discomfort from the pepper spray and needing to pump, and knowing that I was personally going to continue to be denied access to my client, I decided to leave the building.  I left the Whipple Building at approximately 2:00 p.m. without being able to visit either of my clients.

34. I can confirm that ICE is detaining the same people multiple times and releasing them, including detaining people with release orders from the district court.

I declare the foregoing is true and accurate to the best of my knowledge.

Dated: January 22, 2026

                                                          Hannah Brown