UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| The Advocates for Human Rights and L.H.M., through her next friend C.A., | Court File No. 0:260-cv-00749 (NEB/DLM) |
| Plaintiffs, | |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of Homeland Security; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; TODD LYONS, in his official capacity as Acting Director of Immigration and Customs Enforcement; MARCOS CHARLES, in his official capacity as the Acting Executive Director for Immigration and Customs Enforcement's Enforcement and Removal Operations; DAVID EASTERWOOD, in his official capacity as Acting Field Office Director for Immigration and Customs Enforcement's Enforcement and Removal Operations St. Paul Field Office; U.S. FEDERAL PROTECTIVE SERVICE; and FARON K. PARAMORE, in his official capacity as Director of the Federal Protective Service, | **DECLARATION OF KEVIN HEINZ** |
| Defendants. | |

## DECLARATION OF KEVIN HEINZ

I, Kevin Heinz, declare the following is true and accurate to the best of my knowledge and recollection.

1. I am an immigration attorney based in St. Paul, Minnesota. I am the principal attorney and founder of Heinz Law, PLLC, an immigration law firm. I handle a wide variety of immigration matters including family petitions, employment-based petitions, humanitarian relief, and removal defense. I am licensed to practice in Minnesota state and federal court, and the United States Court of Appeals for the Eighth Circuit. I am a member of the American Immigration Lawyers Association ("AILA") and the Minnesota State Bar Association ("MSBA").

2. I have been representing clients detained in Minnesota at the Bishop Henry Whipple Building (Whipple) for fourteen years. Before Operation Metro Surge started in December 2025, when a client of mine was detained at Whipple by ICE, I was able to communicate with them. Typically, my client's family would let me know my client had been detained and I would then call the ERO office at Fort Snelling and ask to speak with the Deport Officer on call. That person would then let me know my client's whereabouts and could put me in contact with my client. ICE used to let me speak to my clients. Before Operation Metro Surge it was also normal to receive phone calls from my clients who had been detained at Whipple.

3. Moreover, before December 2025, I was able to see detained clients at Whipple. I could see clients in the visitation room at Whipple and regularly met with detained clients before their bond or master calendar hearings. If clients were detained before they were transferred to local facilities, like the facility in Sherburne County, I was able to see clients before they were transferred.

4. Since Operation Metro Surge began, I have received zero calls from clients detained at Whipple and I have not been able to see clients in-person at Whipple.

5. Eleven of my clients have been initially detained by ICE at Whipple since December 2025. Ten of them are clients I was already representing in other immigration matters. I found out that my clients were detained at Whipple because their family members contacted me. Of the eleven, ten have been quickly (within 24 hours) transferred out of state – most to Texas and a few to Nebraska. The only one of my clients who hasn't been transferred out of state was the first one detained during Operation Metro Surge, who was transferred within Minnesota to Sherburne County. When I asked why my other clients were moved out of state so quickly, the ICE officer at Whipple told me that local facilities were full.

6. Since December 2025, it has been very difficult, almost impossible, to find out where my clients are when they are initially detained. ERO typically directs attorneys to use the Online Detainee Locator System to find clients. But that locator is often not updated until after a client has already been moved out of state.

7. As a result, I have most often been contacted by family members of clients notifying me of my clients' whereabouts because ICE either doesn't respond to my requests about my clients' location or does not update its own system.

8. Before December 2025, I did not do habeas petitions. Neither did anyone at my firm. These actions weren't even contemplated because there was no need for it. We had the ability to contact our clients before December and could properly represent them. Now we can't. Because of this, we've started doing habeas petitions. We have since filed four, two of which have been granted. One is still pending, and one was rendered moot because ICE removed my client before a judge could issue an order. In one case, a judge ordered my client detained in Sherburne County to be released immediately. *See* Cesar M. v. Easterwood, 26-CV-0280 (PJS/DJF) (D. Minn. Jan. 17, 2026). Another client was recently released after a petition from an attorney licensed to practice law in Texas but the other eight clients remain detained in Nebraska and Texas because they have been unable to find local counsel to file a habeas petition in the local district court.

9. I have been able to talk to one client detained in Nebraska. I attempted to call the facility they were being held in and was permitted to speak to my client when I requested him by name. Otherwise, I have not been able to speak with any of my clients who were transferred out of state. I and other attorneys in my office who represent detained clients transferred to Texas have had very limited contact with our clients, and this limited contact has also been incredibly difficult. ICE controls detainees' whereabouts so my clients are at the whim of the ICE officers. We have had issues scheduling meetings with our clients because the process is limited to using ERO's online system to schedule appointments with detainees. Clients rarely call at the scheduled time since ICE controls their access to the phone. Typically, if clients call it occurs hours late. If ICE does not tell them they have a virtual appointment with their attorney or does not allow them to attend, then my client will not be able to show up. In one instance, my colleague was waiting in a Zoom for her client only to have another detainee (not her client) show up.

10. ICE's practice of denying access to clients has made representation practically impossible. It has also created an almost indefinite detention for our clients. Many of my clients who have been detained have been my clients for years; since they entered the U.S. I am the only legal representation they have in the U.S., and my office is their first phone call for anything legal. ICE prevents my clients from speaking with me from detention, a detention that was unlawful at the outset. Without having access to me and other attorneys, these clients are lost.

I declare under penalty of perjury that the foregoing is true and correct.

Date: January 28, 2026

Kevin Heinz