UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

The Advocates for Human Rights and
L.H.M., through her next friend C.A.,

        Plaintiffs,

v.

U.S. DEPARTMENT OF HOMELAND
SECURITY; KRISTI NOEM, in her
official capacity as Secretary of
Homeland Security; U.S.
IMMIGRATION AND CUSTOMS
ENFORCEMENT; TODD LYONS, in
his official capacity as Acting Director of
Immigration and Customs Enforcement;
MARCOS CHARLES, in his official
capacity as the Acting Executive Director
for Immigration and Customs
Enforcement's Enforcement and Removal
Operations; DAVID EASTERWOOD, in
his official capacity as Acting Field
Office Director for Immigration and
Customs Enforcement's Enforcement and
Removal Operations St. Paul Field
Office; U.S. FEDERAL PROTECTIVE
SERVICE; and FARON K. PARAMORE,
in his official capacity as Director of the
Federal Protective Service,

        Defendants.

Court File No. 0:260-cv-00749 (NEB/DLM)

**DECLARATION OF J.I.B.C.**

---

## DECLARATION OF J.I.B.C.

I, J.I.B.C., declare the following is true and accurate to the best of my knowledge and recollection.

1.  My name is J.I.B.C. I am a 19-year-old man from Ecuador. I will turn 20 years old soon. I have lived in Minneapolis, Minnesota for almost three years. I am applying for Special Immigrant Juvenile status and asylum.

2.  I am filing this declaration under my initials, rather than my full name, due to fear of retaliation against my family or me for opposing the federal government. My full name is known to Plaintiff's counsel.

3.  On Tuesday, January 13, 2026, at approximately 10:00 a.m., I left my home to go to a T-Mobile store to return a cellphone as part of an exchange. I was inside the store for approximately 10 to 15 minutes. When I left the store, I noticed dark-colored cars parked on the street, but I did not think they belonged to immigration authorities.

4.  After leaving the T-Mobile store, I entered my car, started it, and began reversing. Suddenly, another vehicle struck my car. When I looked around, four agents surrounded my car, opened its doors, and started to enter the car to pull me out.  I could see more agents getting out of several cars. There were at least three additional vehicles nearby. The agents spoke to me in Spanish and asked me where I was from. The four agents who tried to enter my car were wearing vests that said "Border Patrol."

5.  The agents forced me out of my car. I asked for a moment to show them my immigration documents and told them that I had papers, but they did not allow me to do anything. When I grabbed my cellphone, they pulled me out of the car and threw me to the ground. I did not resist at any time.

6.  I had all of my immigration documents with me at the time of my arrest. The agents told me they did not need to see any of my papers. The documents were left inside my car.

7.  They handcuffed me very tightly. I was in pain. I did not resist. They put me into one of their vehicles, and one of the agents parked my car in front of the T-Mobile store.

8.  I was transported in a vehicle with four agents for what felt like twenty minutes to the Whipple Federal Building, close to where protests have been taking place.

9.  When I arrived at the detention center, agents patted me down. I didn't know where the agents were from. Their vests didn't say anything.  They took my hat and my cellphone. I asked the agents to loosen my handcuffs because they were causing me significant pain, but they ignored me.

10. This process took about ten minutes. I was then taken to another room with other detained people.

11. I was then taken to speak with an officer wearing a badge that said "ERO," who asked me questions about my origin and personal information.  The officer did not offer me any attorney's contact information. After that, I was placed in a holding cell for what felt like three hours.

12. I was later allowed to make one phone call using a shared phone. There was no privacy. The calls were made in a hallway between cells. The agents briefly turned on my cellphone so that I could look up my girlfriend's phone number. The agents looked over my shoulder the whole time I was pulling up the number and then immediately turned off my phone.

13. I called my girlfriend through the shared cellphone and told her I had been detained. We spoke for about 5 minutes and I tried to calm her down. She told me she would try to find a lawyer for me. An ICE agent told me to tell whoever I called that I was going to be taken to El Paso, Texas.

14. I was returned to a cell holding approximately forty people. The room probably only had room for 20 people. The cell was extremely crowded. It was about the size of a medium-sized office room. It had concrete seating and two toilets with no privacy. There were two big "windows" but I could not see through them; I could only see my reflection. Some people had handcuffs on their hands, while others did not. From this cell, I could see eight to nine cells in the hallway. All the cells looked the same to me and all were extremely crowded. The only communication detainees could have with ICE officers was when they were taking people out of the cell, but most of the time, they ignored us. I was only given crackers when I was there.

15. About an hour later on the same day, agents removed approximately me and about 70 to 80 other people from the cells and placed us on large buses. We were driven for about 15 minutes to the airport. We waited at the airport for about one hour before being flown to El Paso, Texas. The flight lasted approximately two and a half hours. We arrived around 9:00 p.m.

16. After landing in Texas, we were placed on buses and forced to wait inside them for nearly two hours before being admitted to a detention center.

17. From the moment I left Minnesota, I was placed in handcuffs on my wrists and ankles, with chains around my waist. I remained restrained this way on the buses and during the flight. I was extremely confused, stressed, and desperate.

18. In Texas, we were patted down again. We were kept outdoors in the cold before being placed in cells. I was detained there for one week. For much of that time, I was not given a blanket or bedding.

19. I was never offered a lawyer at any point. Up until that point, I had only been allowed to make one initial phone call, which I had used to notify my girlfriend of my detention. On the second day in Texas, I was finally given a blanket and allowed to shower.

20. On the third day in Texas, I was allowed to make a phone call again. There was one phone for eight to ten cells, and each cell was allowed to use the phone on alternating days. Some people were never able to make a call at all.

21. The only call I was able to make in Texas was to my girlfriend. I told her I was in El Paso and asked her to notify my family and find a lawyer for me.

22. In both Minnesota and Texas, some agents identified themselves as ICE, while others wore masks that covered their faces. I was never allowed to speak to an attorney. Over the entire week, I was only able to make two phone calls.

23. I was held in Texas for seven days without being told why I was there or what was happening to my case. Agents repeatedly told me and other detainees that if we chose to fight our cases, we would remain detained longer. They pressured people to sign voluntary self-deportation papers. Many people signed.

24. On January 20, at approximately 5:00 a.m., officers woke me up and told me, "You're leaving," but did not tell me where I was going. They collected people from multiple cells. I was told to leave my blanket and towel behind.

25. I was restrained again at a checkpoint. There were approximately 32 people, including seven women. Officers read all of our names out loud. I thought I was being transferred to another cell, but instead I was placed on a bus to the airport.

26. We waited on the bus outside the airport for approximately two hours while handcuffed, anklecuffed, and chained around our waists. We were searched again. The restraints on my feet caused me significant pain. I asked for help, but the officers ignored me.

27. At no point was I told where we were going. I believed I was being deported to Ecuador or sent to another state. I had heard stories from other detainees that ICE transfers people to different states so their lawyers cannot find them and pressures them into signing papers to self-deport. During the flight, I asked a flight attendant where we were going. She told me we were going to Minnesota.

28. When we arrived in Minnesota, I was placed on a bus and returned to the same detention center where I had initially been held, Whipple. I remained handcuffed the entire time. Once there, they removed the cuffs from my hands and waist, but not immediately from my feet. I was held for approximately 40 minutes.

29. Officers began calling people to sign papers. No one explained anything to me. I heard detainees being insulted and intimidated, both in Texas and Minneapolis, to force them to sign self-deportation papers.

30. Eventually, I was given documents written only in English and told they contained rules I must follow. I was told I could not associate with criminal activity or gangs, must report immediately if ICE contacts me, and must notify ICE of any change in address or phone number. I was told that any violation would result in immediate arrest.

31. The officers read the rules to me, made me sign the papers, and told me I was being released. I didn't understand much of what I was signing because the papers were in English and I only know a little bit of English. I was never told why I had been detained or why I was being released.

32. ICE returned my cell phone to me. I was allowed to call someone to pick me up using the shared phone, but I called an Uber on my own phone and went home.

33. I felt like I had been kidnapped.

34. I was told I must report to the Whipple detention center on January 23 at 2:00 p.m., and again on February 2 at 9:00 a.m.

35. I was released on Tuesday, January 20, at approximately 7:28 p.m.

36. Since my release, I have experienced severe stress and trauma. I have not left my house. I am afraid I will be detained again. I have trouble sleeping and feel constant fear.

37. On Wednesday, January 21, I spoke with my mom who told me that my asylum application attorney had reached out another attorney, Kira Kelley, after I was first detained to help get me back from Texas and released from ICE custody. I learned that Kira filed a habeas petition shortly after I was detained and that there was an order to return me to Minnesota from Texas and release me from custody. ICE did not tell me that I had an attorney while I was in custody and did not tell me that she had tried to see or speak with me while I was at Whipple.

I declare under penalty of perjury that the foregoing is true and correct.


Date: 1/23/2026                                                    /s/ *J.I.C.B*

**CERTIFICATE OF TRANSLATION**

I, Maria Fernanda Chanduvi am competent to translate from Spanish language into English and certify that the translation of <u>Declaration of J.J.B. and Declaration of J.I.B.C.</u> is true and accurate to the best of my abilities.


  /s/Maria Fernanda Chanduvi                            Maria Fernanda Chanduvi

**Signature of Translator**                            **Typed/Printed Name of Translator**

**2055 15th ST N Arlington, VA, 22201**

**Address of Translator**

**(202) 808-4185**

**Telephone Number of Translator**