UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| The Advocates for Human Rights and L.H.M., through her next friend C.A., | Court File No. 0:260-cv-00749 (NEB/DLM) |
| Plaintiffs, | |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of Homeland Security; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; TODD LYONS, in his official capacity as Acting Director of Immigration and Customs Enforcement; MARCOS CHARLES, in his official capacity as the Acting Executive Director for Immigration and Customs Enforcement's Enforcement and Removal Operations; DAVID EASTERWOOD, in his official capacity as Acting Field Office Director for Immigration and Customs Enforcement's Enforcement and Removal Operations St. Paul Field Office; U.S. FEDERAL PROTECTIVE SERVICE; and FARON K. PARAMORE, in his official capacity as Director of the Federal Protective Service, | **DECLARATION OF KIRA KELLEY** |
| Defendants. | |

## DECLARATION OF KIRA KELLEY

I, Kira Kelley, declare the following is true and accurate to the best of my knowledge and recollection.

1. I am an attorney based in the Minneapolis area. I am a part-time staff attorney at the Climate Defense Project and I operate a part time solo practice that is exclusively pro bono, with a focus on indigent clients for whom counsel would otherwise be inaccessible. My legal practice is a mix of criminal and civil litigation at the trial and appellate levels, as well as a small but growing immigration practice. I am licensed to practice in Minnesota and New Hampshire state and federal courts, the nationwide executive immigration courts ("EOIR"), the Eighth Circuit Court of Appeals, and the Courts of the Sovereign Timbisha and Washoe Nations.

2. I have practiced law for 6 years and have practiced in Minnesota for 5 years. In 2023 I started practicing immigration law as part of my pro bono solo practice, by volunteering with the Advocates for Human Rights. My clients in that capacity are mostly Special Immigrant Juveniles and a few asylum seekers. I am a member of the National Lawyers Guild.

3. On January 13, 2026, I was contacted by a colleague, Kimberly Boche, an immigration attorney at the Advocates for Human Rights. One of Attorney Boche's clients (J.I.B.C.) had just been detained. They retained me on behalf of J.I.B.C. and gave me the information about his case that I needed to prepare a habeas corpus petition. Knowing that J.I.B.C. might be imminently flown to Texas if I waited until the morning to prepare his petition, I filed J.I.B.C.'s petition for a writ of habeas corpus, as well as a motion and memorandum for a temporary restraining order seeking to enjoin his transfer out of the State of Minnesota at around 1:00 a.m. on January 14, 2026.

4. On January 18, 2026, the judge granted J.I.B.C.'s habeas corpus petition and ordered his immediate release. At that time he was in Texas.

5. For the past few years, I have occasionally represented clients for their EOIR court hearings in the Bishop Henry Whipple Federal Building ("Whipple") located at 1 Federal Drive, Fort Snelling, Minnesota 55111. The Whipple is used as a federal detention facility by U.S. Immigration and Customs Enforcement ("ICE"). Of the approximately three dozen noncitizens who I have represented since the onset of "Operation Metro Surge" in December of 2025, I believe that every single one of these individuals was first brought to Whipple and then sent to one or more facilities around the state and the country.

6. Prior to Operation Metro Surge, none of my noncitizen clients had ever been detained by ICE.

7. I am in contact with many attorneys who have attempted in the past month to access clients detained at the Whipple. Until January 25, 2026, when as a result of judicial intervention I was at last able to visit a noncitizen client at the Whipple, I had not known of anyone who has successfully been able to visit a client at the Whipple who was detained for perceived violations of the

Immigration Nationality Act ("INA"). My colleagues and I have at times been able to visit people detained at the Whipple for protesting or observing ICE enforcement activity, although ICE officers started adding restrictions or outright denying me access to clients arrested for federal charges right at the same time as I started asking to visit individuals detained at the Whipple for perceived violations of the INA, which was January 10, 2026.

8. On January 6, 7, and 8 of 2026, I conducted jail visits at Whipple for U.S. citizens detained while protesting or simply observing ICE enforcement activity. At this time, it was easy to see detained individuals. I went into Whipple, told ERO and Homeland Security Investigations (a branch of ICE) that I was an attorney and on one occasion provided specific names of detained individuals and on another occasion simply asked to visit all the U.S. citizens in custody at the Whipple. During at least one of these visits, I was not even asked to present my bar card or driver's license. For none of these visits was I required to demonstrate or allege any prior attorney-client relationship or retainer agreement with these detained individuals. I spoke with these individuals as an attorney providing a legal consultation—limited services for the purpose of discussing their current confinement—and was not at that time agreeing to represent them in further legal proceedings. I was told by these individuals that officers had put them in a cell with a sticky note on the door that said "USC," and that was ICE's process for keeping track of who they had in custody, and for what reason they had been detained.

9. Since January 10, visits for people arrested on the alleged basis of federal (non-immigration) related charges have gotten much more difficult. Depending on which federal agents are working that day, attorneys are often not allowed to visit these individuals at all. Sometimes attorneys are only allowed in if the individual has asked for the attorney by name and/or already had retained them prior to being arrested. In these cases, the attorney must also ask for the client specifically by name. This new rule appears to be somewhat inconsistently interpreted and applied. Its practical effect, however, has been to make attorney visits incredibly difficult. For both the attorney and client to request each other by name would require clients to have a lawyer on retainer and to anticipate arrest, which is not something most people prepare for. U.S. citizens held at Whipple generally only get to make one phone call, if that, so they have no way to find out who, if anyone, has been retained for them by family and friends.

10. It is also incredibly challenging to locate and connect with my detained noncitizen clients. From December 1, 2025, to approximately January 10, 2026, my noncitizen clients were booked at Whipple and then most or all of them were sent to county jails around Minnesota for longer term detention. To the best of my knowledge, every single one of my clients who were detained after January 10, 2026, have been sent from the Whipple to a facility out of state, typically the ERO El Paso Camp East Montana facility in El Paso, Texas.

11. Any uncertainty in the location of my noncitizen clients is because ICE/ERO's detention system makes it impossible for me to communicate directly with many of my clients. Most are sent out of state, typically to El Paso, Texas, within a day or even a few hours of being detained at

Whipple. I am often not able to communicate with clients at all. I have never to my knowledge received a confidential phone call from a client who was still at that time being detained at the Whipple. I have strong doubts that the sanctity of attorney-client privilege is being respected on the singular occasion when a client was able to call me from detention at the Whipple. Most of my information about clients comes from their loved ones and family who find my contact information through their own social networks and who then can provide documents and information about their loved one who is in detention. Families can also occasionally update me as to where their loved one is, if the detained individual is given access to a phone–not always the case. I also learn information about the detained person and their arrest from my colleagues who are able to find videos of abductions on social media.

12. Getting information about or access to my clients is incredibly challenging. I was instructed to call (612) 843-0000 to reach the St. Paul ICE Enforcement and Removal Operations ("ERO") field office to receive information about clients. See Exhibit A. I have spent many hours listening to this phone number ring, during the ostensible operating hours of 9:00 a.m. to 4:00 p.m. I have made repeated asks of ICE and ERO officers for better means of communication with attorneys about clients, but these requests for collaboration have gone unanswered. Exhibit B. As of the date of this filing, I have received no response to the email in Exhibit B.

13. Only once has anyone ever answered the phone at the St. Paul ERO field office when I have called.

14. In December and for the first two weeks of January, calling this number would lead me to a numerical menu where multiple options are presented to speak to different divisions of ERO/ICE. But starting around January 17, 2026, whenever I would call, I would hear the "busy signal" even before the phone presented the numerical menu. This leads me to believe that the phone is disconnected in some way so that no calls can go through.

15. Locating an individual on the ICE Detainee Locator website is often impossible. The primary method to search for a detainee's location on the online ICE detainee locator is through use of an assigned "A" number. When people are detained by ICE who have never before had contact with the immigration system, however, they do not have an A number until after they are booked and are often not able to place a phone call to family members or to attorneys to tell them what this number is.

16. Even when I do have the A-number of my client, they still often do not show up in the system. At around 11:30 a.m. on January 20, 2026, I looked for five of my clients, including J.I.B.C., whose whereabouts were unknown on the ICE Detainee Locator. The following screen appeared following each of these five searches:

**Search Results: 0**

Your search has returned zero (0) matching records. Please re-check the search terms you entered to ensure they are correct and try your query again. Please remember the system does not provide information for detainees under the age of 18.

If you conducted a name-based search, please remember that only exact matches to the name you entered will be returned. You may want to try searching any name or spelling variants used by the detainee.

If you conducted an A-Number search you may want to try conducting a name-based search instead.

If you are unable to find the detainee using the Online Detainee Locator System, please contact your local field office.

For more information on the Missing Migrant Program please visit link.

**BACK TO SEARCH >**

17. I was able to speak to an ICE/ERO officer, Agent Cooper, on his direct phone line. I do not know his full name. I informed him that J.I.B.C. and four others had court orders granting their release. I asked if I could provide him with a copy of those orders, and if he could tell me where my clients were located. Agent Cooper refused to provide me with this information or give me an alternate email where I could send these court orders. I had already sent them to St. Paul field office's email address without response.

18. On other occasions, if I have managed to find an individual in the ICE detainee locator, instead of providing a facility location where this person is detained the website says to "contact ICE for details." The instructions on the Detainee Locator website for contacting ICE led me to another phone number for the St. Paul field office, which I have tried half a dozen times and which ICE has never answered.

19. Once a noncitizen is placed into ICE detention, they are moved frequently and without any advanced notice, and often with no way for me or their loved ones to know where they are or how long they will remain in any location. My clients, their families, and I experience directly the black hole of communication that happens once someone is taken into immigration custody. I do not receive notice from the federal government of the impending transfer of a client.

20. To do my due diligence as an attorney and to uphold my clients' rights to counsel, now when I learn that a client has been detained I attempt to visit them in person immediately. With one exception, where judicial intervention was involved (a federal judge ordered ICE to allow me to see my client), every time I have attempted to visit a client for whom I had a G-28 on file and who was detained by ICE at Whipple, ICE refuses to allow me to visit. I have used visitation rooms in the Whipple to visit approximately a dozen U.S. citizens who were arrested for protesting or observing ICE officers during Operation Metro Surge, but this process is not available to perceived noncitizens detained at the Whipple–with the exception of the client who I visited because of a federal judge's involvement.

21.     First, on January 10, 2026, at approximately 7:00 p.m. I was inside Whipple attempting to visit a noncitizen client for whom I had signed and submitted a G-28. Officer Williams, of the Federal Protective Service ("FPS"), informed me that I was not going to be allowed to visit a detained non-citizen client in the Whipple building. He communicated that this was not his decision, he was just relaying the information from the Joint Operations Center: ERO, HSI, and ICE. I asked him to call back to the Joint Operations Center and to ask the person who made this decision to provide me with their name and position. Officer Williams obliged my request, but the person refused to allow Officer Williams to provide me with his name. I was told that the reasoning was that the Whipple is a "temporary detention facility" and thus not set up for visitation.

22.     On January 17, 2026, I received a phone call from the spouse of one of my clients. The spouse was holding two telephones next to each other, one connecting me and her and the second connecting her and my client. A court had issued an injunction prohibiting ICE from moving my client to Texas and then granted her habeas petition on January 15, 2026. Order on Petition for Writ of Habeas Corpus, *Estefany J.S. v. Bondi*, No. 26-cv-216 (D. Minn. Jan. 15, 2026). ICE transferred my client to Texas anyway in violation of this court order. As of January 17, 2026, she was still in detention. I learned on the January 17th call that my client was back in Minnesota, at the Whipple, but was being told that she would be transferred to Sherburne County jail to be detained for the duration of her pending immigration proceedings unless she signed self-deportation papers prior to the transfer going through. She was confused and terrified. I told my client to have the agent who was with her call me.

23.     The agent, Elvira LaPierre, called my cell phone at around 4:25 p.m. on January 17th from the ICE/ERO office line that no one ever answers. I explained to her that a federal judge had ordered that Estefany be released immediately, two days prior. The agent told me that she had no idea about the court order. I told her I had provided a copy by email to the address I had been instructed to use for communications with the St. Paul ERO field office for such matters. She laughed and said something to the effect of "yeah we really need to get someone to check that email." I sent the order to her individual work email, and she told me to come down to the Whipple and that I could pick my client up in the front lobby.

24.     When I arrived at Whipple to try to get Estefany released, two lines of heavily armed DHS personnel were blocking the entirety of the visitor's entrance to the parking lot. They appeared to be having a stand-off with a group of unarmed demonstrators, who had signs and bullhorns and were protesting the activities of Operation Metro Surge. In the last week or so, in response to similar protests, ICE has installed cement and chain link fences all around the entire perimeter of the Whipple and its parking lot, with two gaps: one at the visitor's entrance and the other at the ICE-only entrance about 0.1 miles to the west, which is also secured by a barrier arm gate requiring ICE badge access.

25.     Two Sheriffs' vehicles were parked in the middle of the road blocking cars from driving up to the visitors' entrance. I drove up behind them, put my hazards on, got out of the car, and

approached the Sheriffs to ask for more information about what was going on. They told me that they thought I would be arrested by federal agents if I went any farther past them towards the visitor entrance. I got back in my car and drove to a nearby parking lot, where I tried to call the facility. Nobody answered. I called a friend and told them that there was a chance I would be arrested for trying to pick up a client at the Whipple and instructed them on what to do if they had not heard back from me in the next hour. I missed a phone call from the facility, but the phone appeared to be either "in use" or off the hook both times I attempted to call back. While all this was going on, I could see, hear, and feel federal agents deploying tear gas and what appeared to be flash bang grenades on the unarmed protestors. The tear gas was pervasive in the air, causing me to feel a stinging in my eyes and nose when I was outside of my vehicle or had the windows down.

26. Agent LaPierre called back, wondering what was taking me so long. I explained the situation and she told me to go to the ICE-only entrance and to use the keypad to call in and request access to the facility to pick up my client, and to tell anyone that asked me that she had given me this authorization. I navigated to the ICE only gate circuitously, since the direct route was blocked off, and pulled into the ICE-only driveway up to the barrier arm gate. An ICE vehicle was positioned directly in front of me, and when I fumbled at the keypad not knowing who to call, an officer started to get out of his vehicle. In this exact location, one week prior, I observed from about ten feet away an incident where an agent from Customs and Border Patrol pointed his handgun in the face of an unarmed protestor at point blank range. Remembering this, I was nervous that being in this location might cause federal agents to overreact to my presence or perceive me as a threat. I got out of my car, put both hands in the air above my head, and approached the agent slowly, explaining that I was an attorney and had been instructed by Agent LaPierre to enter this facility to pick up a client. The agent was upset at me, telling me that he didn't know who that officer was, that I wasn't allowed to be in the parking lot, and that I needed to use the visitor entrance or call someone on the inside to let me in. He started moving towards me, and I walked backwards to my car with my hands still in the air. I asked for help navigating the call system on the keypad in front of the barrier arm gate, and he said "just push the button." I said "there are ten buttons, which one should I push?" and he said "push both of them" and then got back in his car. I eventually figured out which of the buttons to push, and was put in contact with someone who agreed to go find Officer LaPierre. Without any further communication, the barrier gate opened. I assumed that this was permission for me to drive in, but I was nervous that I would be arrested anyway. The only people and vehicles I could see around me in the parking lot, and later in the Whipple, were armed federal agents, most in gas masks and full riot gear. I could still feel the effects of ambient teargas in the air around me. I made it into the building, and after some confusion at the front gate about where my client was and whether they were going to release her, I discovered that she had been brought out to the lobby and was standing behind me.

27. In the car with Estefany on January 17th, driving her home, she told me that ICE agents had been pressuring her to self-deport while I had been working to get the judge's order

effectuated. She told me that she had not eaten since her detention began because she has a peanut allergy that was not being accommodated. On the plane back to Minnesota, she was accompanied by only two other detainees, also handcuffed, and every other seat was taken by an ICE officer being newly deployed in Minnesota.

28. On Monday, January 19, 2026, I reviewed my files and compiled six court orders from cases where a federal judge had ordered that my noncitizen clients be released. The ICE detainee locator showed several of these individuals were in El Paso, Texas, one was in Kandiyohi County Jail, and others were not listed. I sent these orders to Attorney Voss at the United States Attorney's Office at 5:11 a.m. on January 19th, 2026. Attorney Voss responded at 9:14 a.m. confirming that the orders had been forwarded to "ICE counsel." Exhibit C.

29. After several hours with no updates from anyone, I was able to find a direct phone number to an on-duty ICE/ERO agent, Officer Cooper. At 3:40 p.m. on January 19, I called to inform him of the court orders, which he said he had not yet been made aware of. I asked if I could email him directly to show him the court order, and I gave him the A numbers for each of my missing clients to whom the orders applied. He declined to provide me with an email to send the orders to and he would not tell me my clients' whereabouts. He told me that the process on his end was for the US Attorney's office to send court orders to OPLA, who then would direct ICE/ERO officers to release people whose orders had been reviewed. He kept promising to "walk upstairs" to talk to OPLA attorneys but appeared not to have done so when I called back repeatedly for updates.

30. I suspected that one of my clients was at the Whipple based on the fact that she had been previously, but was no longer, showing up on the ICE Detainee Locator in Texas. I drove to Whipple at around 5:30 p.m. on January 19th and was able to enter through the visitor's entrance after providing my bar card and ID. FPS stopped me at the security station at the front entrance. I had a witness with me who took an audio recording of the conversations that followed.

a. FPS called ICE/ERO to let them know that I was there to pick up a client who had a court order for her immediate release. FPS said: "OK, so he [an ICE/ERO officer] just looked at the scheduled releases for today. That name is not on there. They might be getting released tomorrow, but they don't have it scheduled for tonight."

b. I clarified that my client had a court order for her release, and informed FPS that continuing to detain her in this facility would be a direct violation of this court order.

c. FPS called ICE/ERO back to let them know about the court order. An ERO agent named "Chuck" came up to the front and said "OK, we did see the information that there's a habeas, it's being worked right now. She is still present here on site." He said that OPLA still had to review the habeas, and that once it was cleared by OPLA they would do "the recommendation about release, at which point [ERO] would start the process" of booking her out.

d. I asked why the habeas process had taken so long, and asked if there was a more expedient or appropriate way I could be interacting with ICE/ERO when I received orders of release for

clients. Chuck initially said that "it wouldn't hurt" to email OPLA directly, but then refused to give me an email address that I could use to do so.

e. Chuck said that some detained noncitizens were put on a flight before they had finished being processed into the ICE/ERO system, and weren't fully booked until they were in Texas, and that detainees can be on a plane to Texas within a matter of hours but that flying people back to Minnesota following court orders takes much longer.

f. He said he did not know when my client would be released, perhaps not until the next morning. He left.

g. I asked the FPS agent at the desk if he would call Chuck to ask if I could be allowed to do an attorney visit with my client. I was told that Chuck said no. FPS claimed that it was a "case by case basis," whether a detained noncitizen could get an attorney visit.

h. I went outside to wait in the car, and my client was released about half an hour later. I suspect that if I had not come to the building, they may not have released her until the next day, if then.

31. On January 19, 2026, when driving this client home, she told me that her plane ride to Minnesota had only five other noncitizen detainees, all handcuffed, and the rest of the passengers on the plane were ICE agents coming to Minnesota for further deployment. She was handcuffed on this plane ride despite already having been ordered to be released by a federal judge.

32. I went to Whipple on January 20, 2026, to visit another client. I had already filed a G-28 for this client. While waiting in line in the ERO office, I observed a distraught person sitting alone. She saw me looking at her and asked if I knew "what was going on in here." I sat next to her and learned that she and her husband were there for his routine ERO check-in, but that he had been gone for half an hour and she did not know what had happened to him. We both suspected that perhaps he had been arrested. I agreed to file a G-28 on his behalf to see if I could do a legal consult with him.

33. With two G-28s filed for two individuals detained at Whipple, I approached the ERO desk and spoke to the person at the front desk.

34. She told me that I could not do attorney visits at the Whipple for noncitizen detainees. The reasoning that she gave was because of "safety concerns," and that if she gave one attorney a legal visit she would have to give everyone a legal visit, and that "30-40 attorneys" would amount to "chaos." Like Chuck did on January 19th, she noted that noncitizens who were taken into custody in Minnesota were not fully processed before they were put on a plane to Texas. She said there would be no way for me to do a legal visit even for the man who had been detained just–at most– half an hour earlier.

I declare under penalty of perjury that the foregoing is true and correct.

Date: 1/28/2026                                                              _____
                                                                                             Kira Kelley