UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| THE ADVOCATES FOR HUMAN RIGHTS, *et al.* | Case No. 0:26-cv-00749 (NEB/DLM) |
| Plaintiffs, | **DECLARATION OF KELSEY ALLEN** |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*, | |
| Defendants. | |

## DECLARATION OF KELSEY ALLEN

I, Kelsey Allen, declare the following is true and accurate to the best of my knowledge and recollection.

1.      I am an immigration attorney at a firm based in Minnesota. I head the Immigration Court practice group at Davis Immigration Lawyers, PLLC. I represent individuals and families in removal proceedings before the U.S. immigration courts, the Board of Immigration Appeals ("BIA"), and the federal courts. I also represent clients in asylum, naturalization, family-based, and humanitarian cases. I am admitted to practice in Minnesota, am a member of the American Immigration Lawyers Association ("AILA") and am a voluntary attorney with Advocates.

2.      I have practiced immigration law in Minnesota since October 2017.

3.      Typically, before the onset of Operation Metro Surge in December 2025, when a client of mine was detained in Minnesota, ICE would process them at Whipple and then transfer them *within* Minnesota to Sherburne County Jail, Freeborn County Adult Detention Center, or Kandiyohi County Jail. In my experience, the clients would stay in Minnesota throughout their immigration proceedings.

4.      Before Operation Metro Surge began, I had never had a client detained in Minnesota and transferred to Texas (or any other jurisdiction). Since December 2025, three out of four of my clients who were initially detained at Whipple were quickly transferred to Texas. Only one, J.J.B. (*see* Advocates for Human Rights v. DHS, No. 26-cv-749, Declaration of J.J.B. (D. Minn. Jan. 28, 2026)), was held at Whipple throughout his detention.

5.      On January 6, 2026, I was retained to represent a client arrested at a Home Depot in Minnesota in bond proceedings. He was arrested in the parking lot by numerous ICE agents and he was handcuffed behind his back, leaving him completely unable to communicate through ASL. He was initially brought to Whipple in the afternoon, held at Whipple overnight, then transported to a plane around 11:00AM the next day. From there, he was fully shackled on his hands, waist and ankles, transported to El Paso, Texas and detained at ERO El Paso Camp East Montana.

6.      I entered my appearance as his attorney by filing a G-28 with ICE and an E-28 with the immigration court on January 10, 2026, and requested a bond hearing, which was later scheduled for January 16, 2026.

7.      My client is deaf and unable to communicate by phone. He communicates through Americal Sign Language ("ASL") in the English language.

8.      On January 12, 2026, I scheduled a one-hour video call with my client through the ERO portal for January 14, 2026, at 12:00PM. I included the Zoom link that I created in the video call appointment instructions on EROeFile online system, per ERO's instructions. I coordinated to

have an ASL interpreter on the scheduled video call, so I would be able to communicate with my client, since we are required to provide our own interpreter for our clients.

9. On January 14, 2026, at 12:00PM, ERO did not bring my client to his video call. No one logged onto the link that was provided and the ASL interpreter and I sat waiting for over 30 minutes.

10. While we were waiting, I tried contacting ERO El Paso Camp East Montana by calling the phone numbers they have listed on ICE's website for the facility, and no one answered. I tried calling multiple times.

11. After about 35 minutes, an officer from ERO El Paso Camp East Montana logged onto the video link I provided and had a man waiting who was not my client. The man they brought to my video was likely not even from the same continent as my client.

12. I explained to ERO that the man was not my client and again told them who my client was. The officer told me they would call for him. I explained he was deaf and would not hear them so they needed to physically look for him. The ASL interpreter and I waited and were told that they could not find my client in his room and so they did not know where he was. I was told the only thing I could do is schedule a new call for tomorrow.

13. I asked the officer how I could contact the detention center if they did not bring my client to the next video meeting, explaining that I had tried to call the main numbers and no one answered. I was given a new number – I was not told whose number it was, but I was given the phone number #915-637-0038 – to call or text if I had issues with the next appointment.

14. On January 14, 2026, the day I was supposed to have an appointment with my client, I scheduled a new video meeting with my client for January 15, 2026, at 3PM. I arranged for an ASL interpreter to be present included the Zoom link that I created in the video call appointment instructions on EROeFile online system, per ERO's instructions. After scheduling this, I called the phone number given to me by the ERO officer and confirmed with him that the appointment was showing up on their end.

15. On January 15, 2026, the ASL interpreter and I waited on the video call for ERO to login. I started calling and texting the number I had been provided with the day before for this type of situation. I called the number many times and then, 15 minutes after the appointment was supposed to start, I received a call back and was told my client could not come to the video meeting because they were "doing count."

16. I asked the officer on the phone when the "count" would be over and she said she wasn't sure, but maybe one hour. I told the officer I needed to speak to my client. I explained that his hearing was the following day, that he is deaf and has not been able to communicate and I need to talk to him for at least 5 minutes, and that perhaps someone could just use Facetime so I could

communicate with him even if he was not in the designated video call area. The officer said she would find him and bring him to the video in 10 minutes.

17. ERO did not bring my client to the video call on January 15, 2026. I texted the number I had been provided many times, gave the video instructions again, requested supervisor intervention, and told the office that he is deaf and has not been able to communicate with me. I did not receive any response.

18. Later that night around 7PM, I received a call from the ERO number I had been texting and was told I could "quickly" Facetime my client by calling an ERO officer's cellphone. I quickly texted the ASL interpreter to see if she was available, and at that point I was able to quickly communicate with my client prior to his hearing the next morning. We only had a few minutes to talk and it's unclear to me if this Facetime was heard by anyone other than my client.

19. During my call with my client, he confirmed that he was unable to communicate with anyone inside or outside of detention as there are no ASL interpreters and he was not allowed to make video calls, whereas some inmates were allowed to make phone calls to their families or friends for 3 minutes per day. He told me that during his medical check-up in Texas, he was labeled "mute and illiterate," neither of which is true.

20. He confirmed that he did not know why he had been arrested at Home Depot by ICE and why he was being detained in Texas.

21. Since I was unable to properly communicate with my client until the night before his bond hearing, and that meeting was just a couple minutes, I had to submit a draft brief in support of his release to the court without complete information from my client. Bond hearings require a detainee's counsel to provide evidence their client is not a flight risk and that they are eligible for certain relief, but without being able to talk to my client, I was unable to properly prepare for the hearing. To properly represent my client, I need access to him. I need to be able to communicate with him. Over the course of the week my client was detained, I called the El Paso facility countless times and set up numerous meetings with my client. I could not speak to my client despite all these efforts. I only got to talk to him for a couple minutes because an ERO officer allowed me to call him on his personal phone and then talk to my client for a few minutes.

22. My client was granted bond on January 16, 2026, and released on January 22, 2026. Although the bond obligor created the online account and paid the bond amount the day he was granted bond, ERO's system did not process it for many days. He was released in Texas and forced to find his own way home to Minneapolis.

23. After release, my client informed me he was heavily pressured by ERO in El Paso to sign voluntary departure. Given that he is deaf, ERO communicated this to him by writing on a paper, and my client would respond. My client was told by ERO that if he signed, he would "be back in the U.S. next year," and when my client told them he wanted a hearing, he wanted to contact his attorney and his significant other, ERO told him they would get him an interpreter only after he

signed. ERO did not ever provide my client with an ASL interpreter, and an interpreter was not present at his bond hearing with EOIR, even though it was requested.

24.     I faced similar obstacles to communicating with my other two clients initially detained at Whipple and transferred to Texas, related to scheduling attorney-client phone calls and ERO not bringing the person to call me, or calling at a time other than when the appointment was scheduled.

25.     ICE has completely interfered with my ability to represent my clients. Once my client leaves Minnesota, it becomes exponentially harder to find them and communicate with them. I cannot adequately prepare filings to support my client's release if I cannot speak to my client. If I cannot adequately prepare these filings, then I cannot properly represent my client. This barrier to representation is directly caused by ICE's new practice of transferring detainees out of reach of their attorneys and blocking access to attorneys.

Date: February 2, 2026