UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| The Advocates for Human Rights and L.H.M., through her next friend C.A.,<br><br>       Plaintiffs,<br><br>    v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of Homeland Security; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; TODD LYONS, in his official capacity as Acting Director of Immigration and Customs Enforcement; MARCOS CHARLES, in his official capacity as the Acting Executive Director for Immigration and Customs Enforcement's Enforcement and Removal Operations; DAVID EASTERWOOD, in his official capacity as Acting Field Office Director for Immigration and Customs Enforcement's Enforcement and Removal Operations St. Paul Field Office; U.S. FEDERAL PROTECTIVE SERVICE; and FARON K. PARAMORE, in his official capacity as Director of the Federal Protective Service,<br><br>       Defendants. | CASE NO. 25-cv-00749<br><br>**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER** |

Defendants Kristi Noem, Todd Lyons, Marcos Charles, David Easterwood, Faron K. Paramore, U.S. Department of Homeland Security ("DHS"), U.S. Immigration and Customs Enforcement ("ICE), and U.S. Federal Protective Service (collectively, "Defendants"), hereby respond to Plaintiffs' Motion for Temporary Restraining Order ("Pls.' Mot."), ECF No. 19, which the Court has converted to motion for a preliminary injunction, Order, ECF No. 39.

## INTRODUCTION

Plaintiffs, the Advocates for Human Rights ("AHR"), a nonprofit organization, and L.H.M., a past detainee at the Whipple Federal Building, a short-term immigration holding facility located in Fort Snelling, MN, contend that Defendants deny L.H.M. access to counsel. To remedy that alleged wrong, Plaintiffs seek a temporary restraining order ("TRO") requiring DHS to provide in-person attorney visits seven days a week, including holidays, for eight hours each day on regular business days and a minimum of four hours on per day otherwise. ECF No. 19 at 44-45. Defendants cannot provide this accommodation because the Whipple Federal Building lacks the space and the physical infrastructure to do so. Defendants do provide aliens in custody with access to counsel by providing free, unmonitored telephone calls of unlimited duration to counsel, and Defendants apprise those in custody of such access. Further, most of the aliens whom ICE holds at the Whipple Federal Building are there for a short period of time before being transferred to an ICE detention center, where they are provided the opportunities to meet with attorneys, face-to-face, in person, in private meeting rooms, or with better options to communicate remotely, such as by video. Given that the Whipple Federal Building is a short-term holding facility, due process generally does not require more than the free, unlimited telephone calls that ICE provides there, and neither Plaintiff has pled any circumstances to the contrary.

1

Plaintiffs have not met their burden to satisfy the four factors set forth in *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981), for granting such relief. To start, neither Plaintiff has standing to bring the claims in any of the eight counts in their complaint. Even if Plaintiffs could establish standing, they have not shown a likelihood of success on the merits. The Fifth Amendment does not entitle detainees to unrestricted attorney access in the time, place, and manner of their choosing. And Defendants' policies are more than sufficient to provide access counsel. Plaintiffs are unlikely to succeed on the merits of their First Amendment claims because any temporary, short-term restriction on access to clients or counsel falls far short of government action that significantly burdens Plaintiffs' right to associate. And the government has an important interest in booking and safely transporting aliens from Minnesota to detention centers, which are equipped for longer term stays and have the infrastructure for in-person meetings with counsel.

Even if the Court concludes that Plaintiffs are likely to succeed on the merits, their proposed TRO is overbroad and does not match the alleged harms they identify. The thrust of Plaintiffs' complaint is that people held at the Whipple Federal Building lack access to counsel. But they already are provided access to counsel, through unlimited, unmonitored telephone calls. The way to remedy the harm of the claimed lack of access, if true, would be to provide better notice of the availability of means that are available to access counsel.

Likewise, Plaintiffs have not demonstrated irreparable harm warranting the extraordinary injunctive relief. Finally, the balance of equities and public interest disfavor an injunction and Plaintiffs' requested relief is overbroad, unworkable, potentially contrary to law, and otherwise improper.

# BACKGROUND

## I. DHS's Authority to Arrest Individuals Based on Probable Cause Without a Judicial Warrant

DHS has clear statutory authority to arrest individuals who are believed to be removable from the United States. Specifically, 8 U.S.C. § 1226(a) grants DHS the authority to arrest and detain individuals pending a decision on their removal. Additionally, 8 U.S.C. § 1357(a)(2) authorizes immigration officers to arrest individuals without a warrant if there is reason to believe the individual is in violation of immigration laws and likely to escape before a warrant can be obtained. Importantly, arrests made for immigration enforcement purposes are administrative in nature and do not require a judicial warrant. The administrative nature of immigration arrests has been upheld by courts, which have recognized that immigration enforcement is distinct from criminal law enforcement. For example, in *Abel v. United States*, 362 U.S. 217 (1960), the Supreme Court held that immigration officers may arrest individuals without a warrant for administrative purposes, such as deportation proceedings, provided the arrest complies with statutory requirements. The Court emphasized that administrative arrests are authorized under immigration law and do not require the same level of judicial oversight as criminal arrests. *See Arizona v. United States*, 567 U.S. 387 (2012); *United States v. Arizona*, 641 F.3d 339, 349–50 (9th Cir. 2011); *Tejeda-Mata v. Immigration and Naturalization Service*, 626 F.2d 721 (9th Cir. 1980).

## II. DHS's Broad Discretionary Authority to Place and Transfer Detainees

DHS has broad authority under 8 U.S.C. § 1231(g) to determine the placement and transfer of detainees to appropriate detention facilities. Section 1231(g) explicitly authorizes DHS to arrange for appropriate places of detention for individuals detained pending removal or a decision on removal. *See also* 2011 U.S. Immigration and Customs Enforcement, Performance-

Based National Detention Standards 2011 (rev. 2016), https://www.ice.gov/doclib/detention-standards/2011/ pbnds2011r2016.pdf. This includes the authority to acquire, build, lease, and operate detention facilities to meet operational needs. Placement and transfer decisions are made based on operational priorities, including proximity to immigration courts, facility capacity, security needs, medical care, and the ability to meet detention standards. For example, detainees may be placed in facilities near immigration courts to ensure efficient processing and participation in removal proceedings. Transfers occur when detainees need to be relocated to other facilities due to medical care, overcrowding, operational necessity, or security concerns. For instance, detainees requiring long-term or specialized medical care may be transferred to facilities like the Northwest ICE Processing Center in Tacoma, Washington, which is equipped to provide advanced care.

The Ninth Circuit's decision in *GEO Group v. Newsom*, 50 F.4th 745 (9th Cir. 2022), further reinforces DHS/ICE's authority over detention and transfers. In Geo Group, the court held that California's AB 32, which banned private detention facilities, was preempted by federal law. The court emphasized that federal immigration law grants DHS/ICE's exclusive authority to manage detention operations, including the ability to contract with private entities and determine appropriate detention locations.

Based on the above, DHS has clear statutory and regulatory authority to arrest individuals, determine the location of detention, transfer detainees, and enforce detention standards.

**III.     DHS's ERO Holding Facility at the Whipple Federal Building**

The Whipple Federal Building is located in Ft. Snelling, Minnesota and accommodates office space for ERO St. Paul, office space for ICE attorneys, a waiting area, a processing area for ERO check-ins, and a processing area for arrests. *See* Declaration of Michael Bottjen,

4

attached as Exhibit A, ¶ 4.  The processing area at the facility is comprised of 17 ICE hold rooms with the following square footage: two large rooms – 481 sq. ft each.; eight medium rooms – 225 sq. ft. each; five small rooms – 95 sq. ft. each; one small medical isolation room – 95 sq. ft.; and one small, padded isolation room – 95 sq. ft.  *Id*. ¶ 5.  The maximum capacity for the ICE hold rooms at the Whipple Building was set by the fire marshal at 142.  *Id*.  At 10 a.m. CST on February 3, 2026, there were 48 aliens in custody at Whipple.  *Id*.

The ICE hold rooms at Whipple are primarily used for the short-term confinement of aliens while they await transfer to other ICE detention facilities, immigration court hearings, removal, or other processing.  *Id*. ¶ 6.  ICE asserts that Whipple is in compliance with ICE Directive No. 11087.2, Operations of ERO Holding Facilities (issued Jan. 31, 2024).  *Id*.

The majority of aliens in custody at Whipple are transported to other ICE facilities within 24 hours, absent exceptional circumstances.  *Id*. ¶ 7.  At 10 a.m. CST on February 3, 2026, four aliens at Whipple had been held there for more than 24 hours.  *Id*.

**IV. Attorney Access at the ERO Holding Facility at the Whipple Federal Building**

At intake, aliens held in custody at Whipple are verbally informed that they can make calls, including to attorneys, family, friends, or the consulate.  Ex. A ¶ 12.  All calls are conducted in the processing area, and they are free of charge to the alien.  *Id*.  Aliens in custody at Whipple can make as many free, unmonitored legal calls to their attorneys via an available landline.  *Id*. ¶ 13.  There is no time restriction on the legal services calls.  *Id*.  The legal services calls are not recorded.  *Id*.  If an alien is issued a Notice to Appear, the alien is provided a Form I-826, Notice of Rights and Request for Disposition, and a list of free or low-cost legal services.  *Id*.  Fully processed aliens who are remaining in Minneapolis are provided with the list of free legal service providers.  *Id*.

Because Whipple is a short-term holding facility and not designed to house people for extended periods of time, and for operational reasons, it is not possible to provide facilities for in-person visitation by legal services providers at Whipple. Ex. A ¶ 14. However, ICE officers periodically monitor the general telephone line and public access email address and review and address concerns that are brought to their attention via the email box. *Id*. Generally ICE detention facilities are better equipped with infrastructure to host in-person meetings with counsel. *Id*.

Language assistance services are provided at Whipple for aliens who have limited English proficiency. Ex. A ¶ 15. Spanish-speaking ICE officers are also available to help with translations when needed. *Id*. ICE has a language contractor which offers translation services for 135 languages, there is a posting in the processing area about the language services. *Id*.

## V.     This litigation

Plaintiffs bring eight claims in their Complaint. In Count One, Plaintiffs claim that Defendants unreasonably interfere with or entirely prevent Plaintiffs L.H.M. from retaining, consulting, and communicating with counsel, in violation of the First Amendment. ECF No. 1 at 11. In Count Two, Plaintiffs claim that Defendants unreasonably interfere with or entirely prevent AHR, its staff, and volunteer attorneys from visiting, contacting, or otherwise communicating with detainees, which, Plaintiffs claim, violated the First Amendment. *Id*. at 11-12. In Count Three Plaintiffs claim that Defendants unreasonably interfere with or entirely prevent Plaintiffs L.H.M. from retaining, consulting, and communicating with counsel, in violation of the Fifth Amendment. *Id*. at 12-13. In Count Four, Plaintiffs claim that Defendants have prevented Plaintiff L.H.M. from exercising lawful statutory privileges under 8 U.S.C. § 1229a(b)(4)(A) and 8 U.S.C. § 1362. *Id*. at 13. In Count Five, Plaintiffs claim that Defendants prevent detainees from contacting, retaining, consulting, and communicating with counsel, or

6

establish ad hoc barriers from doing so, which is an unlawful agency action, for which the Administrative Procedure Act provides remedies, under 5 U.S.C. § 76(2)(A). *Id*. at 13-14. In Count Six, Plaintiffs claim that Defendants fail to abide by their own rules, specifically, the National Detention Standards 163 (revised 2025) ("NDS"), https://perma.cc/CK4U-FTSC (last visited Jan. 22, 2026) (requiring that detention centers "[f]acilities shall allow detainees to meet privately with their current or prospective legal representatives and legal assistants"), in violation of *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954). *Id*. at 14-15. In Count Seven, Plaintiffs claim that Defendants fail to abide by the NDS, which they claim is arbitrary and capricious and must be held unlawful and set aside under 5 U.S.C. § 76(2)(A). *Id*. at 15-16. In Count Eight, Plaintiffs claim that Defendants' alleged denial of access to counsel is a departure from prior policy permitting uch access, and thus an unexplained policy change that is arbitrary and capricious and must be held unlawful and set aside under *Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009). *Id*. at 16.

## LEGAL STANDARDS

Federal Rule of Civil Procedure 65 authorizes a district court to grant injunctive relief in the form of either a TRO or a preliminary injunction. To determine if a party is entitled to preliminary injunctive relief, a court considers: (1) the likelihood of success on the merits of the claimant's claims; (2) the threat of irreparable harm to claimant; (3) the balance between that threat of harm and the injury that granting injunctive relief would inflict on other interested parties; and (4) whether the issuance of a TRO is in the public interest. *See Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981); *Angelica C. v. ICE*, No. 20-CV-913 (NEB/ECW), 2020 WL 3441461, at *11 (D. Minn. June 5, 2020) (citing the *Dataphase* factors)

(other citations omitted), *report and recommendation adopted*, No. 20-CV-913 (NEB/ECW), 2020 WL 3429945 (D. Minn. June 23, 2020).

No single factor is determinative, and all factors must be viewed in totality when a court decides if relief should be granted. *Dataphase Sys.*, 640 F.2d at 113. Because "a preliminary injunction is an extraordinary and drastic remedy, one [ ] should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Angelica C.*, 2020 WL 3441461, at *11 (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)); *Mgmt. Registry, Inc. v. A.W. Co., Inc.*, 920 F.3d 1181, 1183 (8th Cir. 2019) ("The party seeking injunctive relief bears the burden of proving these factors weigh in its favor.") (quotation marks and citation omitted).

## ARGUMENT

### I.     Plaintiffs Are Unlikely to Succeed on the Merits

Plaintiffs are unlikely to succeed on the merits, for three reasons. First, they lack standing to bring their claims. Second, they have not established that Defendants' policies, practices or proedures regarding access to counsel at the Whipple Federal Building violate the Constitution or any statutory or regulatory requirements. Finally, all that aside, the requested relief is overbroad, not tailored to any injury that Plaintiffs allege, and does not account for the operational needs of the facility.

#### A.     Plaintiffs Lack Article III Standing

"As in every case, the 'threshold question' is whether Plaintiffs have Article III standing." *Women's Life Care Ctr. v. Ellison*, No. 24-CV-4250 (NEB/SGE), 2025 WL 2834950, at *8 (D. Minn. Aug. 27, 2025) (quoting *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 378 (2024)). This constitutional limitation requires plaintiffs to demonstrate they have standing to sue so that courts do not operate as an open forum for "general complaints about the way in which the government goes about its business." *Allen v. Wright*, 468 U.S. 737, 760 (1984). To

8

establish standing, "a plaintiff must demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *Women's Life Care Ctr.,* 2025 WL 2834950, at *8 (quoting *All. for Hippocratic Med.*, 602 U.S. at 380). "Because causation and redressability 'are often flip sides of the same coin' the two key questions in most standing disputes are injury in fact and causation." *Id*. (quoting at *All. for Hippocratic Med.*, 602 U.S. at 380–81) (internal quotation marks omitted).

An injury in fact must be concrete and particularized; it must be "actual or imminent, not speculative." *Women's Life Care Ctr.,* 2025 WL 2834950, at *8 (quoting *All. for Hippocratic Med.*, 602 U.S. at 381). "By requiring the plaintiff to show an injury in fact, Article III standing screens out plaintiffs who might have only a general legal, moral, ideological, or policy objection to a particular government action." *Id*. (quoting *All. for Hippocratic Med.*, 602 U.S. at 381).

"[T]he injury must affect 'the plaintiff in a personal and individual way' and not be a generalized grievance." *All. for Hippocratic Med.*, 602 U.S. at 381 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, n.1 (1992)). "And when a plaintiff seeks prospective relief such as an injunction, the plaintiff must establish a sufficient likelihood of future injury." *Id*.

For causation, a plaintiff must show that their injury "likely was caused or likely will be caused by" the defendant's conduct. *Women's Life Care Ctr.,* 2025 WL 2834950, at *8 (quoting *All. for Hippocratic Med.*, 602 U.S. at 382). When government action directly regulates a plaintiff "standing is usually easy to establish." *Id*. The path is harder when a plaintiff challenges the government's regulation of someone else. *Id*. "That is often because unregulated parties may have more difficulty establishing causation—that is, linking their asserted injuries to the government's regulation (or lack of regulation) of someone else." *Id*.

9

The individual Plaintiff, L.H.M. appears pseudonymously, making it impossible for ICE to determine her identity or test, much less respond to her allegations or provide context. The same is true of her pseudonymous next friend, C.A., about whom the only allegation is that he or she is "a resident of St. Paul, Minnesota." ECF No. 1 ¶ 4. But more to the point, L.H.M. does not allege any concrete injury, much less any injury that was caused or will be caused by Defendants. As noted, people held at Whipple Federal Building do have free, unmonitored calls, of unlimited duration to counsel. But neither the complaint nor Plaintiffs' motion describe any attempts by L.H.M. to avail herself of access to counsel by these means or any injury that resulted. Instead, L.H.M. alleges speculative future injury, in the form of "medical needs that may be severely adversely affected by detention conditions or involuntary transfer out of state" and, somewhat more specifically, recent "cranial surgery," ECF No. 1 ¶ 4. Without more, L.H.M. has not alleged more than a sufficient likelihood of future injury, much less one tied to any action by Defendants and that is the subject of any of Plaintiffs' claims in this litigation.

The organizational Plaintiff, AHR, also lacks standing. Plaintiff AHR alleges that Defendants "refuse" to allow detainees to meet with attorneys or to "have a phone call" with their attorneys. ECF No. 19 at 11. Plaintiffs cite several attorneys who visited Whipple Federal Building and were not permitted to meet in person with people held there. *Id*. at 11-17. But Plaintiffs do not identify any of the clients being held at Whipple Federal Building, nor do any describe attempts by persons detained within Whipple Federal Building to contact their attorneys. More importantly, however, given that Whipple Federal Building is a holding facility and not a detention center, the time that most people spend there is less than 24 hours. And, as noted, anyone held at Whipple Federal Building does have access to free, unlimited telephone

calls to their counsel. Thus, any member or affiliate of AHR who had been retained as counsel by an alien held at Whipple does have access to their client.

      **B.    Plaintiffs are Unlikely to Succeed on the Merits of Their Fifth Amendment Right to Counsel Claim.**

Even assuming Plaintiffs have standing to bring a Fifth Amendment claim, their claim is nevertheless without merit. The statutory right to retained counsel in immigration proceedings is rooted in the Due Process Clause. *See Arrey v. Barr*, 916 F.3d 1149, 1157 (9th Cir. 2019) (citing 8 U.S.C. § 1362); 8 U.S.C. § 1229a(b)(4)(A). Removal proceedings are civil in nature and litigants in those proceedings retain no right to counsel under the Sixth Amendment, are not entitled to *Miranda* warnings, and are otherwise not entitled to the "full panoply of procedural and substantive safeguards which are provided in criminal proceedings." *Lyon v. ICE*, 171 F. Supp. 3d 961, 975 (N.D. Cal. 2016) (quoting *United States v. Solano-Godines*, 120 F.3d 957, 960 (9th Cir. 1997); *see also United States v. Barajas-Alvarado*, 655 F.3d 1077, 1088 (9th Cir. 2011) (finding no procedural or constitutional due process violations based on lack of counsel during expedited removal proceedings). Where there has been "a denial of the privilege to be represented by counsel" courts have ordered new removal proceedings. *Comm. of Cent. Am. Refugees v. I.N.S.*, 795 F.2d 1434, 1439 (9th Cir.), amended, 807 F.2d 769 (9th Cir. 1986). "The key factor present in each of these cases showing a constitutional deprivation is the existence of an established, on-going attorney-client relationship." *Id.*

This statutory right, however, does not enshrine unfettered and immediate in-person access to detainees at a particular location and can be satisfied though alternative means of communication such as telephone and virtual access. *Barajas-Alvarado*, 655 F.3d at 1078; *Morales-Izueirdo v. Gonzales*, 486 F.3d 484 (9th Cir. 2007) (finding no right to counsel during the initial stages of reinstatement proceedings during which immigration officers performed

11

ministerial tasks). Where means of attorney access are reasonably available, an individual cannot be said to have experienced a denial of counsel under the Fifth Amendment. *See Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 554, 565 (9th Cir. 1990).

Importantly, Plaintiffs do not argue that detainees lack access to legal counsel under the Fifth Amendment at the detention center. Rather, they focus ICE holding facilities that are used for processing before transfer to the detention center. Defendants have discretionary authority to transfer detainees from a temporary holding facility to a detention facility and the "transfer of unrepresented aliens, standing alone, does not violate the due process clause or any statutory privilege." *Comm. of Cent. Am. Refugees*, 795 F.2d at 1439–40; *GEO Group v. Newsom*, 50 F.4th 745, 752–55 (9th Cir. 2022).

### C.     Plaintiffs are Unlikely to Succeed on the Merits of Their First Amendment Claims.

Plaintiffs bring a claim under the First Amendment seeking prospective relief, arguing that members who may be detained in the future may not be able to communicate with counsel while at the ERO Holding Facility at the Whipple Federal Building before transfer to a detention facility. Plaintiffs are unlikely to succeed on the merits of their First Amendment claims.

"[I]mplicit in the right to engage in activities protected by the First Amendment" is "a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984) (collecting cases). The right of expressive association, however, "is not absolute." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000).

Content-neutral restrictions on speech—time, place, and manner restrictions—are subject to an intermediate level of scrutiny, and will be upheld if they advance "important governmental interests unrelated to the suppression of free speech and do [ ] not burden substantially more

speech than necessary to further those interests." *Turner Broadcasting System, Inc. v. FCC*, 520 U.S. 180, 189 (1997).

Moreover, while the First Amendment protects attorneys' rights to disseminate legal information and provide counsel to clients, these rights are subject to reasonable restrictions that serve legitimate government interests, such as maintaining security, operational efficiency, and facilitating timely transfers. *See NAACP v. Button*, 371 U.S. 415, 437 (1963).

In this case, Plaintiffs do not point to any formal restrictions on speech, but rather to isolated past content-neutral actions. For that reason alone, Plaintiffs' First Amendment claims are likely to fail. Even if Plaintiffs could point to a time, place, and manner restriction on speech itself, any alleged temporary restriction falls far short of government action that significantly burdens Plaintiffs' right to associate. And Plaintiffs have not alleged an inability to to access counsel once they have reached an ICE detention center.

Moreover, any temporary burden on Plaintiffs' ability to consult with an attorney or advise a client here serves important governmental interests. It is well-established that the government has an important interest in protecting its borders and enforcing the nation's immigration laws. *Kariye v. Mayorkas*, 650 F. Supp. 3d 865, 909 (C.D. Cal. 2022) (collecting cases). The government has an interest in the safety and security of its law enforcement officers and those it detains.

Ultimately, Plaintiffs' First Amendment claims fails because the right to advocate does not extend to unrestricted access to detained individuals. *Button*, 371 U.S. at 437. Defendants do provide free, unlimited telephone calls to counsel at Whipple Federal Building. Attorneys therefore still advise clients, for the brief time they are held at Whipple Federal Building, within operational constraints. The First Amendment does not guarantee unrestricted access to potential

clients who have not affirmatively retained counsel, as such access would impose an undue burden on detention operations. For these reasons, Plaintiffs are unlikely to succeed on the merits of their First Amendment claims.

      **D.**      **Plaintiffs are Unlikely to Succeed on Their APA Claims.**

The APA provides a limited waiver of the government's sovereign immunity for "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704; *Gallo Cattle Co. v. U.S. Dep't of Agric.*, 159 F.3d 1194, 1198 (9th Cir. 1998) (quoting 5 U.S.C. § 704). "Section 704 reflects a congressional policy against premature judicial intervention into the administrative process, and in favor of courts resolving only disputes with concrete legal stakes." *Inst. for Fisheries Res. v. Hahn*, 424 F. Supp. 3d 740, 747 (N.D. Cal. 2019). District court review is "inappropriate [where] 'final agency action,' a prerequisite for judicial review, had not yet occurred." *Ass'n of Am. Med. Colls. v. United States*, 217 F.3d 770, 781 (9th Cir. 2000) (citing *O'Brien, Inc. v. Sec. & Exch. Comm'n*, 704 F.2d 1065, 1067 n.6 (9th Cir. 1983), *rev'd* on other grounds (further citation omitted)). In addition, agency action requires a specific "rule, order, license, sanction, relief, or the equivalent." 5 U.S.C. § 551(13).

The APA therefore does not permit "general judicial review of [an agency's] day-to-day operations." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 899 (1990). Nor does the APA authorize agencies to oversee "the common business of managing government programs." *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 20 (D.C. Cir. 2006).

"As a general matter, two conditions must be satisfied for agency action to be final." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up). First, "the action must mark the 'consummation' of the agency's decisionmaking process," and "must not be of a merely tentative or interlocutory nature." *Id.* (citation omitted). Second, "the action must be one by which 'rights

14

or obligations have been determined,' or from which 'legal consequences will flow.'" *Id.* at 178 (citation omitted).

Here, Plaintiffs challenge at most an operational decision by the agency that has the practical effect of restricting access to counsel for a short period of time during processing and transfer. This is not a discrete, identifiable, final agency action subject to challenge under the APA, but rather a challenge to day-to-day operational decisions and conduct that the Supreme Court has advised do not fall within the APA's jurisdiction. *See Lujan*, 497 U.S. at 899. The Court should decline to review such actions, which would bring within the scope of the APA nearly every aspect of ICE's continuing and constantly changing operations at its facility.

Even if the Court finds a reviewable final agency action, Plaintiff will be unable to establish that any practice or policy at the ICE field offices violates the APA by infringing on the right to assistance of counsel under the INA.

A principal feature of the removal system is the broad discretion exercised by immigration officials. *Arizona v. United States*, 567 U.S. 387, 396 (2012); *see id.* at 409 (holding that decisions "touch[ing] on foreign relations . . . must be made with one voice"). Indeed, "any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government." *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952). Here, Plaintiffs' requested relief implicates the Executive Branch's "broad power over the creation and administration of the immigration system," which necessarily includes discretion to determine where individuals will be detained to execute their removal orders. *Kerry v. Din*, 576 U.S. 86, 106 (2015) (Kennedy, J., concurring in judgment). The Executive's discretionary authority to administer the removal process is further reinforced by the statute that governs judicial review of

removal orders—8 U.S.C. § 1252. That statute is replete with provisions "aimed at protecting the Executive's discretion from the courts—indeed, that can fairly be said to be the theme of the legislation." *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 486 (1999) (emphasis added) (citing, *e.g.,* 8 U.S.C. § 1252(a)(A); § 1252(a)(2)(B); § 1252(a)(2)(C), § 1252(b)(4)(D)). This concern with protecting the Executive's discretion appears as well in 8 U.S.C. § 1231(g), which gives the Attorney General broad latitude to "arrange for appropriate places of detention for aliens detained pending removal or a decision on removal." 8 U.S.C. § 1231(g) (emphasis added).

Under the INA, the right to counsel in immigration proceedings, including proceedings in which aliens are seeking asylum, requires that an alien be provided "reasonable time to locate counsel and permit counsel to prepare for the hearing." *Biwot v. Gonzales*, 403 F.3d 1094, 1098 (9th Cir. 2005). But it does not require immediate access to, or by, counsel at the moment of detention. Rather, the right to counsel to prepare for immigration proceedings must be balanced with the Attorney General's broad discretionary authority and latitude to arrange for appropriate places of detention.

Plaintiffs' contentions, taken as true, do not arise to a deprivation of counsel in advance of an immigration hearing under the INA. Plaintiffs have not alleged or shown that they would be unable to obtain counsel for or assist clients with immigration proceedings after detainees have arrived at a detention facility. Accordingly, Plaintiff's APA claim is likely to fail on the merits.

## II.     Plaintiffs Fail to Establish a Likelihood of Irreparable Harm

"Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction." *Caribbean Marine Serv. Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988). This is because a preliminary injunction is an "extraordinary remedy that may only

be awarded upon a clear showing" that Plaintiffs are "entitled to such relief." *Winter v. Natural Resources Defense Council, Inc.,* 555 U.S. 7, 22 (2008).  Courts cannot presume irreparable harm: there must be a satisfactory showing— "No such thumb on the scales is warranted." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157 (2010). "Allegations of irreparable harm must be supported with actual evidence, and not merely conclusory statements or unsupported allegations."  *Nevada v. United States*, 364 F. Supp. 3d 1146, 1151 (D. Nev. 2019).

Plaintiffs' alleged infringements of constitutional and statutory rights are insufficient to establish irreparable harm where the plaintiffs have not demonstrated a likelihood of success to warrant an injunction.  *Associated Gen. Contractors of California, Inc. v. Coal. for Econ. Equity*, 950 F.2d 1401, 1412 (9th Cir. 1991).

### III.    The Balance of Equities and Public Interest Disfavor a Temporary Restraining Order

In preliminary injunction proceedings, a party seeking injunctive relief "must [also] establish . . . that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. To determine how the balance of equities tips, "a court must identify the possible harm caused by the preliminary injunction against the possibility of the harm caused by not issuing it." *Univ. of Haw. Pro. Assembly v. Cayetano*, 183 F.3d 1096, 1108 (9th Cir. 1999).  A court must then weigh "the hardships of each party against one another." *Id*. "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (internal quotation omitted).

But, even if Plaintiffs could satisfy one or both of the first two factors, the remaining factors tip decisively in Defendants' favor.  There is a recognized public interest in the enforcement of United States law, including the immigration laws.  *Nken*, 556 U.S. at 435-36

17

("In considering [the merged final two stay factors], courts must be mindful that the Government's role as the respondent in every removal proceeding does not make the public interest in each individual one negligible.") *Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d 1211, 1221 (D.C. Cir. 1981) ("The Supreme Court has recognized that the public interest in enforcement of the immigration laws is significant."). The government has a compelling interest in the steady enforcement of its immigration laws. *See, e.g., Demore*, 538 U.S. at 523; *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1140 (9th Cir. 2009) (holding that the court "should give due weight to the serious consideration of the public interest" in enacted laws); *see also Ubiquity Press Inc. v. Baran*, No 8:20-cv-01809-JLS-DFM, 2020 WL 8172983, at *4 (C.D. Cal. Dec. 20, 2020) (explaining that "the public interest in the United States' enforcement of its immigration laws is high"); *United States v. Arango*, CV 09-178 TUC DCB, 2015 WL 11120855, at 2 (D. Ariz. Jan. 7, 2015) (finding that "the Government's interest in enforcing immigration laws is enormous").

Moreover, in the context of detention, the Supreme Court has recognized that "the problems of prisons . . . require expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." *Procunier v. Martinez*, 416 U.S. 396, 404-05 (1973). "[C]ourts," by contrast, "are ill equipped to deal with the increasingly urgent problems of prison administration and reform." *Id.* at 405.

## IV. Plaintiffs Must Post a Bond

If the Court is inclined to grant a temporary restraining order, it must do so "only if the movant gives security in an amount that the court considers proper to pay the posts and damages sustained by any party to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Accordingly, the Court should require Plaintiffs to post a bond pursuant to Rule 65(c).

## CONCLUSION

Based on the foregoing, Defendants respectfully request that the Court deny Plaintiffs' motion for a preliminary injunction.

DATED this 3d day of February 2026.

Respectfully Submitted,

GLENN M. GIRDHARRY
Acting Deputy Director

DANIEL N. ROSEN
United States Attorney

WILLIAM C. SILVIS
Assistant Director

s/ David W. Fuller
DAVID W. FULLER
Assistant United States Attorney
United States Attorney's Office
600 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415
(612) 664-5600
david.fuller@usdoj.gov

CHRISTINA PARASCANDOLA
Senior Litigation Counsel

ANDREW ABRAMS
Trial Attorney
United States Department of Justice
Civil Division
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, D.C. 20044
(202) 514-3097
christina.parascandola@usdoj.gov