UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| THE ADVOCATES FOR HUMAN RIGHTS, *et al.* | Case No. 0:26-cv-00749 (NEB/DLM) |
| Plaintiffs, | **REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER** |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*, | |
| Defendants. | |

# TABLE OF CONTENTS

**INTRODUCTION** ........................................................................................................ 1

**ARGUMENT** ............................................................................................................... 2

I. Plaintiffs have standing ................................................................................ 2

    A. L.H.M. has standing ............................................................................ 2

    B. AHR has standing................................................................................ 3

II. Plaintiffs are likely to prevail on the merits ............................................... 4

    A. Plaintiffs are likely to prevail on their Fifth Amendment claims...... 6

    B. Plaintiffs are likely to prevail on their First Amendment claims...... 7

    C. Plaintiffs are likely to succeed on their INA claim ............................ 8

III. Plaintiffs will suffer irreparable harm ........................................................ 9

IV. The public interest favors relief .................................................................. 9

V. No bond is necessary or appropriate......................................................... 10

**CONCLUSION** ........................................................................................................ 10

## INTRODUCTION

Defendants do not dispute many of the core facts. They do not dispute that they bar attorneys from visiting clients at the Whipple Building, despite there being visitation rooms; that detainees cannot take confidential calls with counsel; that they detain some individuals at the Whipple Building for more than 12 hours (sometimes multiple days); or that they transfer many detainees out of state even when they have Minnesota counsel. Those uncontested facts alone warrant relief.

Defendants respond that because they offer phone calls to detainees at the Whipple Building, and because they believe they aren't obliged to provide attorney access at what they call a "holding facility," they are not violating Plaintiffs' rights. But Defendants are wrong on the facts and the law.

Defendants rely on one brief declaration from an ICE official, who disclaims first-hand knowledge of all the facts in his declaration, claiming detainees at the Whipple Building "can make [] free, unmonitored legal calls to their attorneys" at will. Bottjen Decl., ECF 72 ¶ 13. This claim is belied by the seventeen declarations in the record cataloguing the hurdles Defendants have placed between detained individuals and attorneys seeking to contact each other. And even if Defendants' evidence were credible, providing calls with counsel within the earshot of federal agents does not satisfy the requirements of the Constitution or the INA.

Defendants also imply that because ICE calls the Whipple Building "a short-term holding facility," Defs.' TRO Opp., ECF 70 at 1, Plaintiffs' constitutional rights are diminished there. But as described in Plaintiffs'

1

opening brief, this has already been rejected by multiple courts. *See* Pls.' TRO Br., ECF 19 at 30-32. Plaintiffs' rights do not rise and fall with ICE's internal administrative categories.

Because Defendants have not meaningfully contested the key factual and legal issues in this case, the Court should halt their ongoing violations of Plaintiffs' legal rights.

## ARGUMENT

### I. Plaintiffs have standing

Defendants largely argue that Plaintiffs do not have standing because, in their view, detainees *do* have adequate access to counsel. Such arguments about the merits of the case are irrelevant to standing. *See Graham v. Catamaran Health Solutions LLC*, 940 F.3d 401, 407 (8th Cir. 2017) ("Standing analysis does not permit consideration of the actual merits of a plaintiff's claim."). Plaintiffs *are* likely to prevail on the merits, *infra* §§ II.A-II.C, but regardless have *standing* to press their claims. Defendants' secondary arguments against each plaintiff's standing are also unpersuasive.

#### A. L.H.M. has standing

L.H.M.'s attorney attempted to visit L.H.M. at Whipple on January 27, and Defendants prohibited her from seeing her client. Briand Decl., ECF 21 ¶¶ 8-9. Defendants ignore this undisputed evidence, yet fault Plaintiffs for not "describ[ing] any attempts by L.H.M. to avail herself of access to counsel," Defs.' TRO Opp. 10, even though the entire gravamen of Plaintiffs' complaint is that Defendants were blocking her from accessing counsel.[1]

---

[1] Plaintiffs could not procure a declaration from L.H.M. while she was in custody, but submit one with this reply. As she recounts, Defendants' practices prevented L.H.M. from calling counsel for the first day-and-a-half of her

2

Defendants do not address this documented interference with L.H.M.'s attorney-client relationship, instead arguing that they provide access to phone calls and characterizing L.H.M.'s injuries as "speculative." Defs.' TRO Opp. 10. Defendants' representations about phone access are irrelevant to standing and, as described below, *infra* § II, contradicted by extensive record evidence. And while Defendants term L.H.M.'s *medical* needs speculative, the issue is not those needs but her constitutional and statutory rights to counsel.

Defendants also complain that they cannot "test" L.H.M.'s standing because she is proceeding under initials. Defs.' TRO Opp. 10. But Defendants do not suggest any facts that "testing" could find to affect the standing inquiry.[2]

## B. AHR has standing

AHR has (1) organizational standing to vindicate the organization's First Amendment rights and impacts on its mission and resources; (2) representational standing to vindicate the First Amendment rights of its attorneys; and (3) third-party standing on behalf of its clients. Pls.' TRO Br. 13-19. Defendants do not address any of these arguments.

Defendants merely state that AHR did "not identify any of the clients being held at Whipple Federal Building" or "describe attempts by persons detained within Whipple Federal Building to contact their attorneys." Defs.' TRO Opp. 10. But AHR *has* identified clients who they could not contact and who could not contact them. *See, e.g.*, Weyker Decl., ECF 30 ¶¶ 1-2, 4-9, 10-17;

---

detention, and even after that she could not make confidential calls. L.H.M. Decl. ¶ 19.

[2] And Defendants' brief indicates that they *do* know L.H.M.'s identity. *See* Defs. TRO Opp. 1 (calling L.H.M. "a past detainee at the Whipple Federal Building" without record support).

3

O. Decl., ECF 67 ¶¶ 6, 11-12, 15-18. And regardless, Defendants do not explain why the facts as they (mis)characterize them would foreclose standing.

## II. Plaintiffs are likely to prevail on the merits

Defendants' response to Plaintiffs' First and Fifth Amendment and INA claims largely consists of arguing that they provide sufficient access to counsel by phone at the Whipple Building, *see* Defs.' TRO Opp. 13, and that in any case, Plaintiffs' constitutional rights do not attach until a detainee reaches an ICE *detention* center. *See id.* at 2, 13. Both fail.

Defendants have not shown that they provide sufficient access to counsel. They proffer a declaration claiming that detainees have unlimited, free calls with counsel available. Bottjen Decl. ¶¶ 12-13. That declaration is silent as to whether Director Bottjen has even worked in the Whipple Building during Operation Metro Surge, and admits that it draws upon "information obtained from various records, systems, databases, and other DHS employees, and information portals." Bottjen Decl. ¶ 3. Most importantly, it is contradicted by a mountain of first-hand evidence in the record, which courts routinely find entitled to more weight. *E.g.*, *Tincher v. Noem*, No. 25-cv-4669, 2026 WL 125375, at *17 (D. Minn. Jan. 16, 2026), *stayed on other grounds*, No. 26-1105, 2026 WL 194768 (8th Cir. Jan. 26, 2026).

The record shows that most detainees' opportunities to make a call are significantly limited and nonconfidential. Plaintiff L.H.M. was allowed to speak with her sister for less than 90 seconds before an ICE agent cut the call, and first spoke with her attorney a day and a half into her detention for "less than 10 minutes" while an agent stood next to her the entire time. L.H.M. Decl. ¶¶ 10, 15, 19. O. had his first opportunity to make a call about "20 hours" into

4

his detention, but was transferred to Texas before his counsel could return his call. O. Decl. ¶¶ 5-6. Others report people held at the Whipple Building being denied any opportunity to place calls, *e.g.*, J.J.B. Decl. ECF 27 ¶¶ 18, 21, 25; Chitwood Decl., ECF 23 ¶ 19; Keller Decl., ECF 28 ¶ 18, and calls limited to mere minutes, *e.g.*, Young Decl., ECF 63 ¶ 9; Boche Decl., ECF 20 ¶ 15; Allen Decl., ECF 62, ¶ 21.

Attorneys similarly attest to significant difficulties in locating their clients, or getting through to them when they call, often resulting in attorneys being entirely unable to communicate with the individuals Defendants detain. Heinz Decl., ECF 25 ¶¶ 2-7; Kelley Decl. ¶¶ 11-15; Brown Decl., ECF 22 ¶ 10, 30

Defendants do not contest that they routinely transfer represented detainees out of state before speaking with counsel, simply insisting that detainees' access to counsel is adequate once they reach an out-of-state detention center. *See* Defs.' TRO Opp. 1, 12, 13.

But detainees are prevented from accessing counsel even after transfer. *See, e.g.*, O. Decl. ¶ 12 (phone briefly passed around only two or three times during ten-day detention in El Paso). Attorneys describe transfer resulting in a "black hole of communication," Kelley Decl. ¶ 19, impeding their ability to advocate for clients' release. *See* Heinz Decl. ¶¶ 8–9; Allen Decl. ¶ 21; Boche Decl. ¶¶ 14, 18; Edin Decl., ECF 24 ¶¶ 12, 14; Glenn Decl., ECF 61 ¶¶ 6, 7, 9; Young Decl. ¶¶ 8, 11, 12.

Defendants also don't contest that while detainees are isolated from counsel, Defendants pressure (and even offer to pay) detainees to waive their

5

rights and sign self-deportation paperwork. *See* O. Decl. ¶¶ 12, 18, 27; J.I.B.C. Decl. ¶¶ 23, 27; Briand Decl. ¶ 11; Kelley Decl. ¶ 22; Boche Decl. ¶ 22; Glenn Decl. ¶ 6; Allen Decl. ¶ 23. One detainee was told she could call her lawyer only *after* signing the self-deportation agreement. Quam Decl., ECF 64 ¶ 11.

Plaintiffs' evidence overwhelmingly rebuffs Defendants' claims of extensive access to counsel in detention in Minnesota and beyond.

Even if, as Defendants claim, detainees had unlimited calls to counsel at the Whipple Building, Defendants fail to satisfy their constitutional and statutory obligations. Defendants' uncontested prohibitions on in-person attorney visits and refusal to provide for confidentiality of calls between detainees and attorneys violate Plaintiffs' rights.

And Defendants are mistaken to suggest that Plaintiffs' rights do not attach until a detainee reaches an ICE "detention center." *See* Pls.' TRO Br. 31-32.

### A. Plaintiffs are likely to prevail on their Fifth Amendment claims

Defendants primarily argue that the Fifth Amendment is not violated "[w]here means of attorney access are reasonably available," Defs. Br. 12, but they offer no argument that even their admitted restrictions are consistent with "reasonable availability."

The government may violate the Fifth Amendment when it refuses to allow attorney visits, imposes unreasonable restrictions on phone access, or fails to provide privacy in attorney-client communications. *Johnson-El v. Schoemehl*, 878 F.2d 1043, 1052-53 (8th Cir. 1989). "Detainees' right to counsel and due process can [] be compromised by a lack of privacy in consultations

6

with counsel." *Id.* at 1052. Defendants do not contest that attorney visits are prohibited, or that phone calls are not private. The uncontested facts alone show that Defendants' do not satisfy their constitutional obligations; and, as described above, the record *also* shows unreasonable restrictions on phone access.

Defendants assert that transferring unrepresented individuals does not violate due process, Defs.' TRO Opp. 12, but Plaintiffs specifically seek relief against transferring *represented* individuals, *see* Proposed Order, ECF 31, ¶ 6. Courts have recognized that the transfer of represented individuals away from existing attorney-client relationships can burden due process, *e.g.*, *Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 566 (9th Cir. 1990); *Arroyo v. U.S. Dep't of Homeland Sec.*, No. 19-cv-815, 2019 WL 2912848, at *17-18 (C.D. Cal. June 20, 2019), and Defendants offer no argument to the contrary. "[T]he Government cannot actively facilitate a breakdown in ongoing or potential attorney-client relationships, and then claim no responsibility or control over it." *Immigrant Defenders Law Ctr. v. Noem*, 781 F.Supp.3d 1011, 1050-51 (C.D. Cal. 2025) ("*ImmDef*").

Finally, Defendants make no attempt to rebut or distinguish the many courts around the country finding that similar conduct by Defendants violates the Fifth Amendment. *See* Pls.' TRO Br. 23. This Court should reach the same result.

### B. Plaintiffs are likely to prevail on their First Amendment claims

Defendants' purported policy of allowing unlimited phone calls to attorneys, even if true, does not satisfy the First Amendment because these

7

calls are not private. *See, e.g., Mercado v. Noem*, 800 F. Supp. 3d 526, 578 (S.D.N.Y. 2025) (preventing confidential attorney-client conversations was a restriction that was "excessive in the absence of any legitimate justification" and likely violated First Amendment). While Defendants may impose time, place, and manner restrictions on attorney access to advance the government's interests in enforcing immigration laws, Defs.' TRO Opp. 13, Defendants neither explain how those interests would be impaired by providing detainees access to counsel, nor argue that their restrictions do not "burden substantially more speech than necessary." *Turner Broadcasting System, Inc. v. FCC*, 520 U.S. 180, 189 (1997).

### C. Plaintiffs are likely to succeed on their INA claim

Defendants recycle their conclusory arguments that the restrictions they place on access to counsel "do not arise to a deprivation" under the INA and that statutory compliance is not required in a holding facility. *See* Defs.' TRO Opp. 16. But INA's right to counsel "begins before any court proceeding … with the detention itself," *Torres v. U.S. Dep't of Homeland Sec.*, 411 F.Supp.3d 1036, 1062 (C.D. Cal. 2019), and the INA requires "meaningful access to counsel," *ImmDef*, 781 F. Supp. 3d at 1050. Courts have also found that the transfer of represented individuals can interfere with the INA's guarantee. *Orantes-Hernandez*, 919 F.2d at 566; *Arroyo*, 2019 WL 2912848, at *17-18.[3]

---

[3] Defendants also characterize Plaintiffs' claim under the INA as a claim under the Administrative Procedure Act. *See* Defs.' TRO Opp. 14. But Plaintiffs moved for preliminary relief directly under the INA, and did not move for preliminary relief on their APA claims. *See, e.g., Torres*, 411 F.Supp.3d at 1058-60 (recognizing a cause of action under the INA's right's-creating language).

8

### III. Plaintiffs will suffer irreparable harm

Defendants' *only* argument that Plaintiffs will not suffer irreparable harm is that Plaintiffs "have not demonstrated a likelihood of success." Defs.' TRO Opp. 17. But Plaintiffs *have* demonstrated a likelihood of success, *supra* § II. Absent relief, Plaintiffs will suffer a variety of irreparable harms, including constitutional injuries, ongoing unjustified deprivations of liberty, and potential removal without due process. *See* Pls.' TRO Br. at 32-36.

### IV. The public interest favors relief

The fact that the government is violating Plaintiffs' First Amendment rights is sufficient to find that the public interest favors relief. *See Rodgers v. Bryant*, 942 F.3d 451, 456 (8th Cir. 2019) ("if a party shows a likely violation of his or her First Amendment rights, the other requirements for obtaining a preliminary injunction are deemed to have been satisfied."). "[I]t is always in the public interest to protect constitutional rights," *Schmitt v. Rebertus*, 148 F.4th 958, 970 (8th Cir. 2025), and the government "has no interest in enforcing overbroad restrictions that likely violate the Constitution," *Dakotans for Health v. Noem*, 52 F.4th 381, 392 (8th Cir. 2022).

Even if the government's interest in immigration enforcement could outweigh constitutional rights, Defendants have not justified it here. The record in this case and others involving Operation Metro Surge shows that Defendants are indiscriminately arresting and detaining vast numbers of individuals, "many of whom have lawfully lived and worked in the United States for years and done absolutely nothing wrong." *Juan T.R. v. Noem*, 26-cv-107, 2026 WL 200329, at *1 (D. Minn. Jan. 26, 2026); *see also* Glenn Decl. ¶¶ 2, 10 ("vast majority" of 150 habeas petitions since December 2025 "have

9

been granted in full or in part"). Plaintiffs' declarants describe being held for days for seemingly no reason, in horrific conditions, while being prevented from meaningfully consulting with their attorneys to seek their release. *See, e.g.*, J.J.B. Decl., ¶¶ 17, 19-27; O. Decl. ¶¶ 4-5, 7-9, 11-15, 18-27, 33. Systematically and indiscriminately detaining non-removable individuals without access to counsel does not serve the public interest.

## V.  No bond is necessary or appropriate

A court may "waive the bond requirement based on its evaluation of public interest" in a given case. *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps. Of Eng'rs*, 826 F.3d 1030, 1043 (8th Cir. 2016). "[B]ecause it is always in the public interest to prevent the violation of a party's constitutional rights," courts may decline to require bonds where doing so may hamper judicial review of constitutional claims. *Tincher*, 2026 WL 125375 at *35 (quotation omitted); *see also Bukaka, Inc. v. Cnty of Benton*, 852 F. Supp. 807, 813 (D. Minn. 1993) (similar).

Requiring Plaintiffs to post a bond to access constitutional rights would not serve the public interest. And Defendants have not estimated any potential "costs and damages" they would sustain from an injunction. Fed. R. Civ. P. 65(c).

## CONCLUSION

For the foregoing reasons, the Court should preliminarily enjoin Defendants from obstructing their detainees' attorney-client relationships.

Dated: February 5, 2026					Respectfully submitted,

<div style="margin-left:3em">

*s/ Alethea M. Huyser*
Alethea M. Huyser (#0389270)
Rachel L. Dougherty (#0399947)
Devin T. Driscoll (#0399948)
Sarah Theisen (#0402844)
Margaret G. Severson (#0504388)
**FREDRIKSON & BYRON, P.A.**
60 South Sixth Street, Suite 1500
Minneapolis, MN 55402-4400
P: (612) 492-7000
ahuyser@fredlaw.com
rdougherty@fredlaw.com
ddriscoll@fredlaw.com
stheisen@fredlaw.com
mseverson@fredlaw.com

Jeffrey B. Dubner*
Aman T. George*
Mark B. Samburg*
Elena Goldstein**
**DEMOCRACY FORWARD FOUNDATION**
P.O. Box 34553
Washington, DC 20043
P: (202) 448-9090
jdubner@c.democracyforward.org
ageorge@democracyforward.org
msamburg@democracyforward.org
egoldstein@democracyforward.org

* admitted pro hac vice
** pro hac vice application filed

*Counsel for Plaintiffs*

</div>