UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| The Advocates for Human Rights and L.H.M., through her next friend C.A., | Court File No. 26-cv-00749 (NEB/DLM) |
| Plaintiffs, | |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of Homeland Security; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; TODD LYONS, in his official capacity as Acting Director of Immigration and Customs Enforcement; MARCOS CHARLES, in his official capacity as the Acting Executive Director for Immigration and Customs Enforcement's Enforcement and Removal Operations; DAVID EASTERWOOD, in his official capacity as Acting Field Office Director for Immigration and Customs Enforcement's Enforcement and Removal Operations St. Paul Field Office; U.S. FEDERAL PROTECTIVE SERVICE; and FARON K. PARAMORE, in his official capacity as Director of the Federal Protective Service, | **DECLARATION OF L.H.M.** |
| Defendants. | |

1

**Declaration of L.H.M.**

I, L.H.M., declare under penalty of perjury that the following statement is true and correct to the best of my knowledge and belief:

1. I was born in Macuelizo, Santa Bárbara, Honduras, on March 15, 1984. I am a citizen of Honduras. I have three children living in Minnesota, including one daughter who is a U.S. citizen.

2. On or about March 14, 2019, my three-year-old daughter and I entered the United States without inspection in or near Hidalgo, Texas. We were detained by the United States Border Patrol. While in CBP custody, I stated that I was afraid to return to Honduras. The CBP officer documented my fear of returning to Honduras in the Form I-213 Record of Deportable/Inadmissible Alien issued to my daughter and to me with the notation "Credible Fear Claim."

3. On March 16, 2019, my daughter and I received Notices to Appear before the Immigration Court charging us as removable under INA § 212(a)(6)(A)(i). We were released from CBP custody on March 27, 2019.

4. After our release, we moved to Waterbury, Connecticut. In July 2019, we relocated to St. Paul, Minnesota because we have family there and were able to secure more stable housing.

5. As a condition of my release from CBP custody, I was required to enroll in the Intensive Supervision Appearance Program ("ISAP"). On March 27, 2019, I formally enrolled in the program, and I have continued to fully comply with all check-in requirements to date.

6. I currently have a pending asylum application before the Immigration Court. I have complied with all requirements to move my case forward, including attending a biometrics appointment and submitting corroborating evidence in support of my claim. The court has scheduled my final hearing for November 20, 2026, before Judge Monte Miller.

7. On January 27, 2026, I attended my regular monthly ISAP appointment in Bloomington, Minnesota. I arrived at 10:15 a.m. My usual officer since 2024 had been Cristian. At my prior appointment, Cristian asked me to bring the U.S. passport of my youngest daughter to this appointment.

8. After arriving at the appointment, I waited in the waiting room until approximately 11:00 a.m., when an ISAP officer named Teresa asked me to come into her office. As we walked down the hallway, I asked where we were going because we were not going to the room where I usually met with Cristian. Teresa said she had a "surprise" for me and opened a door to an office where five armed ICE officers in uniform were standing. Their faces were not covered. They called my name, and I became very frightened. One officer placed handcuffs on me, and I fainted from shock.

9. When I regained consciousness, I was seated in a chair with my hands still handcuffed. Teresa told me that two officers had picked me up from the floor and that she had placed alcohol under

2

my nose to revive me. She then put alcohol on my hands for me to smell so that I would not faint again, and they gave me two cups of water. I was so overwhelmed that I could not speak or breathe normally.

10. When I felt able to speak, I explained that I had undergone a craniotomy on November 21, 2025, and that doctors had told me my surgery was "high-risk." (I have fibrous dysplasia, which means that some of the bones in my skull are weak and compress my neurovascular system.) I asked the officers why I was being detained, but they did not speak Spanish. Teresa accused me of pretending to faint and said my reaction was not real. I told Teresa that I needed to talk to my lawyer and she said my case was "no longer in [her] hands."

11. Seeing that I was very distressed, Teresa told me to calm down and said the officers would only take my fingerprints, ask some questions, and then send me home. I shouted, "My daughters need me, I am a single mother." I calmed somewhat when Teresa told me I only needed to provide my fingerprints to the ICE officers.

12. Shortly afterward, there were four people detained in total: three men and me as the only woman. Teresa said she needed to check that the waiting room was empty before the officers could leave with us. She later said in Spanish, "*No hay nadie; ya pueden salir.*" ("There is no one left; you can go out now.") The officers took us to a large parking lot and placed the four of us into a vehicle.

13. We were transported to the Whipple Federal Building in Fort Snelling, Minnesota, where other officers were waiting. They spoke Spanish and appeared Latino. They searched us. A female officer slammed my head against the wall while checking my hair. I shouted "my surgery," and I was afraid she would hit the right side of my head where I had been operated on. I said I preferred that she touch the left side instead. From this time on, my head hurt the whole time I was detained.

14. At the federal building, officers took my belongings. I had with me a purse and a wallet containing $704.00 in cash; two checks for $365.00 each; my car and apartment keys; my phone; my Social Security card; my work permit; my Minnesota state ID; one credit card; one debit card; one health insurance card; my youngest daughter's U.S. passport; and several pay stubs. Officers placed my items in plastic bags.

15. I was interviewed by an officer with a translator. They told me that I could only make one phone call, so I called my sister, told her I was detained, and asked her to contact my daughter-in-law so that she could call my attorney, Danielle Robinson Briand, who represents me in my asylum case. An ICE agent cut off the call after less than a minute and a half.

16. A few hours later, another officer called me in to take a statement. He accused me of being part of a Colombian gang. I told him I did not know what he was talking about. He said, "You know that lying to an officer is a crime." I replied that yes, it is a crime, but that he was committing a crime by trying to force me to confess to something untrue. I told him I am from Honduras, not

Colombia, and that I do not even have Colombian friends.

17. After this, officers moved me to a room where I stayed for about five hours with three other women. Later, I was placed alone in a cell. I lost track of time. That night, January 27, 2026, I was transported to a facility called "Douglas County" in Wisconsin. I arrived at approximately 11:30 p.m. I remained there for no more than six hours before two officers returned in a van and took me back to the Federal Building in Minnesota. Because of this transfer, I went approximately 24 hours without food. I was not given any opportunity to make a phone call while at Douglas County, Wisconsin.

18. I was returned to the Federal Building in Minnesota on January 28, 2026, likely in the early morning because it was still dark. Over the next several days, I slept on the floor in very cold temperatures.  For the first three days, I was given nothing to cover myself with.

19. When I was at Whipple, in order to make phone calls, I had to knock on the window and ask an officer. They refused me around six times, but I was able to make several short calls. Officers were there for every call; they would always be in the background, frequently saying things like "your time is done" or "two more minutes." They only let me make one call each time, so I had to choose between calling my sister, who was taking care of my two young daughters, and my attorney. I was first able to call my attorney like this on January 28, 2026, around 10:30 p.m., for a little less than 10 minutes. As with my other calls, an officer was standing near me the entire time.

20. I spent the next two days at Whipple. On the afternoon of January 30, 2026, my attorney came to the federal building to try to speak with me. Officers wouldn't let her meet with me in person, although they eventually let me speak with her by phone again.

21. While I was at Whipple, I asked for medical attention on approximately five occasions from five different officers. My head still hurt from when they slammed me into the wall, and I had pain around my surgical site. I asked for Tylenol each time for the pain, but they told me there was none.

22. On the night of January 30, 2026, I was taken to another detention center in Wilmar, Minnesota with two other women who also needed medical attention. One told me that she was afraid she was about to pass out because they had withheld her blood pressure medication for five days; the other had already been hospitalized for eight days after being beaten up during her arrest. We left around 7:00 p.m. and arrived around 10:00 p.m. at the Kandiyohi County Jail.  During intake, I was finally given food. The other women with me both fainted and were taken to the hospital. I was processed, given clothing and food, and placed in a cell. At this facility, I had a bed to sleep on, and my handcuffs were removed. But I was not given any opportunity to make a phone call while I was there.

23. On January 31, 2026, I was fed again. I was taken to the facility clinic, where staff examined my head at the surgical site and conducted an eye exam because my vision was blurry. Before I was

transported back to Whipple, another female detainee helped me call my daughter-in-law and she told me that my attorneys were doing everything possible to get me released that day. At approximately 3:00 p.m., the facility director began processing my release, and officers transported me back to the Whipple Federal Building in Fort Snelling, Minnesota. We arrived around 5:30 p.m.

24. I was placed again in a cell and feared I would have to spend another night there. An officer later told me my release had been authorized. I requested to call my attorney, Danielle Robinson Briand, and she asked to speak with the officer handling my release. While I waited to be picked up, I began screaming because I was in severe pain near my surgical site.

25. I was in ICE custody from January 27, 2026, at approximately 11:00 a.m. until January 31, 2026, when Defendants told me I could call somebody to pick me up. I called my attorney, and was released at around 7:40 p.m.

26. Upon my release, officers returned my belongings. However, I realized they did not return my daughter's U.S. passport, two checks for $365.71 each, my Minnesota ID, or my work permit.

27. After leaving the Federal Building, I went home and showered for the first time since January 27, 2026 in Douglas County, Wisconsin.  That evening at approximately 9:00 p.m., I went to the Regional Hospital in Saint Paul, Minnesota because I still felt very unwell. I had an intense headache and feared my surgical site might be infected. I was admitted, underwent a head X-ray, remained under observation until about 4:00 a.m., and was then discharged home. The doctors informed me that I likely had a concussion, which would be from when the officer slammed my head into the wall while conducting a body search.

Dated:       02/05/2026            Signed:        /s/ L.H.M

**CERTIFICATE OF TRANSLATION**

I, Danielle Robinson Briand, am competent to translate from Spanish language into English and certify that the translation of <u>Declaration of L.H.M</u> is true and accurate to the best of my abilities.

| | |
|---|---|
| */s/ Danielle Robinson Briand* | Danielle Robinson Briand |
| Signature of Translator | Typed/Printed Name of Translator |

Address of Translator: Justicia Law, 3105 Hennepin Avenue, Minneapolis, MN 55408

Telephone Number of Translator: (612) 284 - 1484