UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| THE ADVOCATES FOR HUMAN RIGHTS, *et al.* | Case No. 0:26-cv-00749 (NEB/DLM) |
| Plaintiffs, | |
| v. | **DECLARATION OF HANNE SANDISON** |
| U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*, | |
| Defendants. | |

## DECLARATION OF HANNE SANDISON

I, Hanne Sandison, declare the following is true and accurate to the best of my knowledge and recollection.

1.      I make this declaration based on my personal observations and statements made directly to me by Department of Homeland Security personnel and detained individuals during a visit to the Bishop Henry Whipple Federal Building (Fort Snelling, Minnesota) (the "Whipple" building) on Monday, February 9, 2026, between approximately 8:30 am and approximately 10:00 am. We conducted this visit at the behest of the Court's February 6, 2026, Order requiring Defendants to "allow full access to all detention facilities in the Bishop Henry Whipple Federal Building to Defendants' counsel and Plaintiffs' counsel (and party representatives)." *See* Order, ECF 81, *Advocates for Human Rights v. Dep't of Homeland Security* (D. Minn. Feb. 6, 2026) ["Order"].

2.      I am the Immigration and Legal Services Director with The Advocates for Human Rights ("AHR"). I oversee and support the work of my colleagues as they represent, and support pro bono volunteers who represent, asylum seekers, trafficking survivors, Unaccompanied Children, Afghan Evacuees, and immigrants held in ICE detention.

3.      I am submitting this declaration in support of Plaintiffs' request for urgent relief to ensure meaningful access to counsel at Whipple and pursuant to the Court's Order that the parties file supplemental declarations regarding the ordered visit to Whipple. *See* Order at 2.

4.      On February 9, 2026, I entered the Whipple detention center in a group including Kim Boche, supervising attorney with AHR, and two attorneys representing AHR in this matter. Our "tour" was led by Tauria Rich and Scott Ladwig from ICE, and also included ICE attorney Laura Trosen and DOJ attorney Christina Parascandola.

5.      As described further below, over the course of our visit to Whipple, cut short by the DHS staff conducting the tour, I observed phones that could not be used to contact legal service providers ("LSPs"), incorrectly listed phone numbers, and dirty conditions, and spoke with individuals who had been detained at Whipple for almost 24 hours. I also observed significant disarray and chaos, with many ICE/ERO staff giving us information that clearly contradicted their own prior statements, the conditions we were seeing, and the conversations we had with detainees.

6.     We were first directed to a small, empty holding cell, marked as S5, that had a phone on the wall. This phone was visually identical to the other phones I observed in holding cells. By my observation, above each such phone, there were a few sheets of stapled paper in a plastic pouch, containing a list of consulates and free LSPs, along with corresponding codes, that detainees could purportedly use to call out. AHR was on the list twice, though its name was listed incorrectly both times and included two different codes. All LSP names started with "EOIR," and were not identified on the sheet as legal service providers. These papers were dated February 5, 2026, and neither the plastic pouches nor the papers I was able to observe appeared to have been handled very much.

7.     I could not successfully call out when I attempted to use the phone in the empty holding cell. The phone directed me to press "1' for English, to state my name, press pound, and then dial the number. The phone did not ask me to enter an A-number. I tried both numbers listed for AHR and the number listed for the Immigrant Law Center of Minnesota ("ILCM"), which were all internal codes and not AHR's or ILCM's intake numbers. The number codes I called were all out of service and did not connect to AHR or ILCM.

8.     The instructions printed above the phones were difficult to understand.

9.     There were around 25 phones at the intake station, which ICE also referred to as the "processing" stations. The stations were in a central area that had no privacy. These phones appeared to work, and I observed counsel successfully using one to call out. I observed the EOIR pro bono list (this time with accurate intake numbers and information) on at least one station. It was unclear how long it had been there. These phones were not private; each was across a narrow counter (maybe 2-3 feet) from an ICE agent and within a few feet of the next processing station.

10.    I was shown an area with two semiprivate showers as well as two changing rooms. The showers had doors which did not fully run from the ground to the ceiling. We were told the showers had warm water but did not test them to verify. One of the changing rooms was blocked by a bunch of junk and the other room had a chair in it. These rooms did not appear to be available for use.

11.     At the end of the hallway to the changing rooms and showers, there was a stack of car seats in new boxes.

12.     We observed numerous notices posted on a wall along the hallway to the showers and changing rooms. Those notices included information about Detainee Assistance Alternatives, information about reporting safety violations, information for individuals detained away from their children, and information about ERO's DNA Sampling Program. Unless a detainee was going to or from the showers or changing rooms, they would not have an opportunity to view those notices.

13.     Tauria Rich informed our group that each detainee receives a "Detainee Handbook" at processing. She provided us with a copy of the Handbook. It contained limited information on rights to legal counsel and that information was only in English.

14.     I did not observe any copies of the Detainee Handbook in any hold room or in the possession of any detainee during our visit.  The one individual we saw getting processed was not holding a copy. It is my understanding that counsel requested to enter rooms, both to check phones and to speak with putative class members, and ICE denied our requests except on one occasion as noted below.

15.     I observed a cell with approximately eight female detainees. We requested to speak to them regarding phone access and were told that doing so would interfere with their medical treatment, which Ms. Rich indicated was happening at that time, but that we could speak to them later. The cell had a toilet and a sink with a half-wall for some, but not complete, privacy. There was toilet paper. I didn't see soap but was told that soap was available.

16.     I observed four ERO visitation rooms that attorneys could use to meet with detained clients. These rooms were empty. There were two entrances to the room, one for attorneys and one for detainees. The lobby on the attorney's side of the room was dark. It did not seem like these rooms were in use. The door to access these rooms from the public portion of Whipple is marked as "ERO Visitation." It took ICE officials approximately five minutes to figure out how to open the detainee sides of these rooms to allow us to enter.

17.     I tested the detainee side of the ERO visitation room while another member of our group tested the attorney side. The room appeared to be sufficiently soundproof to ensure privacy on the detainee side. There were no phones in the ERO visitation rooms, on either side. The rooms did not have slots through which to pass papers. Another member of our group indicated that the room was not soundproof on the attorney side, and that he could hear every word spoken from both parties while in the ERO visitation waiting room.

18.     I asked a DHS employee what these visitation rooms are used for. He said they are not currently in use except for the "rare occasion" there is a family or attorney visit. He explained that these rooms were used before the COVID-19 pandemic. In my experience, AHR attorneys used to use these rooms to meet with detained individuals brought in-person from other Minnesota detention centers before and after hearings at the immigration court in Whipple. Detainees no longer appear in person in immigration court; everyone appears remotely.

19.     I saw several empty rooms in a hall adjacent to the area where the ERO visitation rooms were located. I was told by Mr. Ladwig that these rooms were used to hold arrested U.S. citizens.

20.     I observed different numbers of individuals in each detainee holding room; some were empty, others had a single person or only a few people, and others had a dozen or more.

21.     I looked into each hold room as we walked by. I did not see any legal paperwork or detainee handbooks in any detainee's possession.

22.     All detainees I observed were shackled at the ankles, even while sleeping and in the holding cells. From my observations of several holding cells, I did not see any detainee who had a blanket, pillow, sleeping pad, or cot. I saw men sleeping on the floor with no bedding.

23.     I observed rooms that I assume were used to hold the detainees' property. The rooms had bags with sticky notes above them. Numbers, which I assume to be the last digit of the detainee's A-number, were written on the sticky notes.

5

24. I observed the holding room marked as M4 was noted as out of order.

25. Ms. Rich brought us to a room, designated as L2. In grease marker, the door was labeled "Cell Count 12 Flights." The staff recommended we speak to detainees one-by-one, outside the room, and did not recommend we enter the holding room for "safety reasons." This would have forced detainees to talk to us in directly front of approximately 30 ICE officials, who all would have been able to see and hear them. I told her we were comfortable entering and she agreed.

26. We entered the holding room and Kim Boche briefly explained who we were and why we were there. We confirmed who in the room could speak Spanish and/or English before we spoke with them. One of our team members tested the phones while others spoke to individual detainees to understand how long they had been detained and their ability to access phones and communicate with their attorneys. At least three ERO/ICE agents who were not involved in our tour entered the room with us while we spoke to the detainees.

27. I observed food waste, including apple cores and Uncrustable plastic wrapping, on the floor and the table. The apple cores were browning and appeared to have been sitting there for a while.

28. Tauria Rich and other DHS employees told me multiple times that detainees were only held at Whipple for 12 hours, but the three detained individuals I spoke to in the holding room had been at Whipple since the day before. One of them said they had been there since around 10:00 am the day before, which means he had already been held at Whipple for almost 24 hours at the time of our visit.

29. We were not in the holding room for long before Ms. Rich became agitated and told us the tour was over and we had to leave. She said we "were interfering with operations."

30. I stepped outside of the holding room as some of our attorneys entered to check the phones. While they did so, I spoke to Ms. Rich about the individuals detained in that holding room and where they stood in the intake process, pointing out that the room was marked for "Flight." She stated that, for those who would be deported, moved to Texas, or "decompressed" to other detention centers in their five-state region (Iowa, Nebraska, North Dakota, South Dakota, and Minnesota), their intake would only consist of fingerprinting, a photo, and confirmation of alienage/status. The detainee would then be given a property

receipt with their A-number on it. I asked whether that counted as intake/processing, and she said yes, so I asked whether they should have received the Detainee Handbook, since I did not observe any of the detainees with a handbook. She said they would have received it, but could not control if the detainee refused it or threw it away. I saw no evidence of a garbage can and, as mentioned, there was food waste on the floor since there was no trash receptacle in the room. It also seemed unlikely that every detainee had discarded the handbook but not food waste.

31. Ms. Rich again asserted that the tour was over and that we were interfering with operations. I asked which operations we were interfering with, since the situation was very calm and it did not seem like there was anything going on, and she had just volunteered to bring out detainees to speak with us. She said we were interfering with intake/processing and medical visits because ICE agents stationed at intake needed to be taken away from their jobs to come into the holding rooms with us "for security."

32. I pointed out that those agents who came into the holding room with us were not conducting intake. One agent who had previously been in the holding room with us drew my attention and showed me a document with a photo and some writing on it and stated that he was working on a file. One of our attorneys pointed out that there were at least 24 stations at intake/processing, with many free agents available. I also re-stated her assertion that ICE had already completed intake for this room of individuals and asked what further intake they needed to do. She stated that they had not completed intake. I asked why that was so since these detainees had been at Whipple for almost a day. She responded that they had not been there that long, and I clarified that the three men I spoke to all said they had been detained since the day before. She then grabbed some paperwork hanging in a slot outside the door and reviewed it. She put it back without clarification.

33. After we had exited the room, counsel again asked how we had been interfering with operations, and Ms. Rich said that she considered our discussions about the phones to be outside the scope of the case. Counsel again asked how we had been interfering with operations, and Scott Ladwig indicated that our presence in the cell had interfered with "orderly" operations because ICE agents were in the cell with us rather than inside the ring of processing desks.

7

34.     Counsel reiterated that we wished to speak to more individuals from the women's cell, as we had previously discussed.

35.     ICE allowed us to speak to a woman from the women's cell we had previously seen while she came out for interactions at processing, and told us we could speak to a man, but he was in processing and being fingerprinted at that time, so we were unable to speak with him.

36.     Ms. Rich again declared that the "tour" was over. She said we weren't supposed to be having attorney-client conversations and that these conversations were beyond the scope of the judge's order. We said we were not, and she pointed out a question we had asked about ankle shackles, indicating that this was beyond the scope of the Court's order. In my experience, asking restrained individuals if they were comfortable and whether their restraints hurt are common, humane questions.

37.     Those two individuals and the individuals in L2 are the only detainees with whom we were permitted to attempt to speak.

38.     We only had the opportunity to test the intake phone and phones in the empty single cell and the flight holding cell. ICE did not permit us to access any other holding cells.

39.     Our attorneys tried to step to the side to have a conversation with us given the interference with our visit, but we were not allowed to speak. Laura Trosen stated that it was a secure area and that counsel visits and conversations should not take place in that area because it was not private. This area was more private than any of the other areas except for the private room, which was empty the entire time we were there. They would not let us speak to each other and we agreed to move to the break room.

40.     After we had been ushered to the ICE break room, counsel indicated our willingness to speak to detainees in whatever setting ICE preferred, including by use of the ERO visitation rooms. Ms. Rich reiterated that doing so would interfere with processing and operations. ICE and their attorneys indicated they would consider our request and let us know how they wanted to proceed.

41. Defendants' counsel said they were not prepared for this kind of visit (despite the judge's order that plaintiffs' counsel be permitted to access Whipple and speak to detainees) and kept talking about how uncommon it was for people to go into the holding cells. See Order Regarding Scope of Visit of Whipple Building, ECF 85, *Advocates for Human Rights v. Dep't of Homeland Security* (D. Minn. Feb. 8, 2026) [Clarification Order] ("It is hereby ordered that . . . Plaintiffs' counsel and representatives and defense counsel may interact with detainees in the Whipple Building on topics relevant to this case.").

42. Scott Ladwig escorted us to the waiting area for the ERO visitation rooms (outside the secure ICE area). He unlocked that door and propped it open. We waited for 30 minutes, during which several people entered the room looking for assistance from employees because they had been directed to that room to attempt to recover property. The room was unstaffed for the duration of our visit.

43. After half an hour, Laura Trosen and Christina Parascandola came to the room, and Christine informed us that ICE had decided that the "visit ends, and you're free to go."

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: February 10, 2026

Respectfully Submitted,

/s/ *Hanne Sandison*
The Advocates for Human Rights
330 Second Ave. S, Suite 800
Minneapolis, MN 55401
612-746-4673
hsandison@advrights.org