# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| THE ADVOCATES FOR HUMAN RIGHTS and L.H.M., through her next friend C.A., | Case No. 26-CV-749 (NEB/DLM) |
| Plaintiffs, | |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of Homeland Security; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; TODD LYONS, in his official capacity as Acting Director of Immigration and Customs Enforcement; MARCOS CHARLES, in his official capacity as the Acting Executive Director for Immigration and Customs Enforcement's Enforcement and Removal Operations; DAVID EASTERWOOD, in his official capacity as Acting Field Office Director for Immigration and Customs Enforcement's Enforcement and Removal Operations St. Paul Field Office; U.S. FEDERAL PROTECTIVE SERVICE; FARON K. PARAMORE, in his official capacity as Director of the Federal Protective Service, | ORDER |
| Defendants. | |

Immigrations and Customs Enforcement ("ICE") recognizes that noncitizen detainees have a constitutional right to access counsel. But in recent weeks, ICE has

isolated thousands of people—most of them detained at the Bishop Henry Whipple Federal Building—from their attorneys. Plaintiffs, who are noncitizen detainees and a nonprofit that represents noncitizens, have presented substantial, specific evidence detailing these alleged violations of the United States Constitution. In response, Defendants offer threadbare declarations generally asserting, without examples or evidence, that ICE provides telephone access to counsel for noncitizens in its custody. The Plaintiffs' declarations provide specifics of the opposite. The gulf between the parties' evidence is simply too wide and too deep for Defendants to overcome. Because Plaintiffs have demonstrated a likelihood of success on the merits and the remaining *Dataphase* factors tilt their way as well, the Court grants Plaintiffs' motion for a temporary restraining order.

Before examining the factual record and the law, the Court notes the following about the case's procedural history: After the Complaint and TRO motion were filed on January 27, 2026, the Court set a briefing schedule, allowing six days for Defendants to submit evidence and briefing, and one day for Plaintiffs' reply.[1] Defendants' initial submission included just one declaration containing general assertions but little by way of specifics. (ECF No. 72 ("Bottjen Decl.").) The Court then held a hearing on February 6,

---

[1] The Court granted Defendants' request to extend the briefing schedule, giving Defendants an extra six hours, and Plaintiffs an extra half of a day. (ECF No. 66.)

2026. (ECF No. 87 (Transcript ("Tr.").) At the hearing, counsel for Defendants was unable to answer many of the factual questions posed by the Court, and Defendants noted more than once that they had "a very short window of time in which to respond." (*Id.* at 51.[2]) Counsel for Defendants then said that they[3] had not visited Whipple, but they would like to go, so they requested "time for supplemental briefing and to respond to some of these factual legal issues" to "create a more fulsome record." (*Id.* at 51–52.)

The Court obliged the request and allowed access to Whipple for both parties by 5 p.m. CST on February 9, 2026, with supplemental declarations from both parties due by 5 p.m. CST on February 10, 2026. (ECF No. 81.) The Court also told the parties that it would rule by 5:00 p.m. CST on February 12, 2026.[4] Plaintiffs submitted two supplemental declarations by the February 10, 2026 deadline. (ECF Nos. 89–90.) Defendants submitted none. No party requested any additional briefing.

---

[2] All page citations to the record reference ECF pagination.

[3] The Court had anticipated a potential knowledge gap between counsel and its client, and for that reason ordered someone from ICE with authority to bind operations in Minnesota to be present for the mediation preceding the hearing and for the hearing itself. (ECF No. 78.) Tauria Rich, Deputy Field Office Director for ICE in St. Paul, attended, but her presence did not appear to assist counsel in their ability to respond to the Complaint and Motion.

[4] The Court ordered a mediation with United States Magistrate Judge Arthur J. Boylan (ret.) in an attempt to allow the parties to craft a mutually acceptable remedy. (ECF No. 39.) The parties did not reach an agreement before the deadline.

Then, four hours before the time the Court set for issuance of an Order, Defendants requested to file a declaration out of time due to "excusable neglect."[5] (ECF No. 92.) Defendants attached the substance of the declaration as well, which contained testimony from Tauria Rich, the Deputy Field Office Director at Whipple. (ECF No. 92-1 ("Rich Decl.")). Rich was present at counsel table at the February 6, 2026 hearing. The explanations in today's filing do not constitute excusable neglect, but the Court will consider the late-filed declaration nonetheless. As further explained below, these filings leave the Court with a fairly fulsome record submitted by Plaintiffs, and little submitted by Defendants. The Court emphasizes that its TRO ruling is made on the factual record before it, as is required by the law.

## BACKGROUND

Operation Metro Surge, a recent ICE initiative, has deployed thousands of federal law enforcement agents to Minnesota with the principal aim of detaining and deporting noncitizens. DHS reported thousands of arrests in a matter of weeks.[6]

Those arrested and detained in Operation Metro Surge are usually held at Whipple, at least initially. Some people are detained for hours before being transferred

---

[5] Plaintiffs opposed this motion. (ECF No. 94.)

[6] These arrests are not based on an allegation of criminal wrongdoing; they are civil detentions under immigration statutes.

to Texas; others are held for days. (ECF No. 27 ("J.J.B. Decl.") ¶¶ 19–22 ("Some people detained with me had been at Whipple for 20 days.").) Whipple consists of seventeen hold rooms; each room has concrete benches, one or two toilets, and as many sinks—but no beds. (Bottjen Decl. ¶¶ 9–10.)

Whipple apparently has the mechanisms to provide its detainees access to counsel: Before Operation Metro Surge, agents at Whipple worked with attorneys and detainees to facilitate attorney-client communication. (ECF No. 21 ("Briand Decl.") ¶ 8; ECF No. 29 ("Kelley Decl.") ¶¶ 7–8; ECF No. 25 ("Heinz Decl.") ¶ 3.). Defendants maintain that Whipple continues to respect detainees' access to counsel. (*See generally* Bottjen Decl.; Rich Decl.) But their declarations add no further information. According to Bottjen's declaration, detainees have access to a list of free or low-cost legal service providers and unlimited, unmonitored calls to their attorneys. (*Id.* ¶ 13). This account, however, is belied by the record. As set forth below, Plaintiffs submit nineteen detailed declarations with specific accounts of their experiences. (ECF Nos. 20–30; ECF Nos. 61–64; ECF No. 67; ECF No. 77 ("L.H.M. Decl."); ECF Nos. 89–90.)  Defendants do not dispute Plaintiffs' specific accounts.

Plaintiffs' evidence suggests that since Operation Metro Surge began, Defendants' policies and practices at Whipple all but extinguish a detainee's access to counsel:

- *Immediate transfer.* Detainees are moved frequently, quickly, without notice, and often with no way for attorneys to know where or how long they will be at a given facility. (ECF No. 20 ("Boche Decl.") ¶¶ 9, 13, 18; ECF No. 24 ("Edin Decl.") ¶ 6; Heinz Decl. ¶ 5 (explaining that of eleven clients initially detained at Whipple, ten were transferred out of the state within twenty-four hours); Kelley Decl. ¶ 19.) Once a person has been transferred out of Minnesota, "representation becomes substantially more difficult"—attorneys must secure local counsel to sponsor a *pro hac vice* application and navigate additional barriers. (Edin Decl. ¶ 12; Heinz Decl. ¶ 8 (explaining that eight of the attorney's clients were transferred to Nebraska and Texas and remain in detention there "because they have been unable to find local counsel to file a habeas petition in the local district court"); ECF No. 61 ("Glenn Decl.") ¶ 9.) These rapid transfers impede attorneys' "ability to meet with clients, develop facts, consult meaningfully, and seek timely judicial review of detention decisions." (Edin Decl. ¶ 13; Heinz Decl. ¶ 9.) Other detention facilities impose severe phone access limitations, discussed below. (Edin Decl. ¶ 14; Glenn Decl. ¶ 7 ("Once a client is detained out of state, it becomes virtually impossible to communicate with them directly.").) And, even when an attorney is eventually able to contact a client who has been transferred outside Minnesota, Plaintiffs allege there are still grave restrictions on the client's access to counsel. For example, in one case a detainee who was quickly transferred outside Minnesota missed multiple, scheduled videocall appointments with their attorney for unexplained reasons; this created an additional barrier to access to counsel because the noncitizen communicates through American Sign Language. (ECF No. 62 ¶¶ 15–19.)

- *Locating detainees.* Defendants transfer people so quickly that even Defendants struggle to locate detainees. (Glenn Decl. ¶ 5.) Often, Defendants do not accurately or timely input information into the Online Detainee Locator System. This prevents Minnesota-based attorneys from locating and speaking with their clients. (Boche Decl. ¶¶ 15–19; Heinz Decl. ¶ 6.) The locator either produces no search results or instructs attorneys to call for details, referencing a phone number that ICE does not answer. (*See* Kelley Decl. ¶¶ 16, 18; Glenn Decl. ¶ 4.) Often, Defendants do not update the locator until after detainees are out of state. (Heinz Decl. ¶ 6.) Attorneys frequently learn of their client's location for the first time when the government responds to a habeas petition. (Glenn Decl. ¶ 4.)

- *Phone calls.* At Whipple, detainees are generally (but not always) allowed one phone call, and the time frame of that phone call is unclear. (Boche Decl. ¶¶ 12, 15; J.J.B. Decl. ¶¶ 10, 16.) Many people do not know the name, much less the number, of their attorney—if they have one—so calls are usually to family. (J.J.B. Decl. ¶¶ 10, 16; ECF No. 26 ("J.I.B.C. Decl.") ¶¶ 12–13.) Although Whipple provides printed lists with the names of free legal service providers and the corresponding number codes to reach them via telephone, the lists do not consistently identify those organizations as legal service providers or present accurate codes. (ECF No. 89 ("Sandison Decl.") ¶¶ 6–7, 9.) The phones are located in open, non-private areas where ICE personnel and other detainees can overhear the conversation. (Boche Decl. ¶ 15.) But the phones are not easy to operate. (ECF No. 89 ¶ 8; ECF No. 90 ¶¶ 5, 12–13.) And incoming calls from attorneys are met with a busy signal or never-ending ringing. (Kelley Decl. ¶¶ 12–14; Glenn Decl. ¶ 4.)

- *Entering Whipple.* Even when detainees are not immediately transferred outside of Minnesota, Defendants erect barriers that dissuade attorneys from entering the building. Federal agents outside of Whipple have rebuffed, intimidated, and even threatened many attorneys trying to reach their clients. For example, one attorney trying to see her client—whose habeas petition had been granted three days earlier—was threatened with arrest by two lines of heavily armed personnel if she "went any farther." (Kelley Decl. ¶¶ 24–25). Another attorney was told to "turn [his] car around and get the hell out of here." (ECF No. 28 ("Keller Decl.") ¶ 10.)

- *Visiting clients.* When attorneys are permitted to enter Whipple, Defendants refuse to let them see their clients. (Boche Decl. ¶ 12; Kelley Decl. ¶ 20.) Defendants tell attorneys that they do not allow any attorney visitation because if they gave one person an attorney visit, they would have to give everyone an attorney visit—"imagine the chaos." (ECF No. 22 ¶ 18; Kelley Decl. ¶ 34.)

- *Mail and email.* Detainees at Whipple are not allowed to send mail or email, so they have no way to access the courts themselves. (J.J.B. Decl. ¶ 17.) ICE does not monitor emails from attorneys, even if the attorney's email attaches a release order. When an attorney told an agent that she sent a copy of a release order to the specified email address, the agent laughed and said "something to the effect of 'yeah we really need to get someone to check that email.'" (Kelley Decl. ¶ 23.)

7

- *Pressuring detainees.* Despite these policies and practices that make attorneys inaccessible to detainees, Defendants pressure detainees to sign voluntary removal forms (i.e., self-deportation) without being allowed to talk to counsel. (Boche Decl. ¶ 15; *see id.* ¶ 22 ("Denial of timely access to counsel and confidential communication, combined with transfer-induced disorientation, leaves clients traumatized and vulnerable to coercive tactics."); Briand Decl. ¶ 11 ("When I finally do talk with [clients], they've uniformly reported that Defendants' agents questioned them and pressured them to self-deport, and subjected them to inhumane conditions that made them want to give up on their rights just to escape captivity."); Kelley Decl. ¶ 22; Glenn Decl. ¶ 6 ("Several of my clients who have been transported to Texas from Minnesota have reported that ICE agents lie to them about the status of their habeas cases and the merits of their claims and attempt to pressure them to sign voluntary deportation agreements.").) Detainees are told, among other things, that they will be back in the United States within a year if they sign (ECF No. 62 ¶ 23); they will be detained for months longer if they do not sign (ECF No. 67 ("O. Decl.") ¶ 27); or they will receive money if they sign (*id.* ¶¶ 12, 27). When a detainee asks to speak with an attorney before they sign the form, they are refused. (Boche Decl. ¶ 22 ("Our inability to explain their rights and the status of their cases leaves our clients unable to evaluate DHS' claims and uncertain about whether to give into the pressure to self-deport and abandon their rights.").)

All of these barriers make it difficult—if not impossible—for attorneys to effectively represent their clients.[7] (*Id.* ¶ 12 ("Instead of applications for relief, I am spending time finding my clients, scheduling meetings that then can't proceed because

---

[7] In post-briefing supplemental declarations, the parties also reference detainee handbooks. (ECF No. 89 ¶ 13; ECF No. 90 ¶ 11; Rich Decl. ¶ 5.) Defendants state that each detainee receives their own copy of the handbook, which contains information on how to contact attorneys and family. (ECF No. 91-1 ¶ 5.) Plaintiffs explain that the handbook includes "limited information on rights to legal counsel and that information was only in English." (ECF No. 89 ¶ 13.) Defendants did not submit a copy of the handbook to the Court, so the Court has no other information about the contents of the handbooks.

DHS does not let clients join, spending time updating their families, and in cases where there is additional movement after the first transfer out of Minnesota, finding my clients again.").) While examples abound of the challenges that result from Defendants' policies and practices, the Court below focuses on the experiences of four individuals who were initially detained at Whipple: O., J.J.B., J.I.B.C., and L.H.M.

### I.    O.

O. is a 20-year-old applicant for asylum and Special Immigration Juvenile Status. (O. Decl. ¶ 1.) He has an Employment Authorization Document, and his removal proceedings are administratively closed while he waits for an asylum interview. (*Id.*)

On January 10, 2026, while driving back to work after getting lunch with his father and cousin, a car quickly passed O., sped up, then stopped in front of him. (*Id.* ¶ 3.) A few men in civilian clothes stepped out of the car and asked for his identification. (*Id.*) The men threatened O.—if he did not get out of the car, they would force him out. (*Id.*) O. exited the car and was told he was under arrest. (*Id.*) The men handcuffed him and did not allow him to bring his phone. (*Id.*) O. felt like he was being kidnapped. (*Id.*)

The men detained O., his father, and his cousin, taking them all to Whipple. (*Id.* ¶ 4.) At Whipple, there was "food scattered on the floor, the floor was sticky with mud, and everything stuck to your shoes." (*Id.* ¶ 5.) The space was so cramped that sometimes there was no space to sit on the floor. (*Id.*)

The morning after O. was arrested, ICE allowed him to make one call. (*Id.* ¶ 6.) O. wanted to call his attorney, but he did not have her number. (*Id.*) After repeatedly asking an ICE officer to look up her number, the ICE officer did so and found two numbers. (*Id.*) But both numbers were general organization numbers, so the numbers did not work. (*Id.*) He was not allowed another call. (*Id.*)

Unbeknownst to O., his attorneys filed a habeas petition on his behalf the second day of his confinement. Case No. 26-167 (JWB/JFD) (D. Minn. Jan. 11, 2026), ECF No. 1 (Petition for Writ of Habeas Corpus). His attorney had no opportunity to meet with him to discuss his rights or the claims and facts relevant to his petition. (Boche Decl. ¶ 13.)

Also on his second day of confinement, O. was transferred to El Paso, Texas. (O. Decl. ¶¶ 6–7.) In El Paso, agents told detainees that ICE did not have the resources for detainees to make phone calls. (*Id.* ¶ 12.) There were only two flip phones for all the detainees at the detention facility, and O.'s cell alone held about seventy-two individuals. (*Id.*) Over the ten days of his detention in El Paso, agents brought the flip phones to his cell two or three times, for two hours each. (*Id.*) If someone got the phone, they could only use it for two minutes. (*Id.*)

On January 15—O.'s fifth day of confinement—a judge granted O.'s petition and ordered his immediate release in Minnesota. Case No. 26-167 (JWB/JFD) (D. Minn. Jan.

15, 2026), ECF No. 6 (Order). O.'s attorney scheduled meetings with O. online, but O. was not made available to the attorney. (Boche Decl. ¶ 14.)

The ICE attorney on O.'s habeas case told O.'s attorney that O. would be released in Minnesota by January 20, 2026. (*Id.*) But on January 24—nine days after a court ordered O.'s release—O. was transferred to another location in New Mexico. (*Id.*; O. Decl. ¶¶ 19–20.) O.'s attorney learned this not through ICE, despite repeated calls and emails, but through numerous and time-consuming attempts to locate O. (*Id.*). Then, on or about January 27, 2026, O was transferred back to El Paso. (O. Decl. ¶ 26.)

Back again in El Paso, an officer told O. he "had no chance of returning to Minnesota," "the best thing for [him] is self-deportation," and that if O. fought his case, he would be in El Paso for months longer. (O. Decl. ¶ 27.) O. was offered $2,600 to sign self-deportation forms. (*Id.*) If O. didn't know that his release had been ordered—which he learned through the one call he had with his attorney while in New Mexico. not through Defendants—he might have signed the forms because of the unbearable conditions. (*Id.* ¶¶ 23, 27.)

Shortly after that conversation, Defendants told O. that he "might be free." (*Id.* ¶ 28.) When ICE finally brought O. to the airport, they arrived too late and he missed the plane. (*Id.* ¶ 29.) He made the flight the next day, and his teacher picked him up. (*Id.* ¶¶ 31–32.)

11

O. was detained for 18 days, despite a judge ordering his release on the fifth day of his detention. (*See id.* ¶ 33.) Officers never told him why he was detained or why he was released. (*See id.*)

## II.    J.J.B.

J.J.B. is 20 years old, and a refugee. (J.J.B. Decl. ¶ 1.) On January 13, 2026, J.J.B. parked outside of his home and was immediately surrounded by 20 ICE agents. (*Id.* ¶ 4.) Officers did not allow J.J.B. to tell his mother that he was being detained. (*Id.* ¶ 5.)

J.J.B. asked agents about his case, and explained that he had refugee status, but agents said that officers would look into it in Texas. (*Id.* ¶ 11.) Without access to a lawyer, J.J.B. did not know how to exercise his rights. (*Id.* ¶ 17.) Even if he had known how to ask a court to order his release, it was impossible to send mail or email, so he could not have done so. (*Id.*)

J.J.B.'s holding cell at Whipple "could not hold more than 20 people"—yet it was packed with 100. (*Id.* ¶ 12.) The room had a dirty toilet with excrement overflowing. (*Id.*) J.J.B. had to ask for toilet paper, but was sometimes denied. (*Id.*) There were no beds, blankets, or trashcans, and trash was all over the ground. (*Id.* ¶ 13.) People slept in handcuffs and standing up because there was not enough room. (*Id.*) One person in J.J.B.'s cell had epilepsy and begged for medication; no one answered. (*Id.*)

"ICE beat people and denigrated them." (*Id.* ¶ 15.) J.J.B. explains that it "seemed like the ICE officers wanted to scare" him, and they "treated [him] and the other detainees like animals." (*Id.* ¶ 22.) Through the duration of J.J.B.'s confinement, he was shackled by his ankles with handcuffs meant for wrists. (*Id.* ¶ 12.) Because they were meant for wrists, they were too small and caused pain, and no one listened to his pleas to loosen them. (*Id.*) No one told J.J.B. what they were going to do to him. (*Id.* ¶ 13.)

At Whipple, J.J.B. was initially allowed one phone call—if no one answered, he could not try again. (*Id.* ¶ 10.) An officer told J.J.B. that they had attorneys available but did not provide any contact information. (*Id.*) J.J.B. called his mother, who said she would find him an attorney. (*Id.*)

Through the duration of J.J.B.'s three days of confinement, J.J.B. was able to use the phone multiple times only because he begged, telling the agents he had not called anyone yet. (*Id.* ¶ 16.) The phone calls were not private—they were in an open hallway with ICE agents nearby. (*Id.*) During one phone call, J.J.B.'s mother gave him the phone number for an attorney. (*Id.*). J.J.B. begged for a pen and paper to write it down and pleaded for another phone call so he could call the attorney. (*Id.*) Once he reached his attorney, Defendants limited his call to just a few minutes. (*Id.*)

On J.J.B.'s third day at Whipple, ICE chained his stomach and handcuffed his wrist; his feet remained cuffed. (*Id.* ¶ 20.) He was told he was going to Texas. (*Id.* ¶ 21.) J.J.B. asked to call a lawyer, but agents refused. (*Id.*)

He never left Whipple. Officers told J.J.B. to sign a paper that said "OUT." (*Id.* ¶ 25.) J.J.B. asked what it was and if he could speak to a lawyer; officers told J.J.B. to sign it without a lawyer. (*Id.*) He did so. (*Id.* ¶ 26.) Agents then removed the handcuffs from his ankles; J.J.B. still has marks from the cuffs. (*Id.* ¶ 25.) He was released that day. (*Id.* ¶ 26.)

J.J.B. was never told why he was detained or why he was released; he was never told an attorney tried to visit him. (*Id.* ¶ 27.) Although he is released, J.J.B. is afraid to leave his house and is worried that he will be detained again and denied the ability to speak with a lawyer. (*Id.* ¶ 28.)

### III.    J.I.B.C.

J.I.B.C. is 19-years-old  and has pending applications for Special Immigrant Juvenile status and asylum. (J.I.B.C. Decl. ¶ 1.) On January 13, 2026, he was leaving T-Mobile when another car struck his own. (*Id.* ¶¶ 3–4.) Agents surrounded him, opened the car doors, and wrenched him out. (*Id.* ¶ 4.)

J.I.B.C. offered to show the agents his immigration documents, but the agents said they did not need to see them. (*Id.* ¶ 6.) When he pulled out his cell phone, the agents

14

threw him to the ground. (*Id.* ¶ 5.) The immigration documents were left inside his car. (*Id.* ¶ 6.)

Several hours after arriving at Whipple, J.I.B.C. was allowed one phone call. (*Id.* ¶¶ 8, 12.) There was no privacy—it was a shared phone, located in a hallway between cells with agents nearby. (*Id.* ¶ 12.) J.I.B.C. told his girlfriend he had been detained; she said she would find a lawyer. (*Id.* ¶ 13.) Agents told J.I.B.C. to tell her that he was going to El Paso, Texas. (*Id.*)

That day, J.I.B.C. was transferred to Texas. (*Id.* ¶ 15.) During his weeklong detention, he was allowed only two calls. (*Id.* ¶ 22.) Officers pressured people to sign voluntary self-deportation papers; many did. (*Id.* ¶ 23.) Agents told J.I.B.C. that he would be detained longer if he fought his case. (*Id.*)

J.I.B.C. had no idea that Kira Kelley, an attorney in Minnesota, was working on getting him released. (*Id.* ¶ 37.) Five days into his detention, a judge granted J.I.B.C.'s habeas petition and ordered his immediate release. (Kelley Decl. ¶ 4.) Kelley sent the order to the St. Paul field office email and did not receive a response. (*Id.* ¶ 17.)

Two days after the order, Kelley looked for J.I.B.C. in ICE's Online Detainee Locator, but there were no results for her inquiry. (*Id.* ¶ 16.) Kelley called an ICE/ERO officer on his direct phone line. (*Id.* ¶ 17.) Kelley informed the officer that J.I.B.C.—along

with four others—had court orders granting their release; Kelley asked for her clients' location and to send those orders to ICE.(*Id.*) The officer said no. (*Id.*)

However, that day, officers told J.I.B.C. that he was leaving. (J.I.B.C. Decl. ¶ 24.) Officers did not tell him where he was going; he thought he was being deported to Ecuador or sent to another state. (*Id.* ¶ 27.) He did not learn he was going to Minnesota until he asked a flight attendant. (*Id.*) Back at Whipple, officers gave him documents in English to sign. (*Id.* ¶¶ 28–31.) He does not know what he signed because he does not speak much English. (*Id.* ¶ 31.)

J.I.B.C. called an Uber to take him home. (*Id.* ¶ 32.) He "felt like [he] had been kidnapped." (*Id.* ¶ 33.) He has severe stress and trauma, and he has not left his house. (*Id.* ¶ 36.) He is afraid he will be detained again. (*Id.*)

### IV.    L.H.M.

Plaintiff L.H.M. is a single mother of three children. (L.H.M. Decl. ¶¶ 1, 11.) She is a citizen of Honduras and has a pending asylum application in the United States. (*Id.* ¶¶ 2, 6.)

On January 27, 2026, L.H.M. went to a regular monthly immigration check-in appointment. (*Id.* ¶ 7.) An officer took L.H.M. to an office, telling L.H.M. that she had a "surprise" for her. (*Id.* ¶ 8.) That "surprise" was five armed ICE officers who handcuffed her. (*Id.*)

16

L.H.M. fainted from shock. (*Id.*) When she awoke, she explained that she recently had brain surgery. (*Id.* ¶ 10.) She was accused of faking her reaction. (*Id.*) L.H.M. asked to speak to her lawyer but was not allowed. (*Id.*)

L.H.M. was detained along with three other people; an officer checked the waiting room, and, seeing that no one else was waiting for their immigration check-in, brought her and the three other people into a car in the parking lot. (*Id.* ¶ 12.) They were brought to Whipple. (*Id.* ¶ 13.)

During intake at Whipple, an officer slammed L.H.M.'s head against the wall while checking her hair. (*Id.*) Her head hurt the rest of her detention; L.H.M.'s doctor later told her that this likely caused a concussion. (*Id.* ¶¶ 13, 27.)

L.H.M. was initially allowed one phone call. (*Id.* ¶ 15.) She called her sister, through which she notified her attorney, Danielle Briand, of her detention. (*Id.*) Agents cut off the call after less than 90 seconds. (*Id.*) L.H.M.'s attorney tried to visit her, but she was denied access for lack of "capacity." (Briand Decl. ¶¶ 7–9.) Her attorney was concerned about L.H.M.'s medical condition given her recent cranial surgery and wanted to ensure L.H.M.'s medical needs were met. (*Id.* ¶ 10.) Her attorney also wanted to assist L.H.M.'s habeas counsel in advocating for her release. (*Id.*)

The first night of her detention, L.H.M. was briefly transferred to a facility in Wisconsin, but she returned to Whipple the next morning. (*Id.* ¶ 17.) She was not given food for her first 24 hours of detention. (*Id.*)

Throughout her time at Whipple, officers repeatedly refused her requests for a phone call, but with persistence she was able to make several short calls. (*Id.* ¶ 19.) Officers were present during the calls, telling her that "[her] time is done" or "two more minutes." (*Id.*) She was only allowed one call each time, so she had to choose between calling her sister, who was taking care of her daughters, or her attorney. (*Id.*)

She repeatedly asked for medical attention for her head and pain around her surgical site, but officers refused. (*Id.* ¶ 21.)

On January 30, 2026, her attorney tried to visit her, but officers refused. (*Id.* ¶ 20.) That night, L.H.M. was transferred to a county jail in Minnesota. (*Id.* ¶ 22.) A co-detainee told L.H.M. that officers had withheld her blood pressure medication for five days; another said she had been hospitalized for eight days after being beaten during her arrest. (*Id.*) The next day L.H.M. was taken to a facility clinic and finally received medical attention.(*Id.* ¶ 23.)

She returned to Whipple on January 31 and was released. (*Id.*) But ICE did not return her property to her, including her daughter's U.S. passport, two checks for almost $400 each, her Minnesota ID, or her work permit. (*Id.* ¶ 26.)

18

## ANALYSIS

In analyzing a motion for a temporary restraining order, the Court considers four factors: (1) the likelihood of success on the merits; (2) the threat of irreparable harm to the movant; (3) the balance of the harms; and (4) the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc); *see Bel Canto Design, Ltd. v. MSS HiFi*, 813 F. Supp. 2d 1119, 1124 (D. Minn. 2011) (applying *Dataphase* factors to TRO). Plaintiffs, as the party seeking the injunction, carry the burden of establishing these four factors. *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003). No one factor is determinative. *D.M. by Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 999 (8th Cir. 2019).[8]

## I.    Standing

Defendants assert that Plaintiff AHR (Advocates for Human Rights) lacks standing—a prerequisite to Article III jurisdiction. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). "Ordinarily, one may not claim standing . . . to vindicate the constitutional

---

[8] The Court need not provisionally certify the class to issue preliminary relief. *A.A.R.P. v. Trump*, 605 U.S. 91, 98 (2025) (per curiam); *Tincher v. Noem*, 164 F. 4th 1097, 1099 (8th Cir. 2026) (per curiam). Although the Court does not rule on class certification at this time, it nonetheless concludes based on a review of the record, Rule 23 of the Federal Rules of Civil Procedure, and relevant caselaw, that certification is likely for this putative class: noncitizens taken into custody under the Immigration and Nationality Act and initially detained at the ERO Holding Facility at the Bishop Henry Whipple Federal Building located at 1 Federal Drive, Fort Snelling, Minnesota.

rights of some third party." *Barrows v. Jackson*, 346 U.S. 249, 255 (1953). A party may nonetheless assert third-party standing if they show: (1) an "injury in fact," (2) "a close relation to the third party," and (3) "some hindrance to the third party's ability to protect his or her own interests." *Powers v. Ohio*, 499 U.S. 400, 411 (1991) (citation omitted). AHR makes this showing.

### A.    *Injury in Fact*

Legal aid nonprofits suffer an injury when Defendants' actions "perceptibly impair[]" their "primary mission" rather than merely their "abstract social interests." *Granville House, Inc. v. Dep't of Health & Hum. Servs.*, 715 F.2d 1292, 1298 (8th Cir. 1983). "[D]eflection of an organization's monetary and human resources" is an Article III injury. *Arkansas ACORN Fair Hous., Inc. v. Greystone Dev., Ltd. Co.*, 160 F.3d 433, 434 (8th Cir. 1998).

Plaintiff AHR is an independent, nonpartisan nonprofit that promotes and protects human rights. (Boche Decl. ¶ 2.) One of its core activities is providing and facilitating legal services to migrants. (*Id.*) Based in Minneapolis, AHR provides free legal help to people detained in Minnesota, North Dakota, and South Dakota. (*Id.*)

20

On the record before the Court, Defendants' policies and practices prevent AHR attorneys from effectively representing their clients.[9] Defendants have prohibited AHR and its volunteer attorneys from visiting or speaking confidentially with clients. (*Id.* ¶ 15.) When clients are moved out of state, AHR is "often entirely unable to meet with our clients in person after their transfer and may have considerable difficulty even locating them." (*Id.* ¶ 18.) These practices prevent AHR attorneys from accessing their clients, directly affecting AHR's core mission of providing and facilitating legal services to migrants.

And Defendants' policies and practices result in a diversion of AHR's time and resources toward locating clients, establishing basic communication, and pursuing emergency filings. (*Id.* ¶ 19; ECF No. 30 ¶¶ 1, 17.) Consequently, AHR has made significant operational changes and has less time to spend on substantive legal work at the core of its mission. (Boche Decl. ¶¶ 19–21.) Thus, the injury-in-fact prong of the test is met.

---

[9] Defendants assert that AHR does not identify any clients being held at Whipple or describe attempts by people at Whipple to contact their attorneys. (ECF No. 70 at 10.) That is incorrect. (ECF No. 30 ¶¶ 1–2, 4–9, 10–17; ECF No. 67 ¶¶ 6, 11–12, 15–18.)

**B.      Close Relationship**

"[T]here must be an identity of interests between the parties such that the plaintiff will act as an effective advocate of the third party's interests." *Lepelletier v. FDIC*, 164 F.3d 37, 44 (D.C. Cir. 1999). AHR provides legal representation for its clients, and thus advocates on their behalf. That relationship satisfies this element. *See Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 623 n.3 (1989) ("The attorney-client relationship . . . is one of special consequence . . . .").

**C.      Hindrance**

Finally, AHR must show some hindrance in its clients' ability to protect their own interests. *See Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004). AHR challenges the very hindrances that prevent clients from protecting their own interests. *Caplin*, 491 U.S. at 623 n.3. Detainees have no access to mail and could not initiate suit on their own if they wanted to. Also, detainees cannot meet in person with attorneys and have limited ability to call their attorneys. Detainees are also especially unlikely to initiate suit to vindicate their right to counsel when they have more pressing legal claims to assert—challenges to the fact of their confinement. *S. Poverty L. Center v. U.S. Dep't of Homeland Sec.*, No. 18-CV-

760, 2020 WL 3265533 at * 14 (D.D.C. June 17, 2020). AHR thus has third-party standing to vindicate the constitutional rights of its clients.[10]

## II. Likelihood of Success

"While no single factor is determinative, the probability of success factor is the most significant." *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013) (citation modified). Plaintiffs press three claims in the motion for a temporary restraining order—violations of the Fifth Amendment, First Amendment, and Immigration and Nationality Act. The Court concludes that Plaintiffs are likely to succeed on their Fifth Amendment claim, and so the Court need not address Plaintiffs' other claims at this stage. *United Healthcare Ins. v. AdvancePCS*, 316 F.3d 737, 742–43 (8th Cir. 2002).

The Fifth Amendment Due Process Clause "applies to all 'persons' within the United States," including noncitizens, "whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001). "It is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings." *Reno v. Flores*, 507 U.S. 292, 306 (1993); *see Al Khouri v. Ashcroft*, 362 F.3d 461, 464 (8th Cir. 2004) (similar). Noncitizens' Fifth Amendment right to due process includes both the right to obtain counsel and the right to access counsel. *See Orantes-*

---

[10] Plaintiffs advance other theories of standing, but the Court need not address them here. *See Town of Chester, N.Y. v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017).

*Hernandez v. Thornburgh*, 919 F.2d 549, 554 (9th Cir. 1990) (reiterating that noncitizens "have a due process right to obtain counsel of their choice at their own expense"); *Biwot v. Gonzales*, 403 F.3d 1094, 1098–99 (9th Cir. 2005) (infusing the right to counsel with meaning requires providing noncitizens "with reasonable time to locate counsel and permit counsel to prepare" for immigration proceedings); *see also Arroyo v. U.S. Dep't of Homeland Sec.*, No. SACV 19-815 JGB (SHKx), 2019 WL 2912848, at *17 (C.D. Cal. June 20, 2019) ("[T]he right to counsel contains the related right to consult with counsel.").

Defendants do not contest—and in fact agree—that the Fifth Amendment provides noncitizens these rights in civil proceedings. (ECF No. 70 at 12.) The argument is instead over the contours of the right to obtain and access counsel, and how to determine when a due process violation has occurred.

In the criminal pretrial detainee context, the Eighth Circuit has ruled that "detainees have a substantial due process interest in effective communication with their counsel." *Johnson-El v. Schoemehl*, 878 F.2d 1043, 1051 (8th Cir. 1989). Pre-trial detainees "must have a reasonable opportunity to seek and receive the assistance of attorneys." *Id.* at 1052 (citation omitted). And "access to the legal system must be 'meaningful.'" *Id.* at 1053; *see Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 554 (9th Cir. 1990) (stating that noncitizens' due process right to counsel "must be respected in substance as well as in name") (citation omitted).

24

The Eighth Circuit has not explicitly imported the pretrial-detainee analysis in *Johnson-El* to noncitizen detainees. But it has confirmed that "[i]n certain circumstances, depriving an alien of the right to counsel may rise to the level of a due process violation." *Al Khouri v. Ashcroft*, 362 F.3d 461, 464 (8th Cir. 2004).[11]

When faced with facts similar to those presented here, courts around the country have concluded that plaintiffs were likely to succeed on their Fifth Amendment claim:

- *Mercado v. Noem*, 800 F. Supp. 3d 526 (S.D.N.Y. 2025): Granted a preliminary injunction because of the "[c]lear and substantial likelihood of success" on Fifth Amendment claim. The record evidence showed that: numerous detainees were never told they could speak to a lawyer; one was told ICE was not obligated to provide phone calls after the first day of detention; the hold facility did not permit any visitors; and when phone calls were allowed, they were time-restricted and often monitored or overheard by guards. 800 F. Supp. 3d at 549–50, 577–78.

  - *Remedies granted*: provide free, confidential telephone calls to counsel within 24 hours of being detained, and at least once every 12 hours thereafter while detained; schedule legal calls with counsel within six hours of a request made from 9:00 a.m. to 4:00 p.m., or within 16 hours if request is made thereafter; provide one landline phone for every five detainees; provide detainees a printed Notice of Rights within one hour of arrival in a hold room, including translation as needed; update ICE's Online Detainee Locator System in real time; ensure that ICE's

---

[11] And, although arising in the context of criminal pretrial detainees instead of noncitizens in the immigration context, the Eighth Circuit concluded that a phone system that allows detainees to make only one call during business hours every two weeks would be "patently inadequate" under the Constitution. *Johnson-El v. Schoemehl*, 878 F.2d 1043, 1052 (8th Cir. 1989). The court similarly expressed constitutional concerns over "[f]orcing prisoners to conduct their meetings with their attorneys in the open or to yell over the phone" because that would "obviously compromise[] the consultation." *Id.*

telephone number is monitored and answered without delay from 9:00 a.m. to 5:00 p.m.; and no retaliation against plaintiffs. *Mercado v. Noem*, No. 1:25-CV-6568 (S.D.N.Y. Sept. 17, 2025), ECF No. 97.

- *Vasquez Perdomo v. Noem*, 790 F. Supp. 3d 850 (C.D. Cal. 2025), *appeal dismissed*, No. 25-4312, 2025 WL 4053187 (9th Cir. Nov. 21, 2025): Granted a TRO because of the likelihood of success on Fifth Amendment claim. The record evidence showed that: defendants did not allow in-person attorney visits; moved detainees to different facilities; did not timely update ICE's online locator; failed to provide free and confidential communication between detainees and attorneys; and neglected to refute, with any specificity, plaintiffs' specific claims of lack of phone access in holding cells. *Id.* at 867, 879–882.
  - *Remedies granted*: allow in-person legal visitation by current and prospective attorneys seven days a week for at least eight hours on weekdays and four hours on weekends and holidays; and offer free, confidential phone calls. 790 F. Supp. 3d at 896–97.

- *Innovation L. Lab v. Nielsen*, 310 F. Supp. 3d 1150 (D. Or. 2018): Granted a TRO because of the likelihood of success on Fifth Amendment claim. The Court found that the following facts were more likely true than not: legal visitation for civil immigrant detainees was limited to 12:00 – 3:00 p.m. Monday through Friday; even during that window, attorneys were repeatedly denied access to meet with clients; and detainees were not able to place free legal phone calls. *Id.* 1157–58, 1162–63.
  - *Remedies granted*: allow consultation with attorneys six hours per day, seven days a week; require consent of counsel or leave of court to transfer the detainee out of the judicial district; install at least four phone lines in each unit where detainees are held, allowing free phone calls to legal service providers; allow detainee access to phones during "awake hours"; notify counsel of "credible fear" interview; and provide "know your rights" training. *Id.* at 1165–66.

- *Orantes-Hernandez v. Thornburgh*, 919 F.2d 549 (9th Cir. 1990): Affirmed district court's permanent injunction. The government's conduct consisted of "a pattern of practices which severely impeded class members from communicating with counsel." *Id.* at 567. Those practices included, among others: pressuring El Salvadorians into signing voluntary departure forms

before consulting with counsel; providing legal services lists with incorrect or incomplete information; limiting daytime attorney visitation hours as well as detainees' telephone access; and failing to provide adequate privacy of attorney-client conversations. *Id.* at 564–567.

- o *Remedies granted:* allow confidential attorney-client phone calls; provide one phone per twenty-five detainees; no transfer from the judicial district for seven days to afford class members the opportunity to obtain counsel; allow reasonably physical access to detainees; all counsel may rescind voluntary departure agreements; provide copy of free legal services list and notify detainees of rights; provide notice to counsel before removal; no coercive tactics when informing detainees of voluntary departure; provide notice of rights before informing detainees of voluntary departure; and provide information to family and counsel of detained Salvadorians. *Id.* at 554–55; *Orantes-Hernandez v. Meese*, 685 F. Supp. 1488, 1511–14 (C.D. Cal. 1988).

- *Arroyo v. U.S. Dep't of Homeland Sec.*, No. SACV 19-815 JGB (SHKx), 2019 WL 2912848 (C.D. Cal. June 20, 2019): Granting a TRO in part because of the likelihood of success on Fifth Amendment claim. The record evidence showed that: ICE transferred detainees; transfer limited in-person access to detainees; retained counsel lack resources to represent detainees outside of the area and detainees lack resources to find new counsel; and limited phone and mail access. *Id.* at *17–19.

  - o *Remedies granted:* refrain from transferring detainees represented by counsel outside the ICE Los Angeles Field Office's Area of Responsibility. *Id.* 24–25.

- *Torres v. U.S. Dep't of Homeland Sec.*, 411 F. Supp. 3d 1036, 1063 (C.D. Cal. 2019): The court denied the government's motion to dismiss plaintiffs' Fifth Amendment due process claim in which plaintiffs alleged that defendants restricted access to phone calls and in-person attorney visitation at an immigration detention center. *Id.* at 1044, 1063–64. Afterward, the court granted a temporary restraining order. *Id.*, No. EDCV 18-2604 JGB (SHKx) (C.D. Cal. April 11, 2020.), ECF No. 144.

  - o *Remedies granted:* provide access to free confidential phone calls; remove "positive acceptance requirement" on legal phone calls that makes it difficult to place calls; create a drop box for detainee correspondence

from attorneys; inform detainees of messages left by attorneys; provide facility phone numbers to attorneys for detainees; create an email system for officers; facilitate attorney visitation; and respond to various requests from attorneys within 24 hours. No. EDCV 18-2604 JGB (SHKx), ECF No. 144, at 14–15.

So too here. Defendants do not attempt to rebut or distinguish these cases. Under any explication of the due process analysis on this record, the obstacles the government has put in place at Whipple rise to the level of an unconstitutional infringement of noncitizen detainees' right to access counsel.

*Johnson-El* prescribes that a practice is unconstitutional if it is "not rationally related to a legitimate purpose" or if the practice is "excessive in light of [its] purpose." 878 F.2d at 1048. Mapping this framework onto this case,[12] Plaintiffs have demonstrated that Defendants' practices are likely unconstitutional. Defendants do not explain their purpose in limiting detainees' ability to call family, limiting counsel's ability to call detainees; and failing to timely notify counsel of their clients' location. Defendants appear to implicitly recognize that these practices are unconstitutional—they spill most of their ink explaining that these are not their practices.

---

[12] The Eighth Circuit has not explicitly imported this framework into the noncitizen detainee context, but Defendants do not provide any alternative analysis or push back at this one.

In the late-filed declaration by Rich, Defendants explain that in-person visits are operationally challenging and pose safety risks. Rich explains that there are rooms available, but non-law enforcement is not allowed in this area, and it "would create a significant safety risk to provide access to these rooms" to attorneys. (Rich Decl. ¶ 7.) Any change to standard operating procedures "would require significant resources." (*Id.*) And there are other rooms available, but they are in disuse because of "a lack of security functions" and because the master key does not work to these rooms. (*Id.* ¶ 8.) They would need more funds to renovate these rooms and to station additional officers near these rooms. (*Id.*)

The Court is underwhelmed by this evidence. The record shows that Whipple allowed in-person visits before Operation Metro Surge, and Defendants make no effort to explain why in-person visits suddenly strain their resources. The record also shows that during Operation Metro Surge, the rooms are not used. Putting these evidentiary concerns aside, forbidding in-person visits based on a generic and unspecified risk to safety and lack of resources is excessive. Defendants chose to operate a detention facility, so "they must meet constitutional standards." *Campbell v. Cauthron*, 623 F.2d 503, 508 (8th Cir. 1980). Defendants allocated substantial resources to sending thousands of agents to Minnesota, detaining thousands of people, and housing them in their facilities.

Defendants cannot suddenly lack resources when it comes to protecting detainees' constitutional rights.

Likewise, Defendants' practice of rapidly transferring detainees out of state without an opportunity to consult with counsel is unconstitutionally excessive. The Ninth Circuit has acknowledged that enjoining transfer may be appropriate if transferring the detainee would interfere with an existing attorney-client relationship such that access to counsel is effectively denied. *Cent. Am. Refugees v. I.N.S.*, 795 F.2d 1434, 1439 (9th Cir.), *amended*, 807 F.2d 769 (9th Cir. 1986). That reasoning seemingly tees up a distinction between detainees who have already retained counsel and those who have not. But other courts have concluded that a detainee's right to access counsel can still be violated even if they do not yet have an attorney. For example, in *Torres v. D.H.S.*, the court countenanced "extensive allegations regarding conditions so restrictive as to prevent them from forming any attorney-client relationship to begin with." 411 F. Supp. 3d 1036, 1049 (C.D. Cal. 2019). The same is true here.

Defendants' transfer practices preclude detainees from seeking and retaining counsel in the first place. Oftentimes, Defendants will whisk detainees out of state with no opportunity to find an attorney in Minnesota. (Boche Decl. ¶¶ 9, 13, 18; Edin Decl. ¶ 6; Heinz Decl. ¶ 5; Kelley Decl. ¶ 19.) Once transferred out of state, the record suggests that detainees are similarly isolated from the outside world, as they are at Whipple. (ECF

No. 67 ¶ 12 ("If we could get the phone, we could only use it for two minutes.").) Put together, it does not matter whether detainees already had counsel at the time of detention—Defendants have cut off detainees' access either way.

Defendants generally justify their transfer policy by referencing overcrowding, operational necessity, and security concerns. But Defendants do not explain these concerns or cite evidence supporting them. Recited generally, of course these concerns are related to a legitimate purpose. But a simple recitation of a governmental concern cannot overcome the obvious conclusion from Plaintiffs' evidence—that Defendants' policies are likely depriving detainees of their Fifth Amendment rights.

Defendants make three arguments against this conclusion. None carries the day. *First*, Defendants argue that the Fifth Amendment due process right to access counsel "does not enshrine unfettered and immediate in-person access to detainees at a particular location." (ECF No. 70 at 11.) This is a classic straw-person argument: No one argues for unfettered access to counsel.

*Second*, Defendants state, without evidence, that they provide unlimited "free, unmonitored legal calls to their attorneys via an available landline" without any time restrictions. (ECF No. 70 at 6.) As stated above, this assertion stares down an avalanche of facts to the contrary.

31

*Third*, Defendants seem to suggest that, so long as they provide access to counsel at a noncitizen's final detention center, they can deny access to counsel at holding facilities, like Whipple, which are only "used for processing before transfer to the detention center."[13] (ECF No. 70 at 13.) Defendants concede that the right to counsel in immigration proceedings requires "reasonable time to locate counsel and permit counsel to prepare for the hearing." But they argue that the right does not require immediate access to counsel at the moment of detention, and they note that they have broad discretion on where to house detainees. (ECF No. 70 at 16 (citation omitted).) The Court acknowledges DHS's broad discretion in determining the location of detention. But DHS does not have free rein to violate noncitizens' right to access counsel along the way.

And, putting aside the debate about whether Whipple is, in fact, a holding facility, the Fifth Amendment's due process protections do not depend on whether the place of detention is called a "holding facility" or a "detention center." Any conclusion to the contrary belies elementary Fifth Amendment due process jurisprudence. *See Orantes-Hernandez*, 685 F. Supp. at 1511 (issuing a permanent injunction requiring "access to

---

[13] Defendants say that "Plaintiffs do not argue that detainees lack access to legal counsel under the Fifth Amendment at the detention center." (ECF No. 70 at 13). To the contrary, Plaintiffs do make this argument. (ECF No. 19 at 38 (citing declarations as support for argument that noncitizen detainees are denied access to counsel at detention centers); ECF No. 76 (same).)

telephones *during processing*" because defendants violated noncitizen detainees'
constitutional "rights to effective representation of counsel by unduly restricting attorney
and paralegal visitation, failing to provide private telephone and visitation facilities, and
in some cases failing to provide adequate telephone access." (emphasis added)); *Mercado*,
800 F. Supp. 3d at 577–78 (issuing similar remedies as here, based on a likelihood of
succeeding on a Fifth Amendment claim, for noncitizen detainees housed in an ICE
holding facility). Defendants appear to acknowledge the weakness in this argument; they
state, repeatedly, that they *do* provide access to counsel through phone calls.

Then, relying on their argument that Whipple is a short-term holding facility,
Defendants argue they cannot provide in-person visitation because Whipple "lacks the
space and the physical infrastructure to do so." (ECF No. 70 at 2; Bottjen Decl. ¶ 14
("Because Whipple is a short-term holding facility and not designed to house people for
extended periods of time, and for operational reasons, it is not possible to provide
facilities for in-person visitation by legal services providers at Whipple."); Rich Decl.
¶¶ 7–8.) Importantly, in-person visitation is the only one of Plaintiffs' proposed remedies
that Defendants claim is operationally unfeasible.

"Defendants may not properly choose a facility that is unfit for a particular
purpose and then use the inadequacies of the facility as a justification to deprive detainees
of meaningful, confidential access to legal counsel to the extent demanded by the

Constitution." *Mercado v. Noem*, 800 F. Supp. 3d 526, 577 (S.D.N.Y. 2025). In similar fashion, Defendants' eleventh-hour declaration claims that "[a]ny change to current operating procedures would require significant resources that Whipple does not have and is not required to have based on ICE Policy." (Rich Decl. ¶ 7.) But the United States Constitution—not Whipple's operational capacity or internal ICE policies—is what sets the floor for reasonable access to counsel.

It appears that in planning for Operation Metro Surge, the government failed to plan for the constitutional rights of its civil detainees. The government suggests—with minimal explanation and even less evidence—that doing so would result in "chaos." The Constitution does not permit the government to arrest thousands of individuals and then disregard their constitutional rights because it would be too challenging to honor those rights.[14]

At this preliminary stage, Plaintiffs have made a clear showing of likelihood of success on their Fifth Amendment claim.

---

[14] Defendants also argue, in response to Plaintiffs' First Amendment claim, that "the government has an important interest in protecting its borders and enforcing the nation's immigration laws." (ECF No. 70, at 14.) The Court does not disagree, but Defendants cannot pick and choose which of the nation's laws to follow; it must follow all of the nation's immigration laws, including constitutional protections provided to citizens and noncitizens alike.

## II.    Irreparable Harm, Balance of the Harms, and Public Interest

"In most instances, constitutional violations constitute irreparable harm." *Morehouse Enters., LLC v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 78 F.4th 1011, 1017 (8th Cir. 2023). Plaintiffs have demonstrated the likelihood of Fifth Amendment violations at Whipple. Without counsel, detainees—who are already in a vulnerable position—cannot effectively exercise their rights to challenge the constitutionality, legality, or conditions of their confinement. Counsel also serves the important role of informing people of their constitutional and statutory rights, which is especially important given the complexity of immigration law.

And, the balance of the harms and public interest factors merge when seeking injunctive relief against the government. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The balance of the harms and public interest favor Plaintiffs because "it is always in the public interest to protect constitutional rights." *Schmitt v. Rebertus*, 148 F.4th 958, 970 (8th Cir. 2025) (citation omitted). The Court grants a Temporary Restraining Order under Federal Rule of Civil Procedure 65(b).

## III.    Bond

Under Rule 65(c) of the Federal Rules of Civil Procedure, a court may issue a temporary restraining order "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to

have been wrongfully enjoined or restrained." Courts normally require bond, but "exceptions have been made where . . . the damages resulting from a wrongful issuance of an injunction have not been shown." *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Engr's*, 826 F.3d 1030, 1043 (8th Cir. 2016). Defendants make no effort to quantify the costs or monetary damages that would result from a temporary restraining order. (*See* ECF No. 70 at 18.) The Court will thus waive the bond. *See First Lutheran Church v. City of St. Paul*, 326 F. Supp. 3d 745, 769 (D. Minn. 2018).

## CONCLUSION

Based on the foregoing and on all the files, records, and proceedings herein, Plaintiffs' Motion for a Temporary Restraining Order (ECF No. 17) is GRANTED IN PART. IT IS HEREBY ORDERED THAT each of the defendants, including their officers, agents, servants, employees, and attorneys, and all persons in active concert or participation with any of the foregoing who receive actual notice of this Order, by personal service or otherwise, are ordered and enjoined as follows:

1. Defendants shall ensure that every noncitizen taken into custody under the Immigration and Nationality Act and initially detained at the ERO Holding Facility at the Bishop Henry Whipple Federal Building located at 1 Federal Drive, Fort Snelling, Minnesota ("Detainee"), **within one hour of their**

**detention and prior to being transferred out of state**, is given the following materials:

    a.  Defendants shall provide Detainees their A-number in writing.

    b.  Defendants shall provide a printed copy of Exhibit A to this Order.

    c.  Defendants shall attach to Exhibit A a list of accurate telephone numbers for current free legal service providers serving the jurisdiction of the ICE Enforcement and Removal Operations St. Paul Office.

    d.  **Exhibit A**, the **list of free legal service providers**, and **written notification of the Detainee's A-number** shall be furnished to each Detainee in English, Spanish, Somali, French, and Hmong. Defendants shall provide, without charge, to each Detainee who is illiterate or not proficient in any of those languages an in-person or telephonic oral translation of these materials.

2.  Defendants shall provide Detainees with reasonable and equitable access to telephones. **Within one hour of detention and prior to being transferred out of the Whipple Federal Building**, Detainees shall be provided free, private, and unmonitored access to the telephone. Defendants shall permit Detainees to make the number of calls necessary to reach counsel or family.

3. Thereafter, Defendants shall provide Detainees with access to confidential telephone calls with their legal representation at no charge to the Detainee.

   a. Defendants shall not restrict the number of calls a Detainee places to their legal representatives or to obtain representation. Defendants shall not limit the duration of such calls by rule or automatic cut-off, unless necessary for security purposes or to maintain orderly and fair access to telephones. If time limits are necessary for such calls, the calls shall be **no shorter than 20 minutes**, and the Detainee shall be allowed to continue the call, if desired, at the first available opportunity. Additionally, Defendants shall ensure privacy for Detainees' telephone calls regarding legal matters. Detainees must be able to make such calls without being overheard by officers, other staff, or other Detainees.

   b. Defendants shall allow inbound confidential calls from Detainees' legal representation. A telephone number for counsel to call in order to reach Detainees shall be conspicuously displayed online. Defendants shall monitor that telephone line from 9:00 A.M. to 5:00 P.M. CST, seven days per week. If an attorney requests that Defendants provide the attorney's name, phone number, or other

message to a Detainee, the Detainee shall receive that information, in writing, as promptly as possible.

4. Detainees with disabilities shall be provided access to telephone services on the same terms as Detainees without disabilities are provided access to telephones. Such telephone services may include video relay service or video remote interpretation service.

5. Defendants shall ensure that the Online Detainee Locator System of defendant Immigrations and Customs Enforcement accurately identifies the location of each Detainee by name, date of birth, and A-number in real time.

6. Defendants **shall not transfer a Detainee out of Minnesota during the first 72 hours** of their detention.

7. If Defendants transfer a Detainee from the Whipple Federal Building, the following obligations apply:

   a. First and foremost, **Defendants shall inform the Detainee of the transfer destination**.

   b. After being told the transfer destination, Defendants shall provide the Detainee with the opportunity to use the telephone until they are able to reach counsel or family. These calls shall be free, private, and accessible as outlined in Paragraphs 2 and 4, above.

8. Defendants shall provide access to the Whipple Federal Building for legal visitation by current and prospective attorneys, legal representatives, and legal assistants. Legal visitation shall be permitted seven days per week, for a minimum of eight hours per day on business days (Monday through Friday), and a minimum of four hours per day on weekends and holidays. Defendants shall provide private rooms for closed-door discussions between Detainees and current and prospective attorneys, legal representatives, and legal assistants.

9. Defendants shall not retaliate in any manner against any Plaintiff or Detainee, including in their immigration proceedings or in any other context, for participating in this litigation or complaining about any alleged violation of this Temporary Restraining Order.

10. Defendants shall disseminate notice of this Order to all agents stationed at the Whipple Federal Building and those responsible for the building's operations, including providing copies in paper or electronic format. The Order must be distributed to those individuals within **12 hours** of its issuance.

11. This Order shall remain in effect for fourteen days: until **Friday, February 26, 2026 at 5:00 p.m. CST.**

12. This Court will hold a status conference on **Tuesday, February 24, 2026** at 1:30 p.m. CST in Courtroom 13W of the Diana Murphy United States Courthouse in

Minneapolis, Minnesota. At the status conference, the Court will (a) receive status updates on compliance with this Order and hear any requests for modification; and (b) determine whether a second hearing on the Motion for Preliminary Injunction and Motion for Class Certification is necessary, and if such a hearing would include the presentation of evidence. The parties shall reserve **Thursday February 26, 2026** at 12 p.m. CST for the date of the second hearing. The parties may request amendments to this schedule as necessary.

Dated: February 12, 2026                    BY THE COURT:
Time: 5:00 p.m.

                                            s/Nancy E. Brasel
                                            Nancy E. Brasel
                                            United States District Judge

41