UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

THE ADVOCATES FOR HUMAN
RIGHTS, *et al.*

    Plaintiffs,

v.

U.S. DEPARTMENT OF
HOMELAND SECURITY, *et al.*,

    Defendants.

Case No. 0:26-cv-00749

**PLAINTIFFS' SUPPLEMENTAL
MEMORANDUM IN SUPPORT
OF THEIR MOTION FOR A
PRELIMINARY INJUNCTION
(REDACTED)**

**TABLE OF CONTENTS**

**INTRODUCTION** ..................................................................................... 1

**SUPPLEMENTAL FACTUAL BACKGROUND**............................................ 3

I.    Notice of Rights and Provision of Contact Information for Free Legal Service Providers ................................................................. 4

II.    Telephone Calls within One Hour of Detention..................................... 6

III.    Telephone Calls with Legal Counsel ....................................... 7

IV.    Real-time Updates of the Online Detainee Locator System.................. 14

V.    Transfers Outside Minnesota During the First 72 Hours of Detention.................................................................................. 15

VI.    Legal Visitations at Whipple for Current and Prospective Attorneys.. 18

**ARGUMENT** ....................................................................................... 19

I.    Defendants' Production and the Supplemental Declarations Support Plaintiffs' Showing That They Are Likely to Succeed on the Merits.... 19

II.    The Provisions of the TRO Should Be Converted to a Preliminary Injunction ........................................................................ 21

III.    The Preliminary Injunction Should Apply to All Persons Initially Detained in Minnesota ........................................................... 24

**CONCLUSION** ................................................................................... 25

## INTRODUCTION

On February 12, 2026, this Court found that Plaintiffs had "presented substantial, specific evidence" detailing practices that impeded access to counsel for noncitizens detained by Defendants in Minnesota, likely violating their constitutional rights. TRO at 2, Dkt. No. 95. Based on this "fairly fulsome record," *id.* at 4, the Court entered a Temporary Restraining Order enjoining or requiring various measures to prevent further harm while the parties gathered additional evidence to aid the Court's decision on whether to issue a preliminary injunction, *id.* at 36–41.

This supplemental brief evaluates the evidence amassed since the TRO's issuance three weeks ago. Because the Court previously converted Plaintiffs' Motion for a Temporary Restraining Order, Dkt. No. 17, to a motion for a preliminary injunction under Federal Rule of Civil Procedure 65(a), Dkt. No. 39, Plaintiffs are not retreading the legal analysis laid out in their principal brief, Dkt. No. 19, except to discuss how the new evidence sheds light on the issues discussed therein. Rather, this brief will focus on (a) new evidence demonstrating that Defendants obstructed Class members' access to counsel at the time this case was filed and prior to the entry of the TRO, further supporting Plaintiffs' entitlement to injunctive relief; and (b) an evaluation of conditions since the TRO to evaluate the efficacy and feasibility of the TRO's provisions.

This evidence confirms the conclusions that the Court drew from the initial record: Plaintiffs are likely to succeed in showing that Defendants are violating their constitutional rights, and injunctive relief is warranted to

1

protect those rights during the pendency of this litigation. First, the new evidence shows that Defendants' principal defense at the hearing—that Class members had "unlimited" free calls from phones in their "hold rooms" (i.e., cells)—was untrue. Although some hold room phones were operational in December, not a single call was completed from any of the hold room phones from January 3 through February 7, the day after the Court ordered a site visit. *See infra* pp. 7-10.

Second, the new evidence shows that the TRO's provisions have not resulted in overcrowding or prolonged stays at Whipple; to the contrary, the average length of stay is now less than half of what it was before the TRO, and stays of longer than one day have dropped by 80%. *See infra* pp. 17-18.

Third, the new evidence shows that Defendants *can* comply with the TRO's provisions, including both the 72-hour transfer moratorium and real-time updates to the Online Detainee Locator System—even if they are not doing so consistently. *See infra* p. 14.

Thus, the Court should issue a preliminary injunction continuing the provisions of the TRO for the pendency of the litigation. Plaintiffs suggest one change—expanding the scope of the TRO to include all persons detained under the Immigration and Nationality Act in Minnesota even if their first place of detention was not Whipple—to reduce administrative complexity and to ensure that Class members are not arbitrarily denied the injunction's protection if they happen to be brought by Defendants to a local jail before they arrive at Whipple.

## SUPPLEMENTAL FACTUAL BACKGROUND

The TRO requires Defendants to comply with six key requirements to ensure that detainees are given constitutionally sufficient access to counsel:

1.  Provide detainees notice of their rights and contact information for free legal service provides;

2.  Permit detainees to make a telephone call promptly after being detained;

3.  Provide confidential telephone calls with counsel;

4.  Update detainees' location in the Online Detainee Locator System ("ODLS") in real-time;

5.  Not transfer detainees out of Minnesota for the first 72 hours after their detention and, when transferring detainees, notify them of their transfer destination; and

6.  Provide in-person visits between detainees at Whipple and current or prospective attorneys.

TRO at 36-41.

These requirements have resulted in a significant improvement to Class members' access to counsel, but work remains. Evidence since the TRO makes clear that Defendants can comply with the TRO's requirements—although they are not always choosing to do so. As attorney Lyle Cherneff attests, within a day of the TRO's issuance, Defendants were logging some detainees into their databases in a way that allowed them to show up in the ODLS as being detained in Whipple, responding to some attorney inquiries, and facilitating some attorney-client visits at Whipple. Cherneff Decl. ¶¶ 5, 8–10, 14. The result was "night and day from … before the Order," making a "world of difference" in Mr. Cherneff's ability to represent his Class member client. *Id.*

3

¶ 13. And the result was a marked improvement for both his client and the courts: when a judge in this District granted his client's habeas petition, ICE timely complied. *Id.* ¶ 16.

But while it is clear that ICE *can* comply with the TRO, its track record of doing so has been spotty. The following sets forth supplemental evidence drawn from both Defendants' production and currently available evidence on access since the TRO.

## I.    Notice of Rights and Provision of Contact Information for Free Legal Service Providers.

### A. Pre-TRO Evidence

The statements and testimony of detainees show ICE was providing detainees with very little information on their ability and right to consult with counsel prior to the TRO. *See, e.g.*, J.I.B.C. Decl. ¶¶ 11–13, Dkt. No. 26; Kantor Decl. Ex. A ¶ 3 ("I never receive[d] this document regarding my rights or available resources."). During the February 10, 2026 facility visit, Defendants represented that detainees were provided Detainee Handbooks. Sandison Decl. ¶ 13, Dkt. No. 89; Rich Decl. ¶ 5, Dkt. No. 92-1. Although approximately 40 detainees were in the facility, however, 2d Boche Decl. ¶ 4, Dkt. No. 90, no copies of the handbooks were visible in any holding cell, calling into question Defendants' representation. Sandison Decl. ¶ 14, Dkt. No. 89 ("I did not observe any copies of the Detainee Handbook in any hold room or in the possession of any detainee during our visit."). Moreover, Defendants' first declaration made no mention of handbooks, nor of any notice of rights or list of legal service providers being given to any detainees except the subset issued a Notice to Appear or "remaining in Minneapolis." Bottjen Decl. ¶ 13, Dkt. No. 72; *cf.*

Kantor Decl. ¶¶ 5, 32 & Ex. A ¶ 3 (Class members not served with Notice to Appear or otherwise notified of rights upon detention). The weight of the evidence thus continues to show that Defendants likely were not advising Class members of their rights.

B. Post-TRO Evidence

Under the Court's Order, Defendants now have an obligation to provide a notice issued by the Court, with a list of free legal service providers appended to it in English, Spanish, Somali, French, and Hmong. TRO at 36–37 ¶ 1. In addition, Defendants must provide oral notice and/or translation, if necessary for the detainee to understand their rights. *Id.* at 37 (¶ 1). In response to discovery, Defendants have produced a copy of the Notice in the same form as Ex. A to the Court's Order followed by a list of free legal service providers. Huyser Decl. Ex. 1. This demonstrates that Defendants can comply with the TRO's requirement—although it is not clear whether they are doing so consistently. *See* Zaragoza Decl. ¶ 9 ("Our client who was detained after the TRO did not receive a notice of rights when he was detained at Whipple.").

Notably, the produced Notice lacks translations to any language other than English. *Id.* The evidence thus suggests that Defendants are not complying with paragraph 1(d) of the order. Nor have Plaintiffs been able to confirm whether translation services are furnished to Class members who do not read one of those five languages, as further required by paragraph 1(d) or whether these documents are being furnished to each newly detained Class member.

Defendants have also attached to the Court's Notice an English-language form not authorized by the Court. The form is entitled "Detainee Telephone Call & National Detainee Handbook Receipt" and requires each detainee to disclose who they call and includes a checkbox for declining phone calls, along with a signature line for declining receipt of the Handbook. *Id.* It thus appears that Defendants may be asking Class members, many of whom do not read English, to sign English-only documents waiving certain rights under the TRO—and suggesting that they get just a single phone call and must disclose any person whom they call.

## II.    Telephone Calls within One Hour of Detention.

### A. Pre-TRO Evidence

Prior to the TRO, evidence suggested detainees were allowed a single phone call at the ICE intake agent desk, often hours after their initial arrest, with an ICE officer in close proximity who could cut off the call at their whim. *See, e.g.*, J.J.B. Decl. ¶ 10, Dkt. No. 27; J.I.B.C. Decl. ¶ 12; L.H.M. Decl. ¶ 15, Dkt. No. 77; Sandison Decl. ¶ 9. Some individuals did not receive even that. *See, e.g.*, Kantor Decl. ¶¶ 15–31 (describing Class member who was not given a phone call at Whipple and then, after a heart attack the next day, was prohibited from calling or meeting with attorney for ten days while detained by ICE at hospital).

### B. Post-TRO Evidence

Under the TRO, Defendants are required to provide detainees with "free, private, and unmonitored" access to the telephone within one hour of detention. TRO at 37 ¶ 2.

6

The record is currently unclear as to what, if any, changes Defendants made to their telephone practices in response to the TRO. As set forth above, Defendants have a form designed to track the identity of any call recipient, phone number, and duration of detainee calls, raising questions about the privacy of calls. Huyser Decl., Ex. 1 at 3. To the extent such forms have been filled out by Class members (or by Defendants' officers purporting to record Class members' declinations), they have not been provided or produced to Plaintiffs.

### III.   Telephone Calls with Legal Counsel.

#### A. Pre-TRO Evidence

Prior to entry of the TRO, it was clear that Defendants had the *ability* to facilitate attorney-client calls at the Whipple Federal Building. Indeed, Defendants represented that they were already facilitating free, unmonitored calls with legal counsel. Rich Decl. ¶ 6 ("During in-processing, detainees are verbally informed that they can make as many free, unmonitored legal calls to their attorneys via an available landline."). Yet detainees consistently attested that the only way to make outbound calls to attorneys was to beg for non-confidential access in front of an officer, and attorneys reported that Defendants seldom responded to incoming calls or emails attempting to contact detainees. *See* Mem. of Law in Supp. of Pls.' Mot. for a TRO at 7, Dkt. No. 19 ("TRO Mem."); *see, e.g.*, L.H.M. Decl. ¶ 19; J.J.B. Decl. ¶ 16; J.I.B.C. Decl. ¶¶ 12–13; Brown Decl. ¶ 10, Dkt. No. 22; Kelley Decl. ¶ 11, Dkt. No. 29.

Defendants' production confirms that Defendants were not providing detainees with access to outgoing legal calls at the time that Plaintiffs brought

7

suit. Defendants produced call logs for hold room phones from December 1, 2025 through 9:34 a.m. on February 10, 2026.[1] *See* Huyser Decl., Ex. 2. According to the logs, hold room phones were used routinely in December. *See id.* at 108-179. When Defendants escalated Operation Metro Surge in January, however, these calls all but disappeared. The logs report zero calls from hold room phones between January 3 and January 12; 12 calls total on one phone between January 13 and January 21, all of which were incomplete calls of less than a minute; and zero calls again between January 22 and February 4. *Id.* at 106–08. Then, on February 5 (the day before the TRO hearing), the log reports 21 calls across several different phones, although again none lasted more than a minute and all but one are labeled "incomplete" or "no answer." *Id.* at 103–06. The calls then disappear again the day of the hearing, before returning in earnest on February 7 at 10:58 a.m., right around the time Defendants' counsel began "working with the St. Paul Field Office to arrange for" the Court-ordered site visit. *Id.* at 1–103; Huyser Decl. Ex. 4 at 6. From February 7 through the morning of February 10, 788 calls were made, although the vast majority were less than a minute and are labeled as "incomplete," "no answer," "call limit," or similar codes. Ex. 2 at 1–103.[2]

---

[1] On February 26, Plaintiffs requested that Defendants produce phone logs through the present day or explain why logs after February 10 cannot be produced. Huyser Decl. Ex. 3 at 7. Defendants have yet to either produce them or explain the non-production.

[2] Plaintiffs have requested an explanation of the codes in the call logs, or a data dictionary. *See* Huyser Decl. Ex. 3 at 7. Defendants have not responded to this request.

8

While a full understanding of the data in the logs will have to await depositions and further discovery, the most likely explanation of the available information is clear: Defendants made the hold room phones unavailable to detainees when Operation Metro Surge was at its peak, save for a few unsuccessful calls between January 13 and 21, and then allowed some calls again (or turned the phones on to test them themselves) in advance of the February 6 TRO hearing and the February 9 site visit.[3]

This explanation is not only consistent with the testimony of Plaintiffs' declarants, but would also explain a curious inconsistency among Defendants' evidence and statements at the TRO hearing: Why is it that the February 3, 2026 Bottjen declaration made no mention of phones when listing the contents of the hold rooms, *see* Dkt. No. 72 ¶¶ 5, 9–10, while Defendants' counsel (at the February 6 TRO hearing) and Ms. Rich (in her February 12, 2026 declaration) both claimed that some or all hold rooms contained working phones? *See* Feb. 6, 2026 Hr'g Tr. 48:15–25; Dkt. No. 92-1 ¶ 17. The answer, it seems, is that the phones were not available to Class members when Mr. Bottjen filed his declaration. Instead, as Plaintiffs' declarants consistently testified, detainees had to beg individual ICE agents to use the phones at the processing desks. *See, e.g.*, L.H.M. Decl. ¶ 19; J.J.B. Decl. ¶ 16. For the reasons Plaintiffs

---

[3] As noted above, Defendants have only produced phone records through February 10 at 9:34 a.m. Huyser Decl. Ex 2 at 1. The fact that the log ends mid-morning on February 10, rather than at the end of the day, raises the possibility that Defendants again made the phones unavailable the day after the site visit.

9

explained in their principal briefing and the Court explained in issuing the TRO, this is insufficient to vindicate Class members' constitutional rights.[4]

Thus, Defendants' production bolsters Plaintiffs' evidence that, at the time of Plaintiffs' motion and up until at least the day before the hearing on the motion, Defendants were not providing Class members with regular access to phone calls—much less confidential or unlimited phone calls.

Defendants' production also shows the inadequacy of Defendants' system for accepting incoming inquiries from attorneys seeking to speak with current or prospective clients. Plaintiffs requested "Any and all documents containing communications sent by Minnesota attorneys to DHS and requesting telephone or in-person access to detainees initially detained at Whipple" or "notifying DHS of court cases or court orders requiring the release of detainees" since December 1, 2025. Expedited Disc. Reqs. to Defs. ¶¶ 8–9, Dkt. No. 96-1. Defendants provided just six email exchanges from between December 10 and February 14. Huyser Decl. Ex. 6. This omits numerous communications

---

[4] Defendants' production suggests that this is not the only change that Defendants made on February 5 in advance of the hearing. Defendants produced a photo of DHS's list of consulates, which they are obligated to provide to all detainees by regulation, in a clear plastic hanger on a wall. Huyser Decl. Ex. 5; *see* 8 C.F.R. § 236.1(e). The bottom of the document includes what is presumably the date it was printed: 2/05/26. *Id.* This is consistent with Ms. Sandison's observation during the post-hearing site visit that both the consulate list and the (inaccurate) list of free LSPs "were dated February 5, 2026, and neither the plastic pouches nor the papers I was able to observe appeared to have been handled very much." Dkt. No. 89 ¶ 6. And it is consistent with the Bottjen declaration, which did not say that there were posted lists of consulates and service providers accessible to all Class members, or that all Class members were provided such lists, but only that Class members received such lists if "issued a Notice to Appear" or if they were "remaining in Minneapolis." Dkt. No. 72 ¶ 13.

detailed in Plaintiffs' declarations, such as the emails attached to Kira Kelley's declaration. Dkt. No. 29-2, 29-3; *see also, e.g.*, 1st Boche Decl. ¶¶ 13–14, Dkt. No. 20 (describing emails regarding asylum case, habeas case, and habeas order); Brown Decl. ¶ 20 (describing email regarding access to client); Glenn Decl. ¶ 10 (describing email attaching release order);. In other words, Defendants' system for handling correspondence from attorneys is so inadequate that they cannot even say what emails they received, let alone respond to them appropriately.

B. <u>Post-TRO Evidence</u>

Although the evidence since issuance of the TRO is limited, it does appear that counsel are having somewhat more success communicating with clients now that Defendants are detaining them at facilities in Minnesota rather whisking them to Texas—but they are still encountering significant obstacles. As to outgoing calls, Plaintiffs have not received reports from Class members or attorneys suggesting that Defendants are making outgoing phone calls unavailable as a systematic practice, but neither have they received reports of confidential attorney-client calls out from Whipple. Because Defendants have, without explanation, declined to produce phone logs more recent than the morning of February 10, Plaintiffs are unable to evaluate the extent of Defendants' compliance with their obligations related to outgoing phone calls.

As for facilitating incoming calls from attorneys and complying with paragraph 3(b) of the TRO, the recent evidence is more consistently negative. Numerous attorneys have reported that Defendants continue to leave the

phone line unmonitored, despite paragraph 3(b)'s requirement of monitoring from 9:00 a.m. to 5:00 p.m. *See* Jacobson Decl. ¶ 9 ("I have called the St. Paul Field Office number at least thirty times between February 12 and February 18 and have not been able to speak with somebody at the St. Paul Office who could assist me in contacting a client, nor have I received a return phone call."); Curran Decl. ¶ 9 ("I have tried calling the St. Paul Field Office in the past few weeks about similar client matters but it always feels pointless because no one picks up."); Guerrero Decl. ¶¶ 3–5, 7 (on February 19, "phone rang for a few minutes, but no one answered"). At some times, the line has routed callers to other DHS offices, where DHS personnel have said that the St. Paul Field Office has no phone line and attorneys must email for assistance. Guerrero Decl. ¶¶ 4–5, 7, 11 (DC office told her "the St. Paul ERO field office is no longer using the 612-409-7799 phone number"); Jacobson Decl. ¶ 8 (on multiple occasions since the Order, "my call [to the St. Paul Field Office] has been re-routed to a location outside of Minnesota . . . [The D.C. office] just tell[s] me that I need to call the St. Paul office, to which I respond, 'I called the St. Paul office and was sent to you.'"). Some attorneys report that they have given up trying because they are aware that calling is futile. Cherneff Decl. ¶ 15 ("phone generally just rings and rings without answer"); Curran Decl. ¶ 8 ("feels pointless" to call St. Paul field office).

Plaintiffs raised the issue with Defendants' counsel on Thursday February 19, 2026. Defendants provided the following response on Tuesday, February 24, 2026:

> ICE informs us … [t]here was an IT issue with updating the telephone system to comply with the court's TRO, and that the

issue has been resolved. The TRO requires inbound telephone calls seven days per week, and the telephone system had to be updated to accommodate this mandate. During the week and on weekends, the line is staffed by ERO officers. Officers are instructed to respond to calls from attorneys who seek to talk to their clients detained at Whipple by asking for the name of the attorney and name of the detainee and A# to confirm that the detainee is still at Whipple. If more than one caller is on the line, USCIS will answer the call if the line is busy. If an attorney calls requesting a visit or to speak with a client, arrangements are made immediately. Requests for appointments have been arranged when the detainee was still at Whipple. If an attorney calls, the officer who answers either makes arrangements for the call to be transferred, gives the attorney a specific number to dial for incoming calls, or has the detainee dial the number on a free outgoing line to their attorney. All attorney visits by phone or in-person are conducted in a private setting. To ensure privacy, detainees are provided with a private room for calls with their attorneys. ICE does have visitor logs for in-person visits, but does not track or log incoming phone calls, including attorney phone calls, because the telephone line receives calls from all types of callers.

Huyser Decl. Ex. 9 at 6-7. Plaintiffs have not yet identified any attorneys reporting an experience matching Defendants' description of their policy.[5]

Similarly, the evidence suggests that there continue to be significant obstacles to detainees receiving calls at the detention facilities within Minnesota to which Defendants typically send people from Whipple. *See, e.g.*, Guerrero Decl. ¶¶ 12–14 (explaining that it is "marginally easier" to speak with clients at Freeborn, Kandiyohi, and Sherburne than at Whipple, but describing obstacles to scheduling phone calls at Kandiyohi and Sherburne); Curran Decl. ¶¶ 6, 8 ("I cannot have confidential  communications with my client detained at Sherburne unless I go in person.").

---

[5] Plaintiffs have also been unable to confirm whether accommodations for detainees with disabilities are being provided. *See* TRO at 39 ¶ 4.

Defendants' production of attorney communications also suggests that the problems with their email practices remain after the TRO. As with the pre-TRO record, several communications documented in the post-TRO declarations are missing from Defendants' production. *See, e.g.*, Curran Decl. ¶ 8; Jacobson Decl. ¶ 11; Cherneff Decl. ¶ 14; Zaragoza Decl. ¶ 7.

## IV.    Real-time Updates of the Online Detainee Locator System.

### A. Pre-TRO Evidence

Prior to the TRO, detainee information in the ODLS was often not available for days or even weeks after a detainee was taken into custody. *See* TRO Mem. at 4. Defendants did not dispute, either in their declarations or their briefing, that ODLS failed to report when people were in Whipple and was not being timely updated when people were moved from Whipple. Nothing in Defendants' production suggests otherwise.

### B. Post-TRO Evidence

The Court's order required real-time updates to detainee locations. TRO at 39 ¶ 5. Within 24 hours of the TRO's issuance, at least some individuals detained at Whipple were showing up as located at Whipple. Cherneff Decl. ¶ 5; Jacobson Decl. ¶ 5. This shows that ODLS can be updated timely and can list Whipple as a detainee's location. However, Defendants have not consistently ensured that it is timely updated. *See, e.g.*, Guerrero Decl. ¶ 14 (describing clients who "did not show up in ODLS even though they had been detained at Kandiyohi for a few weeks already"); Zaragoza Decl. ¶ 4 (describing client whose location was listed as "call ICE for details" for a week after the TRO); Curran Decl. ¶ 7 ("ODLS has been a mixed bag since the Order.").

14

## V.   Transfers Outside Minnesota During the First 72 Hours of Detention.

### A. Pre-TRO Evidence

Prior to issuance of the TRO, Defendants often rapidly transferred detainees out of Minnesota. TRO Mem. at 3, 5. The rapid transfers caused significant disruption of detainees' ability to form attorney-client relationships and rely on the services of counsel of their choosing; it also impaired their counsel's ability to represent them. *Id.* at 4–5; *see also, e.g.*, Curran Decl. ¶¶ 4-5. The rapid transfer also appeared to create significant difficulties in Defendants complying with court orders; Defendants repeatedly failed to timely comply with court orders requiring the release of detainees after transfer outside the state. *See, e.g.*, Suppl. Order, Ex. A, *Juan T.R. v. Noem*, No. 26-cv-0107 (D. Minn. Feb. 26, 2026), Dkt. No. 12-1 (Chief Judge Patrick J. Schiltz enumerating 210 orders in 143 cases that Defendants have violated since the onset of Operation Metro Surge); Kantor Decl. ¶ 8 & Ex. B ¶¶ 3(f)-(i) ("[I]nstead of complying with [a habeas order requiring immediate release in Minnesota], DHS personnel drove [Class member Emilio P.] to a bridge crossing into Juarez, Mexico, one of the most dangerous cities in the world, and sent him across the border without any property or documentation that he was a Mexican citizen.").

### B. Post-TRO Evidence

The Court's issuance of a 72-hour hold on transfers has marked a significant and meaningful change. According to Defendants' production, Defendants have only transferred between four and six people outside of

15

Minnesota in less than 72 hours since February 13.[6] Thus, while Defendants appear to have violated the TRO's transfer provision on a few instances, it is clear that they *can* comply with it.

Keeping Class members within the state benefits the courts, since the lack of out-of-state transfers obviates the need for motions practice over jurisdiction and implementation of orders to release people in Minnesota; attorneys, since they retain the ability to represent their clients and can see them in person, making representation both more effective and more efficient; and, most importantly, the Class members themselves, since it is easier for friends and family to retain counsel for them and relief can be obtained more quickly. *See, e.g.*, Cherneff Decl. ¶¶ 10–11 (seeing client in-person at Whipple

---

[6] Four of these appear to be clear violations of the TRO: three minors between the ages of ███████ who were transferred to Texas within an hour of their initial detention on February 19 ████████████████████ ████████, and one adult who was transferred on February 21, a little less than two days after his initial detention ████████████████. Huyser Decl. Ex. 7. The other two are less certain: two men who left Whipple on January 21, at the same time as ████████████, and had been in custody just shy of 72 hours (████████████████████); depending on how soon their flight left after they were booked out of Whipple, these may not have been violations at all. *Id.*

Additionally, on the evening of February 12, Defendants transferred 18 or 19 people who had been detained less than 72 hours, apparently violating this Court's order. *Id.*; *see also* Mem. Op. and Order at 2 n.1, *Jorge F.S.L. v. Bondi*, No. 26-cv-1494 (D. Minn. Feb. 22, 2026), Dkt. No. 9 ("Based on Petitioner's allegation that he was transferred to Texas on the evening of February 12, 2026, it appears that Respondents violated the [*AHR v. DHS*] TRO."); Mem. Op. and Order at 2 n.1, *Jouquin C.S. v. Bondi*, No. 26-cv-1438 (D. Minn. Feb. 20, 2026), Dkt. No. 8 (similar). The data suggests that they left Whipple at 5:20, about fifteen minutes after the Court's order, although it does not indicate how much longer after the order the plane departed.

"materially assisted my ability to represent him in his habeas proceeding"); Curran Decl. ¶ 4 (describing myriad reasons client representation is easier when clients remain in Minnesota); Zaragoza Decl. ¶ 6 (similar). As described *supra* pp. 3-4, the difference in counsel's ability to represent clients, vindicate their rights, and secure compliance with court orders has been "night and day." Cherneff Decl. ¶ 13.

Furthermore, there is no evidence that the transfer moratorium has led to Class members staying at Whipple for prolonged periods of time. According to Defendants' data, the average stay at Whipple from December 1 through February 10 was approximately 12 hours and 14 minutes, while the average stay from February 13 through the end of the data was approximately 5 hours and 21 minutes. Huyser Decl. Ex. 7; Simard Decl. ¶¶ 12-13.[7] Since February 13, only 10.6% of stays at Whipple have been longer than 12 hours, and just 2.6% longer than 24 hours. Huyser Decl. Ex. 7; Simard Decl. ¶ 15. This compares favorably to the pre-February 11 period, when 37.1% of stays were longer than 12 hours and 13.5% were longer than 24 hours. Huyser Decl. Ex. 7; Simard Decl. ¶ 15. In other words, people are spending less than half as much time at Whipple since the TRO as they were before the TRO, the rate of stays past the 12-hour mark (which DHS has traditionally used as a limit for holding facilities) has dropped by two-thirds, and the rate of stays more than

---

[7] This can be calculated by subtracting the "Book In Date Time" from the "Book Out Date Time" for each entry where the "Detention Facility Name" is "BISHOP HENRY WHIPPLE FED BLDG." Simard Decl. ¶¶ 9-11. Plaintiffs are omitting February 11 and February 12 because there appears to have been a temporary increase in 20-hour stays as Defendants adjusted to the TRO; this does not materially affect the results. *Id.* ¶ 16.

one day has dropped by 80%. By any measure, overcrowding and overstaying at Whipple has *decreased* since the TRO, not increased.

## VI. Legal Visitations at Whipple for Current and Prospective Attorneys.

### A. Pre-TRO Evidence

Prior to this case, Defendants were not allowing in-person attorney visits with non-citizen detainees at the Whipple Federal Building. TRO Mem. at 7; *see, e.g.*, Brown Decl. ¶¶ 29, 33; Weyker Decl. ¶¶ 7–9, Dkt. No. 30; Kelley Decl. ¶ 34. Defendants acknowledged that they did not allow visits. Bottjen Decl. ¶ 14; Rich Decl. ¶¶ 7, 10. However, evidence showed that Defendants had the ability to facilitate such visits: there are four ERO visitation rooms available, which Defendants frequently used in the past for attorney-client visits. *See, e.g.*, Sandison Decl. ¶¶ 16–18; Brown Decl. ¶ 15. In addition, even since Operation Metro Surge began, the ERO visitation rooms were used to facilitate attorney-client visitations for U.S. citizens who were arrested. Kelley Decl. ¶ 8.

Defendants did not dispute that they prohibited attorney-client visitation prior to the entry of the TRO. Defendants' production appears to confirm this concession: Defendants produced no logs reflecting attorney visits, and Defendants' counsel represented that the visitor logs produced were "all it had starting December 1, 2025." Huyser Decl. Ex. 3 at 4.

### B. Post-TRO Evidence

Defendants' conduct following the issuance of the TRO further demonstrates they have the ability and capacity to facilitate in-person visits between detainees and attorneys. Cherneff Decl. ¶¶ 8–10. On the other hand, at least one attorney reports going to Whipple with an executed G-28 and a

18

copy of the TRO Order but being denied access to their client, who appears to have been moved from Whipple to Kandiyohi while the attorney was waiting at Whipple. Jacobson Decl. ¶¶ 5–6.

Defendants' production sheds no light on their record of compliance with respect to in-person visits. As noted above, Defendants produced no logs reflecting attorney visits. The only production regarding visitation is four check-in forms for visitors from February 23 and 24. None of the visitors are attorneys; three of the entries appear to be released Class members arriving to retrieve their property and the fourth is just labeled as "friend." Huyser Decl. Ex. 8. Notably, the log does not include even the attorney visit documented in Mr. Cherneff's declaration. *See* Cherneff Decl. ¶ 7. Thus, it is impossible to know from Defendants' production if they are complying with the TRO—and impossible for Defendants to say, based on this production, that the TRO is either unnecessary or infeasible.

## ARGUMENT

### I.   Defendants' Production and the Supplemental Declarations Support Plaintiffs' Showing That They Are Likely to Succeed on the Merits

The evidence acquired since the TRO confirms that Plaintiffs are likely to succeed on the merits of their claims. *See Dataphase Sys., Inc. v. C.L. Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981). Combined with the evidence accompanying Plaintiffs' principal brief, the new evidence shows that Defendants routinely denied Class members confidential access to attorney consultations while at Whipple, and that rapid out-of-state transfers further interfered with Class members' ability to seek and receive meaningful

19

assistance of counsel and The Advocates for Human Rights' ability to exercise their own First Amendment rights.

Defendants' main factual argument at the TRO hearing and in their briefing was that Class members could call attorneys from phones in the Whipple hold rooms. *See, e.g.*, Hr'g Tr. 41:23–24 ("They have free, unmonitored telephone calls at any time of day and the calls for as long as they like to counsel."); *id.* at 48:10–49:2; Rich Decl. ¶ 6. We now know how many "free, unmonitored telephone calls" were successfully made from the hold rooms between the expansion of Operation Metro Surge and February 6, the day of the TRO hearing: zero. *See supra* pp. 7-10. The reason for that will have to await further discovery, but the devastating effect on Class members' constitutional and statutory rights is unmistakable—particularly when combined with the undisputed evidence that attorneys could not meet with their clients and could rarely make calls to them.

The evidence also shows that Plaintiffs are likely to prove that these impediments were "not rationally related to a legitimate purpose" or were, at best, "excessive in light of their purpose." *Johnson-El v. Schoemehl*, 878 F.2d 1043, 1048 (8th Cir. 1989).[8] As the Court noted in the TRO Order, Defendants have primarily denied that the practices borne out by the "avalanche" of evidence in the record are true, rather than arguing that such practices serve

---

[8] Because the Court focused on Plaintiffs' Fifth Amendment claim in the TRO Order, Plaintiffs are doing the same here. For similar reasons, the new evidence confirms that Plaintiffs are likely to succeed on their First Amendment and INA claims. *See* TRO Mem. at 24–31. Plaintiffs can submit supplemental briefing on the relationship between the new evidence and those claims if requested.

a legitimate purpose. TRO at 28. To the extent Defendants now pivot to claiming operational difficulties in complying with the TRO, the evidence shows that Defendants could comply with the TRO's requirements almost immediately. *See, e.g.*, Cherneff Decl. ¶¶ 7–10. Indeed, according to the data, Defendants have had *less* need to house people for prolonged periods at Whipple than prior to the TRO, and have complied with the transfer moratorium in most instances. *See supra* pp. 17-18. Whatever obstacles to compliance Defendants may complain of in their forthcoming supplemental brief, they are not reflected in the documentary evidence. There is thus little question that Plaintiffs have a "fair chance of prevailing" on the merits of their claims. *Jet Midwest Int'l Co., Ltd. v. Jet Midwest Grp., LLC*, 953 F.3d 1041, 1045 (8th Cir. 2020) (quoting *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008)).

## II.    The Provisions of the TRO Should Be Converted to a Preliminary Injunction

The TRO appropriately protects the constitutional rights of Plaintiffs and the putative Class members. Plaintiffs explained in their principal motion why the types of remedies Plaintiffs requested were necessary and consistent with relief issued by other courts. *See* TRO Mem. at 36–38. This Court agreed. Nothing that has occurred since the entry of the TRO suggests otherwise. To the contrary, the evidence demonstrates that the TRO is working and that it is feasible for Defendants to implement.

First, the TRO has materially improved Class members' access to counsel and significantly reduced their risk of being transferred away from counsel and their ability to obtain relief in an orderly fashion. As immigration

attorney Lyle Cherneff explains, within one day of the TRO, the ODLS correctly identified a client of his as being held at the Whipple Building; he was able to meet with that client in person, review documents ICE had given him, and prepare a reply brief in support of his habeas petition; and he received a prompt response to his email to the St. Paul Field Office informing ICE that a judge of this Court had ordered his client not to be transferred outside of Minnesota. Cherneff Decl. ¶¶ 5, 7–9, 14. When the Court granted his client's habeas petition, ICE timely complied. *Id.* ¶ 16. As Mr. Cherneff describes it, the experience was "night and day from what [he] had experienced before the Order," making "a world of difference." *Id.* ¶ 13.

Second, the results and data so far show that compliance with the TRO's provisions is feasible for Defendants. Although there has been some non-compliance, *see, e.g.*, Guerrero Decl. ¶¶ 3–7; *supra* pp. 5, 11-12, 14, 15-16 & n.6, 18-19; reports such as Mr. Cherneff's show Defendants to be capable of complying with the TRO. And while the Court rightly expressed concern that a remedy should not lead to lengthy stays at Whipple, *see* Hr'g Tr. 16:6–17:6, that concern has not materialized. To the contrary, the average length of stays at Whipple has decreased, as has the rate of people staying at Whipple longer than 12 hours or 24 hours. *See supra* pp. 17-18.

Additionally, the places in which the TRO differed from the relief initially requested by Plaintiffs are amply justified. Most significantly, the TRO included detainees without counsel in the moratorium on out-of-state transfer, rather than only detainees with counsel. *Compare* TRO at 39 ¶ 6 *with* [Proposed] TRO ("Proposed Order") ¶ 6, Dkt. No. 31. As discussed at the

22

hearing on the TRO, this is well supported by caselaw. *See* Hr'g Tr. 40:7–41:4; *Orantes-Hernandez v. Meese*, 685 F. Supp. 1488, 1513 (C.D. Cal. 1988) (prohibiting transfer of unrepresented class members for seven days after arrest); *Torres v. U.S. DHS*, 411 F. Supp. 3d 1036, 1049 (C.D. Cal. 2019) (denying motion to dismiss claim that transfer "prevent[ed] [plaintiffs] from forming any attorney-client relationship to begin with"); *cf. Cobb v. Aytch*, 643 F.2d 946, 961 (3d Cir. 1981) (en banc) (requiring "notice of the proposed transfer and an opportunity to be heard in a Pennsylvania tribunal independent of the prison system" prior to transfer out of Pennsylvania, absent emergency); *Ervin v. Busby*, 992 F.2d 147, 149–50 (8th Cir. 1993) (favorably citing *Cobb* and similar cases).

Under the current circumstances, the temporary moratorium on transfer is also an appropriate means of protecting the right of Class members to "a reasonable opportunity to seek and receive the assistance of attorneys." *Johnson-El*, 878 F.2d at 1053 (citation omitted). As one court explained, "[f]or unrepresented immigrants, contact with the outside world is even more critical: they must rely on the limited access Defendants provide to find representation and, when that fails, contact family members and friends to gather evidence in support of their cases (both in immigration court and in ancillary proceedings)." *Torres*, 411 F. Supp. 3d at 1045. Multiple people transferred from Minnesota to out-of-state facilities have attested to severe restrictions on that access. *See, e.g.*, O. Decl. ¶ 12 (over ten days in an El Paso detention facility, officers brought phones to O.'s cell of approximately 72 people just two or three times for two hours at a time, and he could only use

23

the phone for two minutes); J.I.B.C. Decl. ¶ 20 (phone only available every other day, and "[s]ome people were never able to make a call at all"); Kantor Decl. ¶ 11 & Ex. A ¶¶ 15-18 (detainee in Texas limited to one phone call of two minutes during five-day detention, despite requests to contact attorney).

As discussed at the TRO hearing, these violations of Class members' rights could be addressed in either of two ways: by an injunction against transferring any detainee, regardless of whether they have counsel; or by injunctive provisions that apply *after* transfer out of Minnesota. Hr'g Tr. 37:19– 41:4. Plaintiffs remain amenable to either approach, and have no objection to the Court's decision to adopt the former.

The provision requiring pre-transfer notification, TRO at 39 ¶ 7, similarly allows the Court to protect Class members' rights without exercising oversight of conditions in facilities outside Minnesota. Here again, either approach would suffice, and either is supported by caselaw. *See, e.g.*, *Cobb*, 643 F.2d at 961 (requiring advance "notice of the proposed transfer").

## III. The Preliminary Injunction Should Apply to All Persons Initially Detained in Minnesota

There is one regard in which Plaintiffs respectfully request that the preliminary injunction differ from the TRO. While Plaintiffs proposed a class of "all persons initially detained by Defendants in Minnesota pursuant to the Immigration and Nationality Act" and corresponding relief, Compl. ¶ 39, the TRO applies only to "Detainees" and defines "Detainees" to include only people "initially detained at the ERO Holding Facility at [Whipple]," TRO at 36. But the data reflects that, post-TRO, many people are initially detained at a Minnesota jail such as Sherburne or Kandiyohi, and later brought to Whipple.

24

Huyser Decl. Ex. 7. The limitation of relief to people "initially detained" at Whipple thus omits some Class members, even though their constitutional and statutory rights and their exposure to Defendants' practices are the same.

Expanding the preliminary injunction's coverage to include all noncitizens initially detained in Minnesota will ensure that Class members' rights do not go unprotected simply because Defendants initially detained them at a different location within the St. Paul Field Office's area of responsibility. It will also reduce the administrative complexity of the injunction: as currently written, Defendants' obligations vary from person to person, and can differ even among people held at Whipple at the same time. Broadening the scope of the injunction to cover all people detained in Minnesota will thus ensure protection for all Class members even if Whipple was the second or third, rather than first, stop in their detention, while simultaneously simplifying compliance for Defendants.

## CONCLUSION

For the foregoing reasons and those stated in Plaintiffs' principal briefing, the Court should issue a preliminary injunction to protect Plaintiffs' and Class members' rights during the pendency of this litigation.

Dated: March 6, 2026

Respectfully submitted,

*s/ Alethea M. Huyser*
Alethea M. Huyser (#0389270)
Rachel L. Dougherty (#0399947)
Devin T. Driscoll (#0399948)
Sarah Theisen (#0402844)
Margaret G. Severson (#0504388)
**FREDRIKSON & BYRON, P.A.**

25

60 South Sixth Street, Suite 1500
Minneapolis, MN 55402-4400
P: (612) 492-7000
ahuyser@fredlaw.com
rdougherty@fredlaw.com
ddriscoll@fredlaw.com
stheisen@fredlaw.com
mseverson@fredlaw.com

Jeffrey B. Dubner
Aman T. George
Mark B. Samburg
Anashua Dutta
Elena Goldstein
**DEMOCRACY FORWARD
FOUNDATION**
P.O. Box 34553
Washington, DC 20043
P: (202) 448-9090
jdubner@c.democracyforward.org
ageorge@democracyforward.org
msamburg@democracyforward.org
adutta@democracyforward.org
egoldstein@democracyforward.org

*Counsel for Plaintiffs*

26