UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

THE ADVOCATES FOR HUMAN
RIGHTS, *et al.*

    Plaintiffs,

v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, *et al.*,

    Defendants.

Case No. 0:26-cv-00749 (NEB/DLM)

**DECLARATION OF JOSEPH D.
KANTOR**

---

I, Joseph D. Kantor, declare the following is true and accurate to the best of my knowledge and recollection.

1. I am an attorney based in Saint Paul, Minnesota. I work as an associate at the Law Firm of Guzior Armbrecht Maher. I am licensed to practice in the state of Minnesota and the United States District Court for the District of Minnesota.

2. Between the beginning of Operation Metro Surge and the issuance of the Temporary Restraining Order in this case on February 12, my firm and I represented multiple clients seeking release from detention by Immigration and Customs Enforcement ("ICE"). We filed a total of 13 habeas petitions with the Federal District Court for the District of Minnesota. Of the 13 habeas cases we filed nine have been granted, three have been transferred to other jurisdictions, and one was denied. However, we had additional clients who were detained and released before our firm filed habeas petitions on their behalf. These clients included persons who are either Lawful Permanent Residents ("LPR"), US Citizens, or in the country with legal status.

3. During that time, ICE typically made it impossible for me to communicate with my clients. I have never been able to directly communicate with my clients prior to the habeas petitions being granted. The majority of the information that my firm obtained that was used in our habeas petitions was gleaned from friends and family members of the persons detained.

4.      I have struggled with an appropriate way to describe the process and the feeling that came from this situation. The best analogy for me to describe the efforts that my firm went through while attempting direct communications would be taking a shotgun loaded with birdshot, shooting at a bouncing tennis ball 100 feet away, and having all 600 pellets miss the tennis ball. You know the efforts are going to either fail or be futile but you try anyway. All you can do is take the shot and watch to see what happens. Every time I have called the St. Paul Field Office my call has either been unanswered or the person on the other end of the line has said that they could not (or would not) locate our client. I have also heard of other attorneys being told that they could not speak to somebody due to what are best euphemistically categorized as inadequacies at Whipple, i.e. not enough phones, not enough supervisory agents to allow detainees access to phones, not enough rooms to allow confidential calls between attorneys and clients.

5.      For example, I represent Emilio P., a Mexican citizen who has been in the United States since 2000, owns a home and business in Minnesota, and has no criminal record. *See* Decl. of Emilio P. ("Emilio Decl."), *Emilio P. v. Bondi*, No. 26-cv-850, ECF No. 25, ¶ 2 (D. Minn. Feb. 19, 2026) (attached as Ex. A); *see generally* Order, *Emilio P. v. Bondi*, No. 26-cv-850, ECF No. 33 (D. Minn. Mar. 2, 2026 (finding facts and granting motion to enforce judgment). Emilio was arrested without a warrant while shopping at a Walmart on January 24, 2026 and taken to Camp East Montana in El Paso, Texas on January 24 or 25. He was not served with a Notice to Appear.[1]

6.      We were first contacted about Emilio via his friend. When we began trying to locate Emilio and speak with him, our phone calls to the St. Paul Field Office were unanswered and the online ICE locator had no information about Emilio's location. Without a functional online ICE locator or a way to get answers from ICE agents at field offices or individual facilities, it is impossible to reach or even locate clients. During the prior 3 years our firm's immigration clients in ICE custody or with an ICE hold were typically detained at the Crow Wing, Kandiyohi, Faribault, and Sherburne jails. In the last three months, by contrast, our clients originally detained in Minnesota have been transferred (in some instances transferred multiple times) to facilities in Texas, New Mexico, and Nebraska, often without any way to determine their location.

7.      I filed a petition for a writ of habeas corpus on Emilio's behalf on January 30. *Emilio P. v. Bondi*, No. 26-cv-850, ECF No. 1 (D. Minn. Jan. 30, 2026). Judge Bryan

---

[1] My factual recitations are based on my personal knowledge and past declarations, my client's declaration, the order issued in No. 26-cv-850 (ECF No. 33), and my conversations with the paralegals and attorneys at my firm.

issued a text order the same day enjoining DHS and ICE from moving him out of Minnesota and/or requiring them to "immediately return" him if he had already been moved, "in any event no later than February 2, 2026." *Emilio P*, ECF No. 3. As of February 2, the Online Detainee Locator System showed Emilio as being located in an ICE facility in El Paso, Texas, despite the January 30 order.

8.    On February 2, 2026, Judge Bryan ordered Emilio released "immediately in Minnesota … no later than 4:00 p.m. CST on February 3, 2026." *Pena Jimenez*, ECF No. 5 at 7. A few hours later, instead of complying with that order, DHS personnel drove him to a bridge crossing into Juarez, Mexico, one of the most dangerous cities in the world, and sent him across the border without any property or documentation that he was a Mexican citizen. *See* Emilio Decl. ¶ 27; 2d Decl. of Joseph D. Kantor ("Kantor Decl."), *Emilio P.*, ECF No. 13, ¶¶ 3(f)-(i) (D. Minn. Feb. 3, 2026) (attached as Ex. B).

9.    Between his arrest and his expulsion, I was never once able to speak with Emilio.

10.    While detained Emilio was allowed to make two phone calls. The first was at Whipple. Emilio was allowed to contact a friend so that he could obtain his daily required medicine.

11.    Emilio asked to make phone calls on a daily basis, including to his attorney, and was consistently refused. Emilio Decl. ¶¶ 15-16; Kantor Decl. ¶ 3(c). He was told there was only one phone for 14 rooms holding dozens of people each. Emilio Decl. ¶ 16. Emilio's second opportunity to make a phone call, and only opportunity while in custody in El Paso, was on January 29, four days after his arrival, and it was limited to two minutes. *Id.* ¶ 17.

12.    While Defendants were preventing Emilio from contacting me, they were also hindering his ability to treat his diabetes by making access to his medication inconsistent. For example, despite allowing Emilio's friend to bring his medication to Whipple, the medication did not follow him to El Paso. After arriving in El Paso, Emilio asked an officer about his medication, "[t]he officer informed [him] that the medications had been left in Minnesota and then asked if [he] wanted to return to Minnesota for the medications, laughed and walked away." *Id.* ¶ 10. Once in the detention center in El Paso, Respondents repeatedly moved Emilio from one area of the detention camp facility to another, which impeded doctors from finding him and ensuring he was given his needed medication. *Id.* ¶¶ 11–14. This repeated movement prevented doctors from ensuring that Emilio received his daily medication; Respondents even ignored a doctor's order to stop moving Emilio P. around the facility. *Id.* ¶ 13.

13.     Due to the actions of ICE Emilio only received his full dosage three days out of 10 days, leading his diabetes to become uncontrolled and affecting his cognition. *Id.* ¶¶ 11-14, 19.

14.     And sometime during his detention, while Defendants were preventing me from contacting Emilio, preventing him from contacting me, and withholding critical medication, they told him that if he signed papers (which they did not translate for him) he could be released within three days. *Id.* ¶¶ 20-26. Without any way to know that friends in Minnesota had already located an attorney to begin seeking his relief, and thinking his situation was hopeless, he signed voluntary removal papers. *Id.* The first time he learned of Judge Bryan's orders was February 3, 2026, after Defendants had dumped him in Juarez. *Id.* ¶ 28.

15.     As another example, my client Fulgencio S. has been in the United States since 2002, has no criminal record, and has numerous family members in the metro area of the Twin Cities. Pet. for Writ of Habeas Corpus ("Fulgencio Pet."), *Fulgencio S. v. Lyons*, No. 26-cv-395, ECF No. 1, pp. 15-16 ¶¶ 1, 3, 9 (D. Minn. Jan. 16, 2026) (attached as Ex. C); Op. & Order, *Fulgencio S. v. Lyons*, No. 26-cv-395, ECF No. 9, at 1-2 (D. Minn. Jan. 22, 2026). Although Fulgencio was not in removal proceedings and had never been issued a Notice to Appear, Defendants detained him at a Walmart in Bloomington, MN on January 10, 2026. Fulgencio Pet. pp. 15-16 ¶¶ 2, 4. The following day, while Fulgencio was detained at Whipple, he suffered a heart attack. *Id.* ¶ 5. ICE then relocated Fulgencio to the emergency room at Fairview Southdale Medical Center. *Id.* pp. 15-16 ¶¶ 5, 7. After presenting in the ER, Fulgencio was admitted and scheduled for open heart surgery once his condition was stabilized. Ultimately, the surgery was scheduled for January 21, 2026.

16.     Our firm was retained to file a habeas petition on behalf of Fulgencio. Unbeknownst to our firm, a family friend had filed a pro se habeas petition on his behalf, *Fulgencio S. v. Bondi*, No. 26-cv-360 (D. Minn. Jan. 15, 2026). The two files were ultimately consolidated.

17.     After our firm was retained, both my office and Fulgencio's family attempted to contact him while in the hospital. All of the initial efforts to speak with Fulgencio at the hospital were rebuffed. ICE stationed two officers in Fulgencio's hospital room with him at all times, 24 hours a day, while he was at the hospital. These officers attempted to prevent any outside communication with Fulgencio, either with his family or with our firm.

18.     On January 15, 2026, the family was able to ascertain which room Fulgencio was in and called the phone directly in the room. Fulgencio was able to speak with his

family on the phone in his room for one brief call, until the ICE officers in the room realized the call was underway and they forcibly terminated the call.

19. The only call the officers allowed was the day before Fulgencio's bypass surgery, when a charge nurse at the hospital was able to arrange a phone call between Fulgencio and his family so that they could communicate before the surgery. This phone call was neither confidential nor private.

20. My colleague attempted to visit him in the hospital, as did his children and grandchildren; all were refused.

21. On Saturday January 17th at approximately 11:45am-12:00pm, an attorney from my office went to Fairview Southdale to attempt to meet with Fulgencio. When she arrived at the hospital she informed the check-in attendant that she was an attorney representing Fulgencio. The attendant provided her with a visitor's pass sticker and told her Fulgencio's room number and where to go.

22. Once she was in the hallway where Fulgencio's room was located, a nurse spotted her and asked if she needed help. She then asked for directions to Fulgencio's room. The nurse showed her to the room and notified the charge nurse that she was there. The charge nurse came over to speak with her and knocked on the door. One of the two ICE agents inside came out to speak with her. The ICE agent closed the door behind him and the attorney and the ICE agent conversed about the situation with my colleague and the charge nurse.

23. The ICE agent informed the attorney that for security and safety reasons, she was not allowed to speak with our client. The ICE agent stated that Fulgencio was still in the "intake process" like he would be if he were healthy and located at the Federal Henry Whipple Building to be processed and placed with an ICE detention facility. He stated that once Fulgencio was relocated to an ICE detention facility, he would have access to speaking with his family and his attorney.

24. The ICE agent acknowledged that detainees are allowed one phone call while they are in the intake process. The attorney inquired if our client received that one phone call. The ICE agent stated that our client had a medical emergency so he was brought to the hospital and did not receive his phone call at Whipple. The attorney then asked the ICE agent if our client could have that one phone call right then, but the ICE agent said he could only use that in the intake process. The attorney pointed out that the ICE agent had just said Fulgencio was in intake.

25.     The ICE agent then stated Fulgencio would be in intake if he were at the Federal Henry Whipple Building, where it is a more secure controlled environment. The attorney asked about a secure location for a phone call at the hospital. The charge nurse stated that there's got to be a way because our client could not have open heart surgery without talking to his family.

26.     Both the attorney and the charge nurse reiterated to the ICE agent that they understood that there are rules and they wanted to follow those rules but that they were both trying to do their jobs.

27.     The agent stated that the security issue was that they did not want the family members who Fulgencio wanted to contact to pass his location on to other family members or the media. It became increasingly clear that the ICE agents were more concerned with public knowledge that they were at Fairview Southdale than any safety issue with Fulgencio. The agent contacted a supervisor at the attorney's request, but refused to explain the legal grounds for refusing entry.

28.     My colleague offered to agree not to tell anybody other than the family members who already knew Fulgencio's location, and to have the family members sign an NDA, but the ICE agent still refused to let her meet with him.

29.     After the initial conversation where the attorney presented her submitted G28, the ICE agent informed the attorney that ICE would be reaching out to her regarding this situation, but a phone call was never received. In addition, the attorney asked for the specific phone number that would be calling her, but the ICE agent gave her the general USCIS customer service phone number.

30.     The attorney ended up leaving Fairview Southdale without ever having met with or speaking to Fulgencio.

31.     This entire situation was particularly troubling to the attorney and our firm because Fulgencio was in a private room with a dedicated phone line. It would have been the easiest attorney-client call completed during the entirety of Operation Metro Surge to simply have the ICE agents wait outside the hospital room and allow Fulgencio to have a confidential telephone conference with his attorney. But even when the practicalities were so blatantly obvious and easy ICE was unwilling to allow attorney client contact.

32.     A few days after Fulgencio's habeas petition was granted, I received a voicemail from an ICE agent. The voicemail stated that the ICE agent was in Fulgencio's hospital room and was serving him with a notice to appear because ICE was beginning removal proceedings against him.

33. Egregious as they sound, these examples are typical of my experiences, my firm's experiences, and our clients' experiences prior to the Temporary Restraining Order in this case. I couldn't contact my clients, and they couldn't contact me; while I was seeking relief from this Court, Defendants were keeping my clients in the dark about the status of their case in hopes that their fear of an extended stay in abysmal conditions would lead them to "self-deport," as seen in Emilio's case. I don't know how many other detainees ultimately agreed to voluntary removal because of the conditions, but I firmly believe that the number is not zero. Most of those detained in Minnesota were swiftly taken to Texas, where I am not currently licensed to practice, where they are outside of their support network, and where they did not know anybody else who could assist them.

34. Since the Temporary Restraining Order was issued on February 12, the situation has somewhat improved. Rather than being transferred to Texas immediately, I believe that detainees have largely been sent to Crow Wing, Sherburn, and Kandiyohi Counties. This keeps them in Minnesota long enough that orders like the one Judge Bryan issued in *Emilio P.*, requiring Defendants to keep Emilio in the state, can be more easily effectuated. The TRO also leaves detainees closer to my office, allowing me and my colleagues better access to establish representation and obtain more reliable factual statements to support either any eventual habeas petition or filings in immigration court.

I declare the foregoing is true and accurate to the best of my knowledge.


Dated: March 6, 2026                                    /s/ Joseph D. Kantor
                                                        Joseph D. Kantor