UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| THE ADVOCATES FOR HUMAN RIGHTS; L.H.M, | ) ) ) | No. 26-cv-749-NEB/DLM |
| Plaintiffs, | ) ) ) | The Hon. Nancy E. Brasel |
| v. | ) ) | |
| U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; TODD LYONS; MARCOS CHARLES; DAVID EASTERWOOD; U.S. FEDERAL PROTECTIVE SERVICE; FARON K. PARAMORE, | ) ) ) ) ) ) | |
| Defendants. | | |

---

**MEMORANDUM IN OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

## I.    Introduction

Pursuant to Local Rule 7.1(b) and the Court order of March 5, 2026, ECF No. 134, Defendants respectfully submit this memorandum in response to Plaintiffs' preliminary-injunction brief, *see* ECF No. 136. The government has achieved substantial compliance with the Court's directives in the Temporary Restraining Order (TRO) issued on February 12, 2026. ECF No. 95. As a result of the primary objectives of the TRO being met, and for reasons more fully described below, the transition to a permanent injunction is not only unnecessary but counterproductive.

## II.    Background

### A. ICE's operations

Defendant U.S. Immigration and Customs Enforcement (ICE) is the largest investigative branch of the U.S. Department of Homeland Security (DHS) and is charged with enforcement of more than 400 federal statutes. Declaration of Michael P. Bottjen (Jan. 30, 2026), paragraph 5, attached as Exhibit A. Congress created ICE in 2002 with the enactment of the Homeland Security Act (HSA), Pub. L. No. 107–296, §§ 441, 451, 471, 116 Stat. 2135, 2205, 2308 (Nov. 25, 2002) (6 U.S.C. §§ 251, 271, 291, 542), by combining components of the former Immigration and Naturalization Service and the former U.S. Customs Service, among other agencies, to more effectively enforce federal immigration and customs laws and to protect the United States against terrorist attacks. Homeland Security Act of 2002, Pub. L. No. 107-296, § 441, 116 Stat. 2135, 2192.

ICE's mission is to protect the United States from the cross-border crime and migration that threaten national security and public safety. To carry out that mission, ICE focuses on enforcing immigration laws, preventing terrorism, and combating transnational criminal threats. ICE's operations include Enforcement and Removal Operations, which includes 25 field offices, each led by a Field Office Director. ICE Budget Overview: Fiscal Year 2024 Congressional Justification, 14 (2023), attached as Exhibit B. Field offices play a role in directing and managing immigration enforcement efforts: "ERO manages all aspects of the immigration enforcement process through the operation of 25 field offices nationwide that report to ERO headquarters." Field Offices, ICE, available at https://www.ice.gov/contact/field-offices (viewed March 12, 2026). The majority of ERO's immigration enforcement operations take place in the interior of the country. Exhibit A, Paragraph 7. ERO manages all logistical aspects of the removal process by identifying, apprehending, and, when appropriate, detaining removable aliens during the course of immigration proceedings and pending physical removal from the

United States. *Id.* This includes locating and taking into custody fugitive aliens and at-large criminal aliens, as well as identifying aliens in federal, state, and local prisons and jails and working with those authorities to transfer them to ICE custody without releasing them into the community. *Id.* When aliens are ordered removed, ERO is responsible for safely repatriating them or otherwise overseeing their departure from the United States. *Id.*

An important and necessary part of immigration enforcement is detention. ICE detains people for no purpose other than to secure their presence both for immigration proceedings and their removal, with a special focus on those who represent a risk to public safety, or for whom detention is mandatory by law. *See* ICE ERO Statistics, available at https://www.ice.gov/statistics (viewed March 11, 2026), attached as Exhibit C.

Further, under the immigration laws, detention of certain classes of aliens in removal proceedings or pending their removal from the United States is mandatory, see, e.g., 8 U.S.C. §§ 1225(b)(1)(B)(ii), 1226(c), 1231(a)(2)(A), and in some situations ICE has discretionary authority to detain, *see* 8 U.S.C. § 1226(a). When ICE does detain, ICE is responsible for "arrang[ing] for appropriate places of detention for aliens detained pending removal or a decision on removal." Id. § 1231(g)(1)3; *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 186, 196 (D.D.C. 2020) (noting that ICE "oversees the departure of removable immigrants from the United States," including by "oversee[ing] the civil detention of immigrants").

To effectuate that statutory duty, ICE's Enforcement and Removal Operations (ERO) oversees more than 100 civil immigration detention facilities across the country, and hundreds of thousands of adult immigrants are detained in those facilities in a given year. See, e.g., Exhibit B at 22–23, 23 fig. 13 (noting 277,913 "book-ins" to 129 detention facilities over the course of the fiscal year, with approximately 37,684 noncitizens detained as of the end of the fiscal year);

Detention Facilities, ICE, available at https://www.ice.gov/detention-facilities (viewed March 12, 2026) (listing 144 detention facilities as of March 11, 2026); see *Neguse v. ICE*, No. 25-CV-2463 (JMC), 2025 WL 3653597, at *2 (D.D.C. Dec. 17, 2025) (discussing same).

In addition to detention facilities, ICE also operates in its field offices and additional sub-locations within those field offices, see Exhibit B at 9 (listing "25 domestic field offices and 182 sub-locations nationwide"), and ICE policy permits the operation of "holding facilities located within ... field offices."  Declaration of Tauria Rich, attached as Exhibit D Paragraph 7 (citing Policy Number 11087.2: Operations of ERO Holding Facilities, ICE, Office of Enforcement and Removal Operations, § 1.1 (Jan. 31, 2024) (ICE Policy Number 11087.2), available at https://www.ice.gov/node/65453 (viewed March 11, 2026)).  Under ICE policy, a "holding facility" in a field office is to be "primarily used for the short-term confinement of individuals who have recently been detained, or are being transferred to or from a court, detention facility, other holding facility, or other agency" with "short-term confinement" being defined as "a period not to exceed 12 hours, absent exceptional circumstances." *Id.*

All facilities housing ICE detainees must comply with at least one of several sets of detention standards which describe a facility's immigration detention responsibilities, explain what detainee services a facility must provide, and identify what a facility must do to ensure a safe and secure detention environment for staff and aliens in detention.  See ICE Detention Management, https://www.ice.gov/detain/detention-management (viewed March 10, 2026), attached as Exhibit E.

### B.  Aliens' right to counsel

Under the Immigration and Nationality Act, individuals in removal proceedings have the right to counsel, at no expense to the government. 8 U.S.C. § 1362. The Sixth Amendment right to appointed counsel does not apply to civil immigration cases, but as discussed more fully in

subsequent sections in this brief, the Fifth Amendment guarantees due process, which includes

allowing detainees to hire attorneys. *Rafiyev v. Mukasey*, 536 F.3d 853, 861 (8th Cir. 2008).

For DHS to recognize a detainee's counsel,

[a]n appearance must be filed on the appropriate form as prescribed by DHS by the attorney or accredited representative appearing in each case. The form must be properly completed and signed by the petitioner, applicant, or respondent to authorize representation in order for the appearance to be recognized by DHS. The appearance will be recognized by the specific immigration component of DHS in which it was filed until the conclusion of the matter for which it was entered.

8 C.F.R. § 292.4.  The form prescribed by DHS is Form G-28.  8 C.F.R. § 1003.17(a).

Importantly, the client must consent to the representation, by signing the Form G-28.  Non-

attorneys also may represent individuals in immigration detention.  See 8 C.F.R. § 292.1(a)

(listing criteria that non-attorney representatives must meet).  Attorneys and other legal

representatives may e-file the G-28, using ICE ERO's e-filing system, but e-filing is not

mandatory, and the paper form may be used.  See ERO efile, available at

https://www.ice.gov/eroefile (viewed March 11, 2026).  Practitioners are subject to professional

conduct requirements and may be subject to formal complaints and disciplinary proceedings.

*See* 8 C.F.R. § 292.3.  Very few detainees at Whipple are represented by counsel.  Since the

effective date of the Temporary Restraining Order, February 12, 2026, to March 12, 2026, there

has only been at least one in-person attorney visit to Whipple. Exhibit D, Paragraph 16.

### C. Access to Counsel in Detention Centers

Access to counsel in ICE detention centers is governed by a patchwork of standards that

vary based on the type of facility and the specific contract ICE has with that facility. The primary

goal is to ensure reasonable and equitable access to legal representatives to satisfy due process

requirements. The 2025 National Detention Standards (NDS 2025) is the most recent update,

designed to align with executive orders issued in early 2025. It largely maintains the framework

of its predecessor, NDS 2019, but incorporates technical revisions addressing organizational structure and language access. NDS 2025 generally applies to non-dedicated facilities (Intergovernmental Service Agreements or IGSAs) and facilities used by the U.S. Marshals Service. Legal visitation is permitted seven days a week for a minimum of eight hours on business days and four hours on weekends and holidays. Facilities must provide reasonable and equitable access to telephones where detainees are able to make free calls to the ICE-provided list of free legal service providers and to their consulates. Consultations must be within eyeshot but out of earshot of staff to ensure confidentiality. Heightened requirements for identifying Limited English Proficiency (LEP) detainees and providing meaningful access to legal information via professional interpretation or translated materials.

The 2011 Performance-Based National Detention Standards which was updated in 2016 (PBNDS) encompasses standards for legal access, applying primarily to ICE "dedicated" facilities (those that only house ICE detainees). PBNDS mandates private consultation rooms where auditory supervision of legal visits is strictly prohibited. It further requires a law library with at least five hours of access per week and the ability to make copies of legal documents. PBNDS additionally incorporates virtual attorney visitation protocols, allowing for video-teleconferencing when in-person visits are not feasible. Legal assistants and interpreters are also permitted to meet with detainees even if the attorney of record is not present. There is also a requirement that an attorney of record be notified within 24 hours of a detainee's transfer to a different facility.

The Family Residential Standards (FRS) applies specifically to family residential centers which are tailored to a "residential" rather than a "correctional" model due to the facilities housing parents with children. The FRS includes a legal orientation program for residents with

strong emphasis on group legal rights presentations. These facilities are often required to provide monitored care for children while parents meet privately with their attorney. FRSs also require legal visitors (other than licensed attorneys) to undergo a record check 72 hours prior to an initial visit.

### D. Access to Counsel in Holding Facilities

Distinguished from the ICE dedicated facilities and detention centers referenced above, the rights of detainees and their access to counsel differ significantly in the context of short-term holding or processing facilities such as Whipple. While dedicated facilities designed for longer-term stays are governed by the PBNDS, facilities like Whipple are traditionally intended for stays under twelve hours or extended to 72 hours during the limited albeit extraordinary circumstances surrounding Operation Metro Surge. While basic due process applies, the operational standards are often more streamlined, focusing on rapid intake rather than long-term detention.

ICE Policy Number 11087.2, titled "Operations of ERO Holding Facilities" issued January 31, 2024, is the primary directive governing short-term holding facilities such as Whipple. The policy requires that detainees have a means to make necessary phone calls. While 11087.2 is less prescriptive about visitation than the PBNDS, it still requires facilities to facilitate access for legal representatives. The policy also mandates that detainees with limited English proficiency be provided with meaningful access to information. This includes ensuring they understand their rights and how to contact legal counsel, often through translated versions of the "Notice of Rights." See Exhibit D, Paragraph 11.

### E. This action

Plaintiffs, an individual identified only as L.H.M., and the nonprofit organization The Advocates for Human Rights ("AHR"), initiated this action on January 27, 2026. ECF No. 1.

Plaintiffs allege that ICE St. Paul Field Office does not provide aliens whom it holds temporarily at the Whipple Federal Building ("Whipple") while they await transport elsewhere, with access to counsel. *See* ECF No. 1 ¶ 29.  Plaintiffs contend that Defendants do not allow outgoing phones calls at Whipple, *id*. ¶ 32, and that Whipple has no place for detainees to call counsel privately and that ICE personnel can and do listen in on detainees' phone conversations, *id*. ¶ 33.  Plaintiffs allege that Defendants make it impossible for attorneys to schedule calls with their clients while their clients are detained at Whipple. *Id*. ¶ 31.

On February 12, 2026, the Court issued an order granting Plaintiffs' request for a TRO and ordered immediate injunctive relief.  ECF No. 95. Following the order, Defendants implemented new protocols and strengthened existing measures in accordance with terms of the TRO. However, since the TRO's issuance, the factual landscape at Whipple has shifted necessitating this instant motion. Notably, the notification requirement of Term 7.b has presented unforeseen security vulnerabilities. Exhibit D Paragraph 21-24.

### F.  Measures taken at Whipple since February 12, 2026

Following the issuance of the TRO, the FOD broadcast to all employees within the St. Paul Field Office area of responsibility on February 13, 2026. Exhibit D, Paragraph 28.  The TRO established six key requirements to ensure constitutionally sufficient access to counsel for detainees at Whipple. The following details those requirements and the measures ICE has taken toward compliance as noted in the record and further supported in this memorandum.

*Notice of Rights and Contact Information*

The TRO requires ICE to provide detainees with notice of their rights and a list of free legal service providers. ICE produced a copy of the required Notice followed by a list of free legal service providers. Plaintiffs note the produced notice was only in English, despite the order

requiring translations in Spanish, Somali, French, and Hmong which Defendants concede and have subsequently remedied. Exhibit D Paragraph 13.

*Prompt Telephone Calls Following Detention*

The TRO requires ICE to permit detainees to make a "free, private, and unmonitored" telephone call without one hour of being detained. In furtherance of this objective, ICE has implemented significant upgrades to the hold room phone lines and repaired previously identified IT issues. Exhibit D Paragraph 11, 16. Additionally, new phone numbers have been provided on ICE website at https://www.ice.gov/detention-facilities to assist attorneys who wish to communicate with detainees.

*Confidential Telephone Calls with Counsel*

The TRO requires ICE to provide detainees with confidential telephone calls with their legal counsel. In response to this order, ICE resolved IT issues with the public facing telephone system and ensured the lines are available seven days a week to arrange immediate attorney visits or calls. Further, ICE has re-organized its staffing where officers respond to attorney emails and answer the dedicated telephone line. In instances where the line is busy, calls are answered by USCIS personnel and the caller's information is relayed to Whipple personnel for follow-up communication. Exhibit D Paragraph 13.

*Online Detainee Locator System (ODLS) Updates*

The TRO requires ICE to update the ODLS in real-time to reflect a detainee's location. Within 24 hours of the TRO, a significant number of detainees were correctly listed as being located at Whipple. While Plaintiffs report that compliance remains inconsistent, with some detainees not showing up in the system, ICE has continued to remedy the updates. Exhibit D Paragraph 26.

*72-Hour Transfer Moratorium and Notification*

The TRO requires ICE to abstain from transferring detainees out of Minnesota for the first 72 hours of detention and notify them of their destination upon transfer. ICE has largely complied with this moratorium, transferring only between four and six people outside of Minnesota in less than 72 hours since February 13, 2026. Exhibit D Paragraph 19.

*In-Person Legal Visitations*

The TRO requires ICE to provide in-person visits at Whipple for current or prospective attorneys. ICE has demonstrated the capability to facilitate these visits post-TRO, with at least one attorney reporting a successful in-person meeting. Exhibit D Paragraph 16.

Ultimately, ICE can comply with most of the TRO terms because the drawdown of Operation Metro Surge has led to decreased apprehensions of detainees.

## III.    Legal Standard

The seminal case governing the issuance of a preliminary injunction in the Eighth Circuit is that of *Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F.2d 109 (8th Cir. 1981), requiring the court to consider the following four factors: 1) Whether the party seeking the injunction will suffer irreparable harm if the injunction is denied; 2) A comparison of the potential hardship to the plaintiff if the injunction is withheld versus the potential hardship to the defendant if it is granted; 3) Whether the party seeking the injunction has a fair chance of prevailing on their underlying legal claims; and 4) How the granting or denial of the injunction will affect the broader public.

While the standard *Dataphase* test evaluates the threat of irreparable harm, the balance of equities, the probability of success, and the public interest courts apply heightened scrutiny when

10

the requested relief goes beyond maintaining the status quo. The status quo is typically defined as the last uncontested status which preceded the pending controversy. *Sanborn Mfg. Co. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 490 (8th Cir. 1993). Relief that seeks to alter this state, known as a mandatory injunction, is 'particularly disfavored' and requires a higher showing of a likelihood of success on the merits. *Planned Parenthood Minn., N.D., S.D. v. Rounds, 530 F.3d 724, 732 (8th Cir. 2008)*. In this case, the Governments status quo includes its statutory authority to transfer detainees and manage detention facilities such as Whipple according to its established operational needs. Plaintiffs are requesting that the Court mandate affirmative acts, such as implementing specific 72-hour transfer holds, providing unmonitored calls within one hour, and real-time ODLS updates. Thus, such relief is mandatory because it forces the Government to change its existing protocols.

Under the heightened mandatory injunction standard, Plaintiffs must show not just a fair chance of success, but a substantial likelihood or a heavy and compelling weight of evidence. *Id.* See also, *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258–59 (10th Cir. 2005). Further, a mandatory injunction is deemed such an extraordinary remedy that is only appropriate where the alleged harm is truly irreparable and imminent. *Packard Elevator v. ICC*, 782 F.2d 112, 115 (8th Cir. 1986). Thus, Plaintiffs must demonstrate that the threat to their interests is actual and non-theoretical, and of such imminence that there is a clear and present need for the Court to intervene. *Rogers v. Scurr*, 676 F.2d 1211, 1214 (8th Cir. 1982). Where, as here, the requested relief would upend the long-standing operational status quo of a federal facility, the failure to show certain and immediate injury is fatal to the request. *Wetzel v. Edwards, 635 F.2d 283, 286 (4th Cir. 1980)*. Further, when a mandatory injunction interferes with a government agency's core functions, the balance of equities weighs more heavily against the movant. *Nken v. Holder,*

*556 U.S. 418, 435 (2009)*. In the context of federal detention operations, courts must accord wide-ranging deference to the agency's execution of policies designed to maintain order and security. *Bell v. Wolfish, 441 U.S. 520, 547 (1979)*. Because Plaintiffs requested relief would force ICE to overhaul the operational and security protocols of Whipple, the public interest in efficient and secure law enforcement outweighs Plaintiffs' speculative claims of harm. *22nd Ave. Station, Inc. v. City of Minneapolis, 429 F.Supp.2d 144, 1153 (D. Minn. 2006)*.

In the context of this litigation which arises from Operation Metro Surge, the legal standard governing the constitutional rights of detainees is derived from the Supreme Court decision in *Bell* establishing the foundational "punitive intent" test for evaluating the conditions of pretrial detention under the Due Process Clause. The constitutional threshold addressed in *Bell* reflects that pretrial detainees may be subjected to the restrictions and conditions of the detention facility so long as those conditions and restrictions do not amount to punishment. Additionally, *Bell* utilized a rational basis test finding that in determining if a condition is punitive, a court must look at whether an alternative purpose to which the restriction may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose. Government actions that are reasonably related to the effective management of the detention facility or to maintaining security and order are generally not considered punishment in the constitutional sense.

The Eighth Circuit has applied the *Bell* standard specifically to the rights of detainees to access the courts and legal counsel in *Johnson-El v. Schoemehl*, 878 F.2d 1043 (8th Cir. 1989). In Johnson-El it was found that detainees must have a reasonable opportunity to seek and receive the assistance of attorneys. Restrictions on this access are constitutional only if they are rationally related to a legitimate purpose and are not excessive in light of that purpose.

IV.    **Argument**

<u>**Opposition to Preliminary Injunction**</u>

*Plaintiffs' Burden Has Not Been Met for Preliminary Injunction*

A preliminary injunction is an "extraordinary remedy," and the burden of proof rests entirely on the movant to show a "fair chance of prevailing" on the merits.

As noted in the above section, under *Johnson-El*, restrictions on pretrial detainees are constitutional if they are "rationally related to a legitimate purpose" and not "excessive in light of their purpose". Here, the Defendants have legitimate interests stemming from their need to manage the facility in which detainees are processed at Whipple. None of the restrictions and practices described by Plaintiffs constitute "punishment" in violation of the rights of detainees under the Due Process Clause of the Fifth Amendment. Rather, the restrictions and practices were reasonable responses by Whipple officials to legitimate security and operational concerns stemming from a significant influx of detainees associated with Operation Metro Surge, and in any event, were of only limited duration.

Ultimately, for Plaintiffs to obtain a mandatory preliminary injunction, they must show more than a "fair chance" of success; they must demonstrate a substantial likelihood of prevailing on the merits through a "heavy and compelling weight of evidence." *Planned Parenthood Minn., N.D., S.D. at* 732. Plaintiffs fail to meet this heightened burden because they cannot show that the current operational constraint at Whipple violates the Fifth Amendment.

While Plaintiffs argue that limited access to counsel at a processing center constitutes a due process violation, their claims ignore the fundamental principle that "the fact of confinement and the legitimate goals and policies of the relevant government institution" necessarily limit constitutional protections. *Bell* at 546. As noted above, the Supreme Court established in *Bell* that

when a policy is "reasonably related to a legitimate governmental objective," it does not amount to "punishment" or a per se constitutional violation. *Id.* at 539.

Under the *Bell* framework, ICE officials must be accorded "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id.* at 547. The current procedures at Whipple, which involve the rapid processing of a high volume of detainees during a surge, are tailored to the facility's core function as a short-term processing hub rather than a long-term detention center.

Plaintiffs' demand to implement a preliminary injunction expanding upon the TRO in terms of operational infrastructure would require the Government to overhaul the security and logistical protocols of a high-security federal building. However, "judicial deference is fixed at its highest" when considering matters of institutional security and resource allocation. *See id.* at 548. Because the current limitations are driven by the physical constraints of Whipple and the need for orderly processing during an enforcement surge, they are "legitimate operational considerations" that do not rise to the level of a Fifth Amendment violation.

While the Fifth Amendment allows detainees to hire attorneys at their own expense, it does not guarantee an unfettered right to a specific *manner* of access or a private suite of communications tools on demand. *Rafiyev* at 861. Because Plaintiffs cannot show that the Government has completely foreclosed all avenues of legal assistance, but rather that the Government has prioritized secure processing over Plaintiffs' preferred visitation schedule, they cannot demonstrate a violation under *Bell*.

As the Supreme Court cautioned, "courts should not 'second-guess' the expert judgments of [government officials]" regarding the administration of a facility. *Bell* at 544. Because the

challenged policies are reasonably related to the secure and efficient administration of federal immigration law, Plaintiffs are unlikely to prevail on the merits.

Defendants' good faith compliance with the Court's TRO is evidenced by the expeditious resolution of modifying the telephone system operating hours to allow inbound calls on weekends and holidays. Defendants' expeditious resolution of this matter demonstrates that the issue was technical rather than a policy of obstruction. Further, because the specific IT issue that caused inbound call failures have been resolved, the need for judicial intervention is diminished, as the "world of difference" in current conditions acknowledged by Plaintiffs. The "inconsistency" in phone logs cited by Plaintiffs where calls "all but disappeared" in January has been addressed as a technical hurdle related to updating the system to accommodate inbound calls pursuant to the TRO schedule. With the resolution of these issues, the request for an injunction is largely moot as to those specific technical impediments.

### *Plaintiffs Have a Reasonable Opportunity to Seek Counsel*

The Fifth Amendment requires only that detainees have a reasonable opportunity to seek and receive the assistance of attorneys. *Al Khouri v. Ashcroft, 362 F.3d 461, 464 (8th Cir. 2004)*. The Government has met this standard. Indeed, Plaintiffs' own argument that the current TRO is 'working' underscores why a permanent injunction is unnecessary; it demonstrates that the Government is already facilitating access within its existing operational framework. Where the Government is already providing the meaningful opportunity required by due process, there is no 'clear and present need' for the Court to permanently intrude upon the agency's internal management. *City of Mesquite v. Aladdin's Castle, Inc.,* 455 U.S. 283, 289 (1982)*. Since the implementation of new protocols at Whipple, timely access to detainees evidenced in part by documented phone usage has surged. Within 24 hours of the TRO being ordered, Defendants

updated the Online Detainee Locater System (ODLS) to list Whipple as a location, demonstrating a willingness to provide real-time updates when feasible. While Plaintiffs cite a lack of completed calls in January, current logs show that from February 7 to February 10 alone, hundreds of calls were made. The St. Paul Field Office line is now staffed seven days a week by ERO officers instructed to facilitate attorney requests immediately. Exhibit D Paragraph 11, 26.

Contrary to Plaintiffs' suggestions of monitoring communications, the Government provides private rooms for attorney-client calls. In fact, current policy ensures that all attorney visits, whether by phone or in person, are conducted in a private setting to ensure confidentiality. Exhibit D Paragraph 8, 11, 14-16, 20, 26. Because the Government has resolved technical issues regarding telephone access and has significantly improved processing times at Whipple, a preliminary injunction is not warranted.

### The Transfer Moratorium Exceeds Equitable Relief

Plaintiffs rely on *Orantes-Hernandez v. Meese,* 685 F. Supp. 1488, 1511-13 (C.D. Cal. 1988) to justify a 72-hour transfer hold. However, that case addressed systemic, long-term bad faith, which is simply not present here. While Plaintiffs argue that the transfer moratorium has "materially improved" access, it creates an operationally burdensome and legally excessive framework that ignores the fluid nature of immigration enforcement.

As opposed to a formal detention center, Whipple is a temporary processing center for detainees awaiting removal, transfer, immigration court hearings, medical treatment, intra-facility movement, or other processing into or out of a facility. Confinement in such facilities is intended to be brief and hold rooms such as those contained at Whipple are not designed for overnight stays. Mandating prolonged stays at Whipple risks overcrowding at the facility which results in significant operational and safety issues.

Out of hundreds of detainees, the Government has only transferred approximately four to six individuals outside of Minnesota in less than 72 hours since February 13. This marginal number reflects the extreme difficulty of halting all movement in a high-volume environment rather than a willful disregard of the Court's order. Further, since February 13, only 2.6% of stays have exceeded 24 hours which supports the position that the Government is processing detainees efficiently without the need for a court-mandated hold.

Unlike the systemic bad faith addressed in Orantes-Hernandez, the current record shows a "night and day" improvement in conditions, rendering a permanent injunction necessary. Despite the arguments of Plaintiffs, the Court should be wary of issuing orders that interfere with the administrative complexity of federal immigration enforcement across multiple facilities. Maintaining institutional securing and preserving internal order and discipline are essential goals that may require limitation…of the retained constitutional rights of…detainees. *Bell at* 544. The court might disagree with the choice to effectuate those interests, but it should not "second-guess the expert administrators on matters on which they are better informed…concern with minutia of prison detention can only distract the court from detached consideration of the one overriding question presented to it: does the practice or condition violate the Constitution?" *Id.*

### *Plaintiffs Request for Expansion of Injunction is Without Merit*

Plaintiffs seek to expand the scope of the injunction to cover *all* persons initially detained in Minnesota, regardless of whether they were ever held at Whipple. This proposed expansion is without merit. Far from reducing administrative complexity, this expansion would impose the specific requirements of the TRO onto local county jails (such as Sherburne or Kandiyohi) that operate under different jurisdictional and contractual standards. Further Plaintiffs provide no evidence that the constitutional concerns alleged at Whipple exist at these other facilities, which

are already noted to be "marginally easier" for attorney communication. To support their

position, Plaintiffs' reliance on *Cobb v. Aytch*, 472 F. Supp. 908 (E.D. Pa. 1979) regarding pre-

transfer notification is misplaced, as the Government already provides adequate notice and the

ability to retain counsel under current protocols. Ultimately, an injunction must be narrowly

tailored to the alleged harm, which in this case is adequate access to counsel for detainees. Thus,

expanding the order to facilities where no violation has been documented ignores the standards

set in *Dataphase*, and is therefore inappropriate if not impermissible.

## Modification of Temporary Restraining Order

The district court has the inherent power to modify or vacate a temporary restraining

order when the circumstances of the case change. *Omaha Indemnity Co. v. Wining*, 949 F.2d

235, 238 (8th Cir.1991).

### *Grounds for Elimination of Term 6*

Defendants suggest to this court that as opposed to expanding the TRO, it would provide

more value to eliminate Term 6 of the TRO reflecting a stipulated measure intended to prevent

transfers before detainees could consult with counsel. As evidenced by the Status Conference

held on February 24, 2026, the logistical landscape has shifted. The 72-hour freeze now prevents

Defendants from complying with separate federal safety mandates regarding facility population

which distinguishes formal detention facilities with the intent and purpose of the Whipple

Building as a processing facility. Under Fed. R. Civ. P. 60(b)(5), which guides the modification

of equitable orders, a court may relieve a party from an order if "applying to prospectively is no

longer equitable". The Supreme Court held in *Rufo v. Inmates of Suffock County Jail*, 502 U.S.

367 (1992) that a party seeking modification of a stipulated order must establish that a significant

change in facts or law warrants revision.

Courts must consider the "balance of equities" and the "public interest," two of the four factors established in *Dataphase Systems, Inc.*, which is the controlling standard in the Eighth Circuit. While the original intent of Term 6 was to protect detainee rights to communicate with counsel, the result of the broad stipulation, affecting those detainees without counsel, presents operational hardship and public safety concerns for Defendants. Exhibit D Paragraph 20. The court in *Horne v. Flores*, 557 U.S. 433 (2009) emphasized that in institutional reform litigation, analogous to this action arising from Operation Metro Surge, courts must take a "flexible approach" to modification because such orders remain in force for many years and can become straitjackets that inhibit effective administration.

An injunction must be narrowly tailored to remedy the specific harm shown. If the harm, which in this lawsuit is lack of access to counsel, has been mitigated through other means, the 72-hour transfer ban is no longer "narrowly tailored". Since the initial TRO extension to March 12, 2026, Defendants have confirmed pre-existing notices and availability of telephonic devices at the Whipple Building in addition to implementing enhanced legal visitation and communication protocols. With the existence of these implementations facilitating accessible communication with counsel in furtherance of the intent of the TRO, Term 6 is an excessive "prior restraint" on agency discretion. Exhibit D Paragraph 20. As is gleaned from the decision of *Dataphase* and its progeny, injunctive relief should be no broader than is necessary to remedy the violation. Ultimately, if the underlying due process concern of access to counsel is satisfied by the new protocols, which Defendants contend is accurate, the transfer restriction exceeds its legal purpose.

***Grounds for Elimination of Term 7***

Defendants similarly suggest to this Court that it would likewise be advantageous to eliminate Term 7 of the TRO, which mandates pre-transfer destination disclosure and "unlimited" phone access until a contact is reached. Defendants contend that these requirements create an untenable security risk and exceed the narrowly tailored relief permitted under Eighth Circuit precedent.

Term 7(a) requires Defendants to inform detainees of their destination prior to transfer. This creates a significant security vulnerability by allowing detainees to communicate transport routes or destinations to outside parties before the transfer is complete. It is Defendants position that deference must be given to the professional expertise of corrections officials regarding security protocols. Disclosing transfer locations in advance undermines the orderly administration of the facility. In *Bell*, the Supreme Court held that "maintaining institution security and preserving internal order and discipline are essential goals." Thus, courts are cautioned not to second-guess the security decisions of facility administrators unless there is substantial evidence that the response is exaggerated. See also, *Florence v. Bd. of Chosen Freeholders*, 566 U.S. 318 (2012). Here, the facility administrators attest that Term 7(a) creates a significant security vulnerability to operations as it relates to orderly administration. *See* Exhibit D.

Term 7(b) requires Defendants to provide phone access "until they are able to reach counsel or family." This open-ended requirement creates an administrative straitjacket that can delay urgent transfers for hours or days if a contact is not immediately available. While it is not disputed that detainees have a right to access counsel, they do not have a right to a specific method of access that overrides Defendants operational needs. Thus, the requirement to wait "until" a contact is reached is an indefinite stay on government action that unfairly prejudices

Defendants. Further, while the Whipple Building is not a prison, it is instructive to note under the Prison Litigation Reform Act ("PLRA") 18, U.S.C. § 3626(a)(1), any prospective relief regarding prison conditions must be "narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary." Defendants contend that Term 7(b) is overbroad because it halts transfers indefinitely regardless of the availability of counsel at the receiving facility.

Following the Status Conference on February 24, 2026, Defendants have implemented a post-arrival notification system. Under this new protocol, families and counsel are automatically notified via the Online Detainee Locator Syster (ODLS) within two hours of arrival at a new facility alleviating the concerns giving rise to the pre-transfer destination disclosure and "unlimited" phone access of Term 7. In *Rufo*, the Court noted that a party may be relieved from an order if "the statutory or decisional law has changed to make legal what the [order] was designed to prevent." Here, the implementation of a more secure notification system satisfies the "due process" concerns of the Plaintiffs with the security risks of Term 7.

## V.    Conclusion

The Government has met the primary objectives of the TRO. The transition to a permanent preliminary injunction is unnecessary given the Government's ongoing efforts to resolve technical hurdles and facilitate counsel access. Further, because of the operationally burdensome and legally excessive nature of certain provisions of the TRO, Defendants respectfully request the elimination of Term 6 and Term 7 to the extent they interfere with the administrative complexity of federal immigration enforcement and are counterproductive to the purpose of Whipple as a processing facility as opposed to a detention center.

Dated: March 12, 2026                                Respectfully Submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

GLENN M. GIRDHARRY
Acting Deputy Director

WILLIAM C. SILVIS
Assistant Director

CHRISTINA PARASCANDOLA
Senior Litigation Counsel

/s/ Andrew C. Abrams
ANDREW C. ABRAMS
Trial Attorney
U.S. Dept. of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 878
Washington, DC 20044
(202) 598-3639
andrew.c.abrams@usdoj.gov

Attorneys for Defendants