UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

THE ADVOCATES FOR HUMAN
RIGHTS, *et al.*

              Plaintiffs,

v.

U.S. DEPARTMENT OF
HOMELAND SECURITY, *et al.*,

              Defendants.

Case No. 0:26-cv-00749 (NEB/DLM)

**PLAINTIFFS' SUPPLEMENTAL
REPLY IN SUPPORT OF THEIR
MOTION FOR A PRELIMINARY
INJUNCTION**

## TABLE OF CONTENTS

Introduction.................................................................................................... 1

I.    The undisputed facts show that Defendants deny Class members
confidential access to counsel................................................................. 2

II.    Defendants' conclusory references to operational concerns are
unsupported by evidence ......................................................................... 6

    A.    Defendants have made no attempt to justify most attorney
access restrictions......................................................................... 7

    B.    Defendants' attempts to justify their detainee transfer policies
should be rejected ......................................................................... 8

III.    Defendants' characterization of Plaintiffs' requested relief as a
"mandatory injunction" is mistaken and irrelevant ............................. 11

IV.    Partial TRO compliance does not obviate the need for a preliminary
injunction................................................................................................ 16

V.    Relief should cover Minnesota detainees regardless of where they were
initially detained................................................................................... 18

Conclusion ................................................................................................. 19

## INTRODUCTION

Defendants' brief confirms how few facts are in dispute. Defendants do not deny any of Plaintiffs' evidence regarding the pre-TRO period—not the absence of outgoing phone calls from hold rooms, barriers to attorneys contacting their clients, the general prohibition on attorney visits, or the damage to attorney-client relationships from out-of-state transfers. Nor is there any apparent dispute about the general state of affairs since the TRO: Defendants largely *can* comply with the TRO, but have failed to do so in several respects. *See, e.g.*, Opp. to Plfs. Mot., ECF 149, at 1 ("Defs.' Suppl. Br.") (asserting "substantial compliance" with TRO); *id.* at 10 ("ICE can comply with most of the TRO terms …").

Just a few points of contention remain. First, Defendants argue that their restrictions on access to counsel "were reasonable responses … to legitimate security and operational concerns." Defs.' Suppl. Br. 13. But this argument is largely based on conclusory assertions in their brief unsupported by evidence. Defendants offer no evidence of a purported rational purpose for most restrictions, except to resist the TRO's transfer-related provisions—and that evidence is far too weak to overcome the demonstrated harm to Plaintiffs' constitutional rights.

Second, Defendants argue that the TRO is a "mandatory" injunction and that the Eighth Circuit has a higher standard for such injunctions. *Id.* at 11-12. This argument relies on egregious misreadings of authority. *See infra* Part III. In fact, the Eighth Circuit has declined to set a higher standard for mandatory injunctions, affirming "mandatory" injunctions under the familiar *Dataphase* test rather than any heightened standard. *Ferry-Morse Seed Co. v.*

*Food Corn, Inc.*, 729 F.2d 589, 592-593 (8th Cir. 1984). In any event, most of the TRO's provisions are prohibitory, and even the mandatory ones are well justified.

Third, Defendants argue that their partial TRO compliance moots Plaintiffs' request for an injunction. Defs.' Suppl. Br. 15. But even if Defendants had fully complied with the TRO—which they have not—it is black letter law that "[t]he court's power to grant injunctive relief survives discontinuance of the illegal conduct." *U.S. v. W.T. Grant. Co.*, 345 U.S. 629, 633 (1953). As discussed *infra* Part IV, numerous courts have rejected identical arguments that TRO compliance obviates the need for a preliminary injunction.

Finally, Defendants oppose Plaintiffs' request to modify the definition of "Detainee" to include everybody detained in Minnesota, even those not initially detained at Whipple. Defs.' Suppl. Br. 17-18; *see also* Mem. ISO PI, ECF 136 at 24-25 (Pls.' Suppl. Br.). But Defendants misunderstand that modification's effects, and do not rebut Plaintiffs' showing of its appropriateness.

## I. The undisputed facts show that Defendants deny Class members confidential access to counsel

As explained in Plaintiffs' supplemental brief, Defendants' production confirms that prior to the TRO, Defendants were not advising Class members of their rights; Class members in Defendants' custody could not make confidential phone calls; attorneys couldn't call, visit, or even find them; many were being held at Whipple for a troublingly long time; and many were being whisked to Texas, making communication and representation even harder. *See*

2

Pls.' Suppl. Br. 4-19. Defendants' supplemental submission controverts *none* of this.

Indeed, Defendants concede that not a single successful call was made from hold rooms from January 3 to February 7. *See* Defs.' Suppl. Br. 15 (claiming this issue "has been addressed"). They do not even *try* to justify that damning fact. Nor do they identify any other way they enabled confidential conversations between Class members and counsel, as the Eighth Circuit requires. *See Johnson-El v. Schoemehl*, 878 F.2d 1043, 1052 (8th Cir. 1989) ("Detainees' right to counsel and due process can also be compromised by a lack of privacy in consultations with counsel."). Defendants' pre-TRO practices thus indisputably violated Plaintiffs' constitutional rights.

The parties also appear to agree that all changes Defendants have made since the TRO were "measures ICE has taken toward compliance" with the TRO, Defs.' Suppl. Br. 8, not anything Defendants would have done on their own.

There is somewhat more dispute as to Defendants' current practices— although most of that owes to gaps in Defendants' productions and assertions in their brief that do not match their evidence.

*Outgoing Calls*

Defendants' brief states they have "implemented significant upgrades to the hold room phone lines," Defs.' Suppl. Br. 9, but neither the cited paragraphs of Ms. Rich's declaration nor any of Defendants' other evidence supports this statement. Ms. Rich attests that Defendants have "update[ed] the telephone system to take *inbound* calls," 2d Rich Decl., ECF 153 ¶ 16 (emphasis added),

3

but says nothing at all about upgrades to the hold room phones. And even if such an upgrade were in evidence, nothing in the record shows whether *any* calls have been made since February 10, reinforcing Plaintiffs' concern that Defendants may have "again made the phones unavailable the day after the site visit." Pls. Suppl. Br. 9 n.3.

Defendants' claim that "the implementation of new protocols at Whipple" led to a "surge[]" in "documented phone usage," Defs.' Suppl. Br. 15, thus has no grounding in the record. It is not clear what supposed new protocols the brief is referring to, as the only new protocol described in Ms. Rich's declaration deals with ODLS and calls immediately after transfer, not phone access during detention. 2d Rich Decl. ¶¶ 18, 25. To the extent Defendants are referring to the February 13 "broadcast" providing the terms of the TRO to Defendants' employees, *see* 2d Rich Decl. ¶ 28; *id.* Ex. 9, there is no documentation of any phone usage after that time, let alone a surge.

*Incoming Calls*

As for incoming calls and emails, Defendants claim that they fixed any problem through IT upgrades "before February 23, 2026" and staffing reorganizations. 2d Rich Decl. ¶¶ 16, 30; *see also* Defs.' Suppl. Br. 9. Aside from their declarant's word, Defendants offer no evidence of this claim, which is contradicted by multiple attorney declarations. *See* Curran Decl., ECF 142 ¶ 9 (describing unanswered call on February 27 and unanswered emails); Zaragoza Decl., ECF 141 ¶¶ 4, 7 (counsel sent a granted habeas order to the email address in late February but never heard back).

4

*In-Person Visits*

Similarly, Defendants claim that "there has only been at least [sic] one in-person attorney visit to Whipple" since the TRO, citing a visitation log that they have never produced, in violation of the Court's orders. Defs.' Suppl. Br. 5; 2d Rich Decl. ¶ 16. This contradicts Plaintiffs' sworn evidence, which documents two in-person attorney visits (one successful and one denied access) just among attorneys known to Plaintiffs. *See* Cherneff Decl., ECF 146 ¶¶ 8-10; Jacobson Decl., ECF 145 ¶¶ 5-6. Defendants' brief also claims they have "enhanced legal visitation … protocols," Defs.' Suppl. Br. 19, but that too is unsupported by any evidence.

*Detainee Locator Updates*

Defendants acknowledge Plaintiffs' evidence that ODLS "compliance remains inconsistent, with some detainees not showing up in the system," but claim "ICE has continued to remedy the updates." Defs.' Suppl. Br. 9. This claim does not match Defendants' evidence; while Ms. Rich describes a "Post-Arrival Notification Protocol" implemented after the TRO, under which ODLS is supposed to be updated "[w]ithin two hours of a detainee's arrival at a receiving facility," 2d Rich Decl. ¶ 18, she neither explains the continued omissions nor describes any remedial efforts.

*Transfer*

On transfer, at least, the parties seem to agree: Defendants have violated the transfer prohibition at least four to six times since February 13. Defs.' Suppl. Br. 10. (There were 18 or 19 additional violations on the evening of

5

February 12, Pls. Suppl. Br. 16 n.6, which Defendants neither concede nor dispute.)

Altogether, the factual record unequivocally shows Defendants were violating Plaintiffs' constitutional rights prior to the TRO; even under the TRO they are at best inconsistently allowing Plaintiffs to exercise those rights; and any easing of Defendants' restrictions on access to counsel occurred solely to comply with the TRO. Defendants were violating Plaintiffs' rights and likely will do so again without a preliminary injunction.

## II. Defendants' conclusory references to operational concerns are unsupported by evidence

The key merits question for Plaintiffs' due process claim is whether Defendants' restrictions on detainees' rights are "rationally related to a legitimate purpose" and not "excessive in light of their purpose." *Johnson-El*, 878 F.2d at 1048; *accord* Defs Br. 13. Defendants principally argue that "policies designed to maintain order and security" justify the restrictions. Defs.' Suppl. Br. 12; *see also id.* at 11-15. But this argument rests almost entirely on empty buzzwords in their brief, not record evidence. Defendants identify *no* security or operational rationale for the pre-TRO restrictions on phone and visitor access, nor for concealing Class members' location from ODLS. The only aspect of Plaintiffs' claims faintly connected to a policy rationale is on transfer—and there, the evidence greatly outweighs Defendants' arguments.

6

## A.    Defendants have made no attempt to justify most attorney access restrictions

As discussed *supra* Part I, Defendants neither meaningfully contest that they implemented severe attorney access restrictions on detainees throughout the pre-TRO period, nor offer *any* evidence explaining these restrictions.

Instead, Defendants rely on conclusory assertions found only in their brief. For example, Defendants suggest that draconian restrictions on attorney access "were reasonable responses … to legitimate security and operational concerns stemming from a significant influx of detainees associated with Operation Metro Surge." Defs.' Suppl. Br. 13; *see also, e.g.*, *id.* at 14 (describing need for "orderly" and "secure" processing). Defendants' brief cites no record evidence for that justification, because none exists.

The Eighth Circuit has squarely rejected such generalized and unsubstantiated justifications. While prisons and jails have "a compelling interest in institutional security," they "must do more than merely assert a security concern" or simply "offer conclusory statements and post hoc rationalizations for their conduct." *Murphy v. Mo. Dep't of Corr.*, 372 F.3d 979, 988-89 (8th Cir. 2004) (cleaned up); *see also, e.g.*, *Cleavinger v. Saxner*, 474 U.S. 193, 207 (1985) (rejecting "[r]outine and automatic arguments" about institutional discipline and security).

Even if this Court considered Defendants' unsupported assertions, Defendants do not explain how security or operational concerns justified providing *no* avenue for confidential attorney-client communications, shutting off hold room phones, or closing previously available visitation rooms. *See, e.g.*, Pls. Suppl. Br. 7-10, 18. And they offer no justification for withholding Class

7

members' location from ODLS. Thus, even if Defendants had adequately shown these restrictions were "rationally related to a legitimate purpose," they have offered no basis to conclude that these extreme restrictions were not "excessive in light of their purpose." *Johnson-El*, 878 F.2d at 1048.

Moreover, this Court has already considered and rejected Defendants' argument that their proffered operational constraints should "set[] the floor for reasonable access to counsel." TRO 34; *see also, e.g.*, *Brown v. Plata*, 563 U.S. 493, 511 (2011) ("Courts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration."). As the Court previously observed, "fail[ure] to plan for the constitutional rights of its civil detainees" does not justify curtailing those rights. TRO 34.

### B. Defendants' attempts to justify their detainee transfer policies should be rejected

The only practices for which Defendants have proffered *any* evidence of a purported purpose are those concerning out-of-state transfers. Defendants take aim at TRO provisions guaranteeing an opportunity to seek counsel before such transfers. Defs.' Suppl. Br. 16-21.[1] This Court previously summarized extensive evidence of various ways such transfers impede attorney access, TRO

---

[1] Confusingly, Defendants at times style these criticisms as a motion to modify the TRO. *See, e.g.*, Defs.' Suppl. Br. 8 (referencing "this instant motion"); *id.* at 18 (invoking the court's "inherent power to modify or vacate a temporary restraining order"). If Defendants intended portions of their brief to constitute such a motion, that motion has not been properly made and should not be considered. *See* Fed. R. Civ. P. 7(b), 60(b); LR 7.1. If the Court construes Defendants' brief as a motion for such relief, Plaintiffs oppose it for the reasons detailed herein.

6, 8-11, 15, 18, 21, correctly finding "Defendants' practice of rapidly transferring detainees out of state without an opportunity to consult with counsel" to be "unconstitutionally excessive." *Id.* at 30.

Defendants have left this mountain of evidence almost entirely unrebutted. They do not dispute that transfer out-of-state makes it far more difficult for individuals to find counsel or have their counsel of choice effectively represent them, nor do they rebut Plaintiffs' evidence that they obstruct attorney-client communication in out-of-state facilities post-transfer and pressure Class members to "self-deport" while doing so. Nor do they contest Plaintiffs' evidence that the brief delay of transfer required by the TRO has improved detainees' access to counsel. Cherneff Decl. ¶¶ 10-11, 13; Curran Decl. ¶ 4, Zaragoza Decl. ¶ 6.

Their only effort to minimize the constitutional injury of transfers is to state that they have taken steps to facilitate after-the-fact notice to attorneys of detainees' transfer. *See* 2d Rich Decl. ¶ 25 (new "Post-Arrival Notification Protocol" includes post-transfer updating of detainees' location in ODLS and a single, 10-minute phone call to advise counsel of detainees' new location). This leaves most of the problems just described unaddressed.

Because they cannot deny the damage out-of-state transfers wreak on attorney-client relationships, Defendants attempt to justify their practices as rationally related to legitimate purposes. Defs.' Suppl. Br. at 18-21. But their sparse and self-serving testimony falls far short of that standard.

Defendants first attack paragraph 6 of the TRO, the 72-hour transfer restriction, as "[m]andating prolonged stays at Whipple," thereby "risk[ing]

overcrowding at the facility." Defs.' Suppl. Br. at 16; *see also* 2d Rich Decl. ¶¶ 19-20. To the contrary, the TRO simply requires the first 72 hours of a Minnesota detainee's confinement be *in Minnesota*—not necessarily at Whipple. TRO 39. Defendants acknowledge that they detain individuals at Minnesota locations besides Whipple. *See, e.g.*, Defs.' Suppl. Br. 17; Declaration of Alethea M. Huyser, Ex. A, Supplemental Interrogatory Responses at 2-3 (describing non-Whipple detention locations in Minnesota). Defendants have offered no evidence that detaining people in those facilities is operationally burdensome or otherwise suboptimal. And their own data show stays at Whipple are now significantly *shorter* than before the TRO, suggesting other Minnesota facilities have sufficient capacity to avoid overcrowding at Whipple. *See* Pls. Suppl. Br. 17-18.

With respect to the pre-transfer notification provision, Defendants again mischaracterize the Court's order. They posit that notifying Class members of planned transfer creates "a heightened risk of transport interception or coordinated efforts to block government vehicles." 2d Rich Decl. ¶ 21. They even hypothesize that allowing individuals to contact attorneys or family members prior to an upcoming transfer would cause a "significant safety risk." *Id.* ¶ 24.

But the TRO does not require Defendants to "disseminat[e] movement of detainees to the public." *Id.* Defendants need not share the date or time of transfer, nor any other logistical information. The *only* thing that Defendants must tell Class members, and allow them to tell counsel and family, is their ultimate destination. The theoretical security concern that Defendants raise

10

simply is not implicated by the limited information that paragraph 7 requires them to provide, nor does it outweigh the clear harms to Plaintiffs deprived of such information. *See* TRO 6, 8, 30; Pls. Suppl. Br. 22-24.[2]

Defendants also complain that the TRO requires them to delay transfer "until [the detainee is] able to reach counsel or family," Defs.' Suppl. Br. 20 (quoting TRO 39); *see also* 2d Rich Decl. ¶ 23. But it does not follow that Defendants might have to ground an entire group of detainees while one waits to reach counsel or family. Defendants do not explain why that one person could not be sent on the next transport, after completing their call. If the requirement had impacted any of the numerous transfers since February 12, Defendants surely would have entered that into evidence; they have not.[3]

## III.   Defendants' characterization of Plaintiffs' requested relief as a "mandatory injunction" is mistaken and irrelevant

The relief Plaintiffs seek is lawful and warranted, notwithstanding Defendants' misguided argument that it should be rejected as a mandatory injunction. *See* Defs.' Suppl. Br. 10-11.

Injunctive orders can theoretically be categorized as "mandatory" or "prohibitory" depending on whether they "compel[] or forbid[] a single, discrete

---

[2] For similar reasons, Defendants' attempt to link such limited notification to a tragic shooting at an ICE facility in Dallas is baseless. 2d Rich Decl. ¶ 24. While Plaintiffs do not downplay the seriousness of the Dallas attack, Defendants do not suggest it was in any way facilitated by knowledge of an impending transfer.

[3] In any event, Defendants' concern could be addressed by replacing "opportunity to use the telephone until they are able to reach counsel or family," TRO 39, with "meaningful opportunity to use the telephone to attempt to contact counsel or family, including not less than 20 minutes of free, private, and unmonitored calling time."

act." *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 835 (1994). In practice, this distinction is "difficult to apply when conduct that can recur is involved, or when an injunction contains both mandatory and prohibitory provisions." *Id.* And, often, "the same command can be phrased either in mandatory or prohibitory terms." *Id.*

The Eighth Circuit does not rely on the distinction between prohibitory and mandatory injunctions, instead simply focusing on whether particular relief is necessary to "preserve the status quo until" final judgment may offer "full, effective relief." *Ferry-Morse*, 729 F.2d at 590. "[W]here the status quo is a condition not of rest, but of action, and the condition of rest … will cause irreparable harm, a mandatory preliminary injunction is proper." *Id.*

Defendants rely on a troubling array of misreadings or misquotations of relevant caselaw to undermine the use of mandatory injunctions. For example, Defendants assert that mandatory injunctions are "'particularly disfavored' and require[] a higher showing of a likelihood of success on the merits." Defs.' Suppl. Br. 11 (purportedly quoting *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008)). But *Planned Parenthood* is not about mandatory injunctions at all; it is about the heightened burden to enjoin state statutes (something not at issue in this case). *See Planned Parenthood*, 530 F.3d at 732. The phrase Defendants quote, "particularly disfavored," does not appear in that case, nor in any Eighth Circuit case dealing with any standard for injunctions that Plaintiffs have found. The page Defendants cite does not seem to even arguably support their proposition.

12

Defendants also cite *Planned Parenthood* for the proposition that "Under the heightened mandatory injunction standard, Plaintiffs must show not just a fair chance of success, but a substantial likelihood or a heavy and compelling weight of evidence." Defs.' Suppl. Br. 11. Plaintiffs do not believe *Planned Parenthood* can conceivably be read to stand for that proposition. Even Defendants' out-of-circuit case does not quite support it; while it held that mandatory injunctions require substantial likelihood of success on the merits, it specifically *rejected* Defendants' "heavy and compelling" test. *See id.* (citing *Schrier v. Univ. of Co.*, 427 F.3d 1253, 1261 (10th Cir. 2005)).

Then, Defendants state that "a mandatory injunction is deemed such an extraordinary remedy that is only appropriate [sic] where the alleged harm is truly irreparable and imminent," Defs.' Suppl. Br. 11, citing for this proposition *Packard Elevator v. ICC*, 782 F.2d 112, 115 (8th Cir. 1986). *Packard Elevator* states the general standard for injunctions and notes that the injury must be "imminen[t]," 782 F.2d at 115 (internal quotation omitted), but does not discuss mandatory injunctions at all, let alone establish a more demanding test. *Packard Elevator*, 782 F.2d at 115.

Similarly, Defendants cite *Nken v. Holder*, 556 U.S. 418, 435 (2009), for the proposition that "when a mandatory injunction interferes with a government agency's core functions, the balance of equities weighs more heavily against the movant." Defs.' Suppl. Br. 11-12. But *Nken* does not discuss mandatory injunctions or core government functions, and the particular page Defendants cite largely deals with what constitutes irreparable harm in challenges to immigration proceedings. 556 U.S. at 435.

Finally, Defendants cite *22nd Ave. Station, Inc. v. City of Minneapolis*, 429 F. Supp. 2d 1144, 1153 (D. Minn. 2006) for the proposition that "Because Plaintiffs['] requested relief would force ICE to overhaul the operational and security protocols of Whipple, the public interest in efficient and secure law enforcement outweighs Plaintiffs' speculative claims of harm." Defs.' Suppl. Br. 12 (mis-citing the case as 429 F. Supp. 2d 144). But *22nd Ave Station* concerns the constitutionality of a zoning ordinance restricting adult entertainment, and has nothing to do with operational and security protocols of a government facility nor the public interest in efficient and secure law enforcement. 429 F. Supp. 2d at 1146. The page to which Defendants cite predominantly discusses Fed. R. Civ. P. 65(c)'s bond requirement. *Id.* at 1153.

*Actual* Eighth Circuit precedent does not imbue the distinction between "prohibitory" and "mandatory" injunctions with the weight Defendants claim. What matters is whether the "status quo" will cause "irreparable harm." *Ferry-Morse*, 729 F.2d at 593.

This Court has already found that Defendants' violations of Plaintiffs' constitutional rights to counsel constitute irreparable harm. TRO 35. The Court further recognized that those violations lead to further harms, as detainees "cannot effectively exercise their rights to challenge the constitutionality, legality, or conditions of their confinement." *Id.* And it carefully examined decisions from several other courts addressing similar constitutional violations and imposing similar remedies necessary to prevent irreparable constitutional injuries. *See id.* at 25-28. Defendants do not grapple with, much less rebut, that analysis.

14

Most of the relief Plaintiffs seek would simply re-establish the status quo, that is, "the last uncontested status which preceded the pending controversy." *Minn. Min. & Mfg. Co. v. Meter for and on Behalf of N.L.R.B.*, 385 F.2d 265, 273 (8th Cir. 1967). This includes restoring in-person legal visits, *see* Brown Decl. ¶¶ 14-15 (legal visits only recently prohibited at Whipple); allowing free phone calls to counsel, *see, e.g.*, Feb. 6, 2026 Hr'g Tr. 41:23-24; 1st Bottjen Decl., ECF  72 ¶ 13; 2d Rich Decl. ¶¶ 14-15 (claiming extensive phone availability as status quo for detainees at Whipple); and detaining most people in state, *see, e.g.*, Allen Decl., ECF 62 ¶¶ 3-4 (typically, before Operation Metro Surge, detainees would leave Whipple but "stay in Minnesota throughout their immigration proceedings," but since Metro Surge began most of Allen's clients were "quickly transferred to Texas.").

Defendants suggest that the status quo includes uncabined "authority to transfer detainees" away from access to counsel. Defs.' Suppl. Br. 11. Correctly construed, the status quo is that every Class member *is in Minnesota*; it is Defendants' challenged conduct, the very thing Plaintiffs contest, that moves them anywhere else, so an injunction limiting transfer preserves, not alters, the "last uncontested status." *Minn. Min.*, 385 F.2d at 273.

The remaining provisions—Provision 1 (notice of rights), Provision 5 (including Whipple in ODLS), and Provision 7 (pre-transfer notice)—are more fairly described as mandatory, but for the reasons described in Parts I-II, Plaintiffs' previous briefs, and the Court's TRO order they are amply justified as necessary to prevent irreparable harm.

15

## IV.    Partial TRO compliance does not obviate the need for a preliminary injunction

Defendants argue that a preliminary injunction is unnecessary given changes Defendants made to comply with the TRO. Defs.' Suppl. Br. 15-16. But (partial) compliance with a temporary restraining order does not preclude more durable injunctive relief.

"The purpose of an injunction is to prevent future violations." *U.S. v. W.T. Grant. Co.*, 345 U.S. 629, 633 (1953). As such, "[t]he court's power to grant injunctive relief survives discontinuance of the illegal conduct." *Id.*; *see also Lackey v. Stinnie*, 604 U.S. 192, 204 (2025) (plaintiff may continue to seek injunctive relief "unless it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur") (cleaned up).  Otherwise, "a defendant might suspend its challenged conduct after being sued, win dismissal, and later pick up where it left off." *F.B.I. v. Fikre*, 601 U.S. 234, 241 (2024). The test is whether "there exists some cognizable danger of recurrent violation." *W.T. Grant*, 345 U.S. at 633. Relevant factors to consider include "the bona fides of the expressed intent to comply, the effectiveness of the discontinuance and, in some cases, the character of the past violations." *Id.*

"Defendants cannot [] rely on [] *court-ordered* compliance to argue that a court order is unnecessary." *Nat'l Council of Nonprofits v. Off. of Mgmt & Budget*, 775 F. Supp. 3d 100, 120 (D.D.C. 2025) (emphasis in original); *see also Advisors Excel, LLC v. Zagula Kaye Consulting, LLC*, No. 15-4100, 2015 WL 736344, at *8 (D. Kan. Feb. 20, 2015) (a defendant may not "avoid injunctive relief simply by professing that he has complied with his court-ordered obligations"). "If compliance with the terms of a TRO were sufficient to defeat

16

entry of a preliminary injunction, few—if any—cases would make it past the TRO stage." *Costa v. Bazron*, 464 F. Supp. 3d 132, 142 (D.D.C. 2020). "On the contrary, "[t]he fact of compliance with the TRO serves only to show that the process works." *USI Sw., Inc. v. Partners Ins. Ctr.*, 4:19-cv-04768, 2020 WL 2220573, at *4 (S.D. Tex. May 6, 2020).[4]

Here, there is far more than a "cognizable danger" of recurrent violation. *W.T. Grant*, 345 U.S. at 633. Defendants do not represent that they would continue to follow the terms of the TRO or take comparable measures to respect Plaintiffs' rights if left to their own devices. Indeed, they insist that their practices have been constitutional all along—that they can do anything short of "completely foreclose[ing] all avenues of legal assistance." Defs.' Suppl. Br. 14; *compare Johnson-El*, 878 F.2d at 1052. And even Defendants' compliance with the TRO has been incomplete. *See supra* Part I. Plaintiffs have shown numerous undisputed violations of the TRO, and credible evidence continues

---

[4] Defendants assert that "[w]here the Government is already providing the meaningful opportunity required by due process, there is no 'clear and present need' for the Court to permanently intrude upon the agency's internal management," Defs.' Suppl. Br. 15, citing *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982) for this proposition. Here again, this case does not match Defendants' summary. The cited portion of *Aladdin's Castle* reiterates that voluntary cessation "does not deprive a federal court of its power to determine the legality of the practice"— essentially the opposite of the point Defendants cite it for. 455 U.S. at 289. The "clear and present need" language Defendants purportedly quote appears nowhere in the case, which instead sets a high bar for avoiding injunction due to voluntary cessation: "that the likelihood of further violations is sufficiently remote to make injunctive relief unnecessary." *Id.* at 289 n.10 (cleaned up). And *Aladdin's Castle* is about the constitutionality of a local licensing ordinance, *id.* at 284-86, not any "agency's internal management," Defs.' Suppl. Br. 15.

to show substantial unjustified interference with detainees' access to meaningful assistance of counsel. *See, e.g.*, Zaragoza Decl. ¶¶ 10-12; Curran Decl. ¶¶ 7-9; Guerrero Decl. ¶¶ 3-15; Jacobson Decl. ¶¶ 6-11.

The "character of the past violations," *W.T. Grant*, 345 U.S. at 633, further reinforces that conclusion. Defendants are unconstitutionally impairing detained individuals' access to the legal system, "perhaps *the* fundamental constitutional right," without which "[a]ll other rights of an inmate are illusory." *Johnson-El*, 878 F.2d at 1051 (cleaned up). These violations inherently frustrate judicial review: a detainee prevented from communicating with counsel faces overwhelming obstacles to informing a court of her plight. And as described *supra* Part I, Defendants have not explained any legitimate basis for the new restrictions they imposed prior to this lawsuit. Combined with evidence that Defendants used Class members' isolation from counsel to pressure them to abandon their legal rights, *see, e.g.*, Kantor Decl. ¶ 14; *id.* Ex. A ¶ 24, the character of the violations weighs heavily against presuming Defendants will respect Plaintiffs' rights without a court order.

## V. Relief should cover Minnesota detainees regardless of where they were initially detained

Defendants also fail to meaningfully rebut Plaintiffs' suggestion that the preliminary injunction incorporate the Complaint's proposed class definition, covering all individuals initially detained in Minnesota. Defendants offer no reason why a person detained first at a county jail and then taken to Whipple should be subject to more restrictions than a person taken first to Whipple.

Instead, Defendants only argue against requiring them to respect Class members' rights while they are held at facilities in Minnesota other than

18

Whipple. Defendants claim that "Plaintiffs provide no evidence that the constitutional concerns alleged at Whipple exist at [] other facilities," Defs.' Suppl. Br. 17, ignoring evidence of similar attorney access challenges at those facilities. *See, e.g.*, L.H.M. Decl. ¶¶ 17, 22–23 (Douglas County and Kandiyohi); Guerrero Decl. ¶¶ 12–13 (Kandiyohi and Sherburne); Curran Decl. ¶ 6 (Sherburne). Because Plaintiffs' constitutional rights do not vary based on where Defendants choose to detain them, this Court should protect those rights at all detention locations in Minnesota. But even if the Court concludes that Plaintiffs' rights can be adequately protected at this stage by an injunction that applies only while Class members are held at (or transferred from) Whipple, that does not require excluding people who happen to have been detained elsewhere before Whipple.

## CONCLUSION

For the foregoing reasons, the Court should enter a preliminary injunction.

Dated: March 17, 2026

Respectfully submitted,

*s/ Alethea M. Huyser*_____
Alethea M. Huyser (#0389270)
Rachel L. Dougherty (#0399947)
Devin T. Driscoll (#0399948)
Sarah Theisen (#0402844)
Margaret G. Severson (#0504388)
**FREDRIKSON & BYRON, P.A.**
60 South Sixth Street, Suite 1500
Minneapolis, MN 55402-4400
P: (612) 492-7000
ahuyser@fredlaw.com
rdougherty@fredlaw.com
ddriscoll@fredlaw.com

19

stheisen@fredlaw.com
mseverson@fredlaw.com

Jeffrey B. Dubner*
Aman T. George*
Mark B. Samburg*
Anashua Dutta*
Elena Goldstein*
**DEMOCRACY FORWARD
FOUNDATION**
P.O. Box 34553
Washington, DC 20043
P: (202) 448-9090
jdubner@c.democracyforward.org
ageorge@democracyforward.org
msamburg@democracyforward.org
adutta@democracyforward.org
egoldstein@democracyforward.org

* admitted *pro hac vice*

*Counsel for Plaintiffs*