

**Fredrikson & Byron, P.A.**
Attorneys and Advisors

60 South Sixth Street, Suite 1500
Minneapolis, MN 55402-4400
Main: 612.492.7000
fredlaw.com

March 23, 2026


Hon. Nancy E. Brasel
Courtroom 13W
United States District Court
300 South Fourth Street
Minneapolis, MN 55415

Re:     Plaintiffs' Letter Brief Following Hearing on Plaintiffs' Motion for Preliminary
        Injunction, Case No. 26-cv-749 (NEB/DLM)

Your Honor:

Pursuant to the Court's request at the close of the hearing on Plaintiffs' motion for a preliminary injunction, Plaintiffs submit the following letter brief.

### 1.     The Court Should Give Little If Any Weight to DFOD Rich's Testimony.

Credibility determinations at a preliminary injunction hearing are the province of the district court. *See, e.g.*, *Medicine Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc.*, 336 F.3d 801, 803 (8th Cir. 2003) (noting that the "district court" has an "institutional advantage[] in evaluating witness credibility and weighing evidence"). When a fact-finder concludes that a witness is unreliable, they may reject the witness's testimony "in whole or in part." *Mason v. Lockhart*, 881 F.2d 573, 575 (8th Cir. 1989). Deputy Field Office Director Tauria Rich's testimony was, at various points, patently incredible, internally inconsistent, contradicted by documentary evidence, unverifiable, or irrelevant. The Court should reject it in whole, or at most give it minimal weight in limited parts.

Most prominently, DFOD Rich attributed the troubling gaps in the hold-room phone logs to the possibility that none of the thousands of people detained during those gaps attempted to make a call, because they preferred free processing-desk calls in front of ICE agents. Tr. of PI Hr'g ("Tr.") Vol. II at 371:4-375:4. But the processing-desk phones were just as available in December and March, and that did not stop detainees from using the hold-room phones. *See id.* at 372:22-23; Ex. 29 at 108-79; Ex. 66 at 1-12. Her testimony that the hundreds of calls from February 7 to February 9 were likely made by herself and her staff is even more implausible; the calls go literally around the clock, and the idea that DFOD Rich or her staff tested consulate numbers approximately 826 times, Ex. 29 at 7-103, including, for example, 14 times between 12:13 am and 2:07 am on a Sunday, *id.* at 80-82, strains credulity. Nor does it match the fact that several of the calls are many minutes in length, rather than short test calls. *See, e.g.*, *id.* at 95 (calls of 4.97, 7.3, 21.78, and 14.85 minutes). The vastly more likely explanation is that those were the only times the phones were operational—which is consistent with not just common sense but the credible testimony of L.H.M. and J.J.B. *See* Tr. Vol. I at 137:16-138:21 (L.H.M. "tr[ied] to use" phones in two hold rooms but neither worked); *id.* at 68:3-69:6 (when J.J.B. tried to use the hold-room phone on January 13, he



"put the codes, but it didn't work"). And, despite Plaintiffs pointing this issue out more than two weeks before DFOD Rich's testimony, ECF 136 at 9-11, she never inquired as to whether anyone under her supervision turned the phones off. Tr. Vol. II at 375:5-23.

Much of DFOD Rich's most important testimony is contrary to or absent from her declarations. For example, she now claims that Class members can make private calls from two rooms previously used by HSI, with non-Talton phones whose records have never been produced. *Id.* at 312:4-20. According to DFOD Rich, HSI vacated the new phone rooms before the site visit. *Id.* at 385:16-18. Yet on February 12, three days after the site visit, she declared that confidential calls were made from "five small hold rooms," never mentioning the HSI rooms. Ex. 27 ¶¶ 6-7; *see also* Ex. 51 ¶ 11 (stating that "[t]he Whipple facility has a small hold room that can be used for making private calls" without mentioning HSI room); Tr. Vol. I at 197:2-4 (Sandison testifying that Defendants said the rooms were "for HSI use" during the site visit).

DFOD Rich also claimed not to be aware of any transfers within 72 hours that violated the Court's order, *id.* at 329:9-16, 329:23-330:10, yet simultaneously claimed to know that any such transfers had been corrected. *Id.* at 330:20-332:1. Meanwhile, her declaration acknowledged the violative transfers, but did not assert that DHS had returned people to Minnesota. Ex. 51 ¶ 19. The actual data shows that her declaration, not her testimony on the stand, is correct: it lists a Texas facility as the current or final detention facility for all six of the individuals named in Plaintiffs' supplemental brief, ECF 136 at 18 n.6, with the three children apparently still at Dilley and the three adults' last known location in El Paso, with two listed as "removed" and one as "transferred." *See* Ex. 34.

DFOD Rich contradicted herself on other critical points. For example, she admitted that Defendants were able to find keys to the visitation rooms during the February 9 site visit, yet maintains that she had no idea they were available when she submitted her February 12 declaration. *Compare* Tr. Vol. II at 395:2-15, 396:14-397:11; *with id.* at 396:1-7. She verified a plainly false interrogatory response stating that "[t]he government has not detained individuals overnight at [Whipple]," Ex. 63 at 4 (Resp. to Interrog. 1), then reversed herself on the stand. *Id.* at 425:7-9.

The list goes on. DFOD Rich testified that she was one of the "decision maker[s]" "direct[ing]" Operation Metro Surge, Tr. Vol. II at 431:11-431:22, despite repeatedly testifying in a different case two weeks ago that she was not part of its leadership, *see* Mar. 3, 2026 Contempt Hr'g Tr., *Saul N. v. Lyons*, No. 26-cv-114, 115:1-6, 142:3-7. She said she "wasn't asked" about Defendants' visitation policy before her February 12 declaration, Tr. Vol. II at 402:15-21, despite talking about visits at length, *see* Ex. 27 ¶¶ 7-8, 10. She claims that security is a paramount concern preventing attorney visits, *e.g.*, *id.* ¶ 8, but was unaware that visitation rooms were actively used during the time period in question to facilitate meetings with U.S. citizens also held in custody, *id.* at 393:24-394:22; *see also id.* at 229:11-16 (Cherneff testifying to U.S. citizen visit in visitation room); Tr. Vol. I at 103:6-19 (Kelley, same). She insisted the Notice of Rights was translated immediately, *id.* at 305:4-25, despite Defendants' concession that it was not translated until after Plaintiffs pointed out the omission in their March 6 supplemental brief, *see* ECF 149 at 8-9. Her declaration



described the Talton phones as "unmonitored and free of charge," Ex. 51 ¶ 11, but she admitted the opposite on the stand, Tr. Vol. II at 352:21-355:11. She claimed that six people are staffed to an email address that she thinks receives so little traffic that it is plausible Defendants sent and received just 24 pages of correspondence with attorneys from that account. *Id.* at 324:1-14; 411:1-12.

On top of all that, some of her claims are currently unverifiable. She testified about average stays at Whipple since March 1, *id.* at 292:7-295:10, but Defendants only produced data on people first detained on or before February 27, *see* Ex. 34. Nor have Defendants produced any logs from the new, never-before-disclosed phones in the HSI rooms.

In sum, DFOD Rich's testimony is riddled with so many errors, contradictions, and implausible claims that it should be discredited as a whole, or given at most minimal weight in limited parts.

In stark contrast, Plaintiffs' witnesses testified consistently both with each other and with the available record evidence. For instance, both J.J.B. and L.H.M. testified to hold-room phones not working, Tr. Vol. I at 68:3-69:6; 137:16-138:21, on dates that the Talton logs show the phones to have been mostly or entirely inactive, *see* Ex. 29 at 106-108. Similarly, Hanne Sandison testified that she never saw a detainee handbook in the possession of a detainee, Tr. Vol. I at 204:12-205:5; this matches J.J.B. and L.H.M.'s testimony that they neither received nor even saw a detainee handbook at Whipple. *See id.* at 66:3-67:4; 136:18-137:11, 146:15-146:18. And these are just two examples of the extensive and consistent corroboration among Plaintiffs' witnesses' testimony and the available documentary evidence.

## 2. Defendants' Evidence Does Not Satisfy the Legitimate-Purpose Test.

As Plaintiffs explained in their supplemental reply, ECF 162 at 10-13, and in their opening statement, Transcript Vol. I at 15:10-16:24, Defendants provided no evidence of a legitimate purpose for most restrictions, and scant, unpersuasive evidence to justify their transfer practice. They did not improve this record at the hearing. Their evidence still consists entirely of DFOD Rich's opinions, unsupported by *any* documentary evidence. Because DFOD Rich's testimony is wholly unreliable, Defendants' justifications necessarily fail. But even if her testimony were to be credited in part, her operational and security claims neither hold water nor justify Defendants' practices.

First, Defendants still have offered no rationale for the restrictions on incoming and outgoing calls or the failure to update ODLS. Second, the inconsistencies in DFOD Rich's testimony and the fact that Defendants allowed U.S. citizens to meet with attorneys in person belie their claims regarding the visitation rooms; at a minimum, flatly prohibiting attorney-client visits is excessive. *See* Tr. Vol. II at 402:11-13 (admitting that it is "[a]bsolutely" possible to make it work); *id.* at 405:21-23 (admitting that a prior "exceptional circumstances" visitation policy excluded attorney visits). Third, DFOD Rich's new claim about capacity justifications for out-of-state transfers lacks any



documentary support; Defendants refused to answer Plaintiffs' interrogatory regarding capacity at non-Whipple facilities. *See* Ex. 63 at 6-7 (Response to Interrog. 4(c)).

Finally, DFOD Rich's opinion that the requirement of a pre-transfer phone call is a security risk is premised on a misunderstanding that the TRO requires "a phone call up to an hour before they are transferred," Tr. Vol. II at 430:14-19, which the order does not require. Notably, officers often tell detainees during or shortly after processing that they are going to Texas, as they did with J.J.B. Tr. Vol. I at 65:19-22. Under DFOD Rich's approach, people like J.J.B. would get *no* call in Minnesota.

### 3. The Court Has the Authority to Issue Injunctive Relief That Applies Wherever ICE Houses People, but Need Not Include County Jails at This Time.

The Court has authority to issue injunctive relief that binds people "in active concert or participation with" Defendants in violating Plaintiffs' rights, so long as they receive notice. Fed. R. Civ. P. 65(d)(2)(C); *cf. Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001) (noting that inmates in private prison "have full access to remedial mechanisms established by the [Bureau of Prisons], including suits in federal court for injunctive relief . . . and grievances filed through the BOP's Administrative Remedy Program"). The Court thus *could* impose terms that Defendants must ensure are followed when they house people at county jails. However, the record contains enough evidence of meaningful access to attorneys at those facilities that Plaintiffs are not seeking such relief at this time. That said, the Court should ensure that the injunction protects people detained at Whipple even if Defendants housed them elsewhere first; that the out-of-state transfer provisions apply wherever people are housed immediately before their transfer; that ODLS is updated wherever Defendants house Class members; and that the injunction protects people housed by Defendants at hospitals or other non-carceral locations.[1] Plaintiffs accordingly propose the attached redlines to the TRO.

The record includes credible evidence about difficulty facilitating attorney-client communications at county jails. *See, e.g.*, Tr. Vol. II at 255:11-25; Ex. 44 ¶¶ 12-13. That said, it also contains evidence that access to counsel at those facilities is vastly superior to access at Whipple or in Texas

---

[1] Additionally, as previously discussed, the Court has authority to provide injunctive relief to Class members who are currently, or will in the future be, housed at ICE facilities in other states. *See* ECF 136 at 25-26; Feb. 6, 2026 Hr'g Tr. 37:19-41:4. The severe impediments to access to counsel at those facilities are uncontested. *See id.*; *see also* Ex. 2 ¶ 11; Ex. 9 ¶¶ 9-10; Ex. 10 ¶ 18-23; Ex. 17 ¶¶ 16-17; Ex. 18 ¶ 7; Ex. 19 ¶¶ 7-21, 24-25; Ex. 20 ¶¶ 8-12; Ex. 22 ¶ 12; Ex. 37 ¶ 11; Ex. 38 ¶¶ 15-18. If the Court were to credit Defendants' contentions about operational difficulties with the transfer restriction and conclude that they satisfied the legitimate-purpose test (which it should not), the proper response would be to replace the transfer provision with an injunctive requirement that all Class members be provided with the access to counsel required by the National Detention Standards while they are housed at out-of-state facilities.



facilities. *See, e.g.*, Tr. Vol. I at 123:17-23. Accordingly, although the Court has the authority to enjoin Defendants when they are detaining people through agreements with county jails, Plaintiffs do not believe it is necessary at this time.[2] Of course, Defendants should ensure that ODLS accurately reflects an individual's location when they are at a county jail; the evidence suggests this is inconsistent. *See, e.g.*, Tr. Vol. II at 256:22-257:22 (Curran noting that ODLS "returned zero results for one of [her] clients" detained at Sherburne post-TRO); Ex. 44 ¶ 15.

Three other minor adjustments to the TRO are necessary to ensure that omitting county jails does not exclude fact patterns that should be covered. First, as previously discussed, people who are detained first at another facility and then brought to Whipple should be protected. *See* ECF 136 at 26-27; ECF 162 at 20-21. Defendants' cross-examination of L.H.M. illustrates the point: because Defendants arrested her at a check-in at an ICE facility in Bloomington, under the TRO, they could arguably construe her initial detention as having occurred at that Bloomington facility, rather than Whipple. *See* Tr. Vol. I at 150:20-152:15. Under this interpretation, she (and countless others like her) would be unprotected by the TRO, even though her situation was materially indistinguishable from somebody arrested outside an ICE facility and transported directly to Whipple, like J.J.B. or O. *See* Tr. Vol. I at 60:11-23; Ex. 22 ¶¶ 3-4.

Second, people detained at hospitals, in hotel rooms, or other non-carceral housing situations should have access to counsel, to prevent egregious violations such as that experienced by Fulgencio S. *See* Ex. 37 ¶¶ 15-31. Third, people should be entitled to notice of an out-of-state transfer even if they are not transferred *from Whipple*; Defendants should not be able to evade the injunction by housing people briefly at a county jail or hotel and taking them to the airport from there. The minor edits that Plaintiffs propose address all of these issues, while clarifying that the provisions regarding phone calls and legal visits do not regulate county jails' existing practices or obligations.

Sincerely,

FREDRIKSON & BYRON, P.A.

*s/ Alethea M. Huyser*

Alethea M. Huyser
**Direct Dial**: 612.492.7103
**Email**: ahuyser@fredlaw.com

---

[2] There is therefore no need to consider how variation across facilities could affect class certification. That said, Plaintiffs note that it is not uncommon for class actions about conditions of confinement to cover multiple facilities where common practices affect each one. *See, e.g.*, *Brown v. Plata*, 563 U.S. 493 (2011).