# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| THE ADVOCATES FOR HUMAN RIGHTS and L.H.M., | Case No. 26-CV-749 (NEB/DLM) |
| Plaintiffs, | |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY; MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; TODD LYONS, in his official capacity as Acting Director of Immigration and Customs Enforcement; MARCOS CHARLES, in his official capacity as the Acting Executive Director for Immigration and Customs Enforcement's Enforcement and Removal Operations; DAVID EASTERWOOD, in his official capacity as Acting Field Office Director for Immigration and Customs Enforcement's Enforcement and Removal Operations St. Paul Field Office; U.S. FEDERAL PROTECTIVE SERVICE; FARON K. PARAMORE, in his official capacity as Director of the Federal Protective Service, | PRELIMINARY INJUNCTION ORDER |
| Defendants. | |

BACKGROUND .................................................................................................................... 4

   I.   Procedural History................................................................................................ 4

   II.   Attorney-Client Access ....................................................................................... 6

      A.   Rapid Transfers Out of State ...................................................................... 7

      B.   Locating Detainees....................................................................................... 9

      C.   Phone Calls at Whipple............................................................................. 11

      D.   Visiting Clients .......................................................................................... 14

      E.   Email to Whipple ...................................................................................... 15

      F.   Pressuring Detainees ................................................................................. 17

      G.   Information Provided to Detainees.......................................................... 18

   III.   Testimonials....................................................................................................... 19

      A.   Kira Kelley.................................................................................................. 19

      B.   J.J.B. ............................................................................................................ 22

      C.   L.H.M. ........................................................................................................ 24

   IV.   Credibility Determination................................................................................ 27

ANALYSIS ........................................................................................................................... 31

   I.   Article III Jurisdiction..................................................................................... 31

      A.   Standing...................................................................................................... 31

      B.   Mootness .................................................................................................... 36

   II.   Provisional Class Certification........................................................................ 38

      A.   Rule 23(a) Requirements .......................................................................... 40

      B.   Rule 23(b)(2)............................................................................................... 45

   III.   Preliminary Injunction .................................................................................... 46

      A.   Likelihood of Success .............................................................................. 47

      B.   Irreparable Harm, Balance of the Harms, and Public Interest ............ 64

CONCLUSION ................................................................................................................... 65

In recent months, as part of "Operation Metro Surge," Immigration and Customs Enforcement arrested thousands of noncitizens without warning, brought them to a holding facility, flew them across the country, and pressured them to sign self-deportation documents—all without the opportunity to speak with an attorney. Attorneys were refused physical and phone access to their clients, and vice versa. Often, attorneys did not know when or where their clients were detained.

Due process is not a game of keep-away. ICE recognizes detainees' right to access counsel in theory and written policy, but not in practice. Instead, it has placed obstacle after obstacle in front of detainees and their attorneys, blocking communication between clients and counsel.

This Court issued a Temporary Restraining Order on February 12, 2026. Since the TRO issued, Defendants have made considerable but inconsistent efforts to improve attorney access and comply with the Court's Order. The Court held an evidentiary hearing on March 19 and 20, 2026. For Plaintiffs, more than twenty attorneys provided declarations, and five attorneys testified. Four noncitizen detainees provided declarations, and two testified. For Defendants, two officials presented declarations, and one testified. Because Plaintiffs have again demonstrated a likelihood of success on the merits of their Fifth Amendment access-to-counsel claim and otherwise carried their

burden on the remaining *Dataphase* factors, the Court grants Plaintiffs' motion for a preliminary injunction.

**BACKGROUND**[1]

### I.      Procedural History

The Court issued its TRO on February 12, 2026, concluding that ICE's practices likely violated detainees' right to counsel. The TRO ordered Defendants to allow in-person attorney visits and phone calls at the Bishop Henry Whipple Federal Building ("Whipple"), among other temporary relief. (ECF No. 95 ("TRO").)

The Court granted expedited discovery and ordered supplemental briefing before the evidentiary hearing on the preliminary injunction motion, which was held March 19 and 20, 2026.[2] (ECF Nos. 175–76 (collectively, "Tr.")). One person testified for Defendants: Deputy Field Office Director Tauria Rich. She has twenty years of experience at ICE and almost two years of experience at Whipple. Seven people—five attorneys and two noncitizen detainees—testified for Plaintiffs:

---

[1] The Court incorporates by reference its Temporary Restraining Order (ECF No. 95).

[2] The Court also ordered Defendants to respond to discovery requests. (ECF No. 101.) Defendants missed their discovery deadline, so the Court granted Plaintiffs' motion to compel. (ECF No. 119.) However, Defendants continued to miss discovery deadlines (*e.g.*, Ex. 66 (admitted on the record as joint exhibit; not filed), and Defendants' eventual production remained deficient (*e.g.*, ECF No. 138 (sealed)).

- Kira Kelley (an attorney who has filed around sixty to sixty-five habeas petitions during Operation Metro Surge)

- Hannah Brown (an attorney who has regularly filed habeas petitions during Operation Metro Surge and represented J.J.B.)

- Hanne Sandison (an attorney and director of immigration legal services program at AHR)

- Lyle Cherneff (an attorney who has filed nine habeas petitions during Operation Metro Surge)

- Emily Curran (an attorney who has filed sixteen habeas petitions during Operation Metro Surge)

- J.J.B. (a twenty-year-old refugee who was detained at Whipple during Operation Metro Surge)

- L.H.M. (Plaintiff who was detained at Whipple during Operation Metro Surge)[3]

J.J.B. and L.H.M. testified remotely.[4] Everyone else testified in person. The evidence presented was mainly about witnesses' experiences regarding attorney-client access before and after February 12 (the date of the TRO).

---

[3] In addition to the live testimony, Defendants produced declarations from Deputy Field Office Director Tauria Rich and Assistant Field Office Director Michael Bottjen. Plaintiffs produced declarations from J.I.B.C., J.J.B., O., L.H.M., Kimberly Boche, Danielle Robinson Briand, Hannah Brown, John Chitwood, Gloria Contreras Edin, Kevin Heinz, Max Keller, Kira Kelley, Cedar Weyker, Claire Glenn, Kelsey Allen, Ryan Young, Steven John Quam, Alethea M. Huyser, Hanne Sandison, Joseph D. Kantor, Liliana Zaragoza, Emily Curran, Erin Simard, Pamela Guerrero, Grace Jacobson, and Lyle Cherneff.

[4] In an email to Defendants' counsel before the hearing, Plaintiffs' counsel inquired: "In order for JJB and LHM [*sic*] to safely participate in this litigation and provide testimony, please confirm that Defendants will not detain them and/or any family members who

## II.    Attorney-Client Access

Operation Metro Surge deployed thousands of federal law enforcement agents to Minnesota with the principal aim of detaining and deporting noncitizens. DHS reported thousands of arrests of noncitizens within weeks.

Noncitizens arrested and detained by ICE, including during Operation Metro Surge, are typically held temporarily at Whipple for varying lengths of time. Minnesota does not have an ICE-specific detention facility. After Whipple, detainees are usually transferred to local jails or another state that has a longer-term detention facility, such as Camp East Montana in El Paso, Texas.

Some detainees are held at Whipple for just a few hours before being transferred; others are held for days. (ECF No. 27 ("J.J.B. Decl.") ¶ 22 ("Some people detained with me had been at Whipple for 20 days.").) The detention area at Whipple consists of (1) seventeen hold rooms with concrete benches, one or two toilets and as many sinks, but no beds, (2) four attorney-client visit rooms, and (3) two rooms previously occupied

---

attend the hearing with them at the courthouse or in transit to or from the courthouse." (ECF No. 159-4.) Defendants' counsel replied: "ICE-ERO informs us that it will not be able to respond to Plaintiffs' request for confirmation without having these individuals' A-numbers. ICE-ERO will need to review their records before articulating a position on re-detention or alternatives to detention." (*Id.*) L.H.M. and J.J.B. filed declarations under initials "due to fear of retaliation against [them] or [their] famil[ies] for opposing the federal government." (ECF Nos. 160, 161; *see also* ECF No. 2 (Plaintiffs' motion to proceed under initials).)

by Homeland Security Investigations, a division of DHS, that are equipped with phones. (Tr. at 312, 391; ECF No. 92-1 ("Rich Decl. I") ¶ 11; ECF No. 72 ("Bottjen Decl. I") ¶¶ 9–10.)

Whipple has the mechanisms to provide detainees access to counsel. Before Operation Metro Surge, agents at Whipple worked with attorneys and detainees to facilitate attorney-client communication. (Tr. at 29–31 (describing client visitation at Whipple before Operation Metro Surge); ECF No. 21 ("Briand Decl.") ¶ 8; ECF No. 25 ("Heinz Decl.") ¶ 3.) Defendants maintain that Whipple continues to respect and facilitate detainees' access to counsel. (*See generally* Bottjen Decl. I; Rich Decl. I.) But this assertion is belied entirely by the record now before the Court.

### A.   Rapid Transfers Out of State

Before the TRO, Defendants moved detainees frequently, quickly, and often blindly. Attorneys often had no way to know where or how long their client would be detained at a given facility. (Tr. at 107–08 (stating that on January 20, 2026, the attorney could not locate their client and feared he was immediately sent to Texas because "for the past week and a half every single person that I was in contact with was being sent to Texas within a matter of less than 24 hours, sometimes 40 minutes"); Tr. at 247, 252; ECF No. 20 ("Boche Decl. I") ¶¶ 9, 13, 18; ECF No. 24 ("Edin Decl.") ¶ 6; ECF No. 29 ("Kelley Decl.") ¶ 19.)) Once a person has been transferred out of Minnesota, "representation

7

becomes substantially more difficult." (Edin Decl. ¶ 12.) Attorneys cannot meet with clients, develop facts, consult meaningfully, or seek review of detention decisions, and must secure local counsel to sponsor a *pro hac vice* application.[5]

And, while Defendants argue that detainees have "unfettered access to counsel" once they "are transferred to a more permanent detention facility," the evidence in the record shows the opposite. (Rich Decl. I ¶ 9.) Once detainees arrive at their destination, they face similar attorney access restrictions. (Tr. at 123 (Kelley's experience contacting detainees in El Paso and Whipple is "comparably difficult, if not impossible"); Tr. at 126 (attempts at communication once in Texas "were futile"); Tr. at 253–55; Edin Decl. ¶ 14; ECF No. 61 ("Glenn Decl.") ¶ 7 ("Once a client is detained out of state, it becomes virtually impossible to communicate with them directly."); ECF No. 62 ("Allen Decl.") ¶¶ 15–19 (describing reaching her deaf client detained in Texas only because an ERO officer permitted the client to call the attorney using FaceTime on his personal cellphone.)

---

[5] The testimony of the attorneys was uniform on this point. (Tr. at 160–61 ("[I]t is very challenging to be an effective advocate, if not impossible, when these out-of-state transfers are happening."); *id.* at 247–48 ("It's also much more difficult to communicate with them. It becomes impossible to have in-person visits with them" and "there's a real demoralizing aspect to being very far away from friends, family and legal counsel."); *id.* at 252 (explaining that rapid transfer made it difficult to know where to file and to find facts supporting the petitions); ECF No. 61 ¶ 9 ("It becomes difficult to communicate with counsel and coordinate the gathering of evidence in support of bond hearings or defenses to deportation as immigrants are frequently moved from place to place.").)

Because much of this evidence was presented before the TRO hearing, the TRO included a 72-hour hold on transfers from Minnesota. Outside of a few cases, Defendants have complied with the hold. Attorneys report that this change has materially assisted access to their clients and quality of legal representation. (ECF No. 146 ("Cherneff Decl.") ¶¶ 10–11, 13 (explaining that the difference is "night and day"); ECF No. 142 ("Curran Decl.") ¶ 4 ("[I]t is much easier for me to represent [clients] while they are in Minnesota than if they were in Texas."); ECF No. 141 ("Zaragoza Decl.") ¶¶ 5–6.) Nor has the hold increased detainee time at Whipple; indeed, overcrowding has decreased since the TRO. (Ex. 34[6] (sealed); ECF No. 143 ("Simard Decl.") ¶¶ 12–13, 15.)

### B.    Locating Detainees

Before the TRO, Defendants transferred people so quickly that even Defendants struggled to locate detainees. (Glenn Decl. ¶ 5 ("In two of my cases, for example, [the government] was unable to locate my clients for days after transporting them out of state.").) Often, Defendants did not accurately or timely input information into the Online Detainee Locator System ("ODLS"). (Tr. at 223 (explaining that before the TRO, it took "hours, sometimes days after the initial detention" to update the ODLS).) The ODLS either produced no search results or instructed attorneys to call for details, referencing a

---

[6] Joint exhibit admitted on the record; not filed.

phone number that ICE did not answer. (Tr. 238 ("Every time I have called, it has just rang and rang and rang."); Kelley Decl. ¶¶ 16, 18; Glenn Decl. ¶ 4 ("[E]very time I have tried to call ICE's St. Paul Field Office I am met with a busy signal.").) Whipple was not registered as a location in the ODLS, meaning Defendants did not update the ODLS until a detainee was at their next location, even if that next location was across the country and days later. (Tr. at 111–12; Heinz Decl. ¶ 6.) Attorneys frequently learned of their client's location for the first time when the government responded to a habeas petition, including by moving to transfer venue. (Glenn Decl. ¶ 4.)

It is an obvious point, but the inability to locate a client makes representation of that client substantially more difficult. (Tr. at 173 ("[O]ftentimes when you are dealing with cultural barriers or language barriers or you're communicating with people that you've never met before, it is really important to be able to, to be present with your client."); *id.* at 234 ("[E]very time I file a habeas petition, I check on the ICE detainee locator because it's important where they physically are."); Boche Decl. I ¶¶ 12, 15–19; Heinz Decl. ¶ 6.) Jurisdictionally, locating a client is important because a habeas petition must generally name the custodian. (Tr. at 113–14.) Collateral challenges arise as well, such as the inability to deliver medication or health information. (*Id.*)

The TRO required real-time updates to detainee locations, and things have generally improved. (*Id.* at 114, 168, 256.) Defendants added Whipple as a location to the

ODLS. (*Id.* at 318–19.) Still, attorneys report remaining issues with the timeliness of location updates. (ECF No. 144 ("Guerrero Decl.") ¶ 14 (describing clients who "did not show up in the ODLS even though they had been detained at Kandiyohi for a few weeks already"); Zaragoza Decl. ¶ 4 (describing client whose location was listed as "call ICE for details" for a week after the TRO); Curran Decl. ¶ 7 ("ODLS has been a mixed bag since the Order.")).

### C.    *Phone Calls at Whipple*

For incoming calls, Defendants' websites list ostensibly-monitored phone numbers. But attorneys cannot get through. (Tr. at 36 (in January 2026 "it was nearly impossible to get someone to answer the phone. I can't recall the last time I called that phone number and someone answered."); *id.* at 116, 259.) After the TRO, which required that the phone be monitored during work hours, attorneys are still unable to reach anyone at Whipple. One attorney stated: "I have listened to that number ring for more hours at this point than I can count." (*Id.* at 105; *see id.* at 118–19; ECF No. 145 ("Jacobson Decl.") ¶ 9 ("Since the Order, all my calls to the St. Paul Field Office have gone unanswered."); Curran Decl. ¶ 9; Guerrero Decl. ¶¶ 3–5, 7.) Defendants suggest that the problem was fixed (ECF No. 153 ("Rich Decl. II") ¶ 16), but the record demonstrates that problems remain.

As for outgoing calls, Whipple has at least three kinds of phones that, according to Defendants, detainees can use—hold room phones, desk phones, and phones in the former HSI room. Again, the evidence does not align with Defendants' contentions.

### 1.     Desk Phones

Detainees report that agents tell them they can make one phone call, typically from desk phones that sit on the processing desks near the hold rooms. (Boche Decl. I ¶¶ 12, 15; J.J.B. Decl. ¶ 16.) Agents inconsistently allow detainees to use these phones, but never privately or for any length of time. When detainees use these phones, agents are nearby and urging detainees to wrap up the call within a few minutes. (Tr. at 133–34, 64.) Many detainees do not know the number (or sometimes name) of their attorney—if they have one—so calls are usually to family. (*Id.* at 49:16–18 (explaining that it was "nearly impossible to reach [her client] at Whipple to provide him with any information whatsoever," including her phone number); J.J.B. Decl. ¶ 16 ("I called my mom and she gave me the numbers of two attorneys."); ECF No. 26 ("J.I.B.C. Decl.") ¶¶ 12–13.)

Defendants provide no evidence that quantifies how often the desk phones are used by detainees, or how long detainees are allowed to use the phones. So the Court is left with Plaintiffs' specific evidence, which establishes that while some calls from desk phones have occurred, they were nonconfidential, severely limited in amount and duration, and not provided to everyone.

### 2.    Hold Room ("Talton") Phones

These phones are attached to the wall in hold rooms. (Tr. at 185.) They are maintained by the company Talton, which contracts with ICE. The Talton phones are in non-private hold rooms (which were described like cell blocks); ICE personnel and other detainees can overhear the conversation. (Boche Decl. I ¶ 15.) Detainees may place free calls to certain, preprogrammed numbers, or they may place a collect call. (Tr. at 353.) The phones are hard to operate, when they work, which is not consistently.[7] (ECF No. 89 ("Sandison Decl.") ¶ 8; ECF No. 90 ("Boche Decl. II") ¶¶ 5, 12–13.) Calls are monitored. (Tr. at 354:17.)

Talton phone logs show the following: These phones were used routinely in December. (ECF No. 137-2 at 108-79.) On January 3, when Operation Metro Surge began, calls from these phones stopped through January 12. (*Id.* at 109; Tr. at 369.) From January 13 through February 4, there were a few sporadic calls over five days, but they are listed as "incomplete." (ECF No. 137-2 at 107–09.)

The day before the TRO hearing, on February 5, the phones started working again. (*Id.* at 104–07.) On the day of the TRO hearing, the calls stopped. That day, the Court

---

[7] During the Court-facilitated visit to Whipple, posted near the phones were lists of free legal service providers and corresponding number codes, but the list included inaccurate codes. (Tr. at 185; ECF No. 156; Sandison Decl. ¶¶ 6–7, 9.)

ordered Defendants to provide the parties with access to Whipple. The next day, on February 7, through February 9—the day of the visit—calls ballooned to well over one hundred a day. (*Id.* at 103.) Rich claims that she made most of those calls to ensure the phones worked in preparation for the Court-ordered visit—a staggering claim given the amount and duration of calls. (Tr. at 379.) By the morning of February 10—the day after the visit—calls stopped again. (Ex. 66 at 12.)

After the TRO, calls did not resume until March 5. (*Id.*) From March 5–18 (when the phone log ends), there were several, sporadic calls, all coming from the same phone labeled "L1." (*Id.* at 1–12.)

Rich suggested in her testimony that the dearth of calls at particular points was due to detainees' preference for desk phone calls. (Tr. at 471.)

3.    *HSI Room Phones*

According to Rich, near the hold rooms are two rooms previously occupied by HSI, each of which is equipped with a phone. These are the only truly private phones, but there is no evidence that any detainee has used them. (*Id.* at 312.)

D.    **Visiting Clients**

During Operation Metro Surge, but before the TRO, Defendants refused to allow attorneys to see their clients. (*Id.* at 37–45, 227.) So, many attorneys filed habeas petitions without having met with the petitioner. (*Id.* at 227 ("None of them have I been able to

14

meet with in person before filing" the habeas petition).) Defendants' rationale for disallowing visits? That if they gave one person an attorney visit, they would have to give everyone an attorney visit—and "imagine the chaos." (ECF No. 22 ¶ 18; Kelley Decl. ¶ 34.) Without talking to their clients, attorneys have trouble discovering basic facts to aid in filing habeas petitions. (Tr. at 225–28 (explaining that "there's no substitute from hearing from the client themselves" and that "it hurts the attorney-client relationship when you are not able to meet with them face to face prior to filing.").) And this matters not only factually, but legally; for example, knowing whether someone was presented with a warrant can impact whether the court orders a bond hearing or immediate release.

The extent to which Defendants have complied with the TRO requiring Defendants to allow in-person visits is unclear, but at least some in-person visits have occurred. (*Id.* at 234–36; Jacobson Decl. ¶ 6.) One attorney explained that the visit "was excellent" and "made a big difference to me and . . . the client to be able to meet face to face." (Tr. at 235.) They were able to talk about the process; the attorney explained what the client could expect, answered the client's questions, and got the information necessary to file the habeas action. (*Id.*)

### E.    *Email to Whipple*

Detainees at Whipple are not allowed to send mail or email, so they cannot access the courts themselves. (J.J.B. Decl. ¶ 17 ("Even if I had known how to ask a court to order

15

my release, there was no way to send mail or email, so I could not have sought my own release.").) ICE maintains an "outreach" email address that is posted on their website. Attorneys often email court orders to that email address to promote compliance and coordinate release. (Tr. at 258–59.) But the evidence shows that the email address is not monitored. (*Id.* at 239 ("I never received a response from that email address prior to February 12th.").) One attorney testified that she went a month without receiving a substantive response from the address. (*Id.* at 258–59.) Another testified that her "messages were not being responded to," so she tried the phone number, also with no luck. (*Id.* at 36-37.)

After the TRO, things have improved, though not consistently. (*See id.* at 47 ("I received an automatic response stating that the inbox was for general inquiries only."); *see also id.* at 120, 239–40.) Rich testified that she now has "six officers that monitor this every day," and that emails "are responded to." (*Id.* at 324). Given the testimony of multiple attorneys to the opposite, Rich's general testimony on this issue was not credible. And during discovery, Defendants produced only six email chains, bolstering the conclusion that Defendants have an inadequate system for organizing and responding to emails, thus further hobbling detainees' access to counsel. (ECF No. 138.)

### F. *Pressuring Detainees*

The record contains multiple examples of ICE agents pressuring detainees to sign voluntary removal forms (*i.e.*, self-deportation) without being allowed to talk to counsel. (Briand Decl. ¶ 11 ("When I finally do talk with [clients], they've uniformly reported that Defendants' agents questioned them and pressured them to self-deport, and subjected them to inhumane conditions that made them want to give up on their rights just to escape captivity."); Kelley Decl. ¶ 22; Glenn Decl. ¶ 6 ("Several of my clients who have been transported to Texas from Minnesota have reported that ICE agents lie to them about the status of their habeas cases and the merits of their claims and attempt to pressure them to sign voluntary deportation agreements.").) Detainees are told, among other things, that they will be back in the United States within a year if they sign (Allen Decl. ¶ 23); they will be detained for months longer if they do not sign (ECF No. 67 ("O. Decl.") ¶ 27); or they will receive money if they sign (*id.* ¶¶ 12, 27). When a detainee asks to speak with an attorney before they sign the form, they are refused. (*See* Boche Decl. I ¶ 22 ("Our inability to explain their rights and the status of their cases leaves our clients unable to evaluate DHS' claims and uncertain about whether to give into the pressure to self-deport and abandon their rights.").)

### G.    *Information Provided to Detainees*

Defendants assert that detainees at Whipple are provided with a Detainee Handbook, which contains information about their rights and free legal services. (Ex. 64.) The evidence contains a copy of the handbook, but not detainees' access to it. (Tr. at 203 ("[N]obody in the room had a handbook."); *id.* at 344 (Rich explaining that the Handbook is on the island and in drawers); Sandison Decl. ¶¶ 13–14; Rich Decl. I ¶ 5; Boche Decl. II ¶ 11.)

The TRO required Defendants to provide detainees with a notice of their rights and list of legal providers, translated into several common languages in Minnesota. It is unclear how consistently Defendants are complying with that provision. (*Compare* Tr. at 237–38 (stating that client had received a notice of rights), *with* Zaragoza Decl. ¶ 9 ("Our client who was detained after the TRO did not receive a notice of rights when he was detained at Whipple.").) And Defendants did not translate the notice until Plaintiffs pointed out the issue while briefing the Preliminary Injunction. (ECF No. 149 at 8–9.)

\*        \*        \*

All of these barriers make it difficult—if not impossible—for attorneys to effectively represent their clients: "Instead of applications for relief, I am spending time finding my clients, scheduling meetings that then can't proceed because DHS does not let clients join, spending time updating their families, and in cases where there is

additional movement after the first transfer out of Minnesota, finding my clients again."

(Boche Decl. I ¶ 12). Attorneys cannot access clients, and clients cannot access attorneys.

Thus, attorneys cannot obtain necessary information to help clients make strategic

decisions about their case or file a habeas petition.

### III.    Testimonials

The Court has previously related the experiences of O. and J.I.B.C. (TRO at 9–12,

14–16.), and those experiences remain unrebutted, so the Court incorporates them here.

In this Order, the Court focuses on the in-court testimony of Kira Kelley, J.J.B., and L.H.M.

### A.    Kira Kelley

Kira Kelley is an attorney who volunteers for AHR. (Tr. at 91.)[8] During Operation

Metro Surge, they saw a need for detained noncitizens to receive access to justice, so they

learned how to file habeas petitions. (Id.) They have filed between sixty and sixty-five

habeas in around three months. (Id. at 92.)

To file habeas petitions, Kelley needs information about when, where, and how

the person was detained, their immigration status (e.g., whether they entered without

inspection or have an asylum claim), and whether they have a final removal order (and

if they do, whether it is being appealed). (Id. at 93–94.)

---

[8] Kelley uses the pronoun "they," so the Court will as well.

Ideally, Kelley would get this information from the client directly. (*Id.* at 96–97.) They would have an initial meeting where the client would consent to representation, get to know Kelley, and build trust. (*Id.*) If necessary, there would be a second meeting for follow-up questions and to review the habeas petition. (*Id.* at 97; *see id.* at 227 (another attorney explaining that at least two visits would be ideal).)

But, because of Defendants' policies and practices, that has been "literally impossible." (*Id.* at 96–97.) Kelley has had to undertake representation and file habeas petitions without communicating with their clients; Kelley gets information from clients' spouses, parents, or children. (*Id.* at 96.) This makes filing the habeas petition "significantly harder" and "significantly more stressful." (*Id.* at 98.) Kelley has to "cobble together the information that [they] need from a variety of sources, some of which [they] don't have access to." (*Id.*) They have investigators scour social media for videos of their arrest—"it's an Easter egg hunt for [Kelley's] investigators to figure out" the details of the person's arrest. (*Id.*)

Kelley has repeatedly tried and failed to get this information from their client. During Operation Metro Surge, Kelley was allowed to visit U.S. citizen protestor clients at Whipple, but not noncitizens. (*Id.* at 101–5; *see id.* at 228 (another attorney describing meeting with U.S. citizen at Whipple).) Kelley was given a variety of reasons why visitation was impossible—the client was not booked, and would not be booked until

20

they arrived in Texas, but could take visits in Texas; visits were not allowed for safety concerns; and Whipple was a temporary detention facility that was not set up for visits. (*Id.* at 162–63.)

The lack of phone communication compounded the problem for Kelley and their clients. On one occasion, Kelley had a client in Texas who was ordered to be returned to Minnesota and released. (*Id.* at 116–18.) The client had disappeared from the detainee locator, so Kelley didn't know where she was. (*Id.*) The client called her husband, who called Kelley's colleague, who called Kelley, and they held their phones together to facilitate a conversation between attorney and client. (*Id.*) The officer told the client that she needed to sign self-deportation paperwork immediately, otherwise she would be transferred to a county jail for the duration of her immigration proceedings. (*Id.*) Kelley explained to the officer that the client had a court order for release, and that Kelley had emailed it to ICE. (*Id.*) The agent laughed and said "something to the effect of 'yeah we really need to get someone to check that email.'" (Kelley Decl. ¶ 23; Tr. at 117.) The client was ultimately released, but only due to this elaborate telephone relay and Kelley's timely advocacy. (Kelley Decl. ¶¶ 22–27.)

On another occasion, Kelley was hired by the aunt of two clients. (Tr. at 99.) The two clients were detained with a friend—a minor who is a United States citizen—but the aunt did not know the minor's name. (*Id.*) If Kelley could have met with the other two

21

clients, they could have easily identified the Jane Doe. (*Id.*) After considerable time not knowing Jane Doe's identity or where she was, Kelley was forced to file a Jane Doe habeas petition. (*Id.*) Kelley eventually secured the release of all three clients. (*Id.* at 100.)

### B.    J.J.B.

J.J.B. is 20 years old and a refugee; he has never been charged with a crime. (Tr. 59; J.J.B. Decl. ¶ 1.) On the morning of January 13, 2026, J.J.B. parked outside of his home and was immediately surrounded by approximately twenty ICE agents. (Tr. 60; J.J.B. Decl. ¶¶ 3–4.) Officers did not allow J.J.B. to tell his mother that he was being detained. (J.J.B. Decl. ¶ 5 ("I wanted the agents to let me say goodbye and calm her down.").)

J.J.B. asked agents about his case and explained that he had refugee status. (J.J.B. Decl. ¶¶ 11, 17.) Agents told him that officers would examine his case in Texas. (*Id.* ¶ 11.) Without access to a lawyer, J.J.B. did not know how to exercise his rights. (J.J.B. Decl. ¶ 17 ("[W]ithout proper access to a lawyer I did not know how to formally exercise my rights.").)

J.J.B.'s holding cell at Whipple "could not hold more than 20 people"—yet it was packed with about 100. (*Id.* ¶ 12; Tr. at 68.) The room had a dirty, clogged toilet with excrement overflowing. (Tr. at 67; J.J.B. Decl. ¶ 12.) J.J.B. had to ask officers for toilet paper but was sometimes ignored or denied. (J.J.B. Decl. ¶ 12.) The floor was "black with urine," and garbage covered the floor because there was no trash can. (Tr. at 67.) There were no

beds or blankets. (J.J.B. Decl. ¶ 13.) People slept in handcuffs and standing up because there was not enough room. (*Id.*)

"ICE beat people and denigrated them." (*Id.*; *see* Tr. at 61–62.) ICE did not respond when J.J.B. asked to call his attorney. (Tr. at 62.) J.J.B. explained that it "seemed like the ICE officers wanted to scare" him, and they "treated [him] and the other detainees like animals." (J.J.B. Decl. ¶ 22.) Through the duration of J.J.B.'s confinement, he was shackled by his ankles with handcuffs meant for wrists. (*Id.* ¶ 12.) Thus, they were too small and caused pain, and no one listened to his pleas to loosen them. (*Id.*; Tr. 62.) At one point, ICE chained his stomach and wrists as well. (J.J.B. Decl. ¶ 20.)

At Whipple, J.J.B. was initially allowed one phone call to a relative—if no one answered, he could not try again. (J.J.B. Decl. ¶ 10.) An officer told J.J.B. that they had attorneys available but provided no contact information. (*Id.*) With an agent right next to him, J.J.B. used the desk phone to call his mother, who said she would find him an attorney. (*Id.*; Tr. at 64.)

Officers took J.J.B. to a hold room. (Tr. at 68.) The hold room phones did not work, even when J.J.B. tried the codes listed nearby. (*Id.* at 68–69.) So J.J.B. begged and lied to use the agents' desk phones. (*Id.* at 69–70.)

On January 15, 2026, J.J.B.'s attorney, Hannah Brown, tried to visit him. (*Id.* at 35, 37.) Although she persisted for four hours, asking numerous agents to allow a visit, ICE

23

refused to let her see J.J.B. (*Id.* at 43–44.) She was given several explanations: There was no case manager assigned yet (*id.* at 40); there were too many people detained and too many attorneys; and as with Kelley, allowing Brown to see her client meant that they would have to let all attorneys see their clients, causing "chaos." (*Id.* at 39.) One agent explained that the Acting Field Office Director said Brown could not see her client. (*Id.* at 44.) Brown's co-counsel emailed Jim Stolley, then-OPLA[9] chief counsel, but Stolley was unwilling to facilitate an attorney visit. (*Id.* at 46.)

J.J.B. was not told that an attorney tried to visit him; he was instead told that he was going to Texas, but ultimately he never left Whipple. (*Id.* at 71, 73; J.J.B. Decl. ¶¶ 21, 27.) Officers told J.J.B. to sign a paper that said "OUT"—he could not read the rest because it was in English. (Tr. at 72; J.J.B. Decl. ¶ 25.) J.J.B. asked what it was and if he could speak to a lawyer; officers told J.J.B. to sign it without a lawyer. (Tr. at 72–73; J.J.B. Decl. ¶ 25.) He did so, and he was released that day. (J.J.B. Decl. ¶ 26.)

### C.    L.H.M.

Plaintiff L.H.M. is a single mother of three children. (ECF No. 77 ("L.H.M. Decl.") ¶¶ 1, 11.) She is a citizen of Honduras, has a pending asylum application in the United States, and has never been charged with a crime. (*Id.* ¶¶ 2, 6; Tr. at 86.)

---

[9] Office of the Principal Legal Advisor.

On January 27, 2026, L.H.M. went to her regular monthly immigration check-in appointment. (Tr. at 86–87; L.H.M. Decl. ¶ 7.) An officer took L.H.M. to an office, telling L.H.M. that she had a "surprise" for her—five armed ICE officers who handcuffed and detained her. (Tr. at 87, 130; L.H.M. Decl. ¶ 8.) L.H.M. fainted from shock. (Tr. at 130; L.H.M. Decl. ¶ 8.) When she awoke, she explained that she recently had brain surgery, and she asked for pain medication. (Tr. at 131; L.H.M. Decl. ¶ 10.) She also requested a phone call to inform her young daughters of her arrest. (Tr. at 130–31.) The officers refused the requests and accused her of faking her reaction. (*Id.* at 131; L.H.M. Decl. ¶ 10.) She was taken with two others to Whipple. (Tr. at 132; L.H.M. Decl. ¶¶ 12–13.)

During intake at Whipple, an officer searched L.H.M. and slammed her head against the wall while checking her hair. (Tr. at 132; L.H.M. Decl. ¶ 13.) Her head hurt the rest of her detention; L.H.M.'s doctor later told her that this likely caused a concussion. (Tr. at 147; L.H.M. Decl. ¶¶ 13, 27.)[10]

L.H.M. asked for a phone call, but the officers said there was no time. (Tr. at 133.) L.H.M. persisted, asking other officers for a phone call because she was worried about her daughters. (*Id.*) The officers allowed it. (*Id.*) With an agent next to her, she was

---

[10] Officers also accused her of being in a Columbian gang, though she is not in a gang and is not Columbian. (Tr. at 136.)

allowed a two-minute call to her sister using a desk phone, and she asked her sister for help contacting her attorney. (*Id.* at 133–34; L.H.M. Decl. ¶ 15.)

When she was taken to a cell, she tried to use a Talton phone on the wall, but it did not work. (Tr. at 138.) She was taken to another cell, tried the phone in that cell, and again it did not work. (*Id.*)

L.H.M. spent eight hours in detention at Whipple that day, and she was not allowed to speak with her attorney despite many requests. (*Id.* at 139.) ICE briefly transferred L.H.M. to Wisconsin, where she also was not allowed any phone calls. (*Id.* at 140; L.H.M. Decl. ¶ 17.) Because of the transfer, she went approximately 24 hours without food. (L.H.M. Decl. ¶ 17.)

Early the next morning, approximately January 28, 2026, ICE transferred L.H.M. back to Whipple, where she stayed for two nights. (*Id.* ¶¶ 18, 22.) Over the next two days, she repeatedly asked to call her attorney, but she was denied. (Tr. at 142.) When she repeatedly asked to call her sister because she was worried about her children, she was occasionally allowed a call from the desk phone. (*Id.* at 142 ("I called my sister because I have asked for a phone call to talk to my attorney, but they didn't want to give it to me."); *id.* (explaining that she called using the desk phones).) On one occasion, she called her attorney, but only because she misinformed the agents that she planned to call her sister.

26

(*Id.*) The phone calls were not private and rarely lasted more than a few minutes. (*Id.*; L.H.M. Decl. ¶ 19.)

On January 30, 2026, her attorney tried to visit her, but officers refused, although the officers eventually let them talk by phone. (L.H.M. Decl. ¶ 20.) That night, L.H.M. was transferred to a county jail in Minnesota, where she finally received medical attention. (*Id.* at 22–23; Tr. at 143–44.)

L.H.M. returned to Whipple the next day. (L.H.M. Decl. ¶ 23.) Officers told her she would leave that day and asked her to sign something. (Tr. at 145.) She could not read it because it was in English. (*Id.*) ICE released L.H.M. but did not return her property, including her daughter's U.S. passport, two checks for almost $400 each, her Minnesota ID, or her work permit. (L.H.M. Decl. ¶ 26.)

## IV.   Credibility Determination

The testimony of the attorneys and noncitizens described above was credible. While the testimony of the noncitizens was made more difficult to understand due to the use of videoconference technology, the noncitizens were clearly trying to express their points accurately and specifically. Similarly, the attorney witnesses uniformly testified to the facts as they appeared to experience them, without excessive characterization of the events.

This brings the Court to the testimony of Deputy Field Office Director Tauria Rich. Rich testified about Whipple's policies and practices relating to attorney-client access. Rich's testimony was somewhat more fulsome than her previously filed declarations, which recited ICE policy without providing specifics. (Rich Decl. I; Rich Decl. II.) And at the beginning of Rich's testimony, the Court found Rich to be respectful and even earnest, trying to explain ICE's policies and attempts to comply with the Court's TRO.[11]

But Rich was on the witness stand for over two hours, and her testimony was quickly proven inconsistent at best and incredible at worst. The most glaring problem with the testimony was that Rich stated things in vague terms that were often contradicted by specific evidence or her own previous words.[12] Examples of these problems include:

- *Detention.* In Defendants' interrogatory responses, Rich asserted that the "government has not detained individuals overnight at the Whipple Federal Building." (ECF No. 163-1 at 4 (Defs.' Supp. Resp. to Pls.' Interrog. No. 1).) This assertion is incredible given the number of people who have testified about multi-day holds at Whipple, including J.J.B. and O. (Simard Decl. ¶ 15

---

[11] This observation comports with the Court's previous encounters with Rich, who has been the client representative in multiple hearings before the Court in this case and others (though she had never testified at length in any previous case before this Court).

[12] Testimony of Rich in this case includes: Decl. of Feb. 12, 2026 (Rich Decl. I); Defendants' Objections and Supplemental Responses to Plaintiffs' Expedited Discovery Requests signed March 4, 2026 (ECF No. 163-1); Supplemental Decl. of March 12, 2026 (Rich Decl. II); in-court testimony at the Preliminary Injunction Hearing (Tr. at 283–433).

(explaining that before the TRO, 13 percent of people were detained at Whipple longer than 24 hours).) And Rich reversed course on the stand. (Tr. at 425.)

- *Phone use.* In her February 12, 2026 declaration, Rich asserted that detainees "are verbally informed that they can make as many free, unmonitored legal calls to their attorneys via an available landline," there is no time restriction, the calls are not recorded, and confidential calls can be arranged in five hold rooms. (Rich Decl. I ¶ 6.) She reiterated this information in her March 12, 2026 declaration. (Rich Decl. II ¶ 11.) All evidence is to the contrary, including Rich's own testimony at the hearing: She stated that the hold-room phones are indeed monitored. (Tr. at 354–55.) And Defendants' production suggests no one placed any calls from a hold room from February 10, 2026 to March 5, 2026. (*Id.* at 384–85.)

- When confronted with that gap, and others, in the hold-room (Talton) phone logs (Ex. 66), Rich provided an unlikely explanation—that for the periods where no calls were made, no detainee tried to make a call in the hold rooms, preferring to save money by using the free desk phones near ICE agents instead. (Tr. at 371–75.) Given the large gaps in time when no calls were made, and the hundreds of people detained during those periods, this explanation is implausible. It also does not account for detainees' use of hold room phones in December and March (despite the continued presence of the free desk phones). (*See id.* at 372; ECF No. 153-3 at 108-80; Ex. 66 at 1–12.) The more likely conclusion is that the phones did not work for large periods of time.

- In the same vein, Rich testified that the hundreds of calls made in the days leading up to the court-facilitated Whipple visit were not made by detainees; she and her staff made the calls as test calls. (ECF No. 153-3 at 50–103; Tr. at 378–81 ("It was me making those phone calls.").) These calls go around the clock and last minutes long—longer than a test call. (ECF No. 153-3 at 50–103.) The far more likely explanation is that the phones were finally operational for detainee use.

- *Transfers.* Rich testified that she did not know of any transfers that violated the TRO. (Tr. at 329–30.) But her declaration acknowledged that there were transfers in violation of the TRO. (Rich Decl. II ¶ 19.) When made aware of this on the stand, Rich changed course and contradicted herself saying that transfers could have happened but have been corrected. (Tr. at 330–32.)

29

- *Attorney visits.* In her declaration, Rich claimed that the four visitation rooms "have not been used for decades." (Rich Decl. I ¶ 8.) She then testified that they had not been used since before 2017. (Tr. at 392.) Other evidence in the record shows that, during Operation Metro Surge, attorneys could use these rooms to meet with U.S. citizens who were detained for protesting. (*Id.* at 101–04.)

- And Rich's testimony about Defendants' ability to unlock the visitation rooms was misleading. On February 9, 2026, during the court-facilitated attorney visit, Rich found the key to the rooms, so the attorneys were able to look at the room. (*Id.* at 396–97.) Then, in her declaration filed a few days later, Rich explained that the visitation rooms were in disuse in part because "the master physical key does not work in any of the rooms." (Rich Decl. I ¶ 8.) In court, Rich explained that at the time of her declaration, she did not know Defendants could access those rooms—yet she acknowledged that Defendants had indeed accessed the rooms during the February 9, 2026 visit, once Rich found the key. (Tr. at 396–97.)

- In addition, Rich's February 12, 2026 declaration said, "it is infeasible to accommodate in-person attorney visits" (Rich. Decl. I ¶ 8), while her March 12, 2026 declaration said that before the TRO, "ERO had a policy of allowing in-person visits with detainees in exceptional circumstances" (Rich Decl. II ¶ 12).

Many times, Rich could not answer a question because she did not know, it was outside the scope of her job, or someone else was responsible for the task. (Tr. at 375, 377, 381, 386, 414.) That is understandable, but Rich was Defendants' only witness. If she does not have an answer to a question, neither does the Court.

Rich's presence in the courtroom—her body language, tone, expressions, and reactions—also undermined her credibility. Her demeanor shifted on cross-examination, and she became visibly defensive. The Court gives Rich's testimony minimal weight.

30

## ANALYSIS

### I.      Article III Jurisdiction

Although Defendants do not dispute the Court's Article III jurisdiction, the Court must assure itself of its jurisdiction. *Hekel v. Hunter Warfield, Inc.*, 118 F.4th 938, 941 (8th Cir. 2024). Article III limits the jurisdiction of federal courts to actual cases and controversies. To satisfy Article III's limitations, plaintiffs must show that they suffered an injury because of the defendant's conduct. *Valley Forge Christian College v. Americans United for Separation of Church & State*, 454 U.S. 464, 472 (1982). That personal interest must continue throughout the litigation. *McCarthy v. Ozark Sch. Dist.*, 359 F.3d 1029, 1035 (8th Cir. 2004). In other words, Plaintiffs must have standing and their claims must not be moot.

### A.      Standing

To satisfy Article III standing, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citations omitted). Plaintiffs assert three forms of standing—(1) AHR has organizational standing; (2) AHR has third-party standing; and (3) L.H.M. has standing. Plaintiffs carry their burden on all three.

31

*1.    AHR*

AHR asserts standing in its own right (organizational standing) and on behalf of detainees (third-party standing).

a.    Organizational Standing

To establish organizational standing, AHR must show "a concrete and demonstrable injury to an organization's activities which drains its resources and is more than simply a setback to its abstract social interests." *Nat'l Fed'n of the Blind of Mo. v. Cross*, 184 F.3d 973, 979 (8th Cir. 1999); *see FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024). Legal aid nonprofits suffer an injury when defendants' actions "perceptibly impair[]" their "primary mission" rather than merely their "abstract social interests." *Granville House, Inc. v. Dep't of Health & Hum. Servs.*, 715 F.2d 1292, 1297–98 (8th Cir. 1983) (citation omitted). "[D]eflection of an organization's monetary and human resources" is an Article III injury. *Ark. ACORN Fair Hous., Inc. v. Greystone Dev., Co.*, 160 F.3d 433, 434 (8th Cir. 1998).

AHR is an independent, nonpartisan nonprofit that promotes and protects human rights. (Tr. at 178–79; Boche Decl. I ¶ 2.) One of its core activities is providing and facilitating legal services to migrants. (*Id.*) Based in Minneapolis, AHR provides free legal help to people detained in Minnesota, North Dakota, and South Dakota. It also provides resources to its 400 volunteer attorneys. (*Id.*; Tr. at 179.)

32

On the record before the Court, Defendants' policies and practices prevent AHR attorneys from effectively representing their clients. Defendants have prohibited AHR and its volunteer attorneys from visiting or speaking confidentially with clients. (Boche Decl. I ¶ 15.) When clients are moved out of state, AHR is "often entirely unable to meet with our clients in person after their transfer and may have considerable difficulty even locating them." (*Id.* ¶ 18.) These practices prevent AHR attorneys from accessing their clients, directly affecting AHR's core mission of providing and facilitating legal services to migrants.

And Defendants' policies and practices result in a diversion of AHR's time and resources toward locating clients, establishing basic communication, and pursuing emergency filings. (*Id.* ¶ 19; Tr. at 180–81; ECF No. 30 ¶¶ 1, 17.) As a result, AHR has made significant operational changes and has less time to spend on substantive legal work at the core of its mission. (Boche Decl. I ¶¶ 19–21.)

AHR has thus shown that it has suffered an injury because of Defendants' practices, and a favorable decision would redress those injuries. AHR has organizational standing.

b.    Third Party Standing

"Ordinarily, one may not claim standing . . . to vindicate the constitutional rights of some third party." *Barrows v. Jackson*, 346 U.S. 249, 255 (1953). A party may nonetheless

assert third-party standing if they show: (1) an "injury in fact," (2) "a close relation to the third party," and (3) "some hindrance to the third party's ability to protect his or her own interests." *Powers v. Ohio*, 499 U.S. 400, 411 (1991) (citation omitted). AHR makes this showing.

As discussed above, AHR has demonstrated an injury in fact through diversion of its resources.

AHR also shows a close relationship to its clients. *Lepelletier v. FDIC*, 164 F.3d 37, 44 (D.C. Cir. 1999) ("[T]here must be an identity of interests between the parties such that the plaintiff will act as an effective advocate of the third party's interests."). AHR provides legal representation for its clients, and thus advocates on their behalf. That relationship satisfies this element. *See Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 623 n.3 (1989) ("The attorney-client relationship . . . is one of special consequence . . . .").

Finally, AHR shows some hindrance in its clients' ability to protect their own interests. *See Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004). AHR challenges the very barriers that prevent clients from protecting their own interests. *Caplin*, 491 U.S. at 623 n.3. Detainees have no access to mail and could not initiate suit on their own. Also, detainees cannot meet in person with attorneys and have limited ability to call their attorneys. Detainees are also especially unlikely to initiate suit to vindicate their right to counsel when they have more pressing legal claims to assert—challenges to their confinement. *S.*

34

*Poverty L. Ctr. v. U.S. Dep't of Homeland Sec.*, No. 18-CV-760, 2020 WL 3265533, at *14 (D.D.C. June 17, 2020). AHR thus has third-party standing to vindicate the constitutional rights of its clients.

### 2.   L.H.M.

L.H.M. has standing. When Plaintiffs' filed suit, L.H.M. was still in custody, subject to ICE's detention policies that denied her access to counsel.

Her attorney visited Whipple to counsel L.H.M., but ICE did not allow the in-person visit. Without that visit, her attorney could not inform L.H.M. of her rights or the status of her habeas action, nor could her attorney obtain information from L.H.M. that would have informed the habeas action.

L.H.M. was ultimately allowed three phone calls to her attorney, one of which was upon release, and one of which she obtained only by lying to officers, saying that she was calling her sister. The calls never lasted more than a few minutes, and she could not speak freely because an ICE officer was always nearby. She was denied phone calls many times.

Based on these facts, and as discussed further below, L.H.M. has shown a likelihood of success on her claim that Defendants' denied L.H.M. her constitutional right to counsel, which is a constitutionally cognizable injury. These injuries would be

redressed by an order facilitating access to counsel, so L.H.M. has standing to pursue her claims.[13]

### B.    Mootness

The Court examines mootness as part of its assurance of jurisdiction. Mootness is "the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980) (quotation marks omitted). When plaintiffs lose their cognizable interest in the outcome of litigation, the claim is moot. *Id.*

The Court addresses two issues—L.H.M.'s release from custody and the arguable "end" of Operation Metro Surge. L.H.M.'s release from custody does not change the calculus. A claim is not moot when the legal violation is "capable of repetition, yet evading review." *Gerstein v. Pugh*, 420 U.S. 103, 110 n.11 (1975). This rule applies with special force in this context given the brevity of detainees' confinement. *Id.; Nielsen v.*

---

[13] Because L.H.M. was detained and unconstitutionally denied access to counsel when the suit was initiated, *Hussen v. Noem* is inapplicable. 26-CV-324 (ECT/ECW) (D. Minn. March 9, 2026), ECF No. 191. There, United States District Judge Eric C. Tostrud concluded that plaintiffs challenging their arrests lacked standing because plaintiffs had not shown a likelihood of future injury. Standing is, by definition, adjudged based on the time of filing. In *Hussen*, plaintiffs had been arrested, so the inquiry was whether it was likely they would be arrested again; whereas here, when plaintiff filed suit, L.H.M. was in detention and her constitutional rights were presently being violated.

*Preap*, 586 U.S. 392, 403 (2019) (plurality); *see also, e.g.*, *Mercado v. Noem*, 800 F. Supp. 3d 526, 557–58 (S.D.N.Y. 2025) (holding that "inherently transitory" doctrine meant that class action was not moot even though class representative was no longer detained).

Nor does the arguable end of Operation Metro Surge change things. First, the record before the Court is that Operation Metro Surge has not truly ended. When Rich was asked that very question, she answered, "yes and no." (Tr. at 291.) She explained ICE's change in strategy from arresting people in public to taking people into custody from local jails. (*Id.* at 291–92.) Defendants submit no evidence indicating that Operation Metro Surge has truly ended, though Rich testified that there are fewer visiting agents in Minnesota today than in January. (*Id.* at 298.)

Indeed, as United States District Judge Eric Tostrud concluded in another suit challenging ICE's practices during Operation Metro Surge, "[t]he drawdown of Operation Metro Surge has not 'made it absolutely clear' that the unlawful stops and arrests 'could not reasonably be expected to recur.'" *Hussen v. Noem*, No. 26-CV-324 (ECT/ECW), --- F. Supp. 3d ---, 2026 WL 657936, at *42 n.23 (D. Minn. Mar. 9, 2026) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000)).[14] L.H.M.'s claim is not moot.

---

[14] Defendants in *Hussen* conceded that the drawdown did not moot the case. *Id.*

CASE 0:26-cv-00749-NEB-DLM   Doc. 178   Filed 03/26/26   Page 38 of 69

This case is unlike *Tincher v. Noem*, where United States District Judge Katherine M. Menendez concluded that the drawdown was dispositive and made moot the preliminary injunction enjoining retaliation against Operation Metro Surge protesters. *Tincher v. Noem*, No. 0:25-CV-4669 (KMM/DTS), 2026 WL 622745, at \*2–4 (D. Minn. Mar. 5, 2026). There, the requested relief and injunction were explicitly tied to Operation Metro Surge, and defendants presented evidence of the end of the Surge for the purposes of that particular claim. *Id.* Here, the requested relief is not tied to the duration of Operation Metro Surge. That the drawdown did not resolve the access to counsel issues at the heart of this lawsuit.

## II.     Provisional Class Certification

The Court need not certify a class to issue temporary injunctive relief that applies beyond the named parties. *Tincher v. Noem*, 164 F.4th 1097, 1099 (8th Cir. 2026) (per curiam) (citing *AARP v. Trump*, 605 U.S. 91, 98 (2025) (per curiam)). Plaintiffs nevertheless seek to provisionally certify the following class under Rule 23(b)(2) of the Federal Rules of Civil Procedure: "all persons initially detained by Defendants in Minnesota pursuant to the Immigration and Nationality Act." (ECF No. 34 at 2.) Accordingly, the Court analyzes provisional certification of Plaintiffs' proposed class.

Rule 23(b)(2) requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or

38

corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Plaintiffs must also satisfy the familiar Rule 23(a) requirements: numerosity, commonality, typicality, and adequacy. Fed. R. Civ. P. 23(a)(1)–(4). And the Court may, *sua sponte*, provisionally certify a class under a narrower definition than the proposed class such that it satisfies Rule 23's requirements. *DeGeer v. Union Pac. R.R. Co.*, 113 F.4th 1035, 1039 (8th Cir. 2024), *cert. denied*, 145 S. Ct. 1426 (2025); *see* Fed. R. Civ. P. 23(c)(4).

Critically here, the Court must tailor any injunctive remedy to violations demonstrated in the record, and Rule 23(b)(2) requires that remedy to provide uniform relief across the class. *Dakotans for Health v. Noem*, 52 F.4th 381, 392–93 (8th Cir. 2022) ("A preliminary injunction must be narrowly tailored to remedy only the specific harms shown by the plaintiffs, rather than to enjoin all possible breaches of the law." (citation modified)); *Wal-Mart Stores v. Dukes*, 564 U.S. 338, 360 (2011) ("Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class."). Put together, then, the scope of a Rule 23(b)(2) class is indirectly constrained by the evidence presented. Plaintiffs do not dispute that the record evidence overwhelmingly pertains to Whipple. And upon the Court's review, it appears that all putative class members whom Plaintiffs reference were detained at Whipple at least once. The record currently before the Court demands a narrower class definition than the

proposed statewide class: noncitizens taken into custody by Defendants under the Immigration and Nationality Act and detained at the ERO Holding Facility at the Whipple Federal Building.[15]

## A.    Rule 23(a) Requirements

To be provisionally certified, the proposed class must meet each of the four familiar requirements of Rule 23(a): numerosity; commonality; typicality; and adequacy. Fed. R. Civ. P. 23(a)(1)–(4).

*Numerosity.* The numerosity requirement of Rule 23(a)(1) asks whether the proposed class is "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). When the proposed class has at least forty members, there is a presumption that the class is sufficiently numerous. *Lockwood Motors, Inc. v. Gen. Motors Corp.*, 162 F.R.D. 569, 574 (D. Minn. 1995); *see also Portz v. St. Cloud State Univ.*, 297 F. Supp. 3d 929, 944 (D. Minn. 2018) ("Generally, a putative class size of forty will support a finding of

---

[15] Beyond Whipple, Plaintiffs reference two other environments in which Defendants have detained noncitizens: (a) non-carceral settings like hospitals and hotels and (b) county jails. First, Plaintiffs point to only one instance of a detainee held at a hospital, and even then, he was first detained at Whipple. (ECF No. 140 ¶ 15.) Second, Plaintiffs concede that no relief is necessary for those detained at county jails. (ECF No. 172 at 4–5.) Plaintiffs' concern that Defendants would skirt the 72-hour hold on out-of-state transfer by detaining a noncitizen at a county jail and transfer the detainee outside of Minnesota from there is, based on the present record, speculative. If Plaintiffs present evidence supporting a wider class, the Court will consider it upon a final motion for class certification.

numerosity, and much smaller classes have been certified by courts in the Eighth Circuit." (citation modified)).

Citing Defendants' own representations, Plaintiffs contend that the putative class contains hundreds, even thousands, of members. (ECF No. 34 at 5; *see also* J.J.B. Decl. ¶¶ 12, 14.) Defendants do not dispute this ballpark estimate. Instead, they argue that Plaintiffs' approximation as to class size cannot satisfy Rule 23(a)(1).[16] (ECF No. 71 at 5.) But "Plaintiffs need not prove the exact number of proposed class members to satisfy the numerosity requirement as long as they can reasonably estimate the size of the class." *Nerland v. Caribou Coffee Co.*, 564 F. Supp. 2d 1010, 1030 (D. Minn. 2007). Thus, Plaintiffs have satisfied Rule 23(a)(1)'s numerosity requirement.[17]

*Commonality.* The commonality requirement of Rule 23(a)(2) considers whether the proposed class presents common questions of law or fact that are amenable to class-wide resolution. Fed. R. Civ. P. 23(a)(2). "The mere presence of one or more common questions is not enough; rather, the district court must examine 'the capacity of a class-

---

[16] Even in one of Defendants' declarations, the number is over forty on one morning alone. (Bottjen Decl. I ¶ 5 (stating that "there were 48 aliens in custody at Whipple" on the morning of February 3, 2026).)

[17] Although the record before the Court does not reflect post-Surge figures regarding the total number of detainees held at Whipple, the Court has no reason to believe that the tally has dropped below forty.

wide proceeding to generate common answers apt to drive the resolution of the litigation.'" *Postawko v. Mo. Dep't of Corr.*, 910 F.3d 1030, 1038 (8th Cir. 2018) (citation omitted). Commonality also "requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Wal-Mart*, 564 U.S. at 349–50 (citation omitted).

Plaintiffs advance multiple common questions of law and fact concerning the extent and legality of Defendants' restrictions on confidential attorney-client communications at Whipple. Evidence from attorneys and detainees details difficulty communicating by phone. Defendants often did not permit detainees to make phone calls, and when they did, those calls were monitored and cut short. (*See, e.g.*, Tr. at 64–65, 133–34.) Still more evidence highlights the isolating effect of immediate out-of-state transfer. (*See, e.g., id.* at 123.) Altogether, these allegations coalesce around the same basic question: Do Defendants have a common practice of isolating those detained at Whipple from reasonable access to counsel?

True, Defendants may not impede a detainee's access to counsel in exactly the same way each time. (*Compare id.* at 130–31 (denied phone calls), *with* O. Decl. ¶¶ 6–9 (transferred).) Even so, each type of deprivation results in the same constitutional injury. *See Postawko*, 910 F.3d at 1038–39 ("[T]he physical symptoms eventually suffered by each class member may vary, but the question asked by each class member is susceptible to common resolution.").

42

Defendants contend that the varying bases for detention among putative class members preclude commonality. (ECF No. 71 at 8.) But nowhere do Defendants indicate that they condition phone access, for example, on the basis of a detainee's detention. (Rich Decl. II ¶ 14 (describing phone access for "detainees," generally)); *see Mercado*, 800 F. Supp. 3d at 562 (finding commonality where "[d]efendants do not contend that provision of these necessities and services varies by detainee"). Thus, Plaintiffs have satisfied the commonality requirement.

*Typicality.* The typicality requirement of Rule 23(a)(3) looks at whether the claims and defenses of the named plaintiffs are typical of claims or defenses of the proposed class. Fed. R. Civ. P. 23(a)(3). This requirement is met when the claims or defenses of the class representatives and the proposed class members "stem from a single event or are based on the same legal or remedial theory." *City of Farmington Hills Emps. Ret. Sys. v. Wells Fargo Bank, N.A.*, 281 F.R.D. 347, 352 (D. Minn. 2012) (quoting *Paxton v. Union Nat'l Bank*, 688 F.2d 552, 561–62 (8th Cir. 1982)). Defendants' alleged practice of obstructing confidential attorney-client communications gives rise to L.H.M.'s claims just as it does for the rest of the class. Defendants repeatedly denied L.H.M.'s requests to call her attorney, only permitting her to use the phone once she lied to say she was calling her sister. (Tr. at 141–42.) On the isolated occasions L.H.M. did manage to reach her attorney, those calls were cut short and nonconfidential. (*Id.*) Defendants also refused to let

43

L.H.M.'s attorney visit her at Whipple. (L.H.M. Decl. ¶ 20.) Although L.H.M. was not transferred out of state like some other class members, "[f]actual variations in the individual claims will not normally preclude class certification if the claim arises from the same event or course of conduct as the class claims, and gives rise to the same legal or remedial theory." *Postawko*, 910 F.3d at 1039 (citation omitted). The typicality prong is satisfied.

*Adequacy.* The adequacy requirement of Rule 23(a)(4) looks at whether the named plaintiffs and counsel will be able to fairly and adequately protect the interests of the class. To assess adequacy, courts consider "(1) whether the representatives and their attorneys are able and willing to prosecute the action competently and vigorously, and (2) whether each representative's interests are sufficiently similar to those of the class that it is unlikely that their goals and viewpoints will diverge." *Midwest Mach. v. Nw. Airlines, Inc.*, 211 F.R.D. 562, 570 (D. Minn. 2001). The Court is unaware of any conflicts of interest, nor do Defendants independently argue that the adequacy prong is not met here. (*See* ECF No. 71 at 11–12 (arguing only that "Plaintiff did not suffer the same alleged injuries as other members of the class" alongside typicality prong).) Thus, the Court concludes that L.H.M. is an adequate class representative who, with her counsel, will vigorously pursue the claims of the putative class.

### B.     Rule 23(b)(2)

"Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Wal-Mart*, 564 U.S. at 360. "Civil rights cases against parties charged with unlawful, class-based discrimination are prime examples." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997). Defendants' arguments against provisionally certifying a Rule 23(b)(2) class are largely addressed by the above analysis, save for their contention that the class would include detainees subject to expedited removal orders, which strips the Court of jurisdiction under 8 U.S.C. Section 1252(e)(1)(B). (ECF No. 71 at 14.) But that statutory provision has no bearing here. To the extent Plaintiffs' requested relief affects detainees subject to expedited removal orders, the relief in this suit is collateral to the removal process itself. *See Mendoza-Linares v. Garland*, 51 F.4th 1146, 1156–57 (9th Cir. 2022) (explaining that Section 1252(e)(3) provides a "limited grant of jurisdiction to the D.C. district court" to decide challenges to a "regulation that is 'entirely linked' to the expedited removal process"); *Pablo Sequen v. Albarran*, 810 F. Supp. 3d 1084, 1114–15 (N.D. Cal. 2025), *appeal docketed sub nom., Garcia v. Albarran*, No. 25-8055 (9th Cir. Aug. 1, 2025) (certifying class of noncitizen detainees challenging access to counsel). For the reasons set forth above with respect to commonality, Defendants have acted on grounds generally applicable to the class— making provisional certification under Rule 23(b)(2) appropriate.

45

III.   **Preliminary Injunction**

In analyzing a motion for a preliminary injunction, the Court considers four factors: (1) the likelihood of success on the merits; (2) the threat of irreparable harm to the movant; (3) the balance of the harms; and (4) the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc). Plaintiffs, as the party seeking the injunction, carry the burden of establishing these four factors. *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003). No one factor is determinative, but the first factor is the most important. *D.M. by Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 999 (8th Cir. 2019).

In their opposition, Defendants argue that a heightened mandatory injunction[18] standard applies because Plaintiffs are asking the Court to mandate certain affirmative action, like preventing transfers within 72 hours of detention, providing unmonitored calls, and timely updating the ODLS. (ECF No. 149 at 11.) This portion of their brief

---

[18] The typical preliminary injunction seeks to maintain the status quo while a "mandatory injunction" commands an affirmative act. *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 34 (2d Cir. 1995). But the line between these two is not always clear. *See Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 835 (1994) (noting that the distinction between mandatory and prohibitory orders "is difficult to apply when conduct that can recur is involved, or when an injunction contains both mandatory and prohibitory provisions"). Sometimes "essentially the same command can be phrased either in mandatory or prohibitory terms." *Id.*

46

misstates the law and is riddled with misreadings and misquotations.[19] The Eighth

Circuit does not apply—and has specifically rejected—a heightened standard for

mandatory injunctions. *Ferry-Morse Seed Co. v. Food Corn, Inc.*, 729 F.2d 589, 591–92 (8th

Cir. 1984).[20]

### A.    Likelihood of Success

The Fifth Amendment Due Process Clause "applies to all 'persons' within the

United States," including noncitizens, "whether their presence here is lawful, unlawful,

---

[19] Perhaps most egregiously, Defendants twice quote *Planned Parenthood Minnesota, North Dakota, South Dakota v. Rounds*, 530 F.3d 724 (8th Cir. 2008) (en banc), for the propositions that: (a) mandatory injunctions are "particularly disfavored," and (b) Plaintiffs must show a likelihood of success on the merits by a "heavy and compelling weight of evidence" rather than a fair chance of success. (ECF No. 149 at 11, 13.) Neither of these quotes appear in *Planned Parenthood*, nor in any Eighth Circuit case the Court has found that addresses injunctions. Even under the most charitable of readings, *Planned Parenthood* cannot possibly stand for such a proposition; the case discusses the heightened burden that applies to enjoining state statutes and does not involve mandatory injunctions at all. *Planned Parenthood*, 530 F.3d at 730. This portion of Defendants' brief included other mis-citations as well. (Tr. at 268–70.) The Court questioned Defendants' counsel at the hearing and received unsatisfactory responses. (Tr. at 265–68.)

[20] If "the status quo is a condition not of rest, but of action, and the condition of rest . . . will cause irreparable harm, a mandatory preliminary injunction is proper." *Ferry-Morse*, 729 F.2d at 592. The last uncontested period—thus the status quo—was pre-Surge; the Court is not aware of access to counsel issues at Whipple before then. *Id.* at 591–92 (stating that "[i]t was this status quo that was destroyed by the action of [defendant], and we cannot conclude that the district court abused its discretion in restoring the earlier relationship by requiring" an affirmative act from defendant). Even if the Eighth Circuit were to adopt a heightened standard, given the extent and severity of Defendants' constitutional violations, Plaintiffs have met it.

temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).[21] "It is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings." *Reno v. Flores*, 507 U.S. 292, 306 (1993); *see Al Khouri v. Ashcroft*, 362 F.3d 461, 464 (8th Cir. 2004) (recognizing a noncitizen's Fifth Amendment due process right).[22]

And the right to access counsel is critical to due process; without it, all other rights become illusory. *Cruz v. Hauck*, 475 F.2d 475, 476 (5th Cir. 1973) ("It is clear that ready access to the courts is one of, perhaps *the*, fundamental constitutional right."); *Adams v. Carlson*, 488 F.2d 619 (7th Cir. 1973) ("[A]n inmate's right of unfettered access to the courts is as fundamental a right as any other he may hold."); *Johnson-El v. Schoemehl*, 878 F.2d 1043, 1051 (8th Cir. 1989) (citing these propositions from *Cruz* and *Adams* favorably). "[D]etainees have a substantial due process interest in effective communication with their counsel." *Johnson-El*, 878 F.2d at 1051. They "must have a reasonable opportunity to seek and receive the assistance of attorneys." *Id.* at 1052 (citation omitted). "[A]ccess to the legal system must be 'meaningful.'" *Id.* at 1053 (citation omitted); *Orantes-Hernandez v.*

---

[21] Plaintiffs also argue that Defendants' conduct violates the First Amendment and Immigration and Nationality Act. Because Plaintiffs are likely to succeed on their Fifth Amendment claim, the Court does not address Plaintiffs' other claims. *United Healthcare Ins. v. AdvancePCS*, 316 F.3d 737, 742–43 (8th Cir. 2002).

[22] Defendants agree that the Fifth Amendment provides noncitizens the right to due process in civil proceedings. (*See* ECF No. 149 at 12.)

*Thornburgh*, 919 F.2d 549, 554 (9th Cir. 1990) (stating that noncitizens' due process right "must be respected in substance as well as in name" (citation omitted)).

This Fifth Amendment right entails the right to communicate with existing counsel and the right to obtain counsel. *See Orantes-Hernandez*, 919 F.2d at 554 (reiterating that noncitizens "have a due process right to obtain counsel of their choice at their own expense"); *Biwot v. Gonzales*, 403 F.3d 1094, 1098–99 (9th Cir. 2005) (infusing the right to counsel with meaning requires providing noncitizens "with reasonable time to locate counsel and permit counsel to prepare" for immigration proceedings); *see also Arroyo v. U.S. Dep't of Homeland Sec.*, No. SACV 19-815 JGB (SHKx), 2019 WL 2912848, at *17 (C.D. Cal. June 20, 2019) ("[T]he right to counsel contains the related right to consult with counsel.").

Noncitizens retain their right to access counsel even when detained, but it is not unlimited given the government's need to manage places of detention and maintain institutional security and order. *Bell v. Wolfish*, 441 U.S. 520, 546 (1979). To evaluate this balance, the Court looks to law analyzing whether detention conditions violate due process, where the question is "whether those conditions amount to punishment of the detainee." *Id.* at 535. Conditions are unconstitutional if they are "punitive in intent," "not

49

rationally related to a legitimate purpose," or "excessive in light of their purpose." *Johnson-El*, 878 F.2d at 1048.[23]

Plaintiffs have demonstrated that they are likely to prevail on the merits of their Fifth Amendment claim. Defendants' infringements on detainees' access to counsel fall into two buckets: (1) the effect of rapid out-of-state transfer and related practices; and (2) restrictions on access and communication at Whipple.

The Court is cognizant that it must give detention administrators "wide-ranging deference." *Bell*, 441 U.S. at 547. At the same time, "[c]ourts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm" of administering a detention facility. *Brown v. Plata*, 563 U.S. 493, 511 (2011). The Court therefore proceeds with caution. But the deference afforded to Defendants collapses under the weight of Plaintiffs' evidence. And Defendants' protestations are inconsistent. Sometimes Defendants argue that they are not creating any obstacle. Other times they argue that the obstacle is necessary for operational or safety concerns or that an injunction is operationally unfeasible. Even under the most generous of standards, the restraints

---

[23] The parties agree that *Johnson-El*, although arising in the criminal pretrial detainee context, is the best authority to guide the Court's analysis in the noncitizen detainee context. (ECF No. 136 at 22; ECF No. 149 at 12.)

Defendants have imposed on detainees' access to counsel at Whipple are excessive and not rationally related to legitimate purposes.

### 1.    Rapid Transfer and Related Practices

Before the TRO, Defendants transferred detainees frequently, quickly, without notice, and often with no way for attorneys to know where or for how long their clients will be at a given facility. Compounding the issue, Defendants struggled to update the ODLS to reflect a detainee's location. Sworn testimony and declarations from attorney after attorney all voice the same refrain: It becomes virtually impossible to reach clients once they are detained out of state.

This practice of rapid transfer inflicts a severe constitutional injury on detainees with and without retained counsel. The Ninth Circuit has acknowledged that enjoining transfer may be appropriate if transferring the detainee would interfere with an existing attorney-client relationship such that access to counsel is effectively denied. *Cent. Am. Refugees v. I.N.S.*, 795 F.2d 1434, 1439 (9th Cir. 1986), *amended*, 807 F.2d 769 (9th Cir. 1986). Defendants' pre-TRO pattern constituted much more than "interference." This was particularly true in the habeas context, where attorney must file in the district of confinement. Speed became the priority, with attorneys racing to file a petition in the District of Minnesota before clients were transferred without notice, often to Texas. (Edin Decl. ¶ 12 ("[U]nless counsel is able to file a habeas petition almost immediately

51

following detention at Whipple, clients are frequently transferred out of state within a matter of hours.").); *Neri R.C. v. Bondi*, No. 26-CV-912 (NEB/EMB) (D. Minn. Feb. 13, 2026), ECF No. 9.[24] And because many Minnesota attorneys are not licensed in Texas, their clients' arrival in El Paso functionally extinguished the attorney-client relationship.

At the hearing, Defendants repeatedly implied that detainees can obtain counsel when they arrive at the new location, often El Paso. (*See also* Rich Decl. I ¶ 9 (maintaining that detainees have "unfettered access to counsel" once they "are transferred to a more permanent detention facility").) But the record contradicts this promise of "unfettered"

---

[24] In that order, the Court reasoned: "Respondents concede that, at the moment of his arrest in Minnesota, Neri R.C. 'could have filed a petition here, and any post-filing transfer out of Minnesota would not have defeated jurisdiction.' The result? A race between petitioners and Respondents. If Respondents withhold a petitioner's location, limit petitioner's ability to obtain or communicate with counsel, and rapidly move petitioner—not to a detention facility within the State but to an entirely different jurisdiction—all before petitioner can file a habeas petition, Respondents win. The habeas case is transferred. If a petitioner can manage to obtain counsel, and counsel files a habeas petition fast enough—before Respondents have moved the petitioner—the petitioner wins. The habeas case remains here." *Id.* at 4–5 (citation modified); *see also Jonnathan X.D.B.*, No. 26-CV-588 (DWF/DJF) (D. Minn. Jan. 28, 2026), ECF No. 8 at 4 n.1 (observing that ICE's practice of immediate transfer is "deeply concerning and generally suggest that ICE is attempting to hide the location of detainees, and thus, make habeas proceedings more difficult for a petitioner and their counsel"); *Christian A.S.C. v. Bondi*, No. 26-CV-778 (JRT/LIB), 2026 WL 323098, at *2 (D. Minn. Feb. 6, 2026) ("This habeas petition arises in the context of a concerted effort by the government to arrest residents of this state and immediately transfer them (sometimes more than once) to various other detention locations, for an unstated purpose and unstated duration, without notifying Petitioner's family or counsel as to where or when they may be transferred.").

access to counsel at the out-of-state detention facility; instead, detainees experienced the same restrictions they experienced in Minnesota. (O. Decl. ¶ 12 (stating that in El Paso, "[t]here were only two flip phones for all the detainees" at the detention facility, and O.'s cell alone held about seventy-two individuals); J.I.B.C. Decl. ¶ 21–22 (allowed only one call during weeklong detention in Texas).) Defendants' practice of sending detainees to Texas without notice and without a phone call, combined with the isolation waiting for them there, made obtaining new counsel all but impossible.

The Court recognizes that the TRO's 72-hour hold on transfer affects an executive branch function, and it did not impose the requirement lightly. The Court would not have done so if ICE's practices were less constitutionally troublesome. But the 72-hour hold was necessary, and a month later, the TRO appears to have alleviated many access-to-counsel violations. (Cherneff Decl. ¶¶ 10–11 (in-person visit at Whipple "made a world of difference" and it "materially assisted my ability to represent him in his habeas proceeding"); Curran Decl. ¶¶ 4–5; Zaragoza Decl. ¶ 6.)

And now at the preliminary injunction stage, Defendants still advance unconvincing arguments opposing injunctive relief. Defendants take issue with two aspects of the TRO provisions relating to transfer: paragraph 6 (the 72-hour prohibition on transfer) and paragraph 7 (requiring notification to detainees when transferring them, and a phone call to counsel or family). (TRO ¶ 6–7).

53

*TRO Paragraph 6: 72-hour hold without out-of-state transfer.* Defendants do not argue that compliance with the 72-hour hold is operationally infeasible—in fact, they have largely complied. Instead of immediately transferring detainees out of state from Whipple, Defendants have used their preexisting contracts with county jails in Minnesota to house detainees.

In contesting this provision, Defendants raise narrow and unsupported concerns about the availability of bed space in the county jails.[25] Rich testified, "[w]here I see the problem coming is when the facilities in Minnesota, which again we have no control over how much bed space they offer, decide that after we have arrested an aggravated felon female that is mandatory detention and we are told by all of our detention facilities they have no female bed space." (Tr. 329.) She did not testify that this hypothetical, or anything like it, had actually occurred. Rich also testified that "we could call Freeborn in the morning and they can say, yeah, we can take 20, including two females," but the county

---

[25] Had Defendants responded to Plaintiffs' discovery request, which the Court approved, the Court would have more information to evaluate whether the bedspace issue is legitimate. (ECF No. 96-1 at 8 (expedited discovery request for "the daily number of beds (a) available for use by DHS and (b) used by DHS at any facility within [the St. Paul ERO]"); ECF No. 101 (order).)

jail could later say "[w]ell, their local police officers have made 19 arrests, and so far we just have room for one male." (*Id.* at 300.) This concern, too, has not materialized.[26]

*TRO Paragraph 7: Phone calls before transfer.* Defendants focus particularly on this paragraph of the TRO, which provides detainees with a phone call and notice of their destination before transfer. Primarily, Defendants warn that this requirement creates an untenable security risk. (Tr. at 334 (Rich testifying "[I]f the TRO were not in place, we would not do this for significant serious safety risks to both detainee and staff and officers.").) According to Rich, permitting detainees to make a phone call "an hour before they're going to be transferred" risks attracting "protesters" and "people with high-powered rifles" while en route. (*Id.* at 335–36.) In support, Rich recounted a September 2024 shooting in Dallas "where somebody had the knowledge of when and where the officers in Dallas were going to be transporting." (*Id.* at 336.)

But this cannot be a realistic or rational consequence of the TRO provision, which requires only that Defendants "inform the Detainee of the transfer destination" and "provide Detainee with the opportunity to use the telephone until they are able to reach

---

[26] Defendants also postulate that the 72-hour transfer hold generates overcrowding at Whipple, in violation of federal safety mandates. (ECF No. 149 at 16.) But their own documentation regarding the detainee population at Whipple flatly contradicts Defendants' speculation—overcrowding at the facility has decreased, not increased, since the TRO. (Ex. 34 (sealed).)

counsel or family." (TRO at 39–40.) Defendants are under no court-ordered obligation to provide this call within one hour of transfer, nor are they—as Rich acknowledged at the hearing—required to inform the detainee of the date and time at which the transfer will occur. (Tr. at 431.)

Rich also cited a past incident where a detainee who was a victim of domestic violence was allowed a phone call before transfer and chose to call her domestic partner, resulting in unspecified "issues." (*Id.* at 337.) Additionally, Rich cited potential escapes as a reason not to offer phone calls before transfer. (*Id.* at 337.) And, almost as an aside, Defendants posit that providing detainees with phone access "until they are able to reach counsel or family," as required by the TRO, *could* delay transfers indefinitely if a contact is not immediately available. Again, Defendants offer no specific evidence for these risks.

Overall, Defendants' arguments are speculative. Defendants cannot rest on hypothetical justifications for their practice of rapid transfer when the resulting nosedive in access to counsel is real and severe.

2.      *Obstacles to Access and Communication at Whipple*

As explained above, the evidence is clear that Defendants erected obstacles to attorney-client phone calls and attorney-client visitation before the Court's TRO. Defendants offer no rationale for these restrictions. They either contend that there were no restrictions (which is clearly belied by the record), or that the issue was technical and

56

is fixed. (ECF No. 149 at 15.) But it appears some "technical issues" with phones remain. Defendants' phone records show that for three weeks after the Court issued its TRO, not a single call was attempted from a Whipple hold room. (Ex. 66 at 1–12; Tr. at 384–85.) Rich's explanation for this gap, and others in the call log, is not credible. *See supra* Background Section IV. And while some calls began again on March 5, 2026, they came from one hold room, and most were incomplete. (Ex. 66 at 1–12; Tr. at 385.). Moreover, they are not confidential. And neither are calls made from the processing desk.[27] (Tr. at 70, 134, 355.) "Detainees' right to counsel and due process can also be compromised by a lack of privacy in consultations with counsel." *Johnson-El*, 878 F.2d at 1052.

Defendants say that they now provide two closed-door rooms for confidential phone calls, but they offer no evidence that a detainee has used them. (Tr. at 322 (stating that Defendants have not figured out how to transfer calls to these confidential rooms).) Rich described how a detainee *could* use the room. (*Id.* at 322 (explaining that if an attorney called to speak with a detainee, Defendants "*would* take the number" and bring the detainee to the confidential room so that the detainee "*could* dial that number," or Defendants "*can* take the detainee to the confidential room" and give the attorney the room telephone number (emphasis added)).)

---

[27] Rich stated that ERO officers log the first call that a detainee makes, but Defendants did not give the Court a single telephone call log that has been filled out. (Ex. 28; Tr. 386–87.)

Numerous attorneys continue to struggle contacting Defendants by phone.[28] (Curran Decl. ¶ 9 (reporting that calling the listed number "always feels pointless because no one picks up"); Jacobson Decl. ¶ 9 ("[T]he phone numbers ICE provides to attorneys for client information and contact have been useless since the Order."); Guerrero Decl. ¶¶ 7, 11). And while Defendants have improved their email responses, issues and delays remain. (Tr. at 47:4–5 ("I received an automatic response stating that the inbox was for general inquiries only."); *see also id.* at 120, 239–40.) It appears that Defendants have not fully addressed obstacles to attorney-client communications.

As for meetings, Defendants take the position that they did not allow attorney-client visits before the TRO.[29] They claim that such visits pose operational and safety concerns. (Bottjen Decl. I ¶ 14; Rich Decl. I ¶¶ 7-8.) In her first declaration, Rich claimed that Defendants had not used the ERO visitations rooms for attorney client visits in "decades" and the master key did not work for those rooms. (Rich Decl. I ¶ 8. *But see* Tr. at 396–97 (admitting that Defendants found the key to open these rooms three days prior).) On the stand, Rich testified that attorney-client visits are security risks because

---

[28] Rich claims that recently Defendants started keeping a log of incoming calls, but Defendants did not offer this incoming call log as evidence. (Tr. at 311.)

[29] Tr. at 391 (agreeing that Defendants were not facilitating in-person attorney-client visits for individuals at Whipple before the Court's TRO).

only "a trained law enforcement officer [] knows how to handle somebody that is having a psychotic, mental breakdown and is hitting and kicking and biting, even with restraints on." (Tr. at 400.) The record contains no evidence of detainees hitting, kicking, or biting.

As the Court already noted in its TRO, Defendants' security concerns are irreconcilable with Defendants' conduct. Before Operation Metro Surge, Defendants permitted attorney-client visits at Whipple, and even during Operation Metro Surge, Defendants allowed attorneys to meet with U.S. citizens. (*Id.* at 228–29; Kelley Decl. 29 ¶ 8.)

And while one attorney has testified to a successful client meeting at Whipple since the Court issued its TRO, it appears others are still denied access. (*Compare* Cherneff Decl. ¶¶ 6–10 (describing meeting with client at Whipple on February 13, 2026), *and* Tr. at 235 (same), *with* Jacobson Decl. ¶¶ 6–7 (stating that on February 13, 2026 Defendants would not allow attorneys to see clients or prospective clients unless they had an executed G-28 form), *and* Tr. at 422–23 (testifying that from February 12 to March 12, 2026, no attorney had signed the visitor log.)) Defendants have not shown that limiting phone calls and attorney visits are rationally related to security or operational[30] concerns.

---

[30] Defendants express "operational concerns" without providing evidence specifying the limitations. What the evidence shows is that in-person visits used to occur at Whipple, and Defendants maintain that they have provided unlimited phone calls all along. The Court is therefore not convinced that physical or technical constraints at Whipple are

Even if the Court were to accept Defendants' assertions, the restrictions are excessive, and pale in comparison to the constitutional violations. When faced with facts similar to those presented here, courts around the country have agreed that plaintiffs are likely to succeed on their Fifth Amendment claim. *Mercado*, 800 F. Supp. 3d 578 (granting plaintiffs' preliminary injunction because ICE "effectively prevented detainees from obtaining appropriate, timely, and confidential legal assistance" which "can have irreversible consequences for detainees"); *Vasquez Perdomo v. Noem*, No. 2:25-CV-5065 (MEMF/SP) (C.D. Cal. Nov. 13, 2025), ECF No. 256 at 18–20 (concluding that noncitizen detainees were likely to succeed on their Fifth Amendment claim because they provided "numerous, detailed declarations" of attorneys being denied meaningful and consistent access to detainees and defendants' evidence showed only partial compliance with the court's prior TRO); *see Orantes-Hernandez*, 919 F.2d at 565–67 (upholding injunction because the district court found noncitizens were not provided access to telephones until after processing and had limited attorney visitation hours); (TRO at 25–28 (collecting

---

"legitimate operational considerations" weighing against measures to ensure access to counsel. Nonetheless, the Court has removed some of the more specific prescriptions from the TRO in the interest of deference to Defendants' knowledge of how best to operationalize provisions of the preliminary injunction order.

cases that granted a TRO in similar circumstances because noncitizens were likely to succeed on their Fifth Amendment claim).)[31]

### 3.   TRO Compliance

The measures Defendants have taken to comply with this Court's TRO do not, as Defendants argue, alleviate the need for a preliminary injunction. *First*, Defendants' compliance with the TRO is uneven, as highlighted above. *Second* and more importantly, compliance with a TRO does not obviate the need for a preliminary injunction.

"[T]he Court's power to grant injunctive relief survives discontinuance of the illegal conduct." *United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953). This is true even when defendants, by complying with a TRO, have stopped their unlawful conduct. *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 775 F. Supp. 3d 100, 120 (D.D.C. 2025) ("Defendants cannot now rely on this *court-ordered* compliance to argue that a court order is unnecessary."), *appeal docketed*, No. 25-5148 (D.C. Cir. April 25, 2025). Otherwise "no TRO could ever become a preliminary injunction." *Id.*; *Costa v. Bazron*, 464 F. Supp. 3d

---

[31] Defendants do not attempt to distinguish these cases. Instead, they contend that the Fifth Amendment does not guarantee unfettered access to counsel or a specific manner of access. (ECF No. 149 at 14.) There are a few issues with this argument. *First*, this is a straw-person argument; no one argues for unfettered access to counsel. *Second*, Defendants authority is inapposite. They cite *Rafiyev v. Mukasey*, but *Rafiyev* says nothing about a detainees' access to counsel; it concerns a noncitizen's claim of ineffective assistance of counsel. 536 F.3d 853, 861 (8th Cir. 2008).

132, 142 (D.D.C. 2020) ("If compliance with the terms of a TRO were sufficient to defeat entry of a preliminary injunction, few—if any—cases would make it past the TRO stage."). Indeed, Defendants have it backwards. That compliance with the TRO has improved access to counsel and thereby reduced constitutional violations demonstrates only that the process is working as it should. *USI Sw., Inc. v. Edgewood Partners Ins. Ctr.*, No. 4:19-CV-04768, 2020 WL 2220573, at *4 (S.D. Tex. May 6, 2020) ("The fact of compliance with the TRO serves only to show that the process works."). Injunctions serve to prevent future violations; courts may grant them so long as there is "some cognizable danger of recurrent violation." *W.T. Grant*, 345 U.S. at 898. This depends on the genuineness of the expressed intentions to comply, effectiveness of discontinuance, and "in some cases, the character of the past violations." *Id.*

Plaintiffs have shown a cognizable danger of recurrent Fifth Amendment violations. *Supra* Analysis Section I.B. (describing why the case is not moot). And the Court cannot discern the motive behind Defendants' compliance efforts. It is unclear whether Defendants have updated their practices because of (1) the Court's TRO; (2) the drawdown of ICE officers; or (3) a genuine belief that Defendants' practices should comply with the Constitution.[32] Defendants do not represent that they would have

---

[32] *See* Tr. at 312:9–12 ("[I]n order to be in compliance with the TRO, we have two rooms that were previously occupied by HSI" where a detainee can have a private phone call);

implemented changes without judicial intervention. Prior to the Court's TRO, Defendants asserted that they *were* honoring detainees' Fifth Amendment right, despite the mountain of evidence to the contrary. (ECF No. 70 at 3, 12; Tr. at 372 (stating that the "[m]ajority of the requirements outlined in the TRO we were already doing. We just had to tweak a few things, but we were already doing" them).)

And, as explained in the TRO, the nature of the past violations are grave. Defendants have made improvements, but Defendants' past violations were not minor infringements incidental to confinement. They devastated detainees' right to due process—a right upon which all others rest.[33] The Court reiterates its prior concern: It

---

*id.* at 333 (stating that Defendants notify the detainee in advance of any transfer but "if the TRO did not exist, we would not do this," but then stating that it is Defendants' standard policy to give detainee written notification before transfer and Defendants have done so before the TRO); *id.* at 334 (noting that "if the TRO were not in place" then Defendants "would not" allow detainees to make a call before transfer "for significant serious safety risks to both detainee and staff and officers").

[33] Defendants questioning on cross-examination seemed to imply that they believe that detainees' right to access counsel has been fulfilled because many detainees ultimately succeeded on their habeas petitions. (*See* Tr. at 109, 126–27, 165.) But the right to access counsel is not effectuated just because a client, who has been closed off from the entire process, eventually succeeds on their claim. *See Johnson-El*, 878 F.2d at 1051 ("Pre-trial detainees have a substantial due process interest in effective communication with their counsel and in access to legal materials."); *Vasquez Perdomo v. Noem*, 790 F. Supp. 3d 850, 880–81 (C.D. Cal. 2025) (concluding that Defendants' restrictions on access to noncitizen detainees was unconstitutionally punitive because it had the effect of preventing noncitizens "from contacting counsel and receiving any legal advice" (citation omitted)), *appeal dismissed*, No. 25-4312, 2025 WL 4053187 (9th Cir. Nov. 21, 2025).

appears that in planning for Operation Metro Surge, the government failed to plan for the constitutional rights of its civil detainees. At this preliminary stage, Plaintiffs have made a clear showing of likelihood of success on their Fifth Amendment claim.

### B.      *Irreparable Harm, Balance of the Harms, and Public Interest*

"In most instances, constitutional violations constitute irreparable harm." *Morehouse Enters., LLC v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 78 F.4th 1011, 1017 (8th Cir. 2023). Plaintiffs have demonstrated the likelihood of Fifth Amendment violations at Whipple. Without counsel, detainees—who are already in a vulnerable position—cannot effectively exercise their rights to challenge the constitutionality, legality, or conditions of their confinement. Counsel also serves the important role of informing people of their constitutional and statutory rights, which is especially important given the complexity of immigration law.

And the balance of the harms and public interest factors merge when seeking injunctive relief against the government. *Nken v. Holder*, 556 U.S. 418, 435 (2009). These factors favor Plaintiffs because "it is always in the public interest to protect constitutional rights." *Schmitt v. Rebertus*, 148 F.4th 958, 970 (8th Cir. 2025) (citation omitted).[34]

---

[34] Because Defendants make no effort to quantify the costs or monetary damages that would result from the relief sought, (ECF No. 70 at 19–20.) the Court waives the bond requirement under Rule 65(c) of the Federal Rules of Civil Procedure. *See Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Engr's*, 826 F.3d 1030, 1043 (8th Cir. 2016).

## CONCLUSION

Based on the foregoing and on all the files, records, and proceedings herein, Plaintiffs' Motion for Injunctive Relief is GRANTED IN PART and Plaintiffs' Motion for Provisional Class Certification (ECF No. 32) is GRANTED. IT IS HEREBY ORDERED THAT each of the defendants, including their officers, agents, servants, employees, and attorneys, and all persons in active concert or participation with any of the foregoing who receive actual notice of this Order, by personal service or otherwise, are ordered and enjoined as follows:

1. Defendants shall ensure that every noncitizen taken into custody under the Immigration and Nationality Act and detained at the ERO Holding Facility at the Bishop Henry Whipple Federal Building located at 1 Federal Drive, Fort Snelling, Minnesota ("Detainee"), **within one hour of their detention and prior to being transferred out of state**, is given the following materials:

    a. Defendants shall provide Detainees their A-number in writing.

    b. Defendants shall provide a printed copy of Exhibit A to this Order.

    c. Defendants shall attach to Exhibit A a list of accurate telephone numbers for current free legal service providers serving the jurisdiction of the ICE Enforcement and Removal Operations St. Paul Office.

    d. **Exhibit A**, the **list of free legal service providers**, and **written notification of the Detainee's A-number** shall be furnished to each Detainee in English, Spanish, Somali, French, and Hmong. Defendants shall provide, without charge, to each Detainee who is illiterate or not proficient in any of those languages an in-person or telephonic oral translation of these materials.

2. Defendants shall provide Detainees with reasonable and equitable access to telephones. **Within one hour of detention and prior to being transferred out of the Whipple Federal Building,** Detainees shall be provided free, private, and unmonitored access to the telephone. Defendants shall permit Detainees to make a reasonable number of calls necessary to reach counsel or family.

3. Thereafter, Defendants shall provide Detainees with access to confidential telephone calls with their legal representation at no charge to the Detainee.

    a. Defendants shall not restrict the number of calls a Detainee places to their legal representatives or to obtain representation. Defendants shall not limit the duration of such calls by rule or automatic cut-off, unless necessary for security purposes or to maintain orderly and fair access to telephones. Additionally, Defendants shall ensure privacy for Detainees' telephone calls regarding legal matters. Detainees must

be able to make such calls without being overheard by officers, other staff, or other Detainees.

b. Defendants shall allow inbound confidential calls from Detainees' legal representation. A telephone number for counsel to call in order to reach Detainees shall be conspicuously displayed online. Defendants shall monitor that telephone line. If an attorney requests that Defendants provide the attorney's name, phone number, or other message to a Detainee, the Detainee shall receive that information, in writing, as promptly as possible.

4. Detainees with disabilities shall be provided access to telephone services on the same terms as Detainees without disabilities are provided access to telephones. Such telephone services may include video relay service or video remote interpretation service.

5. Defendants shall ensure that the Online Detainee Locator System of defendant Immigrations and Customs Enforcement accurately identifies the location of each Detainee by name, date of birth, and A-number in real time.

6. Defendants **shall not transfer a Detainee out of Minnesota during the first 72 hours** of their detention.

67

7. If Defendants transfer a Detainee out of Minnesota, the following obligations apply:

   a. First and foremost, **Defendants shall inform the Detainee of the transfer destination**.

   b. After being told the transfer destination, Defendants shall provide the Detainee with the opportunity to use the telephone until they have sufficient opportunity to reach counsel or family. These calls shall be free, private, and accessible as outlined in Paragraphs 2 and 4, above.

8. Defendants shall provide access to the Whipple Federal Building for legal visitation by current and prospective attorneys, legal representatives, and legal assistants. Legal visitation shall be permitted seven days per week, for a minimum of eight hours per day on business days (Monday through Friday), and a minimum of four hours per day on weekends and holidays. Defendants shall provide private rooms for closed-door discussions between Detainees and current and prospective attorneys, legal representatives, and legal assistants.

9. Defendants shall not retaliate in any manner against any Plaintiff or Detainee, including in their immigration proceedings or in any other context, for participating in this litigation or complaining about any alleged violation of this Preliminary Injunction.

10. Defendants shall disseminate notice of this Order to all agents stationed at the Whipple Federal Building and those responsible for the building's operations, including providing copies in paper or electronic format. The Order must be distributed to those individuals within **12 hours** of its issuance.

Dated: March 26, 2026                                    BY THE COURT:
Time: 5:00 p.m. CDT

                                                         s/Nancy E. Brasel
                                                         Nancy E. Brasel
                                                         United States District Judge